## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | |
| **v.** | Case No. 21-cr-3 (RCL) |
| **JACOB ANTHONY CHANSLEY**, | |
| *Defendant*. | |

### MEMORANDUM ORDER

On February 2, 2021, defendant Jacob Anthony Chansley filed an "Emergency Motion for Sustenance or in the Alternative, For Pre-Trial Release." ECF No. 6. After the United States Attorney for the District of Columbia filed a response earlier today, the Court held a hearing. ECF No. 7. Upon consideration of defendant's motion, ECF No. 6, the U.S. Attorney's response, ECF No. 7, and all the arguments set forth at the hearing, the Court will **GRANT** defendant's motion seeking a religious dietary accommodation, ECF No. 6. Accordingly, the Court will **ORDER** the D.C. Department of Corrections ("DOC") to provide defendant with food designated "organic" by the United States Department of Agriculture. Furthermore, because defense counsel withdrew the alternative request for pre-trial release, the Court need not rule on that request.

### I. BACKGROUND

On Wednesday, January 27, 2021, shortly after his transfer to the custody of the DOC, defendant filed an inmate request for "organic food." ECF No. 6-2 at 1. In his request, defendant wrote that for the past eight years, because he is a Shamanic practitioner, he has eaten only "traditional food that has been made by God." *Id.* at 1. Defendant explained that such food is made without genetically modified organisms ("GMOs"), herbicides, pesticides, artificial preservatives,

1

or artificial colors. *Id.* He added that he has not eaten since Monday morning at 8:15 A.M. and

"humbly request[ed]" a "few organic canned vegetables," "canned tuna (wild caught)," or "organic

canned soups." *Id.* at 1. And he explained:

> If I have to go a week [without] food or longer then so be it. I will stay
> committed to my spiritual/religious beliefs even if it means I suffer
> physically. I will continue to pray [through] the pain and do my best not to
> complain. I simply ask that you understand that the physical effects of my
> not eating organic food are harmful to my body and bio-chemistry. I have
> strayed from my spiritual diet only a few times over the last 8 years with
> detrimental physical effects. As a spiritual man I am willing to suffer for
> my beliefs, hold to my convictions, and bear the weight of their
> consequences. I simply ask that an exception (please) be made for my
> special circumstances. The last facility I was [at] in Arizona made such an
> exception for the short duration of my visit there. I kindly [and] humbly ask
> that a brief exception be made in this location as well. Please Chaplain as a
> man of God I ask that you please try to understand my convictions and plead
> my case to the necessary parties.

*Id.* at 1, 3.

The DOC sent defendant's dietary request to the DOC Chaplain for review. On February

1, 2021, the DOC Chaplain denied the request with a two-sentence explanation. *See* ECF No. 6 at

1. The Chaplain wrote, "Upon entering the DC DOC institution, you have not identified your

faith/belief. Religious Services was unable to find any religious merit pertaining to organic food

or diet under Shamanism Practitioner." *Id.*

Defendant promptly filed the present motion. ECF No. 6. In it, he explains that he has "not

eaten food in over one week" and reiterates that because of his Shamanic beliefs, eating non-

organic food would cause him serious illness. ECF No. 6 at 9. Defendant requests that he be given

organic food, or in the alternative, that he be released pending trial. ECF No. 6. The United States

Attorney for the District of Columbia opposes defendant's motion for pre-trial release but takes no

position on defendant's request for a religious dietary accommodation. ECF No. 7 at 1.

At the hearing on defendant's motion, defense counsel clarified that his "Motion for Sustenance," ECF No. 6, brings a First Amendment religious liberty challenge to the DOC's refusal to provide defendant with an all-organic diet. Defense counsel further clarified that the request for pre-trial relief is an alternative request and that the Court need not rule on it if the Court rules favorably on defendant's request for a religious dietary accommodation. Furthermore, because the United States Attorney does not take a position on defendant's request for a dietary accommodation, *see* ECF No. 7 at 1, a representative of the DOC appeared at the hearing to defend the DOC's rejection of defendant's request. Defendant's motion is now ripe for consideration.

## II. LEGAL STANDARD

The First Amendment to the United States Constitution protects the "free exercise" of religion. U.S. CONST. AMEND. I. For many years, the Supreme Court interpreted that guarantee as requiring the government to justify even incidental burdens upon religious practice under strict scrutiny. *See, e.g.*, *Sherbert v. Verner*, 374 U.S. 398, 403 (1963); *Wisconsin v. Yoder*, 406 U.S. 205, 220 (1972). Under that framework, a religious claimant had the initial burden to show that he was (1) advancing a religious belief, (2) that his religious belief was sincere, and (3) that the challenged governmental action imposed a substantial burden upon his religious exercise. William D. Lay, *Free Exercise and the Resurgence of the Religious Freedom Restoration Act*, SAGE OPEN 1, 4 (2016), https://journals.sagepub.com/doi/full/10.1177/2158244015625446; *cf. Sherbert*, 374 U.S. at 403; *Yoder*, 406 U.S. at 220.

