```
                IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
_____

United States of America,      ) Criminal Action
                               ) No. 1:21-cr-00003-RCL-1
              Plaintiff,       )
                               ) Motion Hearing (via Zoom)
vs.                            )
                               )
Jacob Anthony Chansley,        ) Washington, D.C.
                               ) February 3, 2021
              Defendant.       ) Time:  3:30 p.m.
_____

             Transcript of Motion Hearing (via Zoom)
                           Held Before
             The Honorable Royce C. Lamberth (via Zoom)
       United States Senior Judge for the District of Columbia
_____

                       A P P E A R A N C E S

For the Plaintiff:       Kimberly L. Paschall
(via Zoom)               U.S. ATTORNEY'S OFFICE FOR THE
                         DISTRICT OF COLUMBIA
                         555 Fourth Street, Northwest
                         Washington, D.C. 20530

For the Defendant:       Albert S. Watkins
(via Zoom)               KODNER WATKINS, LC
                         7733 Forsyth Boulevard, Suite 600
                         Clayton, Missouri 63105

Also Present (via Zoom):
                         Chad Copeland
                         Eric Glover
                         Stephanie Litos

Also Present (via telephone):
                         Andre Sidbury, Pretrial Services
                         Officer
_____

Stenographic Official Court Reporter:
(Via Zoom)               Nancy J. Meyer
                         Registered Diplomate Reporter
                         Certified Realtime Reporter
                         333 Constitution Avenue, Northwest
                         Washington, D.C. 20001
```

P R O C E E D I N G S

THE COURTROOM DEPUTY: Good afternoon, everyone. This Honorable Court is now in session. The Honorable Judge Royce C. Lamberth is now presiding.

Good afternoon.

THE COURT: Good afternoon.

THE COURTROOM DEPUTY: We are here for a motion hearing in Criminal 21-3, the United States of America v. Jacob Chansley.

Starting with counsel for the government, please identify yourself for the record.

MS. PASCHALL: Good afternoon, Your Honor. Kimberly Paschall for the United States.

THE COURTROOM DEPUTY: Defense.

MR. WATKINS: Your Honor, Albert Watkins. I'm here with Kodner Watkins on behalf of the defendant, Jacob Chansley.

THE COURT: Okay.

THE PRETRIAL SERVICES OFFICER: Andre Sidbury for pretrial services.

THE COURT: Okay.

MR. COPELAND: And good afternoon, Your Honor. This is Chad Copeland on behalf of the Department of Corrections. Also with me is Stephanie Litos and DOC's general counsel Eric Glover.

THE COURT: Okay. I have a couple of questions first

1    for Mr. Watkins.  The -- I wanted to clarify the nature of your
2    motion for sustenance.  You didn't cite any cases or other
3    authorities in your motion.  What is the legal basis for the
4    relief that you're seeking on that part of the motion?  You
5    can't simply ask me to order the D.C. Department of Corrections
6    to give Mr. Chansley food without making a legal claim.  You
7    talk about how Mr. Chansley adheres to the religious practice
8    of shamanism.
9            Are you bringing a First Amendment religious liberty
10   challenge, or exactly what is your legal claim that you're
11   making?
12              MR. WATKINS:  Well, it's three-part, Your Honor.  One
13   is that, indeed, there is a First Amendment issue here.  My
14   client is a -- a follower of the shaman faith.  The government
15   has been aware of that since the outset of his period of
16   custody in Phoenix.  The U.S. government, its Bureau of Prisons
17   was aware of it.  The Court addressed it at the arraignment --
18   or at the initial detention hearing.  The issue was reconciled,
19   and Mr. Chansley was directed to be provided organic food.
20           There was a transfer of the custody, physical custody,
21   of Mr. Chansley from Arizona to D.C.  He was turned over by the
22   U.S. Bureau of Prisons with transfer paperwork.  The transfer
23   paperwork specifically delineated the dietary issues that were
24   being addressed under the First Amendment issue.  The
25   Department of Corrections has different protocols in D.C. than

1     the U.S. Bureau of Prisons.

