IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>JACOB ANTHONY CHANSLEY, )<br>)<br>Defendant. ) | Case no. 1:21-cr-00003-RCL-1 |

## DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR PRETRIAL RELEASE

Comes now Defendant, Jacob Chansley, by and through his undersigned counsel, and for Defendant's Reply to Government's Response to Defendant's Motion for Pretrial Release, states to the Court as follows:

1. The Government's Response to Defendant's Motion for Pretrial Release mandates reply.

## THE GOVERNMENT'S ASSERTION THAT DEFENDANT WAS "LEADING THE CHARGE" INTO THE UNITED STATES CAPITOL IS FALSE

2. Concisely put, the Government has falsely characterized the Defendant as having "[led] the charge into the United States Capitol." See p. 1, 2d par., 1st sentence of Opposition to Defendant's Emergency (sic) Motion for Pre-Trial Release.

3. Indeed, the Government has put forth its false characterization in a misguided attempt to have the Court embrace the Defendant as a ringleader of those with nefarious schemes at play. Unfortunately for the Government, the existence of countless miles of video footage exists to memorialize the events of January 6, 2021.

4. This video footage, when superimposed on the timeline of events of January 6, 2021, paints a clear and concise picture of the Defendant, namely one whose presence at the United

1

States Capitol on January 6, 2021 was anything but that which could be defined as exhibiting a leadership position as it related to the "charge into the United States Capitol."

5. Without belaboring the Defendant's obvious absence of any sartorial or other trait which could remotely be associated with "leading" anyone anywhere, the memorialized video footage of the Defendant on January 6, 2021 instead depicts a Shamanic wardrobe donned by an enthusiastic, energized youthful man with red, white and blue face paint.

6. Wikipedia has established and published a timeline of events of January 6, 2021. https://en.wikipedia.org/wiki/Timeline_of_the_2021_storming_of_the_United_States_Capitol

7. The Defendant attended the rally and was present at the Ellipse for the entirety of former President Trump's rally speech.

8. Relying on the Wikipedia timeline, former President Trump ("Trump") commenced his speech at the Ellipse at high noon Eastern Time and immediately commenced his oft rehearsed diatribe that the election was stolen, criticizing Vice President Mike Pence by name a half-dozen times, accusing fellow Republicans of not doing enough to back up his allegations, and stating that he would walk with the crowd to the Capitol, though he opted instead to retire to the White House immediately after the speech to watch some daytime television.

9. During Trump's rally speech, at approximately 12:30 p.m. Eastern Time crowds of people commenced gathering outside the U.S. Capitol building. This constituted the first wave of people at the Capitol.

10. Before the conclusion of Trump's rally speech, at 12:53 p.m. Eastern Time, those who were already at the United States Capitol overwhelmed police along the outer perimeter west of the Capitol building, pushing aside temporary fencing.

11. By 1:03 p.m. Eastern Time, a number of individuals overran three layers of barricades and forced police officers to the base of the west Capitol steps.

12. The Defendant was at the Ellipse during the entirety of Trump's rally speech.

13. At 1:10 p.m. Eastern Time, Trump ended his rally speech by encouraging the crowd to march to the Capitol: "We're going to try and give them [Republicans] the kind of pride and boldness that they need to take back our country."

14. At 1:30 p.m. Eastern Time, Capitol Police were overwhelmed and forced to retreat up the steps of the Capitol. This was the second wave.

15. Also, at 1:30 p.m. Eastern Time, large numbers of Trump supporters, including the Defendant, commenced their march-stroll from the Ellipse 1.5 miles down Pennsylvania Avenue toward the Capitol. This was the third wave.

16. Video footage was acquired by Defendant's counsel's investigator, a recently retired FBI Special Agent with a decades' tenure with the Bureau. A true and correct copy of the blacklined investigator's interview report memorializing the video procurement is attached hereto, incorporated herein by reference, and marked Exhibit A. A true and correct copy of the curriculum vitae of the retired special agent is attached hereto, incorporated herein by reference, and marked Exhibit B.

