**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case no. 1:21-cr-00003-RCL-1 |
| | ) | |
| JACOB ANTHONY CHANSLEY, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO REOPEN DETENTION HEARING AND FOR**
**PRETRIAL RELEASE BASED ON NEW EVIDENCE AND INFORMATION**

COMES NOW, Defendant, Jacob Anthony Chansley, by and through his undersigned

counsel, and for his Motion to Reopen Detention Hearing and for Pretrial Release Based on New

Evidence and Information, states to the Court as follows:

**PROCEDURAL HISTORY**

1.   The Defendant was originally charged under a sealed Complaint filed in this District on

January 8, 2021.The Defendant, having heard that federal law enforcement sought to make

contact with him, promptly contacted the FBI and self-surrendered without incident on January

9, 2021. Two days later, on January 11, 2021, Defendant was indicted in this District. A true and

correct copy of the Indictment is attached hereto, incorporated herein by the reference, and

marked Exhibit A. The Defendant made his initial appearance herein before U.S. Magistrate

Deborah Fine in the District of Arizona. A Detention Hearing was conducted before Magistrate

Judge Fine on January 15, 2021. Magistrate Judge Fine ordered the Defendant detained pending

trial. The Defendant was then transferred to the District of Columbia and is being held in a state

facility run by the Commonwealth of Virginia in Alexandria under an agreement with the U.S.

Bureau of Prisons. The Defendant filed a Motion for Pretrial Release, the hearing for which was

conducted and gave rise to an Order dated March 8, 2021. The March 8, 2021 Order was reasoned and supported by a Memorandum filed by this Court concurrently with the Order denying Defendant's Motion for Pretrial Release. A copy of this Court's March 8, 2021 Memorandum setting forth the reasoning of the Court for its Order of March 8, 2021 is attached hereto, incorporated herein by reference, and marked Exhibit B.

2.   Following the hearing, a transcript of the record of the hearing that gave rise to the March 8, 2021 Order was requested and received. A true and correct copy of same is attached hereto, incorporated herein by reference, and marked Exhibit C.

3.   Also following the hearing, Defendant's counsel made a public plea for video and images depicting the Defendant leading up to, during and immediately following Defendant's January 6, 2021 appearance at the Capitol.

4.   Since the hearing, the Government has commenced with the release of discovery herein, the most of which was released in the days immediately preceding the filing of the present Motion.

5.   New evidence procured and amassed and discovery released since the hearing supports the premise that this Court's March 8, 2021 Order denying Defendant's request for pretrial release was erroneous, based on inaccuracies and without evidence.

6.   Additionally, it has been determined that several other defendants who participated in the events of January 6, 2021 have been released before trial, even though the conduct of those defendants is indistinguishable, or worse (significantly worse) than the well documented conduct of Chansley.

7.    Additionally, in an effort to permit the Government to dissuade itself of its erroneous beliefs about Chansley and to garner insight into the character and person of the Defendant, the Government was permitted to debrief Chansley without restriction on multiple occasions.

8.    Defendant's counsel has been punctilious about sharing with the Government on as close to a real time basis as possible the evidence that supports the erroneous nature of many of the factual assertions made by the Government (and considered by this Court) to deny Defendant's Motion for Pretrial Release by its March 8, 2021 Order.

9.    Defendant's counsel has been equally punctilious about sharing with the Government video footage and images procured as a result of efforts and contacts of Defendant Chansley. While the video footage and images of this category were not all probative of matters related to the Defendant, the procurement and provision of same to the Government demonstrated the Defendant's commitment to doing what was right for the country.

## LEGAL DISCUSSION

10.    Title 18 U.S.C. § 3142(f)(2) allows the Court to reopen a detention hearing under the following circumstances:

> The hearing may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.

18 U.S.C. § 3142(f)(2).  Thus, the hearing may be reopened if (1) information exists that was not known to the movant at the time of the hearing and (2) that information has a material bearing on

the issues of whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of the community.

11.  "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).

12.  The Bail Reform Act of 1984 authorizes one of those carefully limited exceptions by providing that the court "shall order" a defendant detained before trial if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019). Here, the Court appeared to hold that Chansley should be detained on the basis of the danger posed by the finial on the tip of the flagpole he carried through the day of January 6.

13.  In assessing whether pretrial detention is warranted for dangerousness, the district court considers four statutory factors: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the 11 nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)–(4). To justify detention on the basis of dangerousness, the government must prove by "clear and convincing evidence" that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." *Id.* § 3142(f). Thus, a defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety.

14.   In *Salerno*, the Supreme Court rejected a challenge to this preventive detention scheme as

repugnant to due process and the presumption of innocence, holding that "[w]hen the

Government proves by clear and convincing evidence that an arrestee *presents an identified and

articulable threat* to an individual or the community, we believe that, consistent with the Due

Process Clause, a court may disable the arrestee *from executing that threat*." 481 U.S. at 751

(emphasis added).

15.   Other courts have found a defendant's potential for compliance with release conditions

relevant to the detention inquiry. *See, e.g.*, *United States v. Hir*, 517 F.3d 1081, 1092–93 (9th

Cir. 2008) (explaining that release conditions require "good faith compliance" and that the

circumstances of the charged offenses indicate "that there is an unacceptably high risk that [the

defendant] would not comply. . . with the proposed conditions"); *United States v. Tortora*, 922

F.2d 880, 886–90 (1st Cir. 1990). While failure to abide by release conditions is an explicit

ground for revocation of release in 18 U.S.C. § 3148(b), it defies logic to suggest that a court

cannot consider whether it believes the defendant will actually abide by its conditions when

making the release determination in the first instance pursuant to 18 U.S.C. § 3142.

16.   Under 18 U.S.C. § 3142(f)(1)(E), detention is permitted if the case involves "any felony .

. . that involves the *possession* or use of a . . . dangerous weapon." (emphasis added).  The Bail

Reform Act thus explicitly authorizes detention when a defendant is charged with committing

certain felonies while possessing a dangerous weapon, as is alleged in this indictment.

17.   This Court's determinations in support of detention were clearly erroneous; and (2)

several other defendants who participated in the insurrection have been released before trial,

even though the conduct of those defendants is indistinguishable (or worse) than their conduct on

January 6.

