# EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Case No. 21-cr-3 (RCL) |
| JACOB ANTHONY CHANSLEY, | |
| *Defendant.* | |

## MEMORANDUM OPINION

After defendant Jacob Anthony Chansley was arrested on charges stemming from his participation in the January 6, 2021 breach of the United States Capitol, a magistrate judge in the District of Arizona ordered him detained pending trial. ECF No. 11 at 1, 10–13. Defendant now asks this Court to vacate the magistrate judge's order of detention and release him as he awaits trial. ECF No. 12. After the government filed its opposition, ECF No. 17, and defendant replied, ECF No. 18, the Court held a hearing on defendant's motion.

Upon consideration of the parties' filings, ECF Nos. 7, 12, 17, 18, 23, the arguments set forth at the hearing, and the underlying record, the Court finds that no condition or combination of conditions of release will reasonably assure defendant's appearance as required or the safety of others and the community. *See* 18 U.S.C. § 3142(e)(1). Accordingly, the Court will **DENY** defendant's motion to revoke the magistrate judge's order of detention.

# I. BACKGROUND

## A. Factual Allegations

The government proffers the following evidence in support of its opposition to defendant's motion for pre-trial release. At approximately 1:00 pm on January 6, 2021, a joint session of Congress convened to certify the Electoral College vote count for the 2020 Presidential Election. ECF No. 7 at 2. As elected members of the U.S. Senate and House of Representatives met in separate chambers inside the U.S. Capitol building, a large crowd gathered outside. *Id.* U.S. Capitol Police Officers, as well as temporary and permanent security barriers, stood between the crowd and the Capitol. *Id.*

Between 1:00 and 2:00 pm, individuals from the crowd forced their way through the barricades and past Capitol Police officers, advancing to the exterior façade of the Capitol building. *Id.* As the mob approached the building, the joint session continued inside, with then-Vice President Mike Pence presiding in the Senate Chamber. *Id.* Despite the efforts of Capitol Police officers to prevent the crowd from entering the building, the mob forced its way past the officers and into the Capitol. *Id.* As the mob broke into the building, Congressional members and Vice President Pence were forced to evacuate. *Id.* at 2–3.

Defendant was one of the rioters who breached the Capitol building. *Id.* at 3. His actions that day were extensively photographed and recorded. *Id.* at 10; *see* ECF No. 17 at 3 (citing "A Reporter's Video from Inside the Capitol Siege," *The New Yorker* (Jan. 17, 2021), https://www.newyorker.com/news/video-dept/a-reporters-footage-from-inside-the-capitol-siege) (hereinafter "The New Yorker Footage"). Defendant's unmistakable outfit included a horned coyote-tail headdress; red, white, and blue face paint; gloves; and no shirt. ECF No. 7 at 3.

Defendant carried a six-foot pole with an American flag zip-tied to the shaft and a metal spearhead fixed to the top. *Id.* He also carried a bullhorn. *Id.*

As rioters smashed the glass windows of the Capitol building and began climbing inside, defendant entered the building through an adjacent doorway. ECF No. 23, Ex. 2 at 00:10–00:34.[1] Once inside, Capitol Police Officer Keith Robishaw attempted to calm the rioters and move people out of the area, but defendant used his bullhorn to encourage the crowd. ECF No. 7 at 3–4. Defendant then approached Officer Robishaw and screamed at him that "this was their house" and that "they were there to take the Capitol, and to get Congressional leaders." *Id.* at 3. When Officer Robishaw and other officers told the rioters to leave the area from the same way they had entered, most complied. *Id.* at 4. Defendant, however, disobeyed this order and instead began heading up a stairwell toward the Senate Chamber. *Id.*

Once inside the Senate Chamber, defendant began pounding his spear on the ground and screaming obscenities. ECF No. 17 at 3. Officer Robishaw, now in the Senate Chamber alone with the rioters, asked defendant to assist him by using his bullhorn to get the rioters out of the Chamber. *Id.* at 4. Instead of cooperating, however, defendant walked up to the Senate dais where Vice President Pence had been presiding minutes before. *Id.* Defendant announced that he was going to sit in Vice President Pence's chair because "Mike Pence is a fucking traitor." ECF No. 17 at 4. He then asked another rioter to photograph him. *Id.* at 5. While standing at the dais, defendant scrawled a note to Vice President Pence on a piece of paper sitting on the desk, reading, "ITS ONLY A MATTER OF TIME JUSTICE IS COMING!" *Id.* at 5. Defendant then turned to *The New Yorker* reporter filming inside the Senate Chamber and repeated his same message: "It's only a matter of time. Justice is coming." *Id.*

---

[1] Consistent with the protective order governing discovery in this matter, *see* ECF No. 24, Exhibits 1 and 2 to ECF No. 23 were made available to defense counsel and the Court.

After more rioters entered the Chamber, defendant led the crowd in what he described as a "prayer" over his bullhorn. The New Yorker Footage, *supra* at 08:02. "Thank you for allowing the United States of America to be reborn," he exclaimed. ECF No. 17 at 5. "Thank you for allowing us to get rid of the communists, the globalists, and the traitors within our government." *Id.*

**B. Defendant's Interviews and Arrest**

The following day, on January 7, 2021, defendant called the Federal Bureau of Investigation ("FBI") Washington field office and asked to speak with law enforcement. ECF No. 7 at 5. Defendant confessed that he was the person photographed standing at Vice President Pence's seat on the Senate dais, wearing face paint and a horned headdress. *Id.* at 5–6. He further explained that he entered the Capitol "by the grace of God" and said he was glad he sat in the Vice President's chair because Vice President Pence is a child-trafficking traitor. *Id.* at 6. Defendant stated that he did not intend for his note to Vice President Pence to be understood as a threat. *Id.* But he expressed his interest in returning to Washington, D.C. for the 46th Presidential Inauguration, telling the FBI: "I'll still go, you better believe it. For sure I'd want to be there, as a protestor, as a protestor, fuckin' a." *Id.* Later that day, in an interview with NBC News, defendant boasted about his involvement in the events on January 6th, saying, "[t]he fact that we had a bunch of our traitors in office hunker down, put on their gas masks and retreat into their underground bunker, I consider that a win." *Id.* at 6 (citing "Capitol Rioter in Horned Hat Gloats as Feds Work to Identify Suspects," *NBC News* (Jan. 7, 2021), https://www.nbcnews.com/news/us-news/capitol-rioter-horned-hat-gloats-feds-work-identify-suspects-n1253392).

On January 8, 2021, the government initiated this criminal matter by filing a sealed Complaint in this District. ECF No. 1. The Complaint charged defendant with knowingly entering or remaining in any restricted building or grounds without lawful authority in violation of

18 U.S.C. §§ 1752(a)(1) and (2) and with violent entry and disorderly conduct on Capitol grounds in violation of 40 U.S.C. §§ 5104(e)(2)(A) and (G). *Id.* The same day, U.S. Magistrate Judge G. Michael Harvey issued a warrant for defendant's arrest. ECF No. 2-4.

The next day, January 9, 2021, defendant drove to the FBI field office in Phoenix, Arizona to speak with authorities again. ECF No. 7 at 6. At this point, defendant had not yet learned of the warrant for his arrest or the criminal Complaint, as both documents were still sealed. *Id.* During that second interview, defendant twice told law enforcement that he had plans to drive to the Arizona State Capitol. *Id.* Corroborating those plans, law enforcement found the horned headdress, face paint, six-foot spear, and bullhorn in defendant's car, which was parked outside the FBI field office. *Id.* Defendant was then arrested at the Phoenix FBI office. *Id.*

### C. Procedural History

On January 11, 2021, defendant was indicted in this District. ECF No. 3. The Indictment charges defendant with civil disorder in violation of 18 U.S.C. § 231(a)(3) and obstructing an official proceeding in violation of 18 U.S.C. § 1512(c)(2), both of which are felonies. *Id.* at 1–2. It also charges defendant with four misdemeanors: entering and remaining in a restricted building in violation of 18 U.S.C. § 1752(a)(1), disorderly and disruptive conduct in a restricted building in violation of 18 U.S.C. § 1752(a)(2), violent entry and disorderly conduct in a Capitol building in violation of 40 U.S.C. § 5104(e)(2)(A), and parading, demonstrating, or picketing in a Capitol building in violation of 40 U.S.C. § 5104(e)(2)(G). *Id.* at 1–3.

The same day he was indicted, defendant had an initial appearance before U.S. Magistrate Judge Deborah M. Fine in the District of Arizona. ECF No. 11 at 8. The government sought defendant's pre-trial detention and, on January 15, 2021, Magistrate Judge Fine held a detention hearing. *United States v. Chansley*, 2:21-mj-05000-DMF, ECF No. 5; ECF No. 11 at 17. After

hearing argument from both sides, the magistrate judge found that no condition or combination of conditions would reasonably assure the appearance of the defendant as required or the safety of others and the community. ECF No. 11 at 10. Accordingly, she ordered defendant detained pending trial. *Id.* at 10. In support of the order of detention, Magistrate Judge Fine found:

> Despite Mr. Chansley's voluntary communications with federal investigators, the evidence before the Court confirms Mr. Chansley's motivations and capabilities to participate in similar unlawful acts while on pretrial release. Mr. Chansley broke through barricades, unlawfully entered the Capitol Building, disobeyed police orders to leave, refused a police request to quell the crowd using his bullhorn, and instead ran up onto the dais where Vice President Pence had been presiding just minutes before and scrawled a threatening note. Mr. Chansley's willingness to very publicly attempt to obstruct the official duties of the United States Congress certifying the vote count of the Electoral College makes clear his disregard for the importance of following orders during official proceedings such as the D.C. District Court case now charging him with serious crimes. Further, on Twitter in late November 2020, Mr. Chansley had previously promoted identifying and then hanging those he believes to be traitors within the United States government.

*Id.* at 11.

After defendant was transferred to the District of Columbia Central Detention Facility ("D.C. jail"), he submitted an inmate request form for a religious dietary accommodation based on his shamanistic faith. *See* ECF No. 8 at 1–2. He explained that he eats only organic food because of his faith. *Id.* Defendant refused to eat the food given to him while his request was pending, and the D.C. jail eventually denied his request. *Id.* After one week without food, defendant filed an "emergency motion for sustenance or, in the alternative, for pretrial release." ECF No. 6. The government opposed defendant's request for pre-trial release but took no position on his request for organic food. ECF No. 7. After holding a hearing, the Court granted defendant's motion for a religious dietary accommodation, finding that the D.C. jail's refusal to accommodate defendant's sincerely held religious beliefs violated the First Amendment. ECF No. 8 at 6–11. Because

defendant withdrew his alternative request for pre-trial release, the Court did not rule on it. *See id.* at 1. The next day, the D.C. jail represented that it was unable to comply with the Court's Order, so the U.S. Marshal transferred defendant to the Alexandria Detention Facility in Virginia. ECF No. 9.

Now, one month later, defendant again seeks pre-trial release. ECF No. 12. He argues that after Magistrate Judge Fine ordered him detained, "significant developments have occurred and a number of significant facts have come to light, all of which" now make pre-trial release appropriate. *Id.* at 7. Those developments, he argues, include the fact that President Biden was inaugurated and the fact that the COVID-19 pandemic has made it difficult for defense counsel and defendant to have unmonitored communications. *Id.* at 7–8. Alternatively, defendant asks to be temporarily released pursuant to 18 U.S.C. § 3142(i) for the "compelling" reasons that his faith precludes him from receiving a COVID-19 vaccination and that the pandemic has made it "impossible" for defense counsel and defendant to speak privately. *Id.* at 24.

The government opposes defendant's request for pre-trial release. ECF No. 17. It incorporates the arguments raised in its opposition, ECF No. 7, to defendant's "emergency motion for sustenance or, in the alternative, for pretrial release," and it further proffers details of the events on January 6th from a video captured inside the Capitol and published by *The New Yorker*. ECF No. 17 at 1, 4.

After defendant replied, ECF No. 18, the Court held a hearing on defendant's motion. During the hearing, defense counsel represented that defendant was welcomed into the Capitol by police officers. To refute this claim, the government referenced video footage of defendant that was in the government's possession but had not yet been disclosed to defendant. Accordingly, at the Court's direction, the government disclosed the video footage to defendant and the Court. *See*

ECF No. 23 (referencing Exhibits 1 and 2). Also during the hearing, the government referenced

an interview given by defendant and defense counsel to 60 Minutes+, which aired on March 4,

2021. The government provided the link to that interview in its sur-reply. ECF No. 23 (citing "60

Minutes+ | Series Premiere | Full Episode | Paramount+, *YouTube* (Mar. 4. 2021),

https://www.youtube.com/watch?v=osb7X6tAwpc) (hereinafter "60 Minutes+ Interview").

     Defendant's motion is now ripe for consideration.

## II. LEGAL STANDARDS

### A. Pre-Trial Detention Under the Bail Reform Act

     The Bail Reform Act, 18 U.S.C. § 3141 *et seq.*, authorizes the detention of defendants

awaiting trial on a federal offense only under certain, limited circumstances. 18 U.S.C. § 3142(f).

First, the government may seek a defendant's pre-trial detention if the charged offenses fall into

any of five enumerated categories. § 3142(f)(1). Those categories include:

> **(A)** a crime of violence,[2] a violation of section 1591, or an offense listed in section 2332b(g)(5)(B)[3] for which a maximum term of imprisonment of 10 years or more is prescribed,
>
> **(B)** an offense for which the maximum sentence is life imprisonment or death,
>
> **(C)** an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act . . . the Controlled Substances Import and Export Act . . . or [46 U.S.C. § 705],
>
> **(D)** any felony if [the person charged] has been convicted of two or more offenses described in [§§ 3142(f)(1)(A)–(C)], or two or more State or local offenses that would have been offenses described in

---

[2] The Bail Reform Act defines "crime of violence" as (A) "an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another," (B) "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense," or (C) "any felony under chapter 77, 109A, 110, or 117." 18 U.S.C. § 3156(a)(4).

[3] Section 2332b(g)(5)(B) lists offenses that become a "federal crime of terrorism" when the offense is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(B).

[§§ 3142(f)(1)(A)–(C)] if a circumstance giving rise to federal jurisdiction had existed, or a combination of such offenses, or

(E) any felony that is not otherwise a crime of violence that involves a minor victim or that involves the possession or use of a firearm or destructive device[4] . . . or any other dangerous weapon[.]

18 U.S.C. § 3142(f)(1)(A)–(E).

Second, the government may also seek detention—or the court may *sua sponte* hold a detention hearing to determine whether pre-trial detention is appropriate—if the case involves "a serious risk" that the defendant will flee or "will attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror." § 3142(f)(2).

If the Bail Reform Act authorizes pre-trial detention, the judicial officer must hold a hearing to determine whether there are conditions of release that would reasonably assure the appearance of the defendant as required and the safety of any other person and the community. § 3142(f). If the judicial officer finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the judicial officer *shall* order the person detained pending trial. § 3142(e)(1). A finding that no condition or combination of conditions would reasonably assure the safety of any other person and the community must be supported by clear and convincing evidence. § 3142(f). And a finding that no conditions would reasonably assure the defendant's appearance as required

---

[4] The Bail Reform Act defines "destructive device" as (A) "any explosive, incendiary, or poison gas, bomb, grenade, rocket having a propellant charge of more than four ounces, missile having an explosive or incendiary charge of more than one-quarter ounce, mine, or device similar to any of the devices in the preceding clauses," (B) "any type of weapon (other than a shotgun or a shotgun shell which the Attorney General finds is generally recognized as particularly suitable for sporting purposes) by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter," and (C) "any combination of parts either designed or intended for use in converting any device into any destructive device described in subparagraph (A) or (B) and from which a destructive device may be readily assembled." 18 U.S.C. § 921(a)(4).

must be supported by a preponderance of the evidence. *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996).

In two situations, the Bail Reform Act establishes a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of any other person and the community. § 3142(e). First, a rebuttable presumption arises if the judicial officer finds that (a) the person has been convicted of certain listed federal offenses, including a "crime of violence," or similar state offenses, (b) that offense was committed while the person was on release pending trial for another offense, and (c) not more than five years has elapsed since the date of conviction of that offense or the release from imprisonment, whichever is later. § 3142(e)(2). A rebuttable presumption also arises if the judicial officer finds probable cause to believe that the person committed any of five categories of enumerated offenses.[5] § 3142(e)(3).

If the case does *not* involve either of those circumstances, there is no rebuttable presumption of detention and the court instead must consider the following factors to determine whether there are conditions that would reasonably assure the defendant's appearance and the public's safety:

> **(1)** the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of Section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device
>
> **(2)** the weight of the evidence against the person
>
> **(3)** the history and characteristics of the person, including—
>
> > **(A)** the person's character, physical and mental condition, family ties, employment, financial resources, length of

---

[5] Those categories include, (A) "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act . . . the Controlled Substances Import and Export Act . . . or [46 U.S.C. § 705], (B) "an offense under [18 U.S.C. §§ 924(c), 956(a), 2332b], (C) "an offense listed in [18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed," (D) "an offense under [18 U.S.C. § 77] for which a maximum term of imprisonment of 20 years or more is prescribed," or (E) "an offense involving a minor victim" under certain enumerated sections of title 18. § 3142(e)(3).

residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings

**(B)** whether, at the time of the current offense of arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, state, or local law; and

**(4)** the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

§ 3142(g).

## B. Review of a Magistrate Judge's Order of Detention Under 18 U.S.C. § 3145(b)

If a magistrate judge orders a defendant detained, the defendant "may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). The motion shall be decided promptly. *Id.* The court having original jurisdiction of the offense reviews the magistrate judge's order of detention *de novo* as to issues of both law and fact. *United States v. Hunt*, 240 F. Supp. 3d 128, 132–33 (D.D.C. 2017); *United States v. Chrestman*, No. 21-MJ-218, 2021 WL 765662, *5–6 (D.D.C. Feb. 26, 2021).

## C. Temporary Release Under 18 U.S.C. § 3142(i)

In addition to seeking review of a detention order by the court having original jurisdiction of the offense under 18 U.S.C. § 3145(b), the Bail Reform Act also allows defendants ordered detained to move for temporary release under 18 U.S.C. § 3142(i). Section 3142 provides that after a judicial officer enters an order of detention, the officer "may by subsequent order, permit the temporary release of the [defendant], in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). A defendant moving under § 3142(i) bears the burden of showing that he is entitled to relief. *United States v. Riggins*, 456 F. Supp. 3d 138, 149 (D.D.C. 2020).

11

Before the COVID-19 pandemic, few courts had considered what amounts to "another compelling reason" necessitating release, as motions brought under § 3142(i) typically sought temporary release for the defendant's preparation of his defense. *See, e.g., United States v. Lee*, 451 F. Supp. 3d 1, 6 (D.D.C. 2020) (collecting cases). More recently, however, courts have confronted the argument that temporary release under § 3142(i) is necessary due to the conditions in detention facilities caused by the COVID-19 pandemic. *See, e.g., id.*; *Riggins*, 456 F. Supp. 3d at 149; *United States v. Otunyo*, No. 18-CR-251, 2020 WL 2065041, at *9 (D.D.C. Apr. 28, 2020); *United States v. Thomas*, 456 F. Supp. 3d 69, 72 (D.D.C. 2020); *United States v. Dhavale*, No. 19-MJ-92, 2020 WL 1935544, at *5–6 (D.D.C. Apr. 21, 2020). And while some courts have granted temporary release under § 3142(i) when the defendant has serious underlying health conditions that exacerbate the risk of severe illness or death from COVID-19, *see, e.g., Thomas*, 456 F. Supp. 3d at 78–79, courts recognize that the existence of COVID-19 alone does not present a "compelling reason" necessitating temporary release, *see, e.g., Dhavale*, 2020 WL 1935544, at *5–6; *Otunyo*, 2020 WL 2065041, at *9.

## III. DISCUSSION

### A. The Bail Reform Act Authorizes Defendant's Pre-Trial Detention

As a threshold matter, the Court must first determine whether the Bail Reform Act allows the government to seek pre-trial detention. *See* 18 U.S.C. § 3142(f). The government argues that defendant is subject to pre-trial detention under § 3142(f)(1)(E) because he carried a dangerous weapon (a six-foot spear) during the commission of the crimes charged. ECF No. 7 at 8. In response, defendant argues that he did not carry a "dangerous weapon" into the Capitol because the object he carried was not a six-foot "spear" but rather a "flagpole" with "a spear finial." ECF No. 12 at 13. The spear finial, he notes, is the "traditional Native American design." *Id.*

The Court agrees with the government that defendant is subject to pre-trial detention under § 3142(f)(1)(E).[6] Section 3142(f)(1)(E) allows the government to seek pre-trial detention in cases involving "any felony that is not otherwise a crime of violence that involves a minor victim or that involves the possession or use of a firearm or destructive device . . . or any other dangerous weapon." Defendant was charged with two felonies: civil disorder in violation of 18 U.S.C. § 231(a)(3) and obstruction of an official proceeding in violation of 18 U.S.C. § 1752(a)(1). ECF No. 3 at 1–2. As both parties agree, neither of these felonies is a "crime of violence" as defined by the Bail Reform Act. *See* ECF No. 12 at 18; ECF No. 17 at 2 n.2; *see also* 18 U.S.C. § 3156(a)(4) (defining "crime of violence").

The only issue to be decided, then, is whether a six-foot pole with a metal spearhead fixed to the top constitutes "any other dangerous weapon." § 3142(f)(1)(E). The Bail Reform Act does not define the term "dangerous weapon," nor is the Court aware of any case in this Circuit or any other that defines "dangerous weapon" as used in the Bail Reform Act. The same term is, however, used in functionally analogous contexts elsewhere in Title 18 of the U.S. Code, such as the federal assault statutes: 18 U.S.C. §§ 111 and 113. Section 111(b) criminalizes assault of a federal officer using a "deadly or dangerous weapon." 18 U.S.C. § 111(b). And Section § 113(a)(3) punishes assault "with a dangerous weapon" when committed within the special maritime and territorial jurisdiction of the United States. § 113(a)(3).

As used in Sections 111 and 113, courts have consistently defined "dangerous weapon" as an object that is either inherently dangerous or is used in a way that is likely to endanger life or inflict great bodily harm. *See United States v. Anchrum*, 590 F.3d 795, 802 (9th Cir. 2009); *United*

---

[6] Because the Court finds that defendant is subject to pre-trial detention under § 3142(f)(1)(E) of the Bail Reform Act, it need not consider the government's alternative argument that defendant is also subject to detention under §§ 3142(f)(2)(A) and (f)(2)(B). *See* ECF No. 7 at 8–9.

*States v. Smith*, 561 F.3d 934, 939 (9th Cir. 2009) (en banc); *United States v. Sturgis*, 48 F.3d 784, 787–88 (4th Cir. 1995); *United States v. Gibson*, 896 F.2d 206, 210 & n.1 (6th Cir. 1990); *United States v. Guilbert*, 692 F.2d 1340, 1343 (11th Cir. 1982) (per curiam). "Inherently dangerous" weapons are those that are "obviously dangerous" such as "guns, knives, and the like." *Smith*, 561 F.3d at 939 (quoting *United States v. Riggins*, 40 F.3d 1055, 1057 (9th Cir. 1994)). Conversely, "objects that have perfectly peaceful purposes may be turned into dangerous weapons" when used in a manner likely to cause bodily harm. *United States v. Rocha*, 598 F.3d 1144, 1154 (9th Cir. 2010).

Under this definition, the Court finds that a six-foot pole with a metal spearhead fixed to the top is, undoubtedly, a dangerous weapon. Like a knife, it is inherently dangerous. Both objects have a sharpened point designed to inflict harm by piercing or puncturing. Moreover, a spear can inflict those puncturing and stabbing wounds at a distance, making it even more effective as an offensive weapon than a knife. Thus, because defendant's six-foot spear is inherently dangerous, it does not matter whether defendant *actually used it* to cause bodily harm while inside the Capitol. *See Smith*, 561 F.3d at 939.

Defendant's attempt to downplay the dangerousness of the spear by characterizing it as a "flagpole" with "a spear finial" is unpersuasive. ECF No. 12 at 14. No matter the word one uses to describe the object defendant carried, defendant cannot escape the fact that he carried a six-foot pole with an approximately six-inch, sharp, metal object fastened to the top. *See* ECF No. 17 at 3. And whether the sharpened metal point is referred to as a "spear" or "a traditional Native American design," it is still, like a knife, inherently dangerous. ECF No. 12 at 13.

Perhaps most meritless of all is defendant's argument that the spear is not a "dangerous weapon" because state flags with "spear finials" are "universally displayed in easily accessible

public locations in all Federal Buildings." *Id.* This fact, he argues, "give[s] rise to the inevitable conclusion that the Government must not be too concerned that a member of the public will use the flagpole with an eagle or spear finial as a weapon, otherwise they would not employ [them] across the country in Federal Government Buildings." *Id.* at 13–14. Yet whether or not an object is a dangerous weapon, of course, does not turn on its availability within government buildings. By defendant's logic, knives would not be considered dangerous weapons due to their availability in government building cafeterias. The Court declines to adopt defendant's "readily-available-in-government-buildings" standard for determining whether an object is a "dangerous weapon" under the Bail Reform Act.

In sum, the Court finds that because this case involves a "felony that is not otherwise a crime of violence . . . that involves the possession . . . of . . . any other dangerous weapon," the government may seek defendant's pre-trial detention under 18 U.S.C. § 3142(f)(1)(E). When a defendant is subject to pre-trial detention, as defendant is here, the Bail Reform Act provides that the Court must order defendant detained pending trial if, after a hearing, it finds that "no condition or combination of conditions will reasonably assure the appearance of [defendant] as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). In the sections that follow, the Court will address defendant's dangerousness and risk of flight. Ultimately, it concludes that no condition or combination of conditions could reasonably achieve either objective.

**B. The Court Finds, by Clear and Convincing Evidence, that No Condition or Combination of Conditions Will Reasonably Assure the Safety of Other Persons and the Community**

The Bail Reform Act does not establish a rebuttable presumption of detention in this case. *See* 18 U.S.C. § 3142(e)(2)–(3). Accordingly, to determine whether any condition or combination

of conditions will reasonably assure the safety of others and the community, the Court must consider available information concerning four subjects set forth in 18 U.S.C. § 3142(g). Those subjects include the nature and circumstances of the offenses charged, the weight of the evidence against defendant, defendant's history and characteristics, and the nature and seriousness of the danger to any person or the community that would be posed by defendant's release. § 3142(g)(1)–(4). The Court will address each in turn.

     i.    <u>Nature and Circumstances of the Offenses Charged</u>

The first factor to consider under § 3142(g) is "the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1951, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device." 18 U.S.C. § 3142(g)(1). Though defendant was not charged with any of the offenses listed in § 3142(g)(1), defendant's conduct on and after January 6th indicates his willingness to resort to violence to undermine the legitimate functions of the United States government. Furthermore, defendant's refusal to obey orders from law enforcement while inside the Capitol building indicates that he would not comply with conditions of release imposed to keep the public safe.

     a.  *Defendant's Actions and Statements Evince a Willingness to Resort to Violence to Halt the Legitimate Functions of the United States Government*

On January 6, 2021, defendant publicly and proudly displayed his intent to disrupt the legitimate functions of our government. Most troubling of all, however, is the fact that defendant's actions and statements on and leading up to January 6th indicate his willingness to halt those functions by means of violence. Defendant entered the Capitol building carrying a six-foot pole with a metal spearhead fixed to the top. ECF No. 17 at 3. Once inside, he disobeyed orders from Capitol Police Officer Robishaw to leave the building and encouraged other rioters by yelling

through his bullhorn. ECF No. 7 at 3–4. Eventually, he made his way into the Senate Chamber, where he banged his spear on the ground, screamed obscenities, and refused to let Officer Robishaw use his bullhorn to get rioters out of the Chamber. ECF No. 7 at 4; ECF No. 17 at 3–5. Defendant then walked up to the dais, asked another rioter to photograph him, and sat in the Vice President's chair. ECF No. 17 at 4. Defendant, like every other person in this country, has the right to assemble and to peacefully protest. What he cannot do, however, is storm into the Capitol building during a joint session of Congress to stop Congress from certifying the results of a lawful election.

Shedding light on defendant's actions, and distinguishing him from many others present that day, are the statements defendant made leading up to and on January 6th. Before the Court considers those statements, however, it must first confront an objection defendant raises to doing so: that considering his statements when deciding whether to detain him pending trial would violate his First Amendment right to free expression. ECF No. 12 at 20–21; ECF No. 18 at 8.

Defendant is mistaken. While caselaw suggests that "mere advocacy" alone is insufficient for a finding of dangerousness, *Leary v. United States*, 431 F.2d 85, 91 (5th Cir. 1970), the Supreme Court has explicitly held that courts *may* consider otherwise-protected speech to establish a defendant's motive or intent during the commission of some other unlawful conduct. *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) (holding that the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent"). So whether defendant's speech *itself* was criminal is an issue the Court need not decide today. For even if his statements were themselves protected, the First Amendment does not prohibit their consideration as evidence of motive or intent. Indeed, consistent with that principle, courts often consider a defendant's statements as evidence of motive or intent when deciding whether he should

be detained pending trial. *See, e.g.*, *United States v. Daniels*, No. 18-CR-5, 2018 WL 620537, at *6 (N.D. Tex. Jan. 30, 2018); *United States v. Ervin*, 818 F. Supp. 2d 1314, 1317–18 (M.D. Ala. 2011); *United States v. Mehanna*, 669 F. Supp. 2d 160, 165 (D. Mass. 2009); *United States v. Reiner*, 468 F. Supp. 2d 393, 399 (E.D.N.Y. 2006).

Here, defendant's statements on and before January 6th show that, over time, defendant cultivated an intent to halt the legitimate functions of the United States government and a willingness to resort to violence to do so. In November 2020, defendant made statements on Twitter promoting "identifying and then hanging those he believes to be traitors within the United States government." ECF No. 11 at 11. Once inside the Capitol, he screamed at Officer Robishaw that the rioters were there to "get Congressional leaders." ECF No. 7 at 4. After defendant made his way into the Senate Chamber, he announced that Vice President Mike Pence is a "fucking traitor" and left a note for the Vice President on the Senate dais reading, "ITS ONLY A MATTER OF TIME JUSTICE IS COMING!" *Id.* at 4–5. Defendant then thanked God for "allowing us to get rid of the communists, the globalists, and the traitors within our government." ECF No. 17 at 5. These statements cast a shadow in both directions. They show that defendant entered the Capitol building on January 6th not to ponder Statuary Hall, but with an intent to disrupt the functions of our government by means of force. They also illustrate the types of future conduct defendant may engage in should he be released pending trial.

At the hearing and in his briefs, defendant characterizes himself as a peaceful person who was welcomed into the Capitol building on January 6th by police officers. The Court finds none of his many attempts to manipulate the evidence and minimize the seriousness of his actions persuasive. First, defendant argues that the note he left for Vice President Pence was not meant to be a threat. ECF No. 12 at 16. In support of this argument, he points to video footage of him writing

the note, which he says shows "the caution employed . . . to make sure that he replaced the writing utensil utilized to write the note carefully back into the holder from which it had been originally garnered." *Id.* Additionally, he argues, the words written simply mirrored statements made earlier that day by President Trump. *Id.*

Defendant's focus on this minutia does not change the Court's view of the overall tenor of his statements both before and during the assault on the Capitol. Long before January 6th, defendant publicly promoted the hanging of those he believed to be "traitors" in the United States government. ECF No. 11 at 11. Defendant's views on that subject did not dissipate with time. For after he breached the Senate Chamber, defendant announced that he would sit in the Vice President's chair because Vice President Pence is a "fucking traitor." ECF No. 17 at 4. Then, he left a note to Vice President Pence saying, "ITS ONLY A MATTER OF TIME JUSTICE IS COMING!" *Id.* at 5. Reading that note in the context of defendant's earlier promotion of the execution of "traitors" invalidates the notion that defendant breached the Capitol merely to leave peaceful, political commentary on the Senate dais.

Second, defendant argues that "but for the actions and words" of former President Trump, he would not have entered the Capitol building. ECF No. 12 at 10. He claims that he merely "heeded the invitation" of President Trump to "walk down Pennsylvania Avenue and go to the Capitol." *Id.* at 11. To substantiate this claim, defendant points to former President Trump's impeachment trial. *See id.* at 11–13. The Court need not question the sincerity of this claim. Even taking defendant's claim at face value, it does not persuade the Court that defendant would not pose a danger to others if released. If defendant truly believes that the only reason he participated in an assault on the U.S. Capitol was to comply with President Trump's orders, this shows defendant's inability (or refusal) to exercise his independent judgment and conform his behavior

to the law. These are not the qualities of a person who can be trusted on conditional release. Moreover, the fact that defendant attributes his actions on January 6th to President Trump does little to persuade the Court that defendant will not act in the same or similar ways again. In fact, in his interview with 60 Minutes+, defendant stated that he does not regret his loyalty to former President Trump. 60 Minutes+ Interview, *supra* at 12:50–12:54.

For the same reasons, the Court finds unpersuasive defendant's argument that he should be credited because he "admonished others to go home when Trump finally tweeted that it was time to go home." ECF No. 18 at 7. Tellingly, defendant decided it was time to leave not because of the violence and destruction that took place, but because President Trump told him to. Again, defendant refused to exercise his independent judgment in assessing the situation. The fact that defendant left the building only once President Trump told him to—after ignoring the same pleas from Capitol Police Officer Robishaw—further illustrates defendant's disrespect for law enforcement.

Third, defendant argues that he "did not have any specific plan to travel to or enter into the Capitol." *Id.* at 20. Evidence in the record, however, belies the claim that the events of January 6th happened on a whim. As Magistrate Judge Fine noted in her findings of fact, defendant made statements on Twitter in November 2020 promoting the "identifying and then hanging those he believes to be traitors within the United States government." ECF No. 11 at 11. And as defendant himself acknowledged in one of the public statements made since his arrest, "[t]here is a lot that happened over time which led up to January 6, 2021." ECF No. 12 at 11. The Court thus finds incredible defendant's claim that he had no plans to travel to or enter the Capitol.

Fourth, the fact that the 46th Presidential Inauguration has already occurred does not persuade the Court that defendant no longer poses a danger to other persons and the community.

*See* ECF No. 12 at 7. The statements defendant has made to the public from jail show that defendant does not fully appreciate the severity of the allegations against him. To the contrary, he believes that *he*—not the American people or members of Congress—was the victim on January 6th. *See* ECF No. 12 at 11. In his public statement made on February 8, 2021, defendant stated, "[p]ease be patient with me and other peaceful people who, like me, are having a very difficult time piecing together all that *happened to us*, around us, and by us." *Id.* (emphasis added).

Defendant's perception of his actions on January 6th as peaceful, benign, and well-intentioned shows a detachment from reality. *See* 60 Minutes+ Interview, *supra* at 04:21–4:25 ("I was peaceful. I was civil. I was calm. I said a prayer and I sang a song."); ECF No. 12 at 11 ("Please be patient with me and other peaceful people . . . ."). When asked to characterize his actions on January 6th during the 60 Minutes+ interview, defendant stated, "[w]ell, I sang a song, and that's a part of shamanism. It's about creating positive vibrations in a sacred chamber." 60 Minutes+ Interview, *supra* at 00:24–00:40. And though defendant expressed remorse about going inside the Capitol building on January 6th, *see* ECF No. 12 at 11, defendant was not charged with simple trespass. In addition to being charged with entering and remaining in a restricted building, defendant was also charged with civil disorder, obstructing an official proceeding, disorderly and disruptive conduct in a restricted building, violent entry and disorderly conduct in a Capitol building, and parading, demonstrating, or picketing in a Capitol building. ECF No. 3 at 1–3. If defendant does not understand the severity of the allegations against him, the Court finds no reason to believe he would not commit the same or similar actions again.

Finally, defendant claims that by the time he arrived at the Capitol, he "casually" walked up the steps "among a crowd of similarly peaceful people" toward the entrance as he passed police officers who told him, "the building is yours." ECF No. 18 at 4. In support of this claim, defendant

submits a seventeen-second YouTube clip. *Id.* (citing Unlisted Video, *YouTube* (Jan. 14, 2021), https://www.youtube.com/watch?v=BxVSFagSMGM&t) (hereinafter "Unlisted Video"). The clip shows officers wearing black body armor walking down steps through a path cleared by a large group of civilians. Unlisted Video, *supra* at 00:00–00:13. Defendant—wearing his red, white, and blue face paint and horned headdress—appears on the steps among the crowd. An unidentified speaker standing behind the camera then says, "We have the building. They're withdrawing. There's nobody else inside." *Id.* Another unidentified speaker standing outside the view of the video responds to the first speaker: "What do you mean there's nobody else inside?" *Id.* The first speaker replies, "We just extracted. This is the cops. The building is yours," and motions with his hand up the steps. *Id.*

This piece of evidence has two flaws. First, defendant submits this clip as evidence that he was welcomed into the building by Capitol Police officers. But as discussed at the hearing, it is deeply unclear from the video who stated, "the building is yours." Without this information, the Court certainly cannot construe this statement as an invitation from police officers to enter the building. Second, we do not know at what point during the siege the video was taken. This is problematic. If rioters had already breached the Capitol, the officers walking down the stairs may have been *forced* out of the building. So the statement "the building is yours" may have been factually accurate—rioters were indeed in control of the building—but hardly an endorsement by officers of their breach. At the hearing, the Court raised these issues with defense counsel and asked him to explain why he believed the video showed police officers inviting defendant in. Defense counsel responded, candidly, that he believed the video to corroborate defendant's claim because the media had portrayed the video that way. As defense counsel should be well aware,

relying on the media's interpretation of evidence to substantiate a claim will not suffice in a court of law.

Not only is defendant unable to offer evidence substantiating his claim that he was waved into the Capitol, but evidence submitted by the government proves this claim false. A video submitted by the government captures rioters breaking through the windows of the Capitol building. ECF No. 23, Ex. 2 at 00:10–00:25. At the same moment that rioters smash the glass and crawl through the windows, the video pans over to show a large group of rioters walking through an adjacent doorway into the Capitol building. *Id.* at 00:24–00:30. Included in that group is defendant, who is easily identifiable by his horned headdress. *Id.* at 00:26–00:34. The government's video shows that defendant blatantly lied during his interview with 60 Minutes+ when he said that police officers waved him into the building. 60 Minutes+ Interview, *supra* at 05:07–05:08. Further, this video confirms that defendant did not, as defense counsel claims, enter the building "contemporaneously with the exiting by Capitol Police." ECF No. 12 at 16. Nor did he enter, as defense counsel represents, in the "third wave" of the breach. To the contrary, he quite literally spearheaded it.

In sum, defendant has evinced an intent to disrupt the legitimate functions of the United States government and a willingness to resort to violence to do so. This intent indicates that ordering defendant released pending trial would pose a danger to the public.

> b. *Defendant's Statements and Actions on January 6th Show That He Will Not Comply with Court-Ordered Conditions of Release*

Not only do the circumstances of the crimes charged indicate that defendant poses a risk to public safety, but defendant's actions also show that he will not comply with Court-ordered conditions of release. Defendant's conduct inside the Capitol building on January 6th demonstrates his willingness to openly and publicly flout orders from law enforcement. When Officer Robishaw

attempted to calm the crowd inside the Capitol building, defendant used his bullhorn to encourage other rioters. ECF No. 7 at 3–4. And when Officer Robishaw asked the rioters to leave the building, defendant disobeyed this order and instead headed up a stairwell toward the Senate Chamber. *Id.* at 3. Once inside the Senate Chamber, defendant refused to cooperate when Officer Robishaw asked to use his bullhorn to get the rioters out of the Chamber. *Id.* at 4. Based on this conduct, the Court has no faith that defendant would comply with conditions of release, such as a curfew or an ankle monitor.[7]

 ii. <u>Weight of the Evidence</u>

 Furthermore, the evidence that defendant carried a dangerous weapon, disobeyed law enforcement officers, and obstructed lawful government proceedings is not weak or ambiguous. To the contrary, defendant's conduct on January 6th was extensively documented, making him one of the most well-known rioters present that day. *See* ECF No. 17 at 3–5. So not only does the evidence against defendant paint a picture of an individual willing to resort to violence to stop the legitimate functions of our government, but that evidence is voluminous and strong.

 Defendant does not challenge the overwhelming weight of the evidence against him. Instead, he attempts to counterbalance that evidence by raising the defense of "estoppel by entrapment." ECF No. 12 at 21. Specifically, defendant argues that because he felt that he was answering the call of President Trump and acting in reliance on President Trump's statements, prosecuting him for his actions on January 6th would violate the Due Process Clause. *Id.* (citing

---

[7] In the 60 Minutes+ Interview, defendant says that he was "escorted" into the Senate Chamber. 60 Minutes+ Interview, *supra* at 5:09–5:15. It is true that video footage shows defendant walking into the Chamber in front of a Capitol Police officer. *See* New Yorker Footage, *supra* at 6:17–6:24. But everything captured on the video after defendant's entrance undercuts that claim. While inside the Senate Chamber, Officer Robishaw repeatedly asked defendant and other rioters present to leave the area. *Id.* at 6:40–6:43, 7:27–7:29. And though Officer Robishaw did so in a polite tone while inside the Chamber, it is clear from the video that the officer was vastly outnumbered. *See id.* at 7:17–7:23.

*Cox v. Louisiana*, 379 U.S. 536 (1965); *Raley v. Ohio*, 360 U.S. 423 (1959)). The Court need not dwell on defendant's invocation of the estoppel-by-entrapment defense. The same argument was raised and rejected in another case involving a participant in the January 6th events, and the Court adopts the reasons for rejecting that argument set forth there by Chief Judge Beryl Howell. *See Chrestman*, 2021 WL 765662, at *11–14.

### iii.   History and Characteristics of the Defendant

Next, defendant's history and characteristics further indicate that no condition or combination of conditions would reasonably assure the safety of any other person and the community. Though defendant has no criminal history, the Court finds his blatant disregard for the law on January 6th to be a telling indicator of how defendant would act if released pending trial. Not only did defendant have the audacity to enter the U.S. Capitol during a joint session of Congress, disrupt the certification of the Electoral College vote, and walk into the Senate Chamber, but he did so with full knowledge that he was being captured on film. *See,* e.g., ECF No. 17 at 5. In fact, he even asked another rioter in the Senate Chamber to photograph him on the dais. *Id.* These are not the actions of a person who is shy about breaking the law. And, as explained in detail above, defendant's statements after January 6th indicate that does not fully appreciate the severity of the charges brought against him.

Furthermore, defendant's history of drug use and his willingness to lie about that drug use are yet more examples of defendant's willingness to openly break the law. *United States v. Chansley*, 2:21-mj-05000-DMF, ECF No. 5 at 9. A pre-trial services report prepared in the District of Arizona reported that defendant smokes marijuana three times per week. *Id.* And though defendant told pre-trial services that he does not use any other drugs, defendant has openly stated on his podcast that he uses psychoactive substances and mushrooms as part of his shamanistic

practice. *Id.* Thus, despite having no criminal record, defendant's actions on January 6th were not the first time he broke federal law and publicly displayed his remorseless for having done so.

Defendant argues that he should be credited for contacting law enforcement officers as soon as he became aware of their interest in him. ECF No. 12 at 19. His willingness to speak to law enforcement officers, however, does not persuade the Court that he appreciates the gravity of the allegations against him or that he will not break the law again. Defendant's statements to law enforcement officers and NBC News before his arrest indicate that he did not believe he did anything wrong. *See* ECF No. 7 at 6. In fact, defendant told the officers that he would go back to Washington, D.C. if he had the chance. *Id.* He also said that he had plans to go to the Arizona State Capitol. *Id.* These statements are not those of a person who turned himself in after acknowledging his own guilt.

Furthermore, defendant did not "peacefully surrender himself to authorities upon request," as he says he did. ECF No. 12 at 19. Defendant seeks to portray his trip to the FBI office in Phoenix, Arizona as evidence of his willingness to submit to lawful authority. However, at the time defendant arrived at the Phoenix field office in for his second interview, the criminal complaint and arrest warrant were still sealed. ECF No. 7 at 6. So not only did defendant believe that he had done nothing wrong when he arrived at the field office that day, but he also was unaware of the warrant issued for his arrest. Therefore, defendant did not self-surrender. Instead, he merely visited the FBI office for an interview and happened to be arrested while there because of the outstanding warrant. The Court thus finds that defendant's interactions with law enforcement in the days leading up to his arrest do not indicate cooperation warranting pre-trial release.[8]

---

[8] Defendant also explains that he offered to speak at President Trump's impeachment trial. ECF No. 12 at 10, 12. Apparently, defense counsel would like the Court to infer from this offer that defendant is no longer under President Trump's spell. There are two problems with this inference. First, defendant was not actually called as a witness, so the Court is unable to consider this hypothetical testimony as it pertains to his flight

iv.   Nature and Seriousness of the Danger Posed to the Community by Defendant's
       Release

The nature and seriousness of the danger posed by defendant's release also weigh in favor

of pre-trial detention. The Court cannot overstate the gravity of defendant's conduct on January

6th. Were defendant released pending trial, he would have the opportunity to again attempt to

disrupt the United States government or harm members of Congress. Moreover, defendant's

release would allow him to plan with others who might be willing to engage in these acts. Given

the nature of this risk, the Court finds that ordering defendant to remain on home confinement

would not sufficiently protect the public. And though the Court could also order that defendant is

prohibited from communicating with others via telephone or the Internet, the Court is not

persuaded that defendant would comply with this condition. In support of this finding, the Court

relies on defendant's alleged refusal to follow directives from law enforcement officers once inside

the Capitol building. His flagrant disrespect for law enforcement indicates that he would not adhere

to conditions imposed by this Court.

For these reasons, the Court finds by clear and convincing evidence that no condition or

combination of conditions of release could reasonably assure the safety of other persons and the

community. *See* 18 U.S.C. § 3142(e)(1).

**C. The Court Finds, by a Preponderance of the Evidence, that No Condition or
Combination of Conditions Will Reasonably Assure Defendant's Appearance as
Required**

Next, the Court must determine whether any condition or combination of conditions would

reasonably assure defendant's appearance as required. 18 U.S.C. § 3142(e)(1). Again, the Court

must consider the circumstances set forth in § 3142(g) to make this finding. Based on the gravity

---

risk. Second, the notion that defendant is no longer beholden to President Trump is undercut by defendant's
statement on 60 Minutes+ that he does not regret his loyalty to the former President. 60 Minutes+ Interview,
*supra* at 12:52–12:56.

of the conduct leading to the crimes charged, the weight of the evidence against defendant, defendant's ties to the group "QAnon," and the lack of an appropriate custodian, the Court finds by a preponderance of the evidence that no conditions of release would mitigate the risk of flight.

i.    Nature and Circumstances of the Offense Charged

Defendant faces serious penalties if convicted of the offenses charged. The first of defendant's two felony charges, civil disorder in violation of 18 U.S.C. § 231(a)(3), carries a maximum sentence of five years' imprisonment. *See* 18 U.S.C. § 231(a)(3). The second felony charged, obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2), carries a maximum sentence of twenty years' imprisonment. *See* 18 U.S.C. § 1512(c)(2). Though defendant represents that he does not have any prior criminal history (save a speeding ticket on his drive home from the Capitol) convictions for the charged offenses could nevertheless result in a substantial term of imprisonment. *See* ECF No. 12 at 14 & n.1. This fact weighs in favor of pre-trial detention.

ii.    Weight of the Evidence

The strong weight of the evidence against defendant also increases the risk that he will flee. As explained above, defendant's actions inside the Capitol were photographed and captured on video. *See, e.g.*, ECF No. 17 at 3–5. Defendant has also admitted, both to law enforcement and in public statements, that he was the individual wearing the horned headdress and face paint inside the Capitol on January 6th. ECF No. 7 at 5–6; ECF No. 12 at 11. The overwhelming weight of the evidence may further prompt defendant to flee and thus weighs in favor of pre-trial detention.

iii.    History and Characteristics of the Defendant

Next, defendant's history and characteristics further suggest that no conditions can mitigate the risk that defendant will flee. At the detention hearing before Magistrate Judge Fine, the

government proffered evidence indicating that defendant is a leader and mascot of "QAnon," a group that preaches conspiracy theories and has become widely publicized in recent months. *United States v. Chansley*, 2:21-mj-05000-DMF, ECF No. 5 at 9. Given his prominent position in this group, the government argued, defendant is able to "quickly raise large sums of money for travel through non-traditional sources." *Id.* Indeed, defendant has previously "demonstrated an ability to travel long distances using untraceable methods." *Id.* Despite being unemployed and having no known source of income, defendant has traveled across the country to attend protests. ECF No. 11 at 12.

In response, defendant argues that he is not a flight risk because he has resided in Phoenix, Arizona his entire life, lives with his mother, does not travel internationally (except for during his service with the U.S. military), does not have a passport, and does not have a criminal history. ECF No. 12 at 14. The facts that he has lived in one place his entire life, does not travel internationally, and does not have a passport do not persuade the Court that defendant would not abscond somewhere inside the United States. As for defendant's lack of a criminal record, the Court finds that the seriousness of the allegations against him and the video footage of defendant's actions on January 6th reveal defendant's current state of mind and willingness to break the law. Finally, defendant's plan to return to his mother's house would not mitigate his risk of flight. In the March 4, 2021 interview with 60 Minutes+, defendant's mother repeatedly stated that her son did nothing wrong on January 6th. 60 Minutes+ Interview, *supra* at 13:23–13:40, 17:40–17:52. Instead, she said, her son merely "walked through open doors" and was "escorted into the Senate." *Id.* Defendant's mother further stated that she believes defendant to be "innocently sitting in a prison cell." *Id.* at 17:44. The Court is not persuaded that defendant's mother will ensure his compliance with any conditions of release imposed, and defendant identifies no other custodian.

Finally, defendant also argues that he is not a risk of flight because he is a "man of Shamanic faith," has written and self-published two books, "has zero interest in dealing with and addressing all matters political," is an "artist," "wishes to continue his longstanding effort to support abused children," has "created on-line classes on the Shamanic faith," and "wishes to focus his energies and efforts on strengthening his commitment to his faith and the principle of Ahimsa, [i.e.,] being one which promotes living a life which does no harm to any living being, regardless of its size or complexity." ECF No. 12 at 14–15. Though possibly relevant at sentencing, these arguments about defendant's faith, aspirations, and interests are irrelevant to the question of whether any conditions will reasonably assure defendant's appearance as required.

In sum, the Court finds by a preponderance of the evidence that no condition or combination of conditions will reasonably assure defendant's appearance as required. *See Xulam*, 84 F.3d at 442.

### D. Defendant Has Not Shown a "Compelling Reason" Necessitating Temporary Release Under 18 U.S.C. § 3142(i)

In addition to his motion to vacate Magistrate Fine's order of detention, defendant seeks the alternative relief of temporary release under 18 U.S.C. § 3142(i). ECF No. 12 at 24. Section 3142(i) provides that after issuing an order of detention:

> The judicial officer may, by subsequent order, permit the temporary release of the [defendant], in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason.

18 U.S.C. § 3142(i).

As explained above, a defendant moving under § 3142(i) bears the burden of showing that his temporary release is "necessary" for some "compelling reason." *Id.*; *Riggins*, 456 F. Supp. 3d at 149. Here, defendant says that his temporary release is necessary because his faith precludes

him from receiving a COVID-19 vaccination and because COVID-19 has rendered "meaningful" and "unmonitored" communications between defendant and defense counsel "impossible." ECF No. 12 at 24.

To put it plainly, defendant's religious objection to the COVID-19 vaccine is not a relevant reason, let alone a "compelling reason," to grant his temporary release. § 3142(i). Some courts have granted temporary release under § 3142(i) in rare cases when the defendant has serious underlying health conditions that exacerbate the risk of severe illness or death from COVID-19. *See, e.g., Thomas*, 456 F. Supp. 3d at 78–79. By contrast, defendant candidly states that he is "not in a position to honestly represent to the Court that he [has] an underlying medical condition which makes him especially vulnerable to the virus." ECF No. 12 at 24. The fact that defendant will not accept a vaccination (should one even become available to him while he is detained) does not make him any more vulnerable than he is right now.

Last but not least, the Court must address what surely must be the most remarkable assertion in defendant's briefing: that temporary release is "necessary" because defense counsel is currently unable to privately communicate with his client. ECF No. 12 at 24. As defense counsel puts it, the COVID-19 pandemic has made "meaningful unmonitored protracted periods of consultation" with his client "impossible." *Id.* To the contrary, just a few days ago, defense counsel conducted a lengthy videoconference with his client. That meeting, however, was not used to discuss legal strategy but instead was used to conduct an interview with 60 Minutes+, a national news media outlet.

The interview begins with only the defendant and defense counsel visible on the screen. 60 Minutes+ Interview, *supra* at 3:16–3:19. Defense counsel then asks defendant, "You're in a room alone?" to which defendant, speaking from the Alexandria jail, responds "yes." *Id.* at 3:26.

"And the door is closed?" counsel asks. *Id.* at 3:28. Defendant responds, "it is." *Id.* at 3:29. "This is Laurie," defense counsel says, as the 60 Minutes+ reporter enters the field of view of the camera capturing defense counsel. *Id.* at 3:31. From there, defendant and defense counsel spoke at length to the 60 Minutes+ reporter about the events on January 6th.

The issue, then, is not that defense counsel cannot confidentially communicate with his client. The issue is that when defense counsel *is* able to speak with his client, he squanders the opportunity for private conversations, preferring instead to conduct a public interview. Such media appearances are undoubtedly conducive to defense counsel's fame. But they are not at all conducive to an argument that the only way defense counsel could privately communicate with his client is if defendant were temporarily released. Given defense counsel's decision to use what could have been a confidential videoconference on a media publicity stunt, that argument is so frivolous as to insult the Court's intelligence. For these reasons, the Court finds that defendant has not met his burden of establishing a "compelling reason" necessitating his temporary release. 18 U.S.C. § 3142(i).

## IV. CONCLUSION

For the reasons explained above, the Court will **DENY** defendant's motion for pre-trial release, ECF No. 12.

A separate Order consistent with this Memorandum Opinion shall follow.

Date: March 8, 2021

Hon. Royce C. Lamberth
United States District Judge