EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| United States of America, | ) | Criminal Action |
| | ) | No. 1:21-cr-00003-RCL-1 |
| Plaintiff, | ) | |
| | ) | **Detention Hearing** (via video) |
| vs. | ) | |
| | ) | |
| Jacob Anthony Chansley, | ) | Washington, D.C. |
| | ) | March 5, 2021 |
| Defendant. | ) | Time:  3:00 p.m. |

Transcript of **Detention Hearing** (via videoconference)
Held Before
The Honorable Royce C. Lamberth (via videoconference)
United States Senior Judge

A P P E A R A N C E S

For the Plaintiff:        **Kimberly L. Paschall**
(via videoconference)    U.S. ATTORNEY'S OFFICE FOR THE
                         DISTRICT OF COLUMBIA
                         555 Fourth Street, Northwest
                         Washington, D.C. 20530

For the Defendant:        **Albert S. Watkins**
(via videoconference)    KODNER WATKINS, LC
                         7733 Forsyth Boulevard, Suite 600
                         Clayton, Missouri 63105

Stenographic Official Court Reporter:
(via videoconference)    Nancy J. Meyer
                         Registered Diplomate Reporter
                         Certified Realtime Reporter
                         333 Constitution Avenue, Northwest
                         Washington, D.C. 20001

P R O C E E D I N G S

(REPORTER'S NOTE:  This hearing was held during the COVID-19 pandemic restrictions and is subject to the limitations of technology associated with the use of technology, including but not limited to telephone and video signal interference, static, signal interruptions, and other restrictions and limitations associated with remote court reporting via telephone, speakerphone, and/or videoconferencing.)

THE COURTROOM DEPUTY:  We're on the record for Criminal Case 21-3, United States of America v. Jacob Anthony Chansley.

Counsel, please identify yourself for the record.

MR. WATKINS:  My name is -- oh, I'm sorry.

MS. PASCHALL:  Good afternoon, Your Honor.

MR. WATKINS:  I'm sorry.  Go ahead, Ms. Paschall.

MS. PASCHALL:  Good afternoon, Your Honor.  Kimberly Paschall for the United States.

MR. WATKINS:  Good afternoon, Your Honor.  My name is Albert Watkins.  I'm here for the defendant, Jacob Chansley.

THE COURT:  All right.  Mr. Chansley, can you hear me okay?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Ms. Paschall wasn't showing up on my screen.  Let me see if we can get her.

THE COURTROOM DEPUTY:  Judge, I think there's so many parties, everyone is not listed.  So it may kick Ms. Paschall out.  So let me see if I can mute myself and you can see

1    Ms. Paschall.

2              THE COURT:  All right.  Okay.

3              THE COURTROOM DEPUTY:  Can you see her now?

4              THE COURT:  I see her.  All right.

5         Mr. Watkins, it's your motion, so you can go first.

6              MR. WATKINS:  Thank you, Your Honor.

7         We are here for the defendant's motion for pretrial

8    release, which was not something that was unexpected by, I

9    don't think, anyone.  But that being said, the defendant in

10   this matter did have a -- a detention hearing shortly after he

11   surrendered to authorities in Phoenix prior to the inauguration

12   of President Biden.  And since that time, there have been a

13   number of developments, which I believe make it appropriate for

14   the defendant to be released pending trial.

15        First and foremost, and more obviously, President Biden

16   has been duly seated.  The impeachment trial of Donald Trump

17   has been conducted.  The role of our former President in

18   inciting was painstakingly set forth in the impeachment trial,

19   not something that we need to belabor, but it was an important

20   development that occurred since Mr. Chansley was placed into

21   custody.

22        The investigation by the Department of Justice is very

23   fluid.  It's continuing to this day and will continue with

24   remarkable strength for quite some time.  The investigation

25   into the events of January 6th and the roles of -- of the

1    former President and a number of others in positions of

2    authority is currently also being investigated by the

3    Legislative Branch, and that investigation is very fluid.  The

4    investigation of the former President for criminal charges is,

5    upon information and belief, being undertaken by the Department

6    of Justice.

7         The former President has been sued by U.S.

8    Representative Thompson for civil damages for the former

9    President's inciting those that were at the Ellipse on

10   January 6th.  Today, former House Manager for the impeachment

11   of President -- former President Trump filed a civil suit for

12   damages and equitable relief under the terrorism act, and

13   that -- that particular suit is part of this fluid undertaking

14   that seems to be part of what we have been moving forward with,

15   which is a shifting of a dialogue from the lynch mob mentality

16   to one which involves really drilling down into and looking at

17   the facts that have really surfaced and have given rise to

18   this -- this -- this event on January 6th.

19        But the lawsuit today by the former House Manager

20   actually alleges that the President convinced people, like the

21   defendant, that something was occurring at the Capitol, which

22   if it was true, would have justified their actions.  Now, we're

23   not taking that position.  We're just pointing out for the

24   Court's edification that everything is in -- in influx and the

25   mindset that existed when the defendant turned himself into

1   authorities in Phoenix is significantly different than we are

2   dealing with here today.

3   The March 4 resurrection of the Trump presidency

4   obviously did not occur.  A State Department aide appointed by

5   Trump was arrested and is accused of storming the Capitol and

6   beating police with a riot shield.

7   So we have worked very diligently across the virtual

8   courtroom with Ms. Paschall.  It's been collaborative.  It's

9   been respectful.  It's been professional and, actually, a

10   pleasure.  We both have a common objective, and that includes

11   doing that which is in the best interests of our country.  That

12   is an objective that is shared by the defendant.

13   So when we look at this motion for pretrial release,

14   there are not -- not only a bunch of need to acknowledge this

15   shift in dialogue, but we want to make sure that people like

16   Jacob Chansley and millions of others in this country who

17   really did adore former President Trump are not subject to

18   retribution and ridicule that renders even more divisive a

19   nation that is filled with enough divisiveness to last a

20   lifetime.

21   I understand that the issues that the Court has to

22   address with respect to pretrial release are ones that need to

23   be fleshed out.  The government has previously pointed out that

24   Jacob Chansley is a flight risk and should not be released for

25   that reason.

1           Jacob Chansley is 33 years old.  He does not have a

2   passport.  He has zero criminal history.  Other than two years

3   in the U.S. military serving on the Kitty Hawk, he has never

4   gone outside of this country.  He was born in Phoenix.  He has

5   lived in Phoenix all of his life.  He lives there with his

6   mother.  He is a person who has not only zero criminal

7   background, but I pointed out to the Court that he received a

8   traffic ticket in Oklahoma on the way back from D.C. in

9   January.  And I want to confirm with this Court that the mother

10  of Jacob identified in the paperwork and -- the ticket has been

11  paid.  It was in Seminole County, Oklahoma.  So that -- that's

12  not an issue.

13          My client is one of hundreds of thousands of people who

14  appeared at the Ellipse to support President Trump, to help him

15  save the country.  These are our neighbors.  They're our

16  friends.  They are our relatives.  They're our colleagues.

17  They are our fellow Americans, and there's too many of them to

18  hold them in disdain.

19          There is compassion and patience that's going to be

20  required as a great many Americans extricate themselves from a

21  long-standing propaganda-ridden period of leadership by

22  individuals who chose to be untruthful, misrepresent --

23  misrepresent things, just simply lie.

24          The case that we're dealing with is tremendously

25  atypical.  The government has asserted that my client, who,

1   granted, had the -- the most recognizable costume and

2   appearance of probably anybody at the Capitol on January 6th --

3   but the assertion was made that my client was leading the

4   charge into the Capitol.

5          In fact, there's miles and miles and miles of footage of

6   my client from January 6th.  That footage reflects and

7   indicates that my client was in the third wave of folks who

8   went to the Capitol.  My client went to the Ellipse.  If

9   President Trump had told him to walk to the Washington

10  Monument, stand on his head and sing a prayer, my client would

11  have walked to the Washington Capitol [sic] and stood on his

12  head and said a prayer.  My client was walking to the

13  Capitol -- and I provided the Court with the video footage that

14  we were able to garner through an independent investigative

15  undertaking.  The former FBI special agent who garnered it is

16  available in the -- in the anteroom here if the Court wants to

17  inquire of that special agent.

18         My client was a full 1.2 miles away from the Capitol

19  at -- at a time when the Capitol had already been breached.  My

20  client, according to Google, was a 25-minute walk away from the

21  Capitol, but my client wasn't walking.  He was -- he was

22  walking down the street, stopping, talking, letting people take

23  selfies with him, screaming at the top of his lungs the word

24  "freedom."

25         My client was not a leader of the charge.  There's video

1   that's been provided to this Court that's been widely

2   circulated in the media of my client walking like Forrest Gump

3   up the steps into the Capitol as Capitol police are walking

4   down the steps.  There's no barricades.  There's no -- there's

5   no police lines, and the police are saying, "The building is

6   yours."

7            THE COURT:  But that -- that was not quite so clear

8   from the video that I saw, that that's who spoke those words.

9   It looked like a demonstrator.  It sounded more like a

10  demonstrator.  That was not clear that was police who said

11  that.  It was more -- more apparent that that was a

12  demonstrator who said "The building is yours."  How do you

13  characterize that as being a policeman who said it?

14           MR. WATKINS:  Well, two reasons, Your Honor.  And I

15  know this means very little, but the fact of the matter is

16  that's how the media has reported it over and over and over

17  again.  I, of course, do not ascribe to the fundamental

18  principle that if the media says it, it's absolutely true and

19  if they say it over and over again, it's more true.  So I

20  respect that.

21           My impression listening to it --

22           THE COURT:  I'll try to not laugh at that line.

23           MR. WATKINS:  I beg your pardon, Your Honor?

24           THE COURT:  I said I'll not laugh at that line.

25           MR. WATKINS:  Oh, please -- Your Honor, I've worked

1    with a therapist for many years, and he hasn't fired me yet,

2    and I will tell you that I respect anyone who laughs at any

3    time.  It's important in this life.

4          That being said, my -- my client is -- oh, with respect

5    to the law enforcement officers.  In my viewing and my

6    listening to the -- the footage, it did appear to me that

7    that's what the police were saying, but now that you bring it

8    up -- and I don't have the video right in front of me.  I don't

9    have it.  The point that's important there is if you see my

10   client's horns, he's not -- he's just strolling up the steps.

11   There's no police barricade.  There's no police line.  The

12   doors are open and --

13          THE COURT:  But if others had shoved the police

14   aside -- I understand the door might be open.  But I thought

15   the door was open and there were people climbing through the

16   windows at the moment your client went through the open doors.

17   Is that not correct?

18          MR. WATKINS:  No, Your Honor.  My -- my client was

19   coming up the stairs and going into the building well past the

20   breach and well following the breach of the Capitol.  In fact,

21   the stairs that my client walked up, as I -- I understand it --

22   and I did, as best I could with the barbed wire and the fences

23   the other day, attempt to make sure that I have a clear

24   understanding.  I -- I obviously am not the be-all and end-all

25   here.  But the door my client walked into was being held by a

1    Capitol policeman as my client entered into the Capitol.

2    There's a lot of footage of my client interacting peacefully,

3    chatting with and supporting law enforcement who were similarly

4    positioned in this part of the Capitol.

5              THE COURT:  I -- I'll ask the government this, but I

6    thought I had seen a picture of your client walking in a door

7    but 5 feet away people were walking through a window at the

8    same moment.  He could not have not seen that happen from the

9    pictures I saw.

10             MR. WATKINS:  I have not seen that picture, and that

11   picture has not been provided to me, and we have drilled

12   down --

13             THE COURT:  It was on the front page of the

14   *Washington Post*, the one I saw.  I'll ask the government

15   what -- when they respond.  They can tell me if I saw that

16   incorrectly.  I thought I saw it on the front page of the

17   *Washington Post* one day.

18             MS. PASCHALL:  You have not seen that incorrectly,

19   Your Honor, and the government will wait until Mr. Watkins is

20   finished to fully address the walking through open doors.

21             THE COURT:  Okay.  Maybe it was someone else.

22             MR. WATKINS:  Well, I imagine, Your Honor, that there

23   are not many individuals in that crowd who were wearing horns,

24   furs, tattoos, and a shirtless upper torso.  That's just my

25   thought.  And I -- I feel pretty good about that thought, at

1   least the accuracy of that thought.

2          THE COURT:  All right.

3          MR. WATKINS:  So the point I'm making at this point

4   in considering a pretrial motion is that the -- the demeanor

5   and the -- the undertakings of my client as depicted in the

6   tons of video that we have seen -- I have not seen the image

7   that you're referring to, Your Honor -- is my client appears

8   enthusiastic.  He appears energized by the President, but he

9   does not appear as being possessed of a forethought that is

10  nefarious on any level.  He has no -- no zip ties, no camo

11  gear, no bulletproof vests, no helmets.  He has no colleagues

12  with him.

13         He screams, "Freedom."  That was his -- that was his

14  crying call.  In the -- in the Capitol he said a prayer.  In

15  the Capitol when the President tweeted out much later it's time

16  to go home, there's video footage of my client telling people,

17  "The President has said go home.  It's time to go home.

18  Leave."  You have video from -- not video footage, but

19  anecdotally -- but we're looking for video footage -- of my

20  client instructing people to not do damage, to put back little

21  food items that were from a -- a tray that -- or some area

22  where you get food in the -- in the Capitol.

23         I've noted and I will note painstakingly that my client

24  in 33 years has zero criminal history.  He volunteered to

25  appear at the Phoenix FBI.  He spoke honestly.  He spoke

1    transparently.  He provided them with the authority to search

2    his car where his shaman outfit and attire was located.  He's

3    been a long-standing volunteer and worker; by that I mean, a

4    five-year-solid history of working with abused kids.

5            He's a self-published writer.  One of his books -- and

6    this is really important.  One of his books is a fiction piece.

7    I have not read it.  I'm never going to read it.  I'm not going

8    to tell you it's a great book.  I'm going to tell you if you

9    look at the back cover, you can see that the -- the guy has a

10   story to tell.  It's a fiction story.  It looks fun.  I'm not a

11   fiction guy.

12           You have a one man -- or one mind at a time.  Now, this

13   is an important book because it shows you where his mind was

14   before the conspiracy theories, the mindset that was part of

15   this protracted propaganda.  This is a man who is also a

16   writer.

17           And, Your Honor, when we were on -- on Zoom or -- on a

18   prior motion, you looked over my shoulder, and you asked me

19   what that painting was or what type it was.  Over my shoulder

20   right now is a Cheshire Cat.  That's a painting painted by the

21   defendant.  Now, I'm bringing this up because he is -- in

22   addition to being a painter and a writer, he's a potter.  He's

23   a shaman.  His hero was Mahatma Gandhi and Jesus Christ.

24           He follows ahimsa, and the fundamental principle

25   associated with ahimsa is you do not cause damage or harm to

1   any living thing, no matter how big or how small.  This is a

2   man who captures insects and releases them, like -- like a cat.

3        So we're -- we're dealing with the government accusing

4   my client of -- and asserting that my client is a leader of the

5   charge.  And I'm not diminishing the -- the intelligence of my

6   client.  I'm not belittling my client.  I'm calling it for what

7   it is, Your Honor.  My client was wearing horns and a fur.  He

8   had tattoos around his nipples.  He wasn't leading it anywhere.

9   He was a follower.  He was one of millions of Americans who

10  felt for the first time in their lives that they were well --

11  their voices were being heard by a man that they had a special

12  bond with.

13       We can't ignore the role of a former President, but we

14  cannot use that as the basis for effigial painting of people

15  like Mr. Chansley and other peaceful people who did the wrong

16  thing, who broke the law, and who behaved in a fashion that

17  involved making a decision.  So we're not talking about

18  exculpation.  We're talking about mitigating culpability.

19       The circumstances here are other worldly, Your Honor.

20  We have a former President who was prosecuted by our government

21  for inciting, through words and actions, while at the same time

22  the government -- that same government is prosecuting those who

23  were inciting; sending all of us a terrible message that you

24  have no right to believe in the words of the President, that

25  you have no right to expect the words of the President to be

1   truthful and if you do what the President says, you're going to

2   jail.

3           So my client, because of COVID, has been in solitary

4   confinement.  Obviously that's -- it's smart.  The government

5   is doing the right thing.  The detention facility is doing the

6   right thing, but the result is horrific for Mr. Chansley, a guy

7   who was not violent, a guy who was not in any way, shape, or

8   form other than a guy who made some really bad choices and who

9   he put his faith in and allowed him to be vulnerable and made a

10  decision not just to walk down Pennsylvania Avenue because the

11  President was coming with him and not just to go to the Capitol

12  because the President said to do so.  But that he listened to

13  the words and -- for four-plus years the words of our former

14  President and the actions, that he believed wrongfully that

15  that gave him license to go into the Capitol.

16          So when -- on a practical matter, because of where

17  Jacob Chansley is, and because what we're dealing with on

18  behalf of the government -- on behalf of -- on behalf of my

19  client, we are unable to fully and collaboratively undertake

20  matters with the government.  And remember, both the government

21  and defendant share the same goal.  I know that we are -- we

22  are public right now.

23          So my client has charges pending against him.  Some

24  felony.  The federal sentencing guidelines are very important.

25  There's certain sections of this federal sentencing guidelines

1    which can be significant to the benefit of my client,

2    including, by way of example, 5K1.1.  The government has an

3    interest in garnering collaborative undertakings that are not

4    encumbered by COVID and COVID-related protocols.

5         The Court here has seen the difficulty with

6    communication that's created by virtue of the world of

7    one-dimensional Zoom or platforms like Zoom.  They're

8    burdensome.  They're burdensome as they relate to both the

9    defendant and the government.  In fact, the government provided

10   me today with a proposed protective order, which we believe is

11   very appropriate.  It's a consent protective order.  We know

12   and are greatly respectful of the government's duty,

13   obligation, and we don't want to impede in any way or

14   compromise the integrity of the discharge of the duties by

15   Ms. Paschall on behalf of the government and the people of the

16   U.S.

17        But that protective order will render even more

18   cumbersome as it relates especially to electronic data, video,

19   computer-related data, or data and information that requires

20   computer access.  I've been to the facility in Alexandria, and

21   while I think everyone there is doing their level best, COVID

22   is very tough.  The facility is not geared up for a complex

23   case with endless hours of electronic data available and

24   necessarily going to have to be reviewed.

25        More importantly, when I talked about the benefits under

1    the federal sentencing guidelines that can help the government

2    and help the defendant, we've been thwarted, even though we've

3    been trying.  We, the government and the defendant, have been

4    trying to accommodate -- accommodate the detention center's

5    schedule, and we haven't been able to do it.  We tried.  Got

6    cancelled.  And we've got one set up.  We were hoping to have

7    it completed before today so that the contentious nature of our

8    respected discharge of our duties was not going to result in a

9    protracted hearing.

10         The defendant had a flagpole.  The flagpole had a thing

11   on it.  The government has suggested that there are two

12   examples of defendants that were cited that have been detained

13   like Mr. Chansley.  One of them beat up a cop, and, regretfully

14   to us, he did it with a flagpole.  I respect the government's

15   characterization of my client's flagpole -- flag and finial as

16   a potential weapon.  There's been no footage that I've seen, no

17   image that I have seen that demonstrates that my client used

18   that flag as anything other than part of his outfit, the same

19   outfit that he wore at Trump rally after Trump rally.  The

20   government has asserted -- and I point out to the Court that

21   these finials are the same finials that are in federal

22   buildings all over the country.

23         But the government has asserted that my client is a

24   danger, he's a danger for flight risk because nobody will

25   recognize him without his makeup on.  Indeed, one of the first

1    things we did was make sure his mug shot unadorned with paint

2    was out there.  Mr. Chansley is internationally recognized and

3    recognizable.  He has no resources for international travel.

4         And he counsels as a shaman and pays his bills.  He's

5    not a wealthy man, but he is self-sufficient.  He speaks no

6    foreign languages, at least no recognized foreign languages.

7    Perhaps as a shaman he has some shaman howl or something that

8    might be a shaman-like utterance, but it's not a recognized

9    language.

10        With the defendant, what you see is what you get.  He is

11   not a danger.  He is not a risk.  He has never been a danger or

12   a risk.  He has apologized, and he made a point of doing so.

13   There's no plea deal out there.  There's no negotiated

14   disposition or there's no wink or nod.  The defendant's honor

15   is really important as somebody who does ascribe to ahimsa, to

16   make sure that he let our country know that he was mortified at

17   having placed fear in the hearts of others, and he did so

18   publicly.  He did so without equivocation.  He's not hiding

19   behind Trump.  He's not blaming this on Trump.

20        Now, his lawyer -- that would be me, Your Honor -- has

21   made no secret about the mitigation aspects of this case and

22   the role the former President played in all that happened on

23   January 6th.  But it's not my place to judge a former

24   President, nor is it my place to be anything other than an

25   advocate for my client.  It's my duty.

1    So while I am respectful of the position of the

2    government, and while I understand and appreciate the duty of

3    Ms. Paschall vigorously objecting to any assertion that my

4    client is appropriately suitable for release, there is not a

5    characteristic of my client that is depicted in any image, any

6    video, any anecdotal authorities substantiated by evidence that

7    supports the proposition he was anything other than a guy at

8    the Ellipse who, at the invitation of the President, without a

9    forethought, with all of his shaman attire, his outfit, his

10   speech, his regalia, strolled down Pennsylvania Avenue, almost

11   like I said, like Forrest Gump, just ending up walking into the

12   Capitol.

13        Was he wrong?  Yes.  Has he owned that?  Yes.  Is he

14   extricating himself from the mess that has occurred over the

15   course of the four-plus years?  Yeah.  He's meditated.  He's

16   committed himself to being true to his shaman faith and to

17   his -- commitment to ahimsa.  There has been a release widely

18   publicized about his apology.  And, Your Honor, if you watch

19   the history of the story here with this man, my client, he came

20   and he spoke voluntarily to Phoenix police.  He did so openly,

21   not believing for a second that he had done anything wrong.

22        He asked me to request a pardon, despite the fact that I

23   suggested he not hold his breath, and, indeed, it was an

24   important part of the process to ask for a pardon so my client

25   could see firsthand that the man who he's asking to pardon him

1    was not the man that my client thought he was.  And that was a

2    dose of humbling betrayal.  It was gut wrenching.  It was a

3    kick in the chest.

4        My client went from that point to expressing deep

5    disappointment in the former President and to then recognize

6    it, bellying up to the bar.  He recognized he had a duty to our

7    country, to the people of this great land, to the government,

8    to everyone to own that he was wrong.  And he apologized, and

9    he did so in unequivocal fashion.  He did it without a but.

10       So now we are faced with Mr. Chansley requesting of this

11   Court the opportunity to -- to be released during the pendency

12   of this trial, knowing, Your Honor -- I can assure you that the

13   importance to my client of reaching out affirmatively to the

14   government -- and, again, Your Honor, I'm aware we are in a

15   public setting -- reinforces that we are not dealing with a man

16   of violence.  We're dealing with a man who is introspective,

17   who is self-critical, and who is probably significantly more

18   swiftly coming to grips and reconciling this make-believe world

19   that became for millions of Americans -- and still is for

20   many -- reality.

21       And with that, we -- every one of us -- I'm not speaking

22   for the Court, but I suggest every one of us in this country

23   have a duty to look in the mirror and ask ourselves what role

24   we played in creating this environment that was so divisive and

25   so alarmingly dysfunctional as to permit day in, day out,

1    multiple times daily, the affirmative representation of

2    untruths by our highest, most powerful leader in the land.

3         Part of the process of healing our nation is not

4    castigating those who are caught under this horrific

5    make-believe world, but part of it should require compassion

6    and patience by all of us as they go through that process, like

7    Jacob Chansley has and continues to do.

8         And that's how we're going to heal as a nation.  So I

9    would request, Your Honor, that the Court release the defendant

10    during the pendency of this case, subject to the conditions

11    deemed appropriate by this Court, provided that the Court

12    recognizes that I'm in St. Louis, the defendant is in

13    Phoenix -- is a resident, and the -- the Court proceedings are

14    obviously in the District of Columbia.

15         THE COURT:  All right.  Ms. Paschall.

16        MS. PASCHALL:  Thank you, Your Honor.

17     I won't belabor what is already in the government --

18        THE COURT REPORTER:  Ms. Paschall.

19        MS. PASCHALL:  -- reply and then -- Nancy, are you

20    able to hear me?

21        THE COURT REPORTER:  Yes.  Can you just speak up a

22    little bit louder?

23        MS. PASCHALL:  Sure.

24        THE COURT REPORTER:  Thank you.

25        MS. PASCHALL:  I'll get closer to the microphone as

1   well.  Thanks, Nancy.

2        The government's not going to belabor what's already in

3   our papers, Your Honor.  I think Your Honor's question about

4   how the defendant entered the building is an important one,

5   because the evidence shows quite the contrary.  In fact, the

6   government can name at least four points at which the defendant

7   should have known that it would have been completely

8   inappropriate to continue.

9        As Mr. Watkins has mentioned, I am working with him on a

10  protective order.  So there may be videos that he has not been

11  able to see.  What I might suggest is that Your Honor and

12  Mr. Watkins be able to view these videos so that the government

13  is not speaking out of turn and evidence is now available to

14  all parties under some sort of limited protective order so that

15  the record is clear.  And I'm happy to provide video that the

16  government has received with -- with all parties.

17       But suffice it to say that every day the government

18  is getting more and more evidence in these cases, as we are

19  getting videos that come to us not only by law enforcement

20  sources, but also from social media and from other defendants.

21       Your Honor is not incorrect.  There is a photograph of

22  the defendant entering the building, mere feet from -- away

23  from somebody who is breaking through the priceless glass

24  windows of the Capitol.  I know this to be true because we have

25  it on video.  There is absolutely no way that the defendant

1    could have thought that police were escorting him into the

2    building when the window is being cracked open by other people

3    in the mob, the doors were opened with no police in sight, and

4    the alarms of the building are going off.  It's just factually

5    not borne out by the evidence.

6         Before that moment in time, we have video evidence of

7    the defendant on top of the scaffolding that was in place for

8    the inauguration.  He is staring down at a police line, a

9    barrier of bike racks, and officers are present before the

10    steps.  And many mobsters are in front of that police line

11    yelling, screaming, and the police are holding the line.  And

12    the defendant is up above the crowd on the scaffolding watching

13    this happen.  There is no reasonable interpretation of events

14    where this man could believe that it was okay once those

15    barricades had come down, once those police were overborne that

16    he could continue to walk up those steps.

17         Third point in time the defendant should have known that

18    he wasn't allowed in the building is in some of the now famous

19    photographs taken by the AFP that show the defendant standing

20    directly opposite of Capitol Police Officer Robishaw as he

21    holds the line outside the Senate Chamber.  There's a clear

22    interaction happening there in the photographs that showed that

23    the defendant should go no further.  It's not as though

24    Officer Robishaw has opened his arms and let the defendant

25    pass.  That's clearly not what is happening there.

1    And, finally, we have the video from *The New Yorker* of

2    the defendant on the Senate floor where, once again,

3    Officer Robishaw, who is alone in the chamber, is trying his

4    best to keep the peace, get those who are in there out of the

5    chamber.  He asks the defendant multiple times in that

6    *New Yorker* video to leave.  The defendant, again, is up at the

7    Vice President's seat.  He is asking people to take his

8    photograph.  He's leaving the note "ITS [sic] ONLY A MATTER OF

9    TIME JUSTICE IS COMING!"

10    And then other people are flooding to the chamber, and

11    the defendant takes to his bullhorn while Officer Robishaw is

12    standing by unable to remove all of these people from the space

13    and yelling about how thankful he is for the opportunity to

14    take the traitors out of our government.  I don't think there's

15    much debate over what the evidence of this case is, Your Honor.

16    I think it's about the characterization of that evidence.  And

17    the government submits there's no reasonable interpretation of

18    events where this man thought that any of this was appropriate

19    behavior.

20    The government's not going to belabor the point about

21    the weapon.  There is ample evidence that this defendant was

22    carrying a 6-foot long spear with him when he was face to face

23    with Officer Robishaw.  He's not charged with using that weapon

24    in an assault against Officer Robishaw, but it is clearly

25    relevant to the 1512 and 231 charges.  He's obstructing police

1    in their discharge of their duties while holding this weapon.

2    And --

3                THE COURT:  Because it meets the definition of a

4    dangerous weapon?

5                MS. PASCHALL:  It does, Your Honor.  And we noted in

6    our opposition papers the Chief Judge's decision in the

7    Chrestman case.  That's 21-mj-218, I believe.  Where the

8    Chief Judge described how for the purposes of the detention

9    statute under (f)(1)(E) it need not be that the defendant is

10   holding a firearm or destructive device.

11               THE COURT:  Right.

12               MS. PASCHALL:  There are a multitude of weapons that

13   would constitute an (f)(1)(E) hold.  And with respect to that,

14   I would actually point Your Honor back to your own decision in

15   the Munchel and Eisenhart case, 21-cr-118.  Your Honor, of

16   course, is familiar.  Those defendants have not been charged

17   with assaulting police officers.  Those defendants have not

18   been charged with destruction of property.  Those defendants

19   are charged with very similar charges to what this defendant is

20   charged with, carrying a dangerous weapon during a civil

21   disorder during obstruction of Senate.

22               THE COURT:  Well, they had a stun gun, but it was a

23   dangerous weapon, just like this spear would be.

24               MS. PASCHALL:  Correct, Your Honor.

25               THE COURT:  And the picture of the spear shows

1    that -- that end piece is a long piece of metal there; right?

2            MS. PASCHALL:  Yes, Your Honor, at the top of that

3    pole.

4            THE COURT:  I looked at the picture, and it looked

5    like that's a long piece of metal; is that right?

6            MS. PASCHALL:  That is the government's

7    understanding, Your Honor, and the government actually has

8    recovered that item.  It was something that was taken out of

9    the defendant's car in Phoenix when he arrived at the FBI.  So

10   yes.

11           THE COURT:  So, in your view, that would meet the

12   statutory definition of dangerous weapon?

13           MS. PASCHALL:  Yes, Your Honor, it does.

14       I think the -- the characterization that the defendant

15   was merely following the instructions of the President, as if

16   this were the first time that he had ever considered something

17   like this, is not exactly correct.  And we know how the

18   defendant feels to this day about some of these issues because

19   he has spoken to the press about them.  He spoke to the press

20   within a day or so after leaving the Capitol and expressing his

21   delight -- that lawmakers, who he calls traitors, were in gas

22   masks and in bunkers -- in a way that is both chilling and

23   inexcusable.

24       And we know how the defendant feels today, because the

25   defendant continues to give interviews to the press from jail,

1    and his characterization of what happened that day is not

2    supported by the evidence.  His belief that he did nothing

3    wrong except for enter the building is not supported by the

4    evidence.

5          He claims to be sorry, but he also claims to still be an

6    adherent to several of the conspiracy theories that brought him

7    to this place.  And to be clear, Your Honor, the government

8    does not, by any stretch of the interest of justice, argue that

9    this man can't hold whatever beliefs he wants.  His

10   First Amendment is unassailable.  What he cannot do is act on

11   those beliefs in a way that is contrary to the law.  And

12   Your Honor has no reason to believe from the evidence in this

13   case that if he were released he wouldn't continue to do so.

14         The defense argues he's not a flight risk.  I suppose

15   the fact that he is now on national media all the time perhaps

16   mitigates that risk.  The concern the government has is if this

17   man has no job, no money to speak of, how does he keep ending

18   up at these events?  He's been in D.C. for at least two

19   protests.  The defense says he was not a part of any larger

20   group.  The government is not charging him with a conspiracy at

21   this point, but we know that he traveled with other people from

22   Arizona.

23         And we know that he had a rich online following; that he

24   was active on many media platforms.  The government cannot be

25   in a position to say that he wouldn't take to those platforms

1   once again to continue his characterization of these events and

2   to continue the work that may remain for those who are still

3   adhering to this idea that the current government is not a

4   legitimate government and that the 2020 election was stolen.

5   And we know that the defendant still believes that because he

6   told *60 Minutes* as much.

7          So what do we expect from him if he is released?  That

8   he's suddenly going to abandon all of these ideas and will

9   retreat quietly to Arizona?  This man has purposefully drawn

10  attention to himself.  When he spoke with the FBI, he told them

11  as much.  He dresses this way.  He carries these implements.

12  He shows up at these rallies with a bullhorn because it draws

13  attention to him.  It draws attention to his cause.

14         And, again, the government does not argue that

15  Mr. Chansley can't peacefully protest, he can't hold whatever

16  beliefs he wants to.  The government's problem is that

17  adherence to these things and apparently following the former

18  President of the United States led him to commit federal

19  felonies.

20         And there's nothing in the record to indicate that he

21  wouldn't do so again.  In fact, the day that he came to the FBI

22  and was arrested, he was on his way to another protest.  Why

23  did he have the weapon?  All of these accoutrements were in his

24  car, and he was ready to be protesting once again.

25         The -- I think that we need not belabor most of this at

1    this point, Your Honor, but I would just encourage the Court to

2    consider the evidence of this case.  It's actually not unique.

3    It's not atypical.  While we can all hope that January 6th is a

4    once-in-a-lifetime event, we can't rely on that.  We can't on a

5    hope and prayer assume that this defendant wouldn't continue

6    his dangerous activities if he was let out.  We can't assume

7    that he would abide by conditions if he's charged with an

8    obstruction charge, which he is, and that he doesn't believe in

9    the legitimacy of this government, which he does.

10          So the government argues that the clear and convincing

11   standard that the magistrate judge in Arizona found is still in

12   place today; that he is a danger to the community, that he

13   would be a risk for flight and obstruction, and that he

14   wouldn't be able to follow conditions of release.  And that's

15   why the government is asking that he continue to be held.

16          THE COURT:  How do you propose that we -- we made

17   some kind of record -- I just had this problem in the other

18   case, which is on appeal now.  And I had to sign an order today

19   supplementing the record, because it was not entered in the

20   record for the Court of Appeals, the videos which I did view

21   and use in the record of -- of the -- some of the videos that

22   were not -- there was not a record made in the district court

23   of what was in the record.  And I used some videos in my

24   opinion there.

25          So if -- if the defendant is going to have -- and see

1    the videos you were just describing to me, how are we going to

2    do this in the record here and -- and give the defendant

3    access?  We can do it *in camera* and have the -- the defendant

4    present to view them, and we could do that separately.  Or

5    how -- we've got to do this in a way that the defendant can

6    also have the -- so it's in the appellate record as well, if

7    there's an appeal from whatever I do.  I just -- I just signed

8    an order this afternoon in the other case because the Court of

9    Appeals has got to have a record.

10             MS. PASCHALL:  I think what may be appropriate, Your

11   Honor, is the government can file, perhaps, a surreply to the

12   defendant's reply citing as exhibits what we've mentioned

13   today.  And I can work with Your Honor's chambers and with

14   Mr. Watkins to disclose those videos.  Again, they are videos

15   that we would typically be asking for a protective order for.

16   So I may seek a limited protective order just for those videos

17   at this time.  I understand Mr. Watkins and I still have

18   further things to hash out about the larger --

19             MR. WATKINS:  Actually, Ms. Paschall, to -- to save

20   time, I think we have, given your most recent contact with me,

21   worked out a protocol that will be good for making the proposed

22   protective order work.

23             Your Honor, I am compelled, as a matter of record, to

24   make sure that it is clear that the mischaracterization of my

25   client's statements are noted.  One of the things, quite

1    frankly, I'm -- I'm troubled by, the government's

2    contemporaneous position that my client is somehow not in any

3    way, shape, or form susceptible to having his culpability

4    reduced by virtue of the fact that, you know, we have, as a

5    matter of pretty overwhelming substantial record that the world

6    has seen, that the government has put forth that in fact, and

7    indeed, Trump convinced people, like my client, that something

8    was occurring, which if it had been true, would have lawfully

9    justified their actions.

10          And we can't look at peaceful people -- and I don't care

11   whether they're on top of a scaffolding looking down or

12   walking -- skipping and jumping rope down Pennsylvania Avenue.

13   You have millions of Americans in this country, you have

14   hundreds of thousands in D.C. on the 6th, high tens of

15   thousands going down to the Capitol because they genuinely

16   believed in the truth of that which was being asserted by our

17   highest hired hand in the land, our President, our chief

18   executive officer.

19          There was no violence by a man who's 33 years of age

20   with zero criminal history.  We have a guy and defendant -- a

21   defendant in Illinois who was violent, is part of this

22   January 6th event, and he's out.  We have people who are --

23   from Missouri that -- that swiped property, ripped property off

24   of the building itself and tried to sell it online.  They're

25   home.  They're brushing their teeth in their own sink.

1    My guy is not depicted anywhere -- and, obviously,

2    Ms. Paschall, I don't have -- I wish I had been provided

3    interviews that you have referred to, but, nonetheless, none of

4    them depict my client violent.

5    You can look at that flag.  You can look at the images

6    of my client with that flag at Trump rally after Trump rally.

7    He's never used it in any violent or threatening fashion.  He

8    didn't do so on January 6th.  And that top, it's not a spear.

9    It's a finial.  A finial, like a ball, an eagle, or it's a

10   spearhead.  That's a finial.  That's the three finials that are

11   used.

12   We can characterize things on behalf of the government

13   any way you want.  That's your right.  That's your duty.

14   You're an advocate, and I respect that.  And as an American, I

15   respect that -- as a citizen, I respect the desire to put

16   people in jail that were violent, that were -- that were acting

17   in a fashion which was destructive and -- but you can't lump

18   all of them under one moniker.

19   And, Your Honor, we're dealing with this horrible

20   reality that this country is still with millions of people who

21   are good peaceful people that were absolutely smitten by the

22   action of a man who our very same government has prosecuted for

23   inciting those that are being prosecuted for listening to the

24   words of their President.  We had people like Mr. Chansley who

25   are released.  We have people who have acted violently on

1    January 6th who are released.  We have no one who is currently

2    being held without -- without being able to garner pretrial

3    release who was not violent, was not destructive, doesn't have

4    weapons.

5         The only thing that can be done by the government is to

6    take a look at this stick with a flag with zip ties holding the

7    flag on it and call it a spear.  If there was ever a case, a

8    situation, where one of the criminally accused, who has come

9    forth publicly, shared at risk of ridicule, not just how he

10   believes and thinks, but his apology and his doing so without

11   equivocation, doing so without fear of somebody seeing him with

12   what his face looks like, without paint, it's Jacob Chansley, a

13   man who owns it.

14        Your Honor, this is as appropriate case for pretrial

15   release as exists in any that arise out of the January 6th

16   event.

17        THE COURT:  All right.  I have one additional

18   question; that is, the marshal asked me yesterday at noon --

19   he -- it had come to his attention that Mr. Chansley had given

20   an interview to *60 Minutes*, and he asked whether I had given

21   permission for that, because under the marshals regulations,

22   the sheriff could not have authorized that unless I had

23   authorized it.  And he told the sheriff he didn't believe I had

24   authorized it, but he wanted to be sure I had not authorized

25   it.  I assured him I had not.

1    And so can you tell me how that came about?  The

2   circumstance seems to be that you did it as a subterfuge; that

3   there was an interview of you and your client and the interview

4   was done in your office by video --

5          MR. WATKINS:  Yes, Your Honor.

6          THE COURT:  -- to *60 Minutes*.

7          MR. WATKINS:  Yeah.  Absolutely, Your Honor.  I'm

8   not -- there's no subterfuge here at all, and I apologize to

9   this Court if there's anything that I have done that's somehow

10  interpreted that way.  That -- Your Honor, I made sure that

11  there was -- first of all, there was no effort to seek any

12  interview in -- in the jail.  And I thought that's what would

13  have required the acquiescence of the marshals service, the

14  Department of Justice, and I didn't know about this Court.

15         THE COURT:  Well, the jail was only told this was an

16  attorney-client interview by video.

17         MR. WATKINS:  Well, no.  I -- I asked for a Zoom

18  conference with him, Your Honor.  The image of --

19         THE COURT:  But only you and the client.

20         MR. WATKINS:  Well, I didn't --

21         THE COURT:  That's what the jail was told.

22         MR. WATKINS:  I -- I -- I didn't represent that to

23  them, Your Honor.  I didn't say -- in the same breath, I'll

24  tell you, I didn't tell them it was for an interview with

25  *60 Minutes*.

1          THE COURT:  I'm sure you didn't.

2          MR. WATKINS:  No, I --

3          (Indiscernible simultaneous cross-talk.)

4          THE COURT:  They would not have authorized it.  You

5    knew they wouldn't have authorized it.

6          MR. WATKINS:  No, no, Your Honor, I -- it didn't

7    occur to me that I would not be able to capture the image --

8    the video image of my client in my office.  I -- tying into the

9    system would have been --

10          THE COURT:  It didn't occur to you -- they told me

11   that they told you that in advance.  In fact, I have a document

12   where they sent that to you in advance.  I'll file that in the

13   record today.

14          MR. WATKINS:  As an -- as an officer of this court,

15   I'm representing affirmatively to you that I did not under any

16   circumstances try to conduct subterfuge to this Court

17   certainly, but certainly also not to the -- not to the facility

18   where my client is currently housed.  It's just not my style.

19          I will say that, yes, I did make the independent

20   arrangements with *60 Minutes.*  I did take steps to make sure

21   they understood they could not capture an image of my client

22   until it was in my office.  I did take steps to make sure that

23   they were respectful of the protocol that had to be followed to

24   not try to wire into our system to capture audio.

25          So I -- to -- I certainly -- I certainly would not have

1   done this knowing that this was something that was going to be

2   a matter of public record, like pretty high-profile public

3   record, if there was something that wasn't appropriate about

4   it.

5           THE COURT:  I'll make a copy of -- of what was given

6   to me and put it on the record today so you can respond.

7           MR. WATKINS:  Thank you, Your Honor.

8           THE COURT:  Fine.

9       Any other argument on the motion?

10          MS. PASCHALL:  I --

11          THE COURT:  I'll let you file the surreply with

12  whatever you want to get in the record too.

13          MS. PASCHALL:  Thank you, Your Honor.

14      And I just want to direct Your Honor to what is already

15  cited in our motion regarding the defense on estoppel by

16  entrapment.  Again, this was addressed by the Chief Judge in

17  the Chrestman case, and that's laid out fully in the

18  government's motion rather than --

19          THE COURT:  I think the Chief Judge said we don't

20  have kings in this country, was her line; right?

21          MS. PASCHALL:  I believe that's correct, Your Honor.

22          THE COURT:  I think that summed it up.

23      Okay.  Anything else you want to say?

24          MS. PASCHALL:  No, Your Honor.

25          THE COURT:  Mr. Watkins, anything else?

1        All right.  This will be submitted.  I'll rule as prompt

2   as I can after I see this surreply and -- and we get everything

3   we need in the record.

4        Do you have anything else you want to get in the record,

5   Mr. Watkins besides --

6            MR. WATKINS:  Your Honor, I think I've covered

7   everything.

8            THE COURT:  Okay.

9            MR. WATKINS:  I appreciate it.

10           THE COURT:  All right.  Thank you very much, Counsel.

11  We'll be in recess.

12           (The proceedings concluded at 4:20 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>

I, Nancy J. Meyer, Registered Diplomate Reporter, Certified Realtime Reporter, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenograph notes and is a full, true, and complete transcript of the proceedings to the best of my ability.

Dated this 8th day of March, 2021.

/s/ Nancy J. Meyer
Nancy J. Meyer
Official Court Reporter
Registered Diplomate Reporter
Certified Realtime Reporter
333 Constitution Avenue Northwest, Room 6509
Washington, D.C. 20001