Regarding what constituted a "religious" belief, courts entertained a broad definition that encompassed essentially all belief systems aimed at answering questions of "ultimate concern." *Malnak v. Yogi*, 592 F.2d 197, 208 (3d Cir. 1979) (Adams, J., concurring). As to whether litigants *sincerely* believed in those systems, courts declined to interrogate whether claimants' particular

3

religious views departed from established religious doctrines, asking only whether the claimants truly believed the views they espoused. *Thomas v. Review Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 715 (1983); *see also Presbyterian Church v. Hull Church*, 393 U.S. 440, 450 (1969) ("[D]eparture-from-doctrine . . . requires the civil court to determine matters at the very core of a religion—the interpretation of particular church doctrines and the importance of those doctrines to the religion. Plainly, the First Amendment forbids civil courts from playing such a role."). And finally, under the "substantial burden" prong, the claimant had to satisfy two constituent inquiries: the "subjective" burden and the "objective" burden. *See Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449 (1988). In other words, the claimant had to show both that he *perceived* the challenged governmental action burdened his religious belief and that the challenged action had *objectively* coerced him from adhering to his religious precepts. *Id.*

If the religious claimant satisfied that initial showing, the burden shifted to the government to justify the challenged policy under a two-part inquiry. First, the government was required to show that its challenged action was supported by a "compelling state interest." *Sherbert*, 374 U.S. at 406. And second, it had to show that it had selected the means least restrictive on religious practice in achieving that end. *Id.* at 407 (requiring the state "to demonstrate that no alternative forms of regulation would [achieve the purported interest] without infringing First Amendment rights"). Only if the challenged practice could survive that rigorous gauntlet could it impose a substantial burden upon the free exercise of the religious claimant.

In its 1990 decision *Employment Division v. Smith*, the Supreme Court significantly restricted that framework. 494 U.S. 872, 884–85 (1990). It explained that neutral and general laws that incidentally burdened religious practice would no longer merit strict scrutiny, but instead would be subject only to rational basis review. *Id.* So long as the government could show that its

practice was rationally related to a legitimate government interest, its practice could survive a First Amendment challenge. *See, e.g.*, *Miller v. Reed*, 176 F.3d 1202, 1206 (9th Cir. 1999).

Relevant to this case, however, *Smith* explicitly *declined* to overrule the doctrine of *Sherbert v. Verner* in all its applications. Indeed, *Smith* distinguished its own holding—regarding neutral and generally applicable laws—from the situation at issue in *Sherbert*—"individualized governmental assessment of the reasons for the relevant [religious] conduct." *Smith*, 494 U.S. at 884. In *that* context, *Smith* recognized what later scholars termed the "individualized governmental assessment exception." *See* Mary E. McMahon, Note, *May I Be Excused?* Smith*'s Individualized Governmental Assessment Exception and the HHS Mandate*, 53 J. CATHOLIC L. STUDIES 93, 103 (2014) (noting that *Sherbert* "lives on" through the individualized governmental assessment exception). In other words, where the challenged state action is not a general law, but is instead a particularized adjudication that burdens religious exercise, courts can still apply strict scrutiny to resultant religious burdens. *Id.*

Moreover, the Supreme Court's later interpretations of *Smith* have clarified that its holding regarding relaxed scrutiny for neutral and generally applicable laws applies only insofar as the challenged laws genuinely *are* neutral and generally applicable. *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531–36 (1993). Where the state has engaged in a regulatory "gerrymander" that targets a restriction at a disfavored religious sect, such a "gerrymander" can indicate that state action is not truly neutral toward religion. *Id.* at 534–36. And even where the challenged practice is not tainted by non-neutrality, the law still may face strict scrutiny where it is not enforced in a generally applicable manner. *Id.* at 535–36, 542. For instance, where the government provides a litany of exceptions to a policy for *other* religions, but withholds one for a

particular religious claimant, that under-enforcement may itself show that the law is not generally applicable, and thus that it merits heightened review. *Id.*

In the wake of *Smith*, Congress also passed religious liberty statutes intended to restore *Sherbert*'s strict scrutiny framework to particular types of claims. Relevant to this litigation is the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). 42 U.S.C. § 2000cc *et seq*. Echoing *Sherbert*, RLUIPA provides that insofar as a prisoner asserts a sincere religious belief, "no government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of a burden on that person is (1) in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* at § 2000cc-1(a). And like the *Sherbert* framework, RLUIPA broadly defines "religious exercise" to include "*any* exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* at § 2000cc-5(7)(A) (emphasis added). In combination, then, RLUIPA and the First Amendment provide prisoners with powerful mechanisms to challenge aspects of their confinement that substantially burden religious free exercise.

### III. DISCUSSION

Ordinarily, as mentioned above, Free Exercise challenges to neutral and generally applicable laws post-*Smith* merit only rational basis review, under which the DOC's dietary rules would be presumptively valid. But the Court finds that *Smith* does not govern the present inquiry for two independent reasons. First, unlike the neutral and generally applicable drug law at issue in *Smith* itself, the DOC's decision to deny defendant a dietary religious exemption is more akin to an "individualized governmental assessment" of his religious conduct. *Smith*, 494 U.S. at 884.

Defendant submitted his individual request for an accommodation to the DOC's Chaplain. The DOC's procedures clearly anticipate the filing of such requests, given that the DOC furnishes a standardized form on which inmates can make inquiries with the DOC's Chaplain's Office. The Chaplain then adjudicated defendant's claim and determined that defendant's request was without "religious merit." This ad hoc, case-by-case inquiry into whether prisoners' particular claims have religious merit is starkly distinct from Oregon's across-the-board prohibition on the consumption of peyote at issue in *Smith*. It is not generally applicable, but accommodates religious claims case-by-case so long as the relevant adjudicator—the Chaplain's Office—finds they hold "religious merit."

Second, *Smith* is inapposite because the DOC's policy is neither neutral nor generally applicable. As the DOC explicitly acknowledged at today's hearing—and despite its claims about the compelling need to adhere to a uniform diet for prisoners—the DOC provides dietary religious exemptions for both Muslim and Jewish inmates. Its sole rationale for withholding an analogous accommodation for defendant is that his religious views lack "religious merit." But that derisive language simply underscores the fact that not only is the DOC withholding a religious exemption for defendant that it already grants to other religious prisoners, but that it is doing so simply because defendant belongs to a disfavored sect. Indeed, the DOC could not even marshal a single example at today's hearing in which it had denied any other dietary religious exemption for lacking "religious merit."[1] The implication, then, is that if defendant belonged to some other favored sect, he would not have had to seek a federal court order to gain recognition of his religious rights.

---

[1] The only case the DOC cited in support of its position was *Rust v. Nebraska Dep't of Correctional Serv. Religious Study Comm.*, No. 4:08-CV-3185, 2009 WL 3836544, at *1 (D. Neb. Nov. 12, 2009), which the DOC claimed supported the general proposition that prisons may deny accommodations for religiously compelled organic diets. But that case is easily distinguishable from defendant's, since the sect at issue there—Theodish Belief—did not even think organic food was compelled by its religious beliefs, but was merely "preferred." *Id.* at *9.

Because *Smith* is thus inapposite, the Court's inquiry is governed by *Sherbert* and its progeny. Accordingly, the Court begins with the three-part initial showing that the defendant must make. Again, defendant must show that he is (1) advancing a religious belief, (2) that his religious belief is sincere, and (3) that the challenged governmental action imposes a substantial burden upon his religious exercise. *Cf. Sherbert*, 374 U.S. at 403. The Court finds that defendant has established all three of these showings.

First, defendant's dietary accommodation is unambiguously based on a religious belief. Whether analyzed under the *Sherbert* framework or under RLUIPA, there is no doubt that Shamanism is a religion and that defendant requests a dietary accommodation based on that religion. Defendant wrote in his inmate request form that he seeks his dietary accommodation because "of my being a Shamanic Practitioner." ECF No. 6-2 at 1. And in his motion, defendant further explains that he "is a longstanding follower of the faith of Shamanism," which he describes as "a religious practice." ECF No. 6 at 2. At today's hearing, the DOC did not even dispute that Shamanism is a religion. To the contrary, the DOC itself sent defendant's dietary request to its Chaplain, indicating that it, too, apparently thought defendant's request of a religious nature. The Court thus finds that defendant's belief is religious.

Second, defendant's willingness to go without food for more than a week is strong evidence of his sincerity in his religious beliefs. Defendant further stated in his request that he has been adhering to an all-organic diet as part of his Shamanism for eight years. ECF No. 6 at 2. And at the hearing, the DOC stated that it does not dispute the sincerity of defendant's religious convictions. The DOC's only relevant counterargument was that, though defendant *is* a Shaman, an all-organic diet is not actually a tenet of Shamanism, and thus that defendant is mistaken about his own religion's dietary requirements. But even if that were true—the DOC had no evidence for

its claim—it would not matter anyway, because binding Supreme Court precedent forecloses governmental attempts to impeach religious claimants' sincerity by introducing evidence that other followers of the same sect would perceive their religious obligations differently. *Thomas*, 450 U.S. at 715. In *Thomas*, for instance, the Indiana state government attempted to argue that a Jehovah's Witness was not sincere in his belief that his religion forbade him from building military tanks because *other* Jehovah's Witnesses felt no such misgiving. *Id.* The Court acknowledged that the claimant, Thomas, had drawn "a line" at perhaps a different place than would have his co-religionists. *Id.* But the Court explicitly cautioned that "it is not for us to say that the line he drew was an unreasonable one." *Id.* Similarly, defendant has drawn a line in this case regarding the dietary obligations he believes his faith compels. But it is not for this Court, either, "to say that the line he drew was an unreasonable one." *Id.* And since the Court believes he drew that line sincerely, it finds that he has satisfied the second step of his threshold showing.

Third, defendant has shown that the DOC's refusal to provide him with an all-organic diet is a substantial burden—both subjectively and objectively—to his religious beliefs. As for defendant's subjective perceptions, he explains in his motion that eating non-organic food would prevent him from practicing his faith. He states:

> Based on [defendant]'s shamanic belief system and way of life, non-organic food, which contains unnatural chemicals, would act as an "object intrusion" onto his body and cause serious illness if he were to eat it. An "object intrusion," is the belief that disease originates outside the body from unhealthy objects coming into the body. In shamanic traditions, the body, mind, and soul are interconnected, and the well-being of all three are necessary for [defendant] to be able to practice his faith.

ECF No. 6 at 2–3. Defendant thus perceives that the DOC's refusal to provide him with all-organic food is a substantial burden on his ability to practice Shamanism. The DOC's refusal to provide

9

defendant with an all-organic diet amounts to objective coercion as well, as it forces defendant to choose between starvation and consuming food that violates his beliefs.

Because defendant makes the required initial showing, the burden shifts to the DOC to justify the challenged action under a two-part inquiry.[2] To lawfully deny defendant his requested dietary accommodation, the DOC must first show that its denial is supported by a "compelling state interest." *Sherbert*, 374 U.S. at 406. At the hearing, the DOC argued that it has a legitimate interest in simplifying inmate food service to maintain financial and administrative feasibility. It argued that all inmate meals are provided by contractors, rather than procured on an ad hoc basis. Thus, it claimed, accommodating defendant would require it to alter its existing contracts for inmate meals. The Court recognizes the DOC's need to maintain an administratively and financially feasible method of sourcing food for its inmates. But the DOC candidly admitted that it routinely makes dietary accommodations for individuals who adhere to Islam and Judaism. If the DOC is able to make accommodations for individuals of these faiths, the Court finds no reason to believe that it would be administratively infeasible for the DOC to likewise accommodate defendant.

Nor could the DOC identify *any* instance where it had previously denied a request for a dietary accommodation based on a perceived lack of "religious merit." Nor did it point to any past dietary accommodation that had impaired executing its penological goals. That the DOC presently grants religious exemptions to other sects and yet still accomplishes those penological interests is strong evidence that the DOC has not employed a narrowly tailored approach toward defendant's religion. Indeed, the truly least restrictive imposition on defendant's religion that is consistent with

---

[2] As noted above, because the United States Attorney does not take a position on defendant's request for a dietary accommodation, *see* ECF No. 7 at 1, a representative of the DOC appeared at the hearing to defend the DOC's rejection of defendant's request.

DOC's penological interests would be to simply grant the requested exemption—just as the DOC itself explains it has done in many prior instances for other claimants.

### IV. CONCLUSION

For the reasons explained above, the Court **GRANTS** defendant's motion seeking a religious dietary accommodation, ECF No. 6. The D.C. Department of Corrections is hereby **ORDERED** to provide defendant with food designated "organic" by the United States Department of Agriculture. Furthermore, because defense counsel withdrew the alternative request for pre-trial release, the Court need not rule on that request.

It is **SO ORDERED**.

Date: February 3, 2021                                     /s/ Royce C. Lamberth *at 7:58 P.M.*
                                                          Hon. Royce C. Lamberth
                                                          United States District Judge