2         There is also a physical component to this, a health
3     issue, not unlike that which would be experienced by a
4     diabetic.  I brought those to the Court's attention, albeit --
5     and I'm still sitting here not armed with all that I need,
6     Your Honor.  So I'm just being as forthcoming as I can with a
7     couple of phone conversations that have been unmonitored and
8     less-than-an-hour interaction by telephone with my client
9     interrupted routinely by noises and things in the background.

10         We are in difficult times right now with COVID.  So I'm
11     not castigating the Department of Corrections, Bureau of
12     Prisons, the Department of Justice.  It is what it is.

13         In the meantime, I've got a client who has gone nine
14     days without food.  He's lost a great deal of weight.  I am
15     obviously charged with the duty of being his advocate, and I
16     truly wish my resources were being deployed for something other
17     than an issue which I thought had been resolved in this
18     Court -- well, in Phoenix by the magistrate during the
19     detention hearing.

20         THE COURT:  Well, I notice you said in your papers
21     that the magistrate had done that.  I also noticed, though, in
22     the file that the magistrate said she had not ruled on that;
23     that that was something taken care of by the jail authorities;
24     that she had not issued a ruling on that.  So can you clarify
25     that for me?

1   MR. WATKINS:  I wish I could, Your Honor.  I was not
2   present in Phoenix.  I was not present remotely for that.  I
3   was not a counsel of record at that time.
4        And I -- I will be, again, forthcoming with the Court,
5   as I always am.  I just don't know exactly what -- what was put
6   out there by the Court.  I do know what I've read in the paper,
7   and I -- or on the internet, and -- and I know and the world
8   now knows that -- that the clarity that may be going into the
9   internet may not be the clarity that one seeks.
10   THE COURT:  To say the least.
11        All right.  Let me ask you a couple of specific
12   questions, and then I'll talk to the government.  Is
13   Mr. Chansley's request for organic food based on a religious
14   belief?
15   MR. WATKINS:  Yes, Your Honor.  And I -- I tried my
16   level best to provide you with as much information that I was
17   able to credibly give to the Court about shamanism and the
18   nuances related to diet and what they put in their system.  I
19   do know that shamanism is recognized by -- by the government as
20   a faith.
21   THE COURT:  Is his religious belief sincere?
22   MR. WATKINS:  Your Honor, I believe not only is it
23   sincere, I believe the evidence demonstrates conclusively that
24   if a human being goes nine days without eating food that he is
25   doing so for a bona fide faith-based reason.

1          THE COURT: Does Mr. Chansley feel that the refusal
2 to provide him organic food substantially burdens his religious
3 beliefs?
4          MR. WATKINS: Yes -- yes, Your Honor. My client made
5 it clear that while he did not oppose fasting, he absolutely
6 was not in a position to be able to put into his body the --
7 that which is deemed under shamanism to be impure and something
8 that, in effect, sucks the life out of your body. That's the
9 best way I can put it without perhaps more study.
10          THE COURT: Okay. Is the correction department's
11 refusal to provide Mr. Chansley with organic food coercing him
12 to abandon his religious beliefs?
13          MR. WATKINS: Well, it is -- it is forcing and
14 compelling him to choose between starvation, death, and
15 consuming something that is completely adverse to his long-held
16 faith. To the extent that that constitutes a coercion to
17 deviate and depart from his faith, yes, Your Honor.
18          THE COURT: Now, I looked at what was --
19          THE COURTROOM DEPUTY: Your Honor, can I -- Your
20 Honor, I'm sorry. I apologize.
21      Ms. Paschall, do you have co-counsel trying to
22 enter into this hearing by the name of Faith and Downs?
23          MS. PASCHALL: Not that -- not that I'm aware of.
24          THE COURTROOM DEPUTY: Okay. Thank you.
25          MS. PASCHALL: Thank you.

1           THE COURT:  In the -- attached to something I saw,
2   anyway, was the -- I guess maybe the government's opposition.
3   Somewhere I saw the -- the actual request that Mr. Chansley had
4   made.  What is the food that would -- would satisfy his request
5   anyway?  Can you describe that for me?
6           MR. WATKINS:  Your Honor, if I may, with -- with all
7   deference to the Court's desire for information, is it possible
8   for the purposes solely of this subject matter to address it
9   directly with Mr. Chansley?  Again, because of communication
10  issues, it has been overwhelmingly cumbersome and not of value
11  to me on a communication front with Mr. Chansley to date, other
12  than to make sure I have the authority to act on his behalf.
13          THE COURT:  Okay.  Mr. Chansley, if you would briefly
14  describe -- don't get into a lot of issues, but just briefly
15  describe what is the organic food that would comply with your
16  religious interests here.
17          THE DEFENDANT:  Yes, Your Honor.  The organic food
18  that I consume has been labeled with a circular label that is
19  green and white in nature and it says USDA Organic.  And the
20  only way that corporations are able to receive that label is if
21  they undergo a review from an independent -- multiple
22  independent corporations that put the food into what is known
23  as a chromatograph, which basically picks apart anything and
24  everything on a molecular level and tells the people what
25  exactly is in the food.

1       And once they have identified that there's only organic
2  substances -- no pesticides, no herbicides, no genetic
3  modifications, no artificial ingredients, no preservatives or
4  anything like that -- in the food are they then able to apply
5  for the label, the organic label, the circular label that is
6  green and white and says USDA Organic.  And then they have to
7  pay $20,000 to keep that label on their food.
8       For eight years, Your Honor, I have been eating only
9  that food, and it has created a very delicate biochemical
10 balance in my body that affects my serotonin, it affects my
11 body chemistry.  It affects everything about my sleep, my
12 appetite, my mood, because serotonin regulates all of those
13 things, sir -- Your Honor.
14           THE COURT:  Okay.  That is -- that food can be
15 obtained at normal grocery stores, like a Safeway, or not?
16           THE DEFENDANT:  Yes, Your Honor.
17           MR. WATKINS:  Mr. Chansley, I -- I appreciate it.
18 Thank you very much.
19      Yes, Your Honor, this is readily and commercially
20 available at any grocery store, including those which are, you
21 know, located in the Foggy Bottom area of D.C., straight
22 through to where the shops stop as you head toward the Capitol.
23 They are readily available.
24           THE COURT:  Okay.  All right.  I think I understand
25 the questions then.

1           Mr. Copeland, let me ask you some questions.  First,
2   give us the status of where we are in terms of -- of the
3   application that was received by D.C. and -- and what the
4   status of that is.
5           MR. COPELAND:  Yes, Your Honor.  DOC's Religious
6   Services Office received the application for a strictly organic
7   meal, and they were unable to find information through their
8   research that confirmed that the tenets of shamanism require an
9   exclusively organic diet, and so the request was denied.
10          THE COURT:  Okay.
11          MR. WATKINS:  Your Honor, on paragraph 13 -- or 12 of
12  my motion, I provided you with what I was able to garner.  And
13  I can say for the first time in my professional career I -- I
14  cited Wikipedia, Your Honor, in -- in a legal brief.
15          I'm having trouble finding and identifying a reliable
16  shaman advisor that's -- not to be at all disrespectful of the
17  faith.  It's just simply I don't know about it.  The best I
18  was able to discern is that, quite frankly, there is the
19  spiritual element of shamanism that really states, in essence,
20  that these unnatural chemicals become -- and I'm going to use
21  this terminology because that's how it was worded -- an object
22  intrusion onto his body that will cause serious injuries and
23  it -- it, in essence, eliminates the ability to have the
24  spiritual contact -- or compromises the ability to have the
25  spiritual contact with nature and the spirits of other

1    beings in nature by affecting the -- affecting how you
2    spiritually conduct discourse with other spirits and other
3    parts of nature.
4         That's the best I can do, Your Honor.
5         THE COURT:  Does D.C. know the basis for why the
6    authorities in Arizona found that it was based on a religious
7    belief?
8         MR. COPELAND:  No, Your Honor, I'm not -- we're not
9    aware of the -- of why the Court reasoned the way it did.
10        THE COURT:  I don't know that the Court did.
11   Apparently the jail did -- or the Bureau of Prisons.  I don't
12   know.
13        MR. COPELAND:  Yeah, we're not aware, Your Honor, of
14   how they went about it.
15        THE COURT:  So it -- it's -- your position is that
16   the defendant has the burden of proving that it's a religious
17   tenet?
18        MR. COPELAND:  Correct, Your Honor.  The defendant
19   has the burden, the threshold burden, to prove that the
20   consumption of an exclusively organic diet is an exercise of
21   his religion or a tenet of his religion.  And we don't think
22   that that has been established.
23        First of all, the Wikipedia article that Mr. Watkins
24   cited to does not reference an exclusively organic diet.  As we
25   said, the Office of Religious Services did not find any

1  information that would confirm that is a tenet of shamanism.
2  And we have found no case that links an exclusively organic
3  diet to being an exercise or tenet or otherwise to shamanism
4  generally.
5          THE COURT:  Okay.  Can you give the Court any other
6  examples of inmate requests for dietary requirements based on
7  religious beliefs that the Department of Corrections has denied
8  for lack of religious merit, as -- as you've done here?
9          MR. COPELAND:  I don't have any.
10          THE COURT:  You look at something and decide it's not
11  a religious belief, as you're doing here.  Are there other
12  cases where that's happened?
13          MR. COPELAND:  I'm not aware of any, Your Honor.
14      I would like to clarify that.  The District and DOC do
15  not dispute Mr. -- the defendant's religious beliefs.  We're
16  not calling into question whether or not he -- he practices
17  shamanism.  It's that we have found no evidence that the
18  consumption of an exclusively organic diet is a tenet of that
19  religion, which is the quandary we're in.
20          And under -- under RFRA, under RLUIPA, the
21  First Amendment analysis, I believe that's a threshold
22  question, but even if -- but even if it was, the law makes
23  clear that prison officials have a legitimate penological
24  interest in maintaining a simple food service, and there are
25  financial and administrative burdens here on DOC that would

1    carry in that kind of analysis.

2         DOC does not have a discretionary food fund to go out
3    and buy separate meals for residents.  It's all done through
4    contracts, and none of those contracts have a meal plan that is
5    an exclusively organic meal.  So DOC would have to modify its
6    contract with its food vendor, and then it would separately
7    have to go -- because -- because the defendant is a federal
8    inmate, it then has to renegotiate its -- its contract with the
9    marshals service who reimburses DOC for the -- for meals to a
10   federal prisoner.  And so it's our position that that's too
11   much of a cost to the prison and not enough burden on the
12   religious belief to grant relief here.  And I would cite to a
13   case called *Cotton v. Cate* out of the Ninth Circuit and --
14   as -- as a basis for the analysis.

15         THE COURT:  What does that cite say?

16         MR. COPELAND:  It says, basically, it acknowledges
17   the prison officials have a legitimate penological interest in
18   maintaining a simple food service, and it conducts the analysis
19   on whether to grant an organic food meal -- exclusively organic
20   food meal to a resident who practiced a -- a Theodish religious
21   belief.  And the Court ultimately concluded those burdens --
22   administrative and financial burdens outweigh the -- the
23   religious practice.

24         MR. WATKINS:  Your Honor, if -- if I may.  The --
25   that case does not grant the authority to the Department of

1   Corrections, the Bureau of Prisons, or anyone to compromise the
2   integrity of the First Amendment rights of any individual
3   simply because from a bureaucratic standpoint it is more
4   expedient to not have to deal with the contractual interaction
5   by the Department of Corrections with the Bureau of Prisons and
6   perhaps, more importantly, within the context of shamanism.
7         And, again, my -- I -- I take pride in my knowledge
8   of -- of religions.  I am woefully deficient on shamanism, but
9   I do know that one of the fundamental tenets of shamanism is
10  the absence of fundamental tenets.  By that I mean, it is a
11  religion, a faith that actually transcends boundaries, is found
12  all over the world, from the Far East straight through to the
13  shores of North America.  It is predominantly, primarily linked
14  to indigenous peoples.  However, it has grown and broadened in
15  the scope of its practitioners to include those who embrace the
16  faith.  And it is a faith that is not one which is premised on
17  an administrative hierarchy or a bureaucratic infrastructure
18  that one might commonly associate with the Roman Catholic
19  church.
20        We have the Department of Corrections, which is working
21  like a yeoman, trying to accommodate a full house right now
22  during COVID times.  Very difficult.  It's recognized as being
23  difficult.  My client is a shaman who's presenting as somebody
24  who comes from the custody of the Bureau of Prisons with an
25  established -- established diet that was deemed appropriately

1  linked to his faith by the Bureau of Prisons.  And I don't
2  believe the Department of Corrections is appropriately shifting
3  the burden back to my client all of a sudden to prove up the
4  fundamental tenets and -- and core infrastructure of a
5  recognized -- a U.S. government-recognized faith to serve as a
6  basis for the wholesale denial of the -- the preexisting
7  determination that organic food delivery is inappropriate.
8              THE COURT:  Well, I -- I have to say, I assume,
9  Mr. Copeland, that what you just said wouldn't apply to Muslim
10 or to Jewish prisoners or others.  So those recognized
11 religions like that are going to have different diets; right?
12             MR. COPELAND:  That's correct, Your Honor.  They
13 have --
14             THE COURT:  Because shamanism has not been
15 recognized, is that why you're questioning it here?
16             MR. COPELAND:  No.  And I don't contend that
17 shamanism is an unrecognized religion.  Certainly courts have
18 recognized it as -- as a religion.  What I'm saying is that
19 from the research that we were able to do from the information
20 that we have been provided is that there is -- there is not --
21 we do not yet have a basis to understand, other than the
22 contention of the defendant himself, that consumption of an
23 organic -- exclusively organic meal is a religious belief, is a
24 religious tenet.
25             In fact, as Mr. Watkins just said, this is a religion

1    that seems to have no tenets, which would -- in our

2    perspective, it further supports the notion that -- that --

3    that this -- that the tying it to the religion, as an exercise

4    of religion, it is -- he hasn't carried his burden on -- on

5    that front.

6         And, Your Honor, I need to clarify for Your Honor.  I

7    apologize.  I cited to the wrong case, whatever I said earlier.

8    It's not *Cotton v. Cate*.  It's a case called *Rust v. Nebraska*

9    *Department of Corrections* out -- out of -- and so I apologize

10    for citing to the wrong case.

11         THE COURT:  And what does that case say?

12         MR. COPELAND:  That's the case that spoke to the

13    Theodish belief that required an all organic -- exclusively

14    organic meal, and that the Court concluded that the plaintiffs

15    haven't shown that the administrative and financial burdens

16    associated with accommodating that religious belief posed --

17    put a burden on their religious exercise in their denial of

18    feeding him an exclusively organic meal.  Basically found for

19    the Department of Corrections.

20         MR. WATKINS:  Your Honor, that -- that was a case

21    that cited the case that he did cite to begin with, and it --

22    it does not -- it does not apply to this case because it has to

23    do with a religion that does have tenets and guidelines and

24    fundamental -- fundamental codification of those -- of those

25    tenets that did not include organic food, you know, much like

1       the Catholic faith, by way of example.
2               THE COURT:  So the basis for D.C. acting is what;
3       that you don't believe the religion requires it, but you don't
4       question whether he is sincere, or what -- what is the basis
5       for D.C.'s action?
6               MR. COPELAND:  The basis is that it's twofold.
7       First, it is that the defendant has not established that an
8       exclusively organic diet is an exercise of his shamanism, and,
9       secondly, that even if it is, that the -- that the DOC's
10      legitimate interest in maintaining a simple food service and --
11      specifically accounting for the financial and administrative
12      hurdles it has to undertake to provide an exclusively organic
13      diet outweigh the religious belief, if the Court finds it to be
14      one.
15              MR. WATKINS:  Your Honor, the second reason does
16      not -- is not supported by law.  The first reason is -- is,
17      again, not -- not germane to the facts here.
18              We have a man who is a shaman.  Neither the Department
19      of Corrections nor the defendant obviously disagree with the --
20      with the embracing of the faith by -- the genuine embracing of
21      the faith of shamanism by the defendant.  And, moreover, we
22      have a -- just factually, we have genuine support of the
23      proposition that my client's faith has dictated his
24      nonconsumption of food for a period of nine-plus days now.
25              And, you know, I -- I do have the alternative prayer for

1   relief.  I don't want to go there unless the Court wants to go
2   there.  I'd be delighted to have my client released, but the
3   fact of the matter is just on the food and dietary issue
4   itself, this is not something that's brand-new, that's all of a
5   sudden erupted.  This is something that has been addressed by
6   the Bureau of Prisons.
7           We do have a disconnect between the Bureau of Prisons,
8   its finding, its decision, whether it was judicially suggested
9   or decided by the Bureau of Prisons, that this disconnect
10  when -- when there is a transport of a prisoner into the
11  custody of the Department of Corrections, I don't believe the
12  Department of Corrections has the ability, the authority, much
13  less the discretion, to simply say to the Bureau of Prisons:
14  No.  I'm sorry.  We're not going to handle your prisoner that
15  way because it doesn't work for us bureaucratically and
16  administratively.
17          THE COURT:  I understand the issues, and the -- the
18  Court will issue an order that his religious diet requests be
19  granted.  I'll issue written findings and conclusions
20  supporting that determination later this afternoon or -- or
21  early this evening, but I think that the Court is satisfied
22  with the prior decision made by the prison authorities in
23  Arizona; that there has not been a justification to change that
24  determination to my satisfaction, and I think it should be
25  adhered to.  And I think his prior diet requests should be

1   honored here as well.  So I'll issue an order to that effect.
2           Now, I know -- in the other part of your motion is a
3   motion for pretrial release.  At the time when we were here
4   Friday, you had indicated, Mr. Watkins, that -- I guess the
5   only -- the only thing that changed from the time the
6   magistrate issued her ruling was that the inauguration
7   occurred, and you were looking at whether you might be able to
8   get the government to go along with the pretrial release under
9   some conditions once the government had more information and
10  was able to look at more things about your client and -- and
11  what he had actually done and not done --
12          MR. WATKINS:  If I may, Your Honor.
13          (Indiscernible simultaneous cross-talk.)
14          THE COURT:  -- the -- the circumstances changed
15  enough that you really want to go forward with that, if I issue
16  this order that I'm talking about now.
17          MR. WATKINS:  No, Your Honor.  If I may.  I'll make
18  it very clear for the Court.
19          The motion that we had for pretrial release was an
20  alternative motion within the context of a motion seeking food
21  for my client.
22          I am still continuing a dialogue with the government.
23  We're still working in a collaborative fashion, and I don't
24  think it's appropriate right now for us to -- to address the
25  motion for pretrial release until I've had an opportunity to

1   have a -- more dialogue with -- with the government, which in
2   turn requires as a condition preceding my -- my dialogue with
3   my client, which I believe has been remedied
4   through undertakings with the Department of Corrections; that
5   again, they -- they've worked really hard under difficult
6   circumstances.  I'm very, very grateful for the -- for the
7   work, effort, and time they have put into it.
8            But for the Court's purposes today, the -- the ruling
9   that you have made precludes the need to address and,
10  therefore, we will withdraw the portion relating to a pursuit
11  of pretrial release.
12           THE COURT:  Okay.  That's perfect.
13           All right.  Anything further the government wants to do?
14           MS. PASCHALL:  No, Your Honor.  Thank you.
15           THE COURT:  Okay.  Thank you very much, Counsel.
16  I'll issue an order promptly so we can get that carried out.
17  The Court will be in recess.
18           (The proceedings concluded at 4:01 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Nancy J. Meyer, Registered Diplomate Reporter, Certified Realtime Reporter, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenograph notes and is a full, true, and complete transcript of the proceedings to the best of my ability.

Dated this 4th day of February, 2021.

/s/ Nancy J. Meyer
Nancy J. Meyer
Official Court Reporter
Registered Diplomate Reporter
Certified Realtime Reporter
333 Constitution Avenue Northwest, Room 6509
Washington, D.C. 20001