17. The video footage referenced in the attached Exhibit A depicts the Defendant at approximately 1:30 p.m. Eastern Time clearly situated on Pennsylvania Avenue among the throngs of the second wave of the Trump rally speech attendees heading toward the United States Capitol directly in front of the National Museum of American History, being geographically positioned 1.2 miles away from the United States Capitol (being a 25-minute walk, per Google).

18. A link to the footage referenced in the attached Exhibit A is as follows:

https://documentcloud.adobe.com/link/track?uri=urn:aaid:scds:US:d4cdb175-329d-4f8d-b070-e3ca5dc503d6

19. In viewing the immediately preceding link to footage, the Defendant is not walking, but rather, dallying, celebrating "freedom" by hollering the word with a bellowing tenor, interrupted from time-to-time to permit others in the crowd to take selfies with the smiling, graciously accommodating and nattily clad Shaman.

20. By the time the Defendant arrived at the United States Capitol, being at approximately 2:15 p.m. Eastern Time, the Defendant walked up the steps as Capitol Police were walking down the steps, stating, "The building is yours." The following link to a widely published video depicts the police as they proclaimed, "The building is yours" with the Defendant, in all his Shamanic splendor, casually walking by them up the steps among a crowd of similarly peaceful people climbing the same steps to enter the United States Capitol. Video footage of Defendant's walking up of the steps of the Capitol as Capitol Police descend is available here:

https://www.youtube.com/watch?v=BxVSFagSMGM&t=3s

21. At 4:17 p.m. Eastern Time, Trump uploads a video to his Twitter denouncing the riots, but maintaining the false claims that the election was stolen. In the video he says:

> "I know your pain, I know you're hurt. We had an election that was stolen from us. It was a landslide election and everyone knows it, especially the other side. But you have to go home now. We have to have peace. We have to have law and order. We have to respect our great people in law and order. We don't want anybody hurt. It's a very tough period of time. There's never been a time like this where such a thing happened where they could take it away from all of us — from me, from you, from

4

our country. This was a fraudulent election, but we can't play into the hands of these people. We have to have peace. So go home. We love you. You're very special. You've seen what happens. You see the way others are treated that are so bad and so evil. I know how you feel, but go home, and go home in peace."

22. The following link access a video depicting the Defendant assisting law enforcement in directed people, at the behest, albeit belated, tweeted request of Trump:

https://www.youtube.com/watch?v=emggKyR65Zg

23. The foregoing videos display the Defendant following, not leading, the "charge" into the United States Capitol.

24. At 6:01 p.m. Eastern Time Trump tweeted,

"These are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long. Go home with love & in peace. Remember this day forever!"

25. Indeed, as Defendant sits in solitary confinement, he knows he shall remember the 6th day of January, 2021 forever.

## GOVERNMENT CITES TWO CASES IN WHICH DEFENDANTS PARTICIPATING IN JANUARY 6, 2021 EVENTS AT THE UNITED STATES CAPITOL HAVE BEEN DENIED RELEASE

26. All video footage garnered by the Defense counsel to date depict the Defendant at all times maintained the flag pole in a respectful non-offensive fashion, never using same in a threatening or menacing manner. The Government has not disclosed or supported the proposition that the flag and flag pole constituted a weapon.

27. The Government has cited two cases of criminally accused defendants whose requests for pretrial release were denied. Both of the cited defendants can easily be distinguished from the peaceful Defendant herein.

28. One of the two cases cited was that which involved William Chrestman. The Department of Justice published a press release corresponding to Chrestman which reads in paraphrased salient part:

29. According to the indictment, Chrestman, Kuehne, Colon, and Ashlock were members of the Kansas City Chapter of the Proud Boys, a group self-described as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Chrestman, Kuehne, Colon, and Ashlock all traveled to Washington, D.C. from the Kansas City metropolitan area. On January 6, 2021, they met with other Proud Boys on the National Mall. Felicia Konold and Cory Konold traveled, met up with the group, and traveled with them to the Capitol. The indictment alleges that the defendants planned with each other, and with others known and unknown, to enter the Capitol forcibly on January 6, and to stop, delay, and hinder the Congressional proceeding occurring that day. The defendants brought and wore paramilitary gear and supplies—including camouflaged combat uniforms, tactical vests with plates, helmets, eye protection, and radio equipment, and affixed orange tape to their clothing and tactical gear to identify each other. The defendants marched with other members of the Proud Boys to the Capitol and forcibly stormed past exterior barricades, U.S. Capitol Police officers, and law enforcement officers, before all but Ashlock entered the Capitol. The indictment also alleges that Chrestman faced the crowd of rioters on the Plaza, including Kuehne, Colon, Ashlock, Felicia Konold, and Cory Konold, and shouted, "Whose house is this?" The crowd responded, "Our house!" Chrestman shouted, "Do you want your house back?" The

crowd responded, "Yes!" Chrestman shouted back, "Take it!" Chrestman shouted at a Capitol Police officer who was preparing to fire non-lethal projectiles to protect the Capitol, "You shoot and I'll take your fucking ass out!" Felicia Konold shouted to the crowd of rioters to "fight for America" while the crowd was held at the Plaza. Chrestman, Kuehne, Colon, Felicia Konold, and Cory Konold proceeded into the Capitol building and attempted to disable crash barriers -- barriers that descend from the ceiling to the floor, which Capitol Police used to try to prevent rioters from advancing further into the Capitol building.

30. The second of the two cases cited related to Peter Francis Stager who is accused of using a "deadly or dangerous weapon," to "forcibly assault, resist, impose, impede, intimidate and interfere with an officer." Stager is accused of attacking a Washington police officer. FBI agents at the D.C. field office identified Stager in videos after they were posted on Twitter. Another video shows an interview Stager conducted where he points toward the Capitol building and says "death is the only remedy for what's in that building."

31. The Defendant herein was not violent. He had no colleagues with him. He did not shroud himself in secrecy. He did not wear a bullet-proof vest and cammo gear. In fact, he wore no shirt at all. He had no zip ties. He had no pipe bomb. He wore no riot helmet, no tactical goggles, had no gun, no pepper spray, no gas mask. He was not destructive. He was not threatening. He did not overcome police lines or barriers. He did not speak words of violence. He admonished others in the Capitol to respect law enforcement. He admonished others to go home when Trump finally tweeted it was time to go home. He said a prayer. He was happy. He was smiling. He chatted with others. He chatted with law enforcement. All that was missing was an organic coffee klatch.

## GOVERNMENT MISCHARACTERIZES NOTE TO FORMER VICE-PRESIDENT PENCE

32. The note written by the Defendant and left for former Vice-President Pence read, "It is only a matter of time justice is coming."

33. In addition to but not to replicate that which was proactively set forth in Defendant's present Motion for Pretrial Release, the Government, again, mischaracterizes facts. The Government's own discovery released herein specifically notes the Defendant's immediate denial of threatening intent behind the note when Defendant voluntarily and cooperatively responded to inquiries propounded upon Defendant by federal law enforcement at the time of the Defendant's peaceful and voluntary surrender to authorities.

34. The text of Defendant's Motion for Pretrial Release herein painstakingly links the words on the note Defendant left for former Vice-President Pence to the words spoken by Trump during his rally speech at the Ellipse.

35. The Government's citation of words spoken by Defendant in different settings and contexts simply supports the proposition that the Defendant has exercised his right to freedom of speech in a fashion consistent with the proposition that the Defendant heeded the words of the President, believed the words of the President, and did that which the President told him to do.

## DEFENDANT HAS NOT HIDDEN BEHIND THE FORMER PRESIDENT

36. Remarkably, the Government attempts to characterize the Defendant as hiding behind Trump. In fact, as a matter of record, the Defendant has traversed significant introspective ground since being confined. The Defendant spoke openly, honestly freely and voluntarily to law enforcement at the time of his peaceful appearance at the FBI offices in Phoenix.

37. The Defendant directed his counsel to publicly request a pardon from then President Trump to permit the former President to "do the honorable thing" and pardon the Defendant and other similarly situated peaceful people."

38. When the former President's term expired and no pardon was granted, the Defendant reflected on the pardoning of Lil' Wayne and other beneficiaries of Trump's pardon largesse and thereafter permitted the public disclosure of his "deep disappointment" with Trump.

39. Thereafter, the Defendant publicly owned his actions, apologized for them, and in a public release, express regret and remorse, stating unequivocally his actions were "wrong."

40. The Defendant did not apologize or express regret or remorse with a caveat. The Defendant has not placed blame at the feet of Trump.

41. The words and actions of Trump speak for themselves. The effect of the words and actions of Trump are a matter of permanent and comprehensive record in the U.S. Senate as part of the one article impeachment trial conducted this year.

42. While the legal implications of the words and actions of Trump have cut a wide but highly uncertain and rough-edged swath.

43. The Defendant has apologized.

44. Trump has not.

45. The Defendant owns his actions.

46. Trump has not.

47. The Defendant is remorseful.

48. Trump is not.

49. The Defendant, like millions of Americans, is traversing a path away from the propaganda induced world of what became a very real world of make-believe back to a world of truth, reality, integrity and complete sentences.

50. Trump has not.

51. More accurately, Trump is hiding behind the Defendant, and other similarly situated peaceful people.

WHEREFORE, Defendant prays this Honorable Court issue an Order directing the release of the Defendant pending trial herein and for such other and further relief as the Court deems just and appropriate in the circumstances.

Respectfully Submitted,

KODNER WATKINS, LC

By: /s/ Albert S. Watkins
ALBERT S. WATKINS, LC DC#399625
7733 Forsyth Boulevard, Suite 600
Clayton, Missouri 63105
(314) 727-9111
(314) 727-9110 Facsimile
albertswatkins@kwklaw.net

**CERTIFICATE OF SERVICE**

Signature above is also certification that on March 4, 2021, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court utilizing the CM/ECF system which will send notification of such filing to all parties of record.

# EXHIBIT A



Shamrock Global, LLC

# Report of Interview

Interview of: ▓▓▓▓▓▓▓
Date of Interview: January 18, 2021 (Telephonic)
Drafted By: Kevin Cosentino
Case ID: Jacob Chansley

▓▓▓▓▓▓▓ telephone 812-575-7530 was advised of the identity of this writer and the nature of the interview. ▓▓▓ lives in the Evansville, Indiana area. ▓▓▓ provided the following information:

▓▓▓ stated he was in Washington DC attending a Trump rally on January 6, 2021 and recorded video of whom he now knows to be Jacob Chansley. ▓▓▓ advised he would provide a copy of this video to this writer.

▓▓▓ stated the first video he recorded on his cell phone was taken after the rally concluded and everyone was migrating toward the Capital Building (approximately 1:20 p.m. to 1:30 p.m.) ▓▓▓ stated he zoomed in on Chansley who was taking a "selfie" with a woman and yelling the word "Freedom" which ▓▓▓ thought was from the movie, Braveheart.

▓▓▓ noted that in the first video, at the 1:55 mark of the recording, his wife says "there goes the presidential limousine" referring to President Trump leaving the rally.

▓▓▓ stated the second video he recorded was taken about twenty minutes later wherein he (▓▓▓) zoomed in on the Capital Building to show how many people had gathered there (▓▓▓ is still many blocks away from the Capital). ▓▓▓ stated at this time, it was his understanding that the Capital Building had already been breached and claimed that there is no way Chansley could have made it to the Capital Building in time to have been part of any violent breach.

▓▓▓ stated his cellphone videos may be time stamped in Central Time, but he is not sure.

▓▓▓ is of the belief that many people were later allowed in to the Capital Building and Chansley "followed suit." ▓▓▓ believes that Chansley's attire makes him easy to recognize and politically prosecute.

1

# EXHIBIT B

# KEVIN COSENTINO



## Education:

Bachelor of Science Degree in Accounting, University of Illinois

## Professional Certification:

Certified Public Accountant (CPA), American Institute of Certified Public Accountants

Associate in Premium Auditing (APA), Insurance Institute of America

## Professional Experience:

Shamrock Global, LLC – Owner                                                                         Present

Shamrock Global is a limited liability company which provides consulting, and investigative services to law firms. Services include document review, financial analysis, witness interviews, and other services as directed by Counsel.

Fidelity Consultants, LLC – Partner                                                                     Present

Fidelity Consultants is a limited liability company which provides investigative and audit review services to the Roman Catholic Church and related Dioceses and Religious Orders.

Chenega Corporation – Senior Financial Investigator                April 2018 – January 2019

Worked as a contract Senior Financial Investigator assigned to the Federal Bureau of Investigation, St. Louis, Division. Responsibilities included working with the FBI's Drug and Organized Crime Squads and the U.S. Attorney's Office in seeking Administrative, Criminal, and Civil forfeiture with emphasis on criminal forfeiture money judgements, substitute assets, and seizure of facilitating property.

Federal Bureau of Investigation – Special Agent                        January 1991 – March 2018

Created the first FBI Health Care Fraud Task Force (HCFTF) in the St. Louis Division to investigate Medicare and private insurance billing fraud. The HCFTF included Agents from the U.S. Department of Health and Human Services, Office of Inspector General, United States Postal Inspection Service, National Insurance Crime Bureau, and private insurance Special Investigative Units (SIU's). Worked with Medicare intermediaries and the United States Attorney's Office to successfully investigate and prosecute numerous health care fraud cases in the Eastern District of Missouri. Familiar with ICD-10 and CPT manuals.

Served on the White-Collar Crime Squad for over 18 years specializing in highly complex financial fraud and money laundering investigations. Case Agent on numerous mail and wire fraud, bank fraud, public corruption, and investment fraud cases to include the largest Ponzi scheme in St. Louis history (U.S. vs. Martin Sigillito) which was also featured on CNBC's American Greed. Case Agent on the first stock option backdating case to be successfully prosecuted in the United States (U.S. vs. Engineered Support Systems, Inc.). Case Agent on the ACORN voter registration fraud investigation which led to numerous indictments and national publicity highlighting voter registration fraud. Led the White-Collar Crime squad in arrests, convictions, and forfeiture seizures. Regularly worked with the U.S. Attorney's Asset Forfeiture Unit. Asset forfeitures on U.S. vs. Sigillito include over 800 valuable items (antique books and maps, jewelry, ancient artifacts, Persian rugs, rare cognac and whiskey, vehicles, and a vacation home) seized during multiple search warrants. As Case Agent on U.S. vs. Don Weir, (see "Plot of Gold" St. Louis Riverfront Times), thousands of precious metal coins worth nearly $6 million were seized and forfeited to the U.S. Government.

Collaborated with the U.S. Attorney's Office, and numerous other federal, state, and local law enforcement agencies in the successful prosecution of numerous individuals and corporations. Assisted the U.S. Attorney's Office with trial and motions hearing preparation, exhibits, expert witness selection, and testimony.

As Chief Security Officer (CSO) of the FBI's St. Louis Division, responsibilities included management of personnel security, information security, physical security, and operations security. Duties included conducting personnel security interviews, security briefings and debriefings, physical protection of classified and sensitive information, SCIF accreditation, and preparation of emergency operations and continuity of operations plans. Duties also included supervising nine uniformed guards, one Personnel Security Specialist, and one Information System Security Officer. Created a Protest / Demonstration Action Plan to manage and address planned or spontaneous demonstrations at FBI facilities as a result of the 2014 civil unrest in Ferguson, Missouri.

Served as the Coordinator of the St. Louis Metropolitan Fugitive Task Force (SLMFTF) for 5 years supervising 12 local and state police officers assigned to the team. The SLMFTF accumulated over 1000 violent felony arrests in St. Louis City and County and Jefferson County. Served as Acting Supervisor of the Violent Crime Major Offender Squad throughout the same 5-year period working and supervising violent crime cases including bank robberies and kidnappings. During this time period, was responsible for planning and executing the rescue of a newborn infant kidnapped from a hospital in Kansas City, Kansas, and transported by the kidnappers to Jefferson County, Missouri. Also helped create a weekly television news segment, St. Louis' Most Wanted, with Fox 2 News reporter Don Lemon, which profiled local violent fugitives. Case Agent on the notorious Dennis Rabbitt fugitive investigation. Rabbitt, also known as the "South Side Rapist" was wanted for attacking over two dozen St. Louis area women over a ten-year period. The investigation involved working with the FBI's Behavioral Analysis Unit and profiling the case on America's Most Wanted (AMW). Rabbitt was captured by authorities in Albuquerque, New Mexico a day after AMW aired.

Served on the St. Louis Division FBI SWAT (SL SWAT) team for 8 years, including 2

years as Senior SWAT Team Leader. Duties included planning, coordinating, and executing numerous high-risk arrests and search warrant entries for a team of twelve operators. Duties also included providing monthly firearms and tactical training for members of the team. Responsibilities also included providing advance teams and protection details for the U.S. Attorney General and Director of the FBI. Worked with the St. Louis Metropolitan Police Hostage Rescue Team and the St. Louis County Police SWAT Team in joint training scenarios and real time operations. Worked with the St. Louis Airport Police in developing a joint terrorist response plan subsequent to the September 11, 2001 terrorist attacks. As a member of the SL SWAT team, was responsible for terrorism response at the 1996 Olympics in Atlanta, Georgia. SL SWAT was the first team to arrive and secure the scene of the bombing in Centennial Park, later performing grid searches in the Nantahala National Forest in search of bombing suspect Eric Rudolph.

Served as a Counselor to over 300 local, state, and international law enforcement executives at the FBI National Academy (NA), Session 238. Counselors serve as mentors and role models to NA students and assist with the rigors of classroom training, physical training, and the demands that arise from being away from home for 10 weeks. Counselors are also responsible for dispute resolution, and the consistent adherence and enforcement of established academy rules. Additionally, Counselors ensure NA students have access to cultural enrichment, as well as social functions and activities.

Served as a member of the FBI's Joint Terrorism Task Force (JTTF) investigating International and Domestic Terrorism cases. Served as Case Agent on the New Black Panther investigation wherein two members of the group attempted to purchase explosive devices in order to target St. Louis law enforcement officials involved in the Ferguson, Missouri unrest. Maintained a Top-Secret Security Clearance with SCI accesses of SI, TK, G, and H.

<u>Wausau Insurance Companies</u> – Senior Field Auditor          January 1985 – January 1991

Duties included performing methodical examinations of an insured's operations, records, and books of account to determine the actual insurance exposure for the coverages provided and concluding with a precise report of the findings. The policy coverages included Worker's Compensation, General Liability, Product Liability, Trademark, Automobile, and Fire. Internal duties included interaction with Sales Representatives, Property and Casualty Underwriters, Loss Control Engineers, and Senior Managers.

## Professional Training:

| | |
|---|---|
| September 2018 | Federal Inter-Agency Forfeiture Summit – Drug Enforcement Administration, St. Louis, Missouri. |
| February 2015 | Specialized Asset Forfeiture Training – Financial Institution Fraud Unit – Federal Bureau of Investigation and U.S. Attorney's Office, Eastern District of Missouri. |
| July – Sept. 2013 | Advanced Counterterrorism Investigations and Operations |

COSENTINO 4

| | |
|---|---|
| | Training – Federal Bureau of Investigation, Counterterrorism Division. |
| July 2004 | Bank Fraud Investigation and Prosecution – Federal Bureau of Investigation, Financial Crimes Division, White Collar Crime Unit. |
| July 2003 | Advanced Hostage Rescue Course – CSAT, U.S. Army 1st Special Forces Operational Detachment – D. |
| July 2001 | Chemical Agent Instructor School – Federal Bureau of Investigation, Critical Incident Response Group. |
| February 2001 | International Fugitive Investigation Training – Toronto Police Service, Toronto, Canada. |
| August 2000 | Emergency Vehicle Pursuit Training Course – Missouri State Highway Patrol, Training Division, Jefferson City, Missouri. |
| September 2000 | Tactical Emergency Medical Technician – Counter Narcotics and Terrorism Operational Medical Support (CONTOMS), Department of the Interior, United States Park Police, Washington, DC. |
| May 1999 | Special Weapons and Tactics Training Course – Federal Bureau of Investigation, SWAT Training Unit. |
| January 1999 | FBI Street Survival School – Federal Bureau of Investigation, Critical Incident Response Group. |
| August 1998 | FBI Fitness Instructor School – U.S. Olympic Training Center, Colorado Springs, Colorado. |
| August 1998 | Emergency Medical Technician (Basic) – National Registry of Emergency Medical Technicians. |
| November 1995 | Health Care Fraud Training Conference – Federal Bureau of Investigation and National Health Care Anti-Fraud Association. |
| July 1991 | FBI Firearms Instructor School – Federal Bureau of Investigation, Firearms Training Unit. |
| April 1991 | Tactical and Evasive Vehicle Operations Course (TEVOC) – Federal Bureau of Investigation, Training Division. |

## Awards Received:

| | |
|---|---|
| April 2015 | Citation for Special Achievement – Federal Bureau of Investigation, Director's Office, for the successful investigation and prosecution of members of the New Black Panther Party. |

COSENTINO 5

| | |
|---|---|
| February 2015 | Citation for Special Achievement – Federal Bureau of Investigation, Director's Office, for the successful investigation of a Counterterrorism matter resulting in the arrest of 6 subjects charged with providing material support to terrorists. |
| November 2012 | Award for Commitment to the Pursuit and Prosecution of Health Care Fraud – Special Investigative Unit, Blue Cross Blue Shield, St. Louis, Missouri for the successful prosecution in the matter U.S. vs. Dr. Anthony Colandro. |
| October 2012 | Distinguished Service Award – U.S. Department of Justice, United States Attorney's Office, Eastern District of Missouri, for the successful investigation and prosecution in the matter U.S. vs. Martin Sigillito. |
| October 2009 | Distinguished Service Award – U.S. Department of Justice, United States Attorney's Office, Eastern District of Missouri, for the successful investigation and prosecution in the matter U.S. vs. Don Weir. |
| October 2008 | Distinguished Service Award – U.S. Department of Justice, United States Attorney's Office, Eastern District of Missouri, for the successful investigation and prosecution in the matter U.S. vs. Gary Gerhardt. |
| October 2007 | Distinguished Service Award – U.S. Department of Justice, United States Attorney's Office, Eastern District of Missouri, for the successful investigation and prosecution in the matter U.S. vs. Andre Mitchell and Henry Allen. |
| August 2007 | Certificate of Achievement – Federal Bureau of Investigation, Director's Office for the successful investigation and arrest in the matter U.S. vs. James Franklin Jones. |
| September 2005 | Distinguished Service Award – U.S. Department of Justice, United States Attorney's Office, Eastern District of Missouri, for the successful investigation and prosecution in the matter U.S. vs. Jeffery Thomas et al. |
| October 2002 | Distinguished Service Award – U.S. Department of Justice, United States Attorney's Office, Eastern District of Missouri, for the successful investigation and prosecution in the matter U.S. vs. Arthur Stevenson. |
| September 1999 | Commendation - St. Louis County, Missouri Police Department, for the arrest of an individual wanted for Burglary, Robbery, and Assault 1st Degree of a Law Enforcement Officer. |
| June 1993 | FBI Possible Club Medal – Federal Bureau of Investigation, Firearms Training Unit. |

COSENTINO 6

## Articles:

"Health Care Fraud in America" – Fraternal Order of Police, Missouri State Lodge Journal, Spring 1994

## Board Memberships:

<u>Board of Governors for the Special Agents Insurance Fund</u>     February 2010 – December 2014

The Board of Governors for the Special Agents Insurance Fund (SAIF), a benevolent fund, representing 14,000 active duty FBI Special Agents. Duties include exercising diligence and care in the direction and control of the business management and affairs of the SAIF to include levying assessments, authorizing contracts, and investing and expending funds.

<u>Board of Governors for the Charles S. Ross Fund</u>     February 2010 – December 2014

The Board of Governors (BOG) for the Charles S. Ross Fund (CSRF), a benevolent fund, representing 14,000 active duty FBI Special Agents. The BOG acts as advisors to the Director of the FBI, in his capacity as Trustee of the CSRF, on matters regarding investment of Ross funds and payment of benefits.