18.   In this case, this Court and the Government knows the Defendant has no criminal history. Thus, his history and characteristics weigh against a finding that no conditions of release would protect the community. *Munchel*, 2021 WL 620236, at *6, *8. The crux of this Court's reasoning was that Defendant's flagpole and finial was a spear and, as such, a dangerous weapon.

19.   The crux of the constitutional justification for preventive detention under the Bail Reform Act is that "[w]hen the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community, . . . a court may disable the arrestee from executing that threat." *Salerno*, 481 U.S. at 751. Therefore, to order a defendant preventatively detained, a court must identify an articulable threat posed by the defendant to an individual or the community.  The threat need not be of physical violence, and may extend to "non-physical harms such as corrupting a union." *United States v. King*, 849 F.2d 485, 487 n.2 (11th Cir. 1988) (quoting S. REP. NO. 98–225, at 3(1984), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3195–96).  But it must be clearly identified. *See Salerno*, 481 U.S. at 750 (noting that the Act applies in "narrow circumstances" where "the Government musters convincing proof that the arrestee, already indicted or held to answer for a serious crime, presents a demonstrable danger to the community"); *cf. Tortora*, 922 F.2d at 894 (Breyer, C.J., concurring) (reversing an order of release where the district court failed to "carefully analyze[] the danger [the defendant] posed"). Detention cannot be based on a finding that the defendant is unlikely to comply with conditions of release absent the requisite finding of dangerousness or risk of flight; otherwise, the scope of detention would extend beyond the limits set by Congress. Under The Bail Reform Act of 1966, "[t]he law requires reasonable assurance[,] but does not demand absolute certainty" that a defendant will comply with release conditions because a

stricter regime "would be only a disguised way of compelling commitment in advance of judgment." *United States v. Alston*, 420 F.2d 176, 178 (D.C. Cir. 1969).

20.   The threat must also be considered in context. *See Tortora,* 922 F.2d at 888 ("Detention determinations must be made individually and, in the final analysis, must be based on the evidence which is before the court regarding the particular defendant. The inquiry is fact bound." (internal citations omitted)). It follows that whether a defendant poses a particular threat depends on the nature of the threat identified and the resources and capabilities of the defendant. *Cf. Nwokoro*, 651 F.3d at 110–11 (noting that evidence "favoring appellant's pretrial release" included the fact that appellant had no assets under his control, no ability to flee the country, and "no prior criminal record"). Whether the defendant poses a threat of dealing drugs, for instance, may depend on the defendant's past experience dealing, *see, e.g.*, *United States v. Briggs*, 697 F.3d 98, 102 (2d Cir. 2012), and her means of continuing to do so in the future, *see, e.g.*, *United States v. Henry*, 172 F.3d 921 (D.C. Cir. 1999) (unpublished).

21.   Here, the Government has not adequately demonstrated that it considered whether Defendant posed an articulable threat to the community in view of his conduct on January 6, and the particular circumstances of January 6. This Court based its dangerousness determination on a finding that "defendant's flagpole was a dangerous weapon," and that "he poses a clear risk to the community." *Munchel*, 2021 WL 620236, at *6.  In making this determination, however, the Court did not explain how it reached that conclusion except by asking the Government's AUSA her opinion, and despite the fact that "the record contains no evidence indicating that, while inside the Capitol, Defendant vandalized any property or physically harmed any person," and the absence of any record evidence that Defendant committed any violence on January 6; that Defendant assaulted no one on January 6; that he did not enter the Capitol by force; and that he

vandalized no property are all factors that weigh against a finding that Defendant poses a threat. If, in light of the lack of evidence that Defendant committed violence on January 6, the District Court finds he does not in fact pose a threat of committing violence in the future, the District Court should consider this finding in making its dangerousness determination. Defendant was not one of those who actually assaulted police officers and broke through windows, doors. A proper dangerousness determination to justify detention must be made based on evidence.

22. The Government also failed to demonstrate that it considered the specific circumstances that made it possible, on January 6, for Defendant to threaten the peaceful transfer of power. The Defendant had a unique opportunity to obstruct democracy on January 6 because of the electoral college vote tally taking place that day, and the concurrently scheduled rallies and protests. Thus, Defendant was arguably able to attempt to obstruct the Electoral College vote by entering the Capitol together with a large group of people. Because Defendant did not vandalize any property or commit violence, the presence of the group was critical to their ability to obstruct the vote and to cause danger to the community. Without it, Defendant who did not engage in any violence and who was not involved in planning or coordinating the activities— seemingly would have posed little threat. The Court found that Defendant was a danger to act in the future, but did not say how the Defendant would be capable of doing so now that the specific circumstances of January 6 have passed. This, too, is a factor that the Court should consider.

23. Finally, Defendant argues that the Government's proffer of dangerousness should be weighed against the fact that the Government did not seek detention of defendants who admitted that they pushed through the police barricades nor did it seek to detain defendants charged with punching officers, breaking windows, discharging tasers at officers, and with planning and fundraising for the riot.

24.  It cannot be denied that the violent breach of the Capitol on January 6 posed a grave danger to our democracy, and that those who participated could rightly be subject to detention to safeguard the community. *Cf. Salerno*, 481 U.S. at 748 ("[I]n times of war or insurrection, when society's interest is at its peak, the Government may detain individuals whom the government believes to be dangerous." (citations omitted)).  But Courts have a grave constitutional obligation to ensure that the facts and circumstances of each case warrant this exceptional treatment.

## GOVERNMENT-DEFENDANT INTERACTION

25.  On March 16, 2021, Defendant's counsel provided to the Government a Report of Interview  prepared by Defendant's counsel's investigator, a recently retired FBI Special Agent, which permitted the Government to be possessed of information regarding the provenance of video footage of value not previously possessed by the Government. The video footage depicted destruction and theft of classified Government property and, further, depicted clearly those responsible for same. But for the efforts of Defendant Chansley, this footage would not have been received by the Government at that opportune time. The Government expressed an elevated degree of appreciation for this video.

26.  The video footage referenced in the preceding paragraph, was uploaded to the Government's secure portal for use by the Government and dissemination to law enforcement.

27.  On March 19, 2021, Defendant's counsel provided to the Government video footage depicting Defendant Chansley during his January 6, 2021 visit to the Capitol thwarting a crime (theft) by yelling at another person in the Capitol who was attempting to steal a "muffin" from a breakroom in the Capitol. A link to this video:  https://youtu.be/xnlHZzI-Mx8.

28.  On March 22, 2021, the Defendant's counsel provided the Government with a copy of a school related "Career Paper" written by the Defendant in 2005. The paper evidences the long-

standing loving and caring nature of the Defendant for all, even those who hate him. A true and correct copy of the paper is attached hereto, incorporated herein by reference, and marked Exhibit D.

29.  On April 6, 2021, the Defendant's counsel provided the Government with a video depicting Defendant Chansley on the stairs located on the East Side of the U.S. Capitol Building across from the Supreme Court at approximately 4 PM on January 6, 2021. The video depicts Mr. Chansley in close proximity to two Capitol Police. Mr. Chansley is holding his flag and flagpole, replete with the finial that the Court has described as the tip of a spear.  Notably, the Government did not produce for the Courts or Defendant's counsel's inspection the flagpole with the finial, despite Government's discovery provided after March 8, 2021 reflecting they were in the possession of the Government.  In the video, Mr. Chansley is speaking on his megaphone. Images of those listening to Mr. Chansley are also obviously depicted. It was noted, the Capitol Police appeared to be protecting Defendant Chansley as he spoke, did not seek to disarm Defendant, and did not exhibit indicia of trepidation or concern. The provenance of this video was provided to the Government. A link to this video:  https://youtu.be/PyjfNBP24ro .

30.  Also on April 6, 2021, the Defendant's counsel provided the Government with a video that depicts clearly a number of individuals (not the Defendant, who did not scale any wall) surrounding and actively participating in the scaling of the wall in front of the Capitol Building, this despite stairs being located immediately to the left of the wall being scaled.  The provenance of this video was provided to the Government. A link to this video: https://youtu.be/15Fesf-qjf8 .

31.  Also on April 6, 2021, the Defendant's counsel provided the Government with a copy of the following images assembled in exhibit form using Government verbiage from the Indictment of other January 6 defendants (Pope brothers) showing them in the Capitol at 2:00 PM per the

Government's surveillance cameras.  The third photo (bottom right) shows Mr. Chansley strolling through the open door at 2:13:40.  It was pointedly noted that per the Government's own images, the Pope Brothers were not the only protesters in the building at 2:00 p.m. As part of the cover letter issued to the Government, it was made clear Mr. Chansley was not in the first wave of those entering the Capitol Building on January 6, 2021, despite the Government's assertion to that effect, which it made during the hearing of Defendant's Motion for Pretrial Release and which gave rise to the March 8, 2021 Order of this Court denying same.



32.   On April 7, 2021, Defendant's counsel confirmed with the Government the uploading to the Government's secure portal of 22 videos received by virtue of Mr. Chansley. The videos depicted 22 non-public videos of the January 6, 2021 events at the Capitol. As part of this presentment to the Government, Defendant's counsel provided the Government with a copy of

the Interview Report prepared by Defendant's counsel's investigator to memorialize the interview.

33.   Also on April 7, 2021, Defendant's counsel provided to the Government a series of still images redacted from the *New Yorker* video used by the Government herein which depicts the Defendant as he enters the Chamber with his flagpole in one hand and a megaphone in the other, confirming that the door through which he passed was being held open by Capitol Police Officer Robishaw, a proposition soundly repudiated by the Court in its March 8, 2021 Memorandum.

34.   It was determined after the hearing by this Court of the Defendant's Motion for Pretrial Release that the *New Yorker* video was not presented in temporally chronological order and was heavily edited.



35.   On April 9, 2021, Defendant's counsel provided the Government with a journalist provided montage of images, one of which depicted the Defendant with an individual (one of countless individuals who sought selfies with the Defendant during the Defendant's stroll down Pennsylvania Avenue toward the Capitol on January 6, 2021). The individual depicted with the Defendant was subsequently identified as a foreign national of interest to the Government. This image was provided to assist the Government in its preparation for one of the debriefings of the Defendant, which was subject to delay and re-setting due to the same logistical issues experienced by Defendant's counsel with scheduling of meetings and contact with Defendant. The provenance of the image was also provided to the Government. The Government acknowledged that it found the image to be helpful.



36.   On April 21, 2021, Defendant's counsel provided the Government with additional information recalled by the Defendant after one of the debriefing conferences then recently conducted by the Government with Chansley.

37.  On April 28, 2021, Defendant's counsel provided the Government with a video depicting the Defendant, replete with his flagpole and finial, outside the Capitol Building following his presence inside the Capitol Building on January 6. Chansley is pontificating in the immediate presence of Capitol Police and giving rise to no indicia of alarm or concern by law enforcement (who actually appear to be protecting Mr. Chansley). A link to this video:

https://youtu.be/PyjfNBP24ro .

38.  On April 28, 2021, Defendant's counsel provided the Government with a PowerPoint compilation of videos that chronicle the actions of Chansley prior to his entry into the Capitol, through the Capitol, and after his departure from the Capitol. Simultaneously, Defendant's counsel provided the Government with a PowerPoint video presentation and index delineating the sources of the videos comprising the PowerPoint and a separate spreadsheet which delineates each portion of the produced piece, describes same, delineates the time of the day to which each of the January 6 images/videos correspond, and the source of the video (as depicted in the attached list).

39.  A copy of the Index corresponding to the video PowerPoint is attached hereto, incorporated herein by reference, and marked Exhibit E.

40.  A copy of the Spreadsheet corresponding to the video PowerPoint is attached hereto, incorporated herein by reference, and marked Exhibit F.

A link to the video PowerPoint:

https://youtu.be/52ge1NaFYBc
https://youtu.be/wTcwgLy2N2Y
https://youtu.be/K3fY6jWdgzQ
https://youtu.be/Q3gfU3wEVRw
https://youtu.be/qCml7W-M1RU
https://youtu.be/qAHrKyzJPFk
https://youtu.be/uug0fChKZJ4
https://youtu.be/uvJtrgoM_uU
https://youtu.be/GrK_TJkXfg4



https://youtu.be/3nyT_ryjF-c
https://youtu.be/E-NHVtsMWdo
https://youtu.be/ph_37Us_aWo
https://youtu.be/UZncSuCG-vE
https://youtu.be/9Sz64T-MNkE
https://youtu.be/KLhBcmBNBmM
https://youtu.be/ruyaI_AGnUk
https://youtu.be/qsxaHwrBZDA



https://youtu.be/aO-Zc7Jo19Q
https://youtu.be/H09J6U4s1c8
https://youtu.be/9qb0iiHIAlU
https://youtu.be/uIc_2DY5m00
https://youtu.be/AZamJEDVD70
https://youtu.be/eEXV3CpqB_M
https://youtu.be/0phocFE2giA
https://youtu.be/lgKu7euBDc8
https://youtu.be/YIn0kIiiHeY
https://youtu.be/OjNcrO_1oJ4



https://youtu.be/NuJYneIIIeo
https://youtu.be/8ME0EYAMcK4
https://youtu.be/7e-NUP1IQT4 .

41.  On May 11, 2021, Defendant's counsel provided to the Government the following

publicly available video depicting what was represented to be the departure of then Vice-

President Pence from the Capitol at 1:59 PM  on January 6, 2021, prior to Mr. Chansley's 2:13

PM entry into the Capitol Building.

Referenced link: https://projects.propublica.org/parler-capitol-videos/?id=rqAltiD2WvNU.

42.  It has since been learned that the Government in some cases has asserted on the record

the former Vice-President was present inside the Capitol at all times during January 6, 2021 until

the Electoral College vote had been completed. It has since been noted the Government has not

noted this position in other cases arising out of January 6 events at the Capitol. The temporal

issue in this regard relates to the designation of the Capitol as a "restricted" building, as defined

under federal law and appears to call into question viability of not less than two of the Counts

herein.

43.   On May 13, 2021, Defendant's counsel provided the Government with a video depicting law enforcement holding open a door to the Capitol and a number of law enforcement personnel standing by as people walk by into the Capitol Building. At least one of the officers is captured uttering what appear to be supportive words to those walking into the Capitol Building. A link to this video:   https://youtu.be/dR_XFeLS-bc .

44.   Also on May 13, 2021, Defendant's counsel provided the Government with another video depicting law enforcement personnel on January 6, 2021 waving protesters past barricades after having opened the barriers. A link to this video:   https://youtu.be/ZCs7WkgftbY .

45.   Also on May 13, 2021, Defendant's counsel provided the Government with two other videos. One was a longer video understood to not have been possessed by the Government. One was a 40 second video depicting a group of people, including Chansley, in the Senate Salon on the Second Floor.  The protestors are talking with the police.  "The police here are willing to work with us and cooperate peacefully with our First Amendment allowance, to gather more Americans under the condition that they will come and gather peacefully to discuss what needs to be done to save our country," says a third-party, using Chansley's bull horn.  The totality of the video demonstrates a clear granting of permission to Defendant and others to be in the Capitol provided they were peaceful. In addition to Officer Robishaw, an identified senior Capitol Police Inspector is immediately present and expressing concurrence with the permission. They evidence no concern about Chansley's flagpole or finial.



An image of the Senior Capitol Police Inspector:

A link to the shorter publicly available video: https://amgreatness.com/2021/05/16/video-shows-u-s-capitol-police-gave-protesters-ok-to-enter/

    46.  On May 15, 2021, Defendant's counsel provided the Government a study of *The New Yorker* video for the purposes of identifying where Chansley fell in the line of those who entered the Senate Chamber on January 6, 2021. This temporal order of appearances required careful scrutiny given the edited nature of the video. The study comprised still shots of portions of the video to permit tracking of the Chamber attendees. The abbreviation "JAC" is used to refer to

Chansley. _The New Yorker_ video depicts the groups in the Senate Chamber – between Josiah

COLT (who scaled the chamber walls and was photographed at 2:45p in Speaker's chair) and

"JAC" being escorted in to the Chamber by Officer Robishaw just before 3:00p. The study also

reflects another group that comes in during Chansley's recital of a prayer. Color coding has been

used for clarity of that which is depicted. The code is as follows: YELLOW: people who are in

Senate lobby with JAC, or came up with first group. GREEN: people who appear more than once

with JAC in different areas. Based on the study, it appears Defendant was the 45th person to enter

into the Chamber on January 6, 2021, depending on whether previously situated members of the

media are included.



47.   In addition to thwarting a theft inside the Capitol, and contrary to the prior assertions by the Government, Chansley assisted law enforcement at the request of law enforcement by directing people to leave the Capitol per then President Trump's directive. A link to video depicting same:  https://youtu.be/YFsht5ygtdk .

48.   In addition to the foregoing, at all times during interaction with law enforcement, Chansley was supportive of law enforcement, going so far as to get in line with them to protect law enforcement and attempting to force another fur wearing "caveman" attendee at the Capitol to return a shield taken from law enforcement.

49.   On May 25, 2021, Defendant's counsel provided the Government video which depicted Chansley in front of The Capitol prior to entering the building. Chansley is standing in a decorative elevated circle of grass. Chansley is shouting his trademark, "Freedom." The video depicts hundreds of others walking by and past Chansley to enter the Capitol well prior to Chansley (again supporting the fact Chansley was not leading the charge into The Capitol as erroneously asserted by the Government in its pleadings herein). In the immediate vicinity of the Defendant, the video further depicts people walking through temporary fencing which had been moved aside by law enforcement (as depicted in another video provided herein), this despite the signage on the temporary fencing reading, "Area Closed." The video further depicts in the immediate vicinity of the Defendant law enforcement handing out bottles of water to and elbow bumping with other attendees at The Capitol as they traverse forward toward the open entry into The Capitol (Note, water is designated in the Capitol's official visitor policies as "Strictly Prohibited"). The video also depicts the Defendant taking time to permit another attendee at The Capitol to take a selfie with Defendant. The video further depicts clearly that the Defendant was high profile, shouting, with his flagpole (replete with finial described by the Court as a spear) in

the immediate vicinity of law enforcement who exhibited zero indicia of concern with or alarm

about the flagpole (finial or spear notwithstanding) and did nothing to akin to that which was

otherwise done by law enforcement on January 6, 2021 when dangerous weapons were noted,

i.e. seize them, arrest the bearers of same, disarm the person possessing same, or otherwise

neutralizing any concern arising therefrom. Link to this video here:

https://youtu.be/1Vxeh2Nu1Zw .

### **DISPRATE PRETRIAL RELEASE TREATMENT OF JANUARY 6 DEFENDANTS**

50.  On May 15, 2021, Defendant's counsel provided the following image to the Government:



51.  The foregoing image is actually an image procured from public pleadings filed by the

Government in the **USA v. Secor** case arising out of events of January 6. Mr. Secor is

understood to have been recognized by the Government as the first person involved in the

January 6 events to have sat in former Vice-President Pence's chair. This is at the outset of the

first group appearing in the Senate Chamber. The Chamber clock corroborates that this is well

before Chansley was escorted into the Chamber by Officer Robishaw.

52.  Mr. Secor was ordered released pending trial in March. He is understood to be a 22-year-old college student, who had an "America First flag" with him during his time in the Capitol on January 6. The flag had a finial. His counsel argued as a matter of record there was no evidence the pole was used for violence, and Mr. Secor didn't commit any violence.

53.  "In determining whether conditions of release can ensure the safety of others, "[t]he weight of the evidence is the *least* important of the factors and the bail statute neither requires nor permits a pretrial determination of guilt." United States v. Gebro, 948 F.2d 1118, 1121-22 (9th Cir. 1991) (citing United States v. Winsor, 785 F.2d 755, 757 (9th Cir. 1986)); accord United States v. Jones, 566 F. Supp. 2d 288, 292 (D.NY 2008).

54.  On May 15, 2021, Defendant's counsel provided the Government with sixteen (16) images as part of an ongoing effort to demonstrate the disparate position of the Government vis-à-vis Defendant. The images related to another January 6 defendant, Albert Chiarpelli. There are also images depicting Mr. Chansley well back in the pack of individuals following Defendant Chiarpelli.

55.  Mr. Chiarpelli then traversed throughout the Capitol at approximately the same time as and in close proximity to Chansley. Notwithstanding same, and even though it appears Chiarpelli was not initially candid about his appearance in the Capitol, no detention was sought. No passport was required to be turned in. He was released on his own recognizance. One of the images provided the Government in this regard is depicted below:



56.   As a necessary part of the process of evaluating the posture to date of the Government vis-à-vis Chansley, it was necessary to examine the position of the Government in cases involving similarly situated January 6 defendants.

57.   In *United States v. Michael Foy*, 1:21-cr-00108-TSC the Government has not sought detention for individuals who were demonstrating outside or even inside the Capitol. The government has not requested detention for individuals charged with various felony offenses, including Obstruction and Assault on a Federal Officer. Upon close inspection, even defendants who have been accused of similar or more destructive conduct have been released.

58.   *United States v. Chad Jones*, 1:21-mj-00076-ZMF –Mr. Jones is also charged under section 111(b), alleging the use of a deadly or dangerous weapon or infliction of bodily injury. Mr. Jones's intent was on display when he used a flagpole to repeatedly and forcefully strike and break the glass of the doorway where Ashley Babbitt was shot and killed as she climbed through a broken pane. (Mr. Foy is not alleged to have used any force inside the Capitol building, not with

the hockey stick or anything else and not against anything or anybody). Just before Mr. Jones

started breaking the glass, lawmakers and staff were seen on the other side of the doors from the

angry mob, being evacuated. Below is a still shot from the Complaint.

59.   The still shot depicts Mr. Jones in a red jacket in which he is shown breaking the glass

with the pole moments before Babbitt is shot.





60.   The Complaint states: "An officer inside the Speaker's Lobby, facing the door with a

gun raised, can be seen at the [left] side of the video in the close vicinity of the doorway as the

officer points the gun and fires at Ms. Babbitt, Jones could still be seen next to the door with

the pole, just to the left of where Ms. Babbitt was shot. The Government did not request Mr.

Jones's detention and Magistrate Judge Harvey released him on special conditions.

61.   *United States v Vitali Gossjankowski*, 1:21-cr-00123-PLF – According to the

Indictment, Mr. Gossjankowski has been charged under 18 U.S.C. § 111(b) for assaulting a

federal officer with a dangerous weapon (a Taser) after being videotaped trying to forcefully and violently enter a restricted area of the Capitol and activating the Taser multiple times. The Complaint describes that an officer near Mr. Gossjankowski suffered a heart attack and was hospitalized after being Tased multiple times on the back of his neck. While Mr. Gossjankowski said he recognized the officer during an interview, he denied using the Taser on him. He is also charged with Section 1752 offenses for being in restricted areas of the Capitol while carrying or using a dangerous weapon. The government did not object to his release.

62.   *United States v. Matthew Miller*, 1:21-cr-00075-RDM –Mr. Miller was charged with ten offenses, including assault on a federal officer under section 111(b), the lead charge against Mr. Foy. Mr. Miller allegedly discharged a fire extinguisher, as captured in the image below. He is also accused of using a crowd barrier fence as a makeshift ladder to scale the walls of the Capitol. Mr. Miller was also charged with offenses under Section 1752 involving use or carrying of a dangerous weapon.

63.   *United States v. Rachel Powell*, 1:21-mj-00197-GMH – Ms. Powell, known in the press as the "bullhorn pink hat lady", was filmed using a battering ram to break a large window of the Capitol so that she and others could force their way into the Capitol.  Ms. Powell was also filmed using a bullhorn to direct people inside the Capitol toward lawmakers, seeming to have detailed knowledge of the floor plan. Among other charges, Ms. Powell is accused of entering or remaining in a restricted area with a dangerous weapon. Ms. Powell was released by a magistrate judge in the Western District of Pennsylvania. The Government appealed the release order, but Chief Judge Howell denied the appeal.

64.   *United States v. Robert Packer*, 1:21-cr-00103-CJN – Mr. Packer was photographed inside the Capitol wearing a "Camp Auschwitz" t-shirt, suggesting anti-Semitic beliefs and

endorsement of the Holocaust, depicted in an image set forth in his Complaint. Mr. Packer was charged with entering or remaining in a restricted building and violent entry and disorderly conduct on Capitol grounds. He had previously been convicted of forging public records, driving under the influence, driving without a license, and had a warrant for failing to appear in court. The government did not request pretrial detention of Mr. Packer.

65.  *United States v. Mark Leffingwell*, 1:21-cr-00005-ABJ – Mr. Leffingwell was charged with assault on a federal officer under section 111, as well as several counts under 18 U.S.C. § 1752(a) and 40 U.S.C. § 5104I(2). Mr. Leffingwell allegedly pushed past a wall of law enforcement officers who were attempting to keep people out of the Capitol and then repeatedly punched an officer with a closed fist. Mr. Leffingwell did not raise any facts justifying his conduct.  The Government did not object to Mr. Leffingwell's release on conditions.

66.  *United States v. Joseph Biggs*, 1:21-mj-00126-RMM – Mr. Biggs is an admitted member of the Proud Boys, an extremist group the government describes as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western chauvinists." Mr. Biggs posted a plan on social media for the Proud Boys to go to D.C. on January 6, 2021, but not to wear their distinctive black and yellow clothing, saying "we are going to blend in like you" (referencing Antifa). He is alleged to have been at the front of the crowd whose members breached the Capitol and to have entered the Capitol within 20 seconds of its breach. He appeared to have been wearing an earpiece and carrying a walkie-talkie for communication purposes (and presumably coordination with other Proud Boys) during the riot. He was released in the Middle District of Florida and it does not appear that the government appealed his release.

67.  *United States v. Matthew Capsel*, 1:21-mj-00122-RMM – Mr. Capsel was charged with assaulting a federal officer. Mr. Capsel was captured on video fighting against National Guardsmen attempting to hold a boundary with riot shields, as shown below in an image from his complaint. There is no evidence supporting a justification defense for Mr. Capsel. Mr. Capsel persisted in fighting until he was pepper sprayed. The Government's oral motion to detain Mr. Capsel was denied in the Southern District of Illinois.  It appears that the Government did not appeal Mr. Capsel's release.

68.  *United States v. Josiah Colt*, 1:21-cr-00074-TFH – Mr. Colt went to the rally on January 6 wearing tactical assault gear, including a helmet. He was infamously photographed scaling down the wall of the gallery in the Senate chamber. According to the Complaint, Mr. Colt claimed in a Facebook video that he was the first person to sit in Speaker Pelosi's chair (which was actually Vice President Pence's chair) and calls Pelosi a traitor. The Government did not seek Mr. Colt's detention. See image below:



69.  *United States v. Christopher Alberts*, 1:21-cr-00026-CRC – Mr. Alberts was

stopped on Capitol grounds on January 6, 2021, after the emergency curfew, when a law

enforcement officer noticed a bulge on his hip that turned out to be a handgun with a fully

loaded high-capacity magazine. He also carried a spare magazine in a holster on his other

hip and was wearing a bullet- proof vest. In his backpack, he was carrying a gas mask, a

military-style meal-ready-to-eat (MRE), and a first aid kit. The Government's oral motion

to detain Mr. Alberts was denied and he was released by Magistrate Judge Harvey. The

Government did not appeal.

70.  *United States v. Nicholas DeCarlo and Nicholas Ochs*, 1:21-cr-00073-BAH —

Messrs. DeCarlo and Ochs are charged with conspiring with each other and other persons

to stop Congress's certification of the election results. Mr. Ochs is a founding member of

the Proud Boys Hawaii chapter with the group's name tattooed on his arm. They engaged

in planning, fundraising, and forcibly stormed past barricades. In a video posted on social media, DeCarlo stated he traveled to DC to stop the vote counting. Another video of the two of them is titled "Twas the Night Before REVOLUTION!!!" They are alleged to have defaced the Memorial Door of the Capitol with the words "Murder the Media," as shown below in an image from Mr. DeCarlo's complaint.



71.   Ochs is charged with stealing flex cuffs from a Capitol police officer. Ochs posted a picture of them on social media showing them smoking cigarettes in the Capitol. The Government did not seek their pretrial detention.

72.   *United States v. Matthew Council*, 1:21-mj-00008-GMH – Mr. Council is alleged to have forced his way through a police line inside the Capitol during which process he pushed a

female uniformed Capitol police officer and had to be pepper sprayed. There were no facts

alleging that Mr. Council's actions were justified. The Government did not seek Mr. Council's

detention.

73.   *United States v. Gina Bisignano*, 21-cr-00036-CJN –Ms. Bisignano is accused of being

an "instigator, a director, and an active participant in the violence, destruction and obstruction

at the Capitol" on January 6. ECF No. 12 at 1. On the front lines of the crowd pushing against

the police line, as pictured below, she allegedly shouted through a bullhorn things like:

"Everybody, we need gas masks! We need weapons! We need strong, angry patriots to help our

boys!"



74.   In her case, she is charged in her Indictment with destruction of Government property.  After she was released in her home district, Judge Nichols denied the appeal and ordered Ms. Bisignano to be released.

75.   *United States v. Jenny Cudd*, 21-mj-00068-TNM – Ms. Cudd is alleged to have been inside the Capitol without authorization. According to the Complaint, after leaving the Capitol, Ms.  Cudd livestreamed a video in which she stated, "I was here today on January 6th when the new revolution started in the Capitol." In describing her entrance, she further stated, "we just pushed,  pushed, and pushed, and yelled go and yelled charge." She also said, "fuck yes, I am proud of my actions, I fucking charged the Capitol today with patriots today. Hell, yes, I am proud of my actions." She later told a local news station during an interview, "Yes, I would absolutely do it again." The  Government did not seek Ms. Cudd's detention. Moreover, on February 4, 2021, the Court  granted Ms. Cudd's motion to travel to Mexico to participate in a work-related retreat, which  neither the Government nor Pretrial Services opposed.

76.   *United States v. Bruno Cua*, 21-cr-00107-RDM – Mr. Cua entered into Senate chamber floor,  armed with a baton and is alleged to have pushed officers. Prior to January 6th, he made  numerous posts on social media imploring others to abandon peaceful protests and to take  weapons to Washington D.C. on January 6th. Subsequent to January 6th, he posted on social media and bragged about "fighting his way into the Capitol." Mr. Cua was released into third- party custody after the appeal of the Magistrate Court's detention order.

77.   *United States v. Mostofsky* (Case No. Unknown) -  Mr. Motofsky is alleged to have stolen a Capital Police shield. He stole a police bullet proof vest. He carried a

pointed 5-foot wooden spear. He wore animal pelts like those worn by the Defendant. Ironically, the Defendant tried to help law enforcement by asking Mr. Motofsky to return the shield to law enforcement. He was given bond immediately.

78. *United States v. Michael Sparks*, 21-cr-00087 – Mr. Sparks is charged with multiple counts, including obstructing law enforcement. He was released on his own recognizance.

## MENTAL WELL BEING OF DEFENDANT

79. Defendant has been in solitary confinement (22 hours or more per day) since promptly and peacefully self-surrendering in early January 2021.

80. Concern about the apparent and emergent need of Defendant for mental health care was brought to the attention of the Court of May 22, 2021. This Court has ordered a Psych Exam be conducted on Defendant. More importantly, the Court also advised it would communicate to U.S. Marshals the need to provide the Defendant with interim mental health care. The goal should be to keep Defendant in a position of not having his psychological state in question.

81. The Court has been apprised of the difficulties and cumbersome nature of the COVID related protocols which remain in place at the facility where the Defendant is being detained. The Government has sought the designation of this case as "complex." The discovery corresponding to this case is sizeable, much of it electronic in nature.

82. A protective order has been issued in the case relative to discovery and its copying and dissemination.

83. Defendant is currently detained in Virginia.

84. Defendant's counsel is based in St. Louis, Missouri.

85. Weekend visits have been restricted by the facility to family members seeking time with their loved ones.

86.   Weekday visits are limited in time and availability.

87.   The hours required to simply view the videos and images associated with discovery in the present case significantly exceed the time available to permit anything resembling a timely and meaningful completion of this undertaking.

88.   Review of discovery with a criminally accused is a necessary part of the administration of justice and the accordance of an accused of due process.

89.   The mental health of the Defendant required to navigate the discovery review process is vital to putting the Defendant in a position of knowledge with respect to the discovery, evidence, the case, risks associated with decisions relating to the case, and the meaningful processing by the Defendant of same.

90.   The pre-existing mental vulnerabilities of the Defendant were evident and patent at the time of his shirtless presentation on January 6, 2021 in the cold of a Washington, DC winter day. The acuity of the vulnerable Defendant has waned with each passing day of solitary confinement. The effects of same, like ivy, have slept, crept and now leapt.

91.   To the Defendant, there is no end in sight.

92.   The combined issues of acuity and availability simply must enter into the mix of the Court in its decision with respect to pretrial release.

93.   The color of the face, painted or otherwise, should not play a role in the Government's position or the Court's decision with respect to pretrial release.

## THE DEFENDANT

94.   The Court is already aware of the fact that Defendant has zero criminal history.

95.   The Court is already aware of the fact that Defendant is a life-long resident of Phoenix, where he resides with his mother, also a life-long resident of Phoenix.

96.   The Court is already aware of the Defendant's Shaman faith and commitment to Ahimsa.

97. The Court is already aware of the fact the Defendant does not have a passport, speaks no foreign languages, and has been out of the country only as part of his service in the U.S. Military.

98. The Government has not alleged nor can the Government allege that Defendant assaulted anyone or threatened anyone on January 6. This is because the Defendant did not do so.

99. The Government has not alleged the Defendant stole any property on January 6. This is because the Defendant did not do so.

100. The Government has not alleged the Defendant had a gun or knife, zip tie, camouflage, SWAT attire, or other indicia consistent with violence or plans of violence. This is because the Defendant did not do so.

101. The Government has not alleged the Defendant was destructive to any property or thing inside the Capitol on January 6. This is because the Defendant did not do so.

102. Rather, the Government, in a fashion inconsistent with its posture in other cases involving other January 6 defendants with flagpoles with finials, has garnered the attention of the Court to the mischaracterization of the flagpole carried by the Defendant.  The Court has embraced the mischaracterization of same as a spear. Indeed, review of the transcript of this Court's inquiries propounded upon the Assistant United States Attorney about the characterization of the Defendant's flagpole as a "dangerous weapon" appears to be anything but spontaneous. The flagpole is in the possession of the Government. It has been in the possession of the Government since the Defendant self-surrendered. The Defendant voluntarily granted the Government access to it. The Government knows it was part of the Defendant's Shaman attire, routinely donned at political rallies, including those at which security checkpoints existed to preclude the presence of weapons (such as the rally at The Ellipse on January 6), at which the Secret Service protected President spoke.

103.  The Government has not alleged the Defendant acted violently or threateningly with his flagpole. This is because the Defendant did not do so.

104.  The law enforcement with whom Defendant interacted from the time the President spoke at The Ellipse, during his selfie-laden stroll down Pennsylvania Avenue, in front of, up and into the Capitol, through the Capitol, and immediately outside of the Capitol after exiting the Capitol did not state or exhibit any indicia of alarm or threat.  If there was a perceived "dangerous" component to same, why was nothing done?

105.  Throughout this journey, Defendant interacted with and was in ongoing close contact with law enforcement, many of whom engaged in conversation with the Defendant. No one stopped the Defendant. No one asked the Defendant to surrender his flagpole. No effort was made to seize the flagpole. Countless others had flags and poles and finials.

106.  It is no secret the Defendant's image has become the media driven face of January 6. It is no secret the Defendant's costume, fur, horns, bare tattoo ridden torso, and iconic dental perfection has caused Defendant to be the go-to image, day-in-day-out, for traditional and social media throughout the world when reporting, discussing, castigating, pitying, insulting, parodying, demonizing, supporting and explaining the events and people involved in the events of January 6.

107.  The Defendant is and at all times pertinent hereto has been vulnerable. Vulnerable to the words and actions of his commander-in-chief. Vulnerable to social media. Vulnerable to those who held themselves out as lovers of America, lovers of the Constitution, lovers of all that is the American Way. The Government knew the Defendant was in the military. The Government has access to the Defendant's military records. The Government knows the Defendant was honorably discharged after service as a "super soldier" in the Navy. He took an oath to defend the

Constitution against all enemies, foreign and domestic. The Government has done its due diligence on the Defendant. The Government has spared no expense. The Government has been granted access to the Defendant. The Government has taken advantage of the opportunity. The Government cannot identify one single incident ever in the life of the Defendant in which the Defendant has been violent.

108.   Our nation and our Courts and our people all recognize the importance of the words "cruel" and "unusual," especially when they are used back-to-back.

109.   Having pointed out the foregoing not previously produced or procured evidence which significantly alters the mix of that upon which the Court previously relied as a basis for its March 8, 2021 Order, Defendant is compelled to place front and center the fact the Government did not produce the all-important flagpole and finial for examination by the Court and Defendant's counsel.

110.  As noted, the Government has been in possession of same since the Defendant voluntarily provided the Government access to same at the time of his peaceful voluntarily self-surrender.

111.  The foregoing is supported by FBI Reports of Interviews produced by the Government after the hearing giving rise to this Government's March 8, 2021 ruling.

112.  Upon review of the Court's March 8 2021 Order, one is compelled to note the Court's apparent *sua sponte* inquiry to the Government's Assistant United States Attorney about the "spear" held by the Defendant being a "dangerous weapon" and the Court's one word support for the Government's erroneous opinion with the word "right".  (Exhibit B, Page 24, Lines 3-11).

113.  Upon information and belief, and as corroborated by the Government's subsequently-produced documents, the finial on Defendant's flagpole was affixed to the pole with a zip tie.

This was required because the screw originally at the bottom of the finial had (long before January 6) broken off, hence the use by Defendant of a zip tie to permit the flagpole to be adorned by a finial which could not be used as a spear.  The finial was affixed by a zip tie for decorative purposes and was not able to be used for violent purposes.

114.  The Government knew or should have known the flagpole and finial were not dangerous – the Government has possessed same for over five (5) months.

115.  The Government represented to this Court the Defendant was "leading the charge" into the Capitol, permitting that characterization to bleed into the same allegation about Defendant's entry into the Chamber.  The Government knew Chansley was not in the first wave of those who entered the Capitol; knew Chansley did not have to overcome Police lines or barriers; knew that Defendant and others in his proximity during ingress into both the Capitol and Chamber reasonably could have believed they were doing so as express permittees versus nefarious interlopers.

116.  The Court gave much attention to a video also referenced, again purportedly *sua sponte*, by the Court during the hearing of Defendant's Motion for Pretrial Release that the Court opined depicted Chansley leading the charge into the Capitol at a place which precluded Defendant from not noting the concurrent entry through a broken window right next to the doorway through which Defendant traversed to gain entry into the Capitol.

117.  Again, only after hearing was the Defendant accorded the opportunity to identify and view the video upon which the Court relied.

118.  The video is one-dimensional.  The Capitol is majestic.  It has molding, pillars, corners, edging, recesses and domes.  It echoes and resonates from within its walls.  Sound bounces.  On January 6, 2021, at the time of the Defendant's entry, the entire foyer was filled with exuberant,

loud, noise makers.  The window has since been scrutinized.  It sets back from the flow of people

gaining entry into the Capitol through the open doorway through which Defendant passed,

effectively being "around the corner."  The flow of people ran perpendicular to the line created

by the handful of people who appear to enter by means of the recessed window shrouded by

corner molding.  This is noted not because of its lack of relevance to the Defendant's pursuit of

pretrial release (indeed there is no relevance), but rather, is mentioned because of this Court's

apparent *sua-sponte* focus on same at the hearing of Defendant's Motion for Pretrial Release.

119.  Further pretrial detention of Defendant is not supported by any evidence, much less the

weight of the evidence.

120.  The foregoing forecloses any contention that pretrial release is anything but appropriate.

121.  Rhetorical bravado aside, the Government has zero basis to support any assertion the

Defendant is a flight risk, a danger to the community, or even that the Defendant was ever in his

life violent.

122.  If the Defendant had wanted to be violent, he wouldn't have rendered himself the most

readily identifiable January 6, 2021 attendee at the Capitol, he wouldn't have helped thwart a

theft, he would not have helped empty out the Capitol, he wouldn't have tried to recover property

stolen from law enforcement, he wouldn't have aligned himself with law enforcement, engaged

in supportive banter with law enforcement or admonished others to be respectful of law

enforcement.  And certainly, he would not have peacefully and promptly self-surrendered.

123.  In reviewing the FBI Reports of Interview provided by the Government <u>after</u> the hearing

of Defendant's Motion for Pretrial Release, it is clear (contrary to the Government's prior

assertion) that the Defendant was not threatening to go to the inauguration of President Biden.

Regardless, that transition has come and gone.

124.  The threat of a March 4, 2021 uprising has also come and gone.

125.  The Government is incapable of identifying or articulating a threat of any nature posed by Defendant.

126.  The record in the prior hearing giving rise to the March 8, 2021 Order of this Court was incomplete, and misrepresented.

127.  Since January 9, 2021, Defendant has been subjected to COVID-19 response protocol mandated solitary confinement for 22 plus hours per day, Defendant has been compelled to endure cruel and unusual punishment of a nature akin to the gulag of Solzhenitsyn fame.  The former President blanketly referred to those who appeared at the Capitol on January 6, 2021 as "special."  Chansley is indeed special.  The Government knows Chansley is special.

128.  This proclamation of Former President Trump may, to many, be the sole proclamation which they can embrace without apprehension.

129.  It appears the Government has abandoned the assertion the Defendant is a flight risk because his image without face paint is now universally recognized.

130.  The Government's job is to see justice done.  Defense counsel's job is to advocate for that justice on behalf of a client.  It is the Court's duty, regardless of the color(s) of the face of the Defendant, to follow the law and not prompt a record to support a predetermined fate of a special, vulnerable American.

131.  To date, the United States does not acknowledge having laws governing opinion or thought, and while to date the United States does not acknowledge having re-education prison camps ala Cambodia circa 1977, the resultant effect of confining its "special" citizens in solitude for 22 hours plus per day for an indefinite term is nothing short of a wholesale Khmer Rouge-like protocol designed to send a message that if you are special enough to believe and act with

reliance on the words and actions of your standing Commander-in-Chief, you deserve neither

compassion nor patience, but rather, deserve the fate of the forgotten.

132.  This Court is uniquely positioned to read aloud for the benefit of the Government, nay the

world, the words of late Soviet/Russian poet, Yevgeny Yevtushenko, in his work "Babi Yar."

". . . Wild grasses nestle over Babi Yar, the trees look sternly as if passing judgment.  Here,

silently, all screams, and hat in hand, I feel my hair changing shade to gray . . . "

WHEREFORE, Defendant prays this Honorable Court issue an Order granting Defendant

pretrial release subject to such terms and restrictions as the Court deems just and meet in the

circumstances.

Respectfully Submitted,

KODNER WATKINS


By:   ___/s/ Albert S. Watkins _____
        ALBERT S. WATKINS, LC DC #399625
        1200 South Big Bend Boulevard
        St. Louis, Missouri 63117
        Phone:  (314) 727-9111
        Facsimile:  (314) 727-9110
        E-Mail:  albertswatkins@kwklaw.net

## CERTIFICATE OF SERVICE

Signature above is also certification that on May 26, 2021, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court utilizing the CM/ECF system which will send notification of such filing to all parties of record.