IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 21-CR-003 (RCL) |
| ) | |
| JACOB ANTHONY CHANSLEY, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO REOPEN DETENTION HEARING AND FOR PRETRIAL RELEASE**

The Government's Response provided the Court with three (3) Exhibits. The Government affirmatively represented to the Court they demonstrated the Defendant was not welcomed into the U.S. Capitol by Police Officers, nor a mere follower among the riotous crowd, nor a peaceful protestor at the United States Capitol on January 6, 2021.

The three (3) Exhibits of the Government do not support the proposition propounded by the Government.

Exhibit 1 does not depict the Defendant "storming" anywhere. They depict the Defendant well in the back of a crowd walking up the stairs to the upper west terrace of the Capitol. The Government affirmatively represents to the Court that those in the presence of the Defendant at that time were part of the "mob" that overran offices holding a Police line at the top of the scaffolding leading to the first story of the U.S. Capitol building at approximately 2:10 p.m.

The importance of semantics cannot be underestimated.

The Government continues to deny the reality that the flagpole carried by the Defendant was not a "dangerous weapon," It was comprised of a flagpole which the Government

1

characterized, at the Court's prodding at the original hearing, as dangerous. The Government did not produce the flagpole at the original hearing.

The Government has not responded to the assertion by the Defendant that the flagpole's finial was not affixed in a fashion which would render it dangerous, but rather, was solely affixed utilizing zip ties. It had no screw to affix it to the pole. It was a sheath with no screw or nail. It had a plastic zip tip which held the flag too. The Government has not even gone so far as to indicate to the Court a willingness to provide to the Court for inspection the flagpole and finial which has been in the possession of the Government since the time the Defendant voluntarily surrendered himself to Federal authorities in January, 2021.

In an act of deflection, the Government chooses to mischaracterize the actions of the Defendant as they relate to the Government's Response Exhibit 1.

Defense counsel took the Capitol tour accorded to Defense counsel as part of this and other cases involving Defendants present at the Capitol on January 6, 2021.

Indeed, the Defendant is depicted in Exhibit 1 on U.S. Capitol CC TV video walking up the stairs behind countless other individuals. The Government ignores the Exhibit (link) previously provided to this Court in its Motion herein which depicts the Defendant in an elevated circular grass region outside of the Capitol on the upper west terrace harmlessly dilly dallying around and permitting others to take selfies with him, all the while countless other individuals were proceeding with their entry into the U.S. Capitol.

As noted, semantics are important.

As a matter of public record, the Government has confirmed the first barricades surrounding the Capitol were breached at approximately 12:53 p.m., well before the completion

of the speech then being conducted by former President Trump at the Ellipse. This was the first wave.

The Government has confirmed as a matter of public record that at approximately 2:00 p.m., barricades on the east side of the Capitol building were breached. This was the second wave.

The Government has confirmed as a matter of record that at approximately 2:10 p.m., scores of individuals reached the doors to the Capitol building on the west side of the Capitol at approximately 2:10 p.m. and the Capitol building itself was breached at 2:11 p.m. This was the third wave.

The Defendant did not physically enter into the Capitol building until well after scores of other individuals did so on the west side of the Capitol building.

The Government is correct only in its assertion that the Defendant was not in the third wave of the breach of the U.S. Capitol. Quite to the contrary of having "literally spearheaded it" as asserted by the Government, the Defendant was part of the fourth wave.

The Defendant then proffered yet another Capitol CC TV camera viewing and marked same as Exhibit 2, purportedly supporting the proposition that the Defendant was "spearheading" the entry into the Capitol. There are a number of facets of the video comprising Exhibit 2 which cannot by the Government be denied. First, the image clearly depicts the Defendant peacefully entering into the building without breaking through, over, crossing, traversing any line, barricade or fencing or in any fashion aggressively interacting with anyone, much less law enforcement.

The Court at the original hearing brought significant attention to the entry by the Defendant into the Capitol concurrently with individuals who were entering into the Capitol through a window reflected in the same video frame as the Defendant's doorway entry.

Close examination of this doorway reflects and depicts that the interior of the Capitol is markedly accented by pillars, columns and walls which butt into the main hallway, effectively creating a blind and a corner which would have precluded the Defendant from entering the building with an ability to witness others who were violently entering into an otherwise public building through a window.

It should also be noted that the most casual of Government guided visits by a profoundly hearing-impaired counsel gave rise to the inescapable observance of the resonating nature of virtually any and all sounds made within the Capitol hallways, necessarily rendering any noise associated with a crowd and the breaking of windows or entry by other individuals into the Capitol through a window nothing short of a din.

The Government's Exhibit 3 is yet another Capitol CC TV camera video depicting the Defendant doing exactly that which he has at all times confirmed that he had done, namely to help law enforcement empty out the Capitol when then President Trump directed everyone to go home.

In fact, the video depicts the Defendant walking in line with law enforcement who appeared to have made the Defendant part of their team.

Equally troubling within the context of the Government's patent misrepresentation of that which is depicted in the videos is the fact that the Government has not, to date, chosen to disclose these videos to the Defendant as part of the discovery herein.

The Government has made much ado as a matter of public record in countless cases arising out of events occurring on January 6, 2021 at the Capitol about the scope and extent of videos and discovery which renders these cases either complex and/or subject to the tolling of the Speedy Trial Act calculations.

The Government has repeatedly, as a matter of public record in cases arising out of the events of January 6, 2021, asserted that the "relevant" materials have been identified by the Government and disclosed to Defense counsel.  Notwithstanding same, the Court is now compelled to recognize that the Government is apparently opting to elect to make its relevance determinations only at times and only to the extent convenient to the Government.

None of the three Exhibits provided by the Government in its response in opposition to the Defendant's Motion herein even remotely characterize the Defendant as violent, a threat, or dangerous.  The Government has simply elected not to even address the all-important issue of the erroneously asserted dangerous nature of the flagpole and finial, this despite the overwhelming reliance by this Court on the representations by the Government that the flagpole and finial constituted the weapon the Court was compelled to identify as a matter of public record as being dangerous and despite the fact that the flagpole and finial were never produced by the Government, even after the issue of its capability to be used as a dangerous weapon was brought to the fore by the Defendant in his Motion herein.

The fact that the finial was not affixed to the flagpole in a fashion which would permit it to be utilized as a weapon is new information which, by virtue of the affirmative misrepresentations by the Government to this Court, is not simply new, but, in light of the original ruling of this Court, highly probative and material to the issue of whether there are conditions of release that will reasonably assure the appearance of the Defendant as required and the safety of any other person and the community.

The crux of the Defendant's Motion to Reopen the Detention Hearing is not comprised of the Defendant's own evaluation of his character or the strength of the case against him, but rather, comprised of "truly changed circumstances," the unexpected reality that the "dangerous"

weapon was nothing more than a flagpole with a finial that could not be utilized, and within the context of this case, evidence information was actually only available to the Government. Remember, the prior hearing was conducted remotely with Defendant confined and not in a position to share information by whispering in the ear of his defense attorney. The Court should have the unmitigated right and entitlement to rely on the integrity of the representatives of the Department of Justice handling prosecution of any case. The fact that the Court did so at the original hearing with respect to representations made about the flagpole and finial is not worthy of challenge. What is worthy of the attention of this Court is the fact that the Government was indeed in possession of the flagpole and finial at the time of the original hearing and remains in possession of the original flagpole and finial to the present date. Notwithstanding same, and despite the important nature of the issue relating to the purported "danger" presented by the flagpole and finial, described by the Government to be a "spear," the Government has chosen not only to not present the flagpole and finial, but has chosen to simply not discuss anything having to do with same.

The Government appears to assert that the videos that were provided by the Defendant as part of his Motion herein were of no value because they are comprised of YouTube video links. In fact, so as to permit this Court to have ready access to a link to garner viewing to the videos, a number of the videos that were provided by the Defendant as part of its Motion filed herein were purposely placed by the Defendant's counsel on YouTube to create the very links provided the Court. Notwithstanding, there is zero relevance as to whether the videos were on any Internet platform.

Without referencing the flagpole and finial, the Government proceeds to shift emphasis in its response to focus on the political opinions and leanings of the Defendant, leaving the

Defendant and the rest of the world with the inescapable need to conclude that the Government is comfortable with deviating from the longstanding concept of presumption of innocence and the mischaracterization of the risk of a Defendant as part of the challenging of any efforts for pretrial release simply because of the thoughts, opinions, or political leanings embraced, advocated or held by an accused. It is respectfully suggested to the Court that the Government's reliance on the Defendant's use of four-letter words as a basis for the indefinite pretrial detention in solitary confinement is simply without precedent. The utilization of vulgarities as a basis for Federal criminal prosecution, much less detention in solitary confinement for an indefinite period, is sheer folly.

Moreover, the emphasis by the Defendant in his Motion on the effect of the COVID-19 protocols is material, especially in light of the indefinite nature of same.

The unwieldy and cumbersome nature of garnering access to the Defendant telephonically, via video feed, or by even in person, is spotty, troubling, and unreliable.

In June, 2021, after having visited in person with the Defendant on two time-consuming and logistically cumbersome prior occasions since January, 2021, during which a surgical face mask was all that was required to garner access to the Defendant, Defense counsel traveled to Washington, DC and on to Alexandria, Virginia in June, 2021 for a planned in-person meeting with the Defendant only to be advised for the first time at the front door that a surgical mask was not acceptable, an N95 was required, and further, that a face shield was required. A great deal of the limited time slated for in-person visiting with the Defendant was consumed navigating the administrative and bureaucratic infrastructure associated with the facility at which the Defendant was detained to ultimately garner limited temporal access to the distraught Defendant for an in-person meeting.

It is not without a touch of disappointment that one notes the deviation by the Government from its high bar of conduct within the context of prosecutions. The Government has mischaracterized the argument of the defense by asserting that the Defendant argues that ***"he would no longer be a danger if released."*** Rather, the defense has argued that the Defendant was never a danger. The Government characterizes its citation of quotes from open, notorious, public and readily-easily-available Facebook musings of a man who wore horns, a fur, and was shirtless on a winter day in January in Washington, DC, to support the proposition that the Government has continued to "investigate" this case, implying that the Government's recent investigative undertakings brought forth a treasure trove of knowledge about the Defendant. This does not square with the Government's knowledge of and familiarity with the Defendant's longstanding status as a comedic source of non-sensical banter, the crux of which illustrate zero escalation in "rhetoric," as asserted by the Government, but rather, illustrate the Defendant's longstanding mental health vulnerabilities. It was Defendant who was open and notorious with the Government. It was Defendant's counsel who brought same to the attention of the Government.

The social media "evidence" cited by the Government is generally accurately recited, however, contains nothing of relevance or value.

The Government is fixated on utilizing more inflammatory words designed to misrepresent to the Court the nature and character of the Defendant's actions and words than it is seeking to pursue justice.

The Defendant's vulnerabilities were placed front and center in 2006 military medical records corresponding to Defendant. These records were recently shared with the Government, the doctor assigned to conduct the psych exam of Defendant and this Court.

8

The medical records were received from the Government, by and through its military, during the week preceding the filing deadline date corresponding to this Reply. The records were then promptly circulated. The military's medical records clearly depict a vulnerable then service-member with mental health issues which have clearly been exacerbated by the protracted solitary confinement the Defendant has been compelled to endure for approximately 150 consecutive days, a psychosocial stressor.

In August 2006, the Defendant was serving on the USS Kitty Hawk as a member of the U.S. Armed Forces. On August 6, 2006, the Defendant had his first consultation with the Ship's psychologist at which time the Defendant reported that he wanted to know if he was "either walking the line of being very intelligent or insane."

On August 29, 2006, the Defendant again was examined by the Ship's psychologist about whether his views are "indicative of genius or insanity." Diagnostic impressions included noting the presence of symptoms of anxiety disorder, schizotypal personality features, transient in

On September 12, 2006, again was examined by the Ship's psychologist, presenting with concerns of being "crazy." The Defendant's mood during the interview was described as "euthymic" (cheerfulness and tranquility), which is commonly experienced among bipolar individuals.

The Government cannot deny that its position and posture in myriad cases being concurrently prosecuted by the Government of individuals involved in events occurring at the Capitol on January 6, 2021 are divergent. Some involve actual acts of violence and destruction to which the Government either did not object or challenge pretrial release, did not appeal decisions granting pretrial release, or tacitly consented to pretrial release. The Government ignores this in its Response. Here the Government has chosen to simply not address the reality

9

that it opted to make characterizations to this Court about the dangerous nature of a flagpole and finial despite possessing the very flagpole and finial which was assembled in such a fashion as to preclude same from being used for dangerous acts. The Government uses words like "obsessing" and "spewing rhetoric" to describe Defendant. Characterizing Officer Robishaw's comments as demonstrating that he "begs" those in the Capitol to not be violent when, in truth, the Government knows the words of Officer Robishaw were anything but begging in nature.

The Government is being less than transparent with respect to its characterization of the whereabouts of then-Vice President Pence on January 6, 2021. In response to the proffering by the Defendant of a video showing the Vice President's motorcade departing the Capitol at 1:59 p.m., the Government has stated unequivocally, "This assertion is false."

The Government, in the very next sentence states, "As confirmed by the U.S. Secret Service, then-Vice President Mike Pence remained in the U.S. Capitol building "***and Grounds*** throughout the entire riot on January 6, 2021."

The Government has changed its story.

The Indictment herein alleges U.S. Capitol was a protected building. The U.S. Secret Service has acknowledged as a matter of record that the then-Vice President Pence was escorted from the Capitol building to other buildings in the Capitol complex. The Government fails to state, rebut, or otherwise refute with any credibility the fact that the Government is speaking out of both sides of its mouth, indicting the Defendant and hundreds of others of felonies requiring the status of the Capital to be "protected" within the meaning of 18 USC Section 17.52(a). The U.S. Code does not provide for the unilateral expansion by the Government of the geographic scope of a protected building by simply adding the words ". . . and Grounds."

In the present case, the Government has not stated the time at which the former Vice President Pence departed the U.S. Capitol building to other buildings and areas in the Capitol complex. This is a matter subject to further discovery and germane within the context of the Defendant's present Motion only to the extent that it clearly demonstrates the Government's willingness to prosecute in a fashion which falls well below the standard bar of excellence otherwise routinely employed by the Department of Justice.

The Defendant is not a threat. The Defendant has never been a threat. The Defendant was not violent. The Defendant is not violent. The Defendant was not a part of the first breach of the U.S. Capitol building. The issue of the whereabouts of the former Vice President on January 6, 2021 is one which will be front and center not only in the present case, but in hundreds of other cases pending in this District.

The Defendant has zero social media presence at this time. The Defendant failed to note for the Court the fact that Defendant's prior social media presence was not substantial and not well followed and nothing short of patent indicia of a long-standing vulnerability.

The only spewage of the Defendant is that which supports the proposition that the Defendant is possessed of vulnerabilities which should not be exacerbated so as to render the Defendant so far outside the proverbial Bell curve of "normalcy," as to preclude his role in his own defense. There are no sanctioned "thought-police" in the United States of America, nor should there be. While the Government may feel otherwise, our Courts prohibit same. As seen in the present Motion, spewage appears to be bilaterally employed within the context of this case. The difference is the spewage of the Defendant is indicia of mental health vulnerabilities while the spewage of the Government is further indicia of a wholesale departure from fundamental tenets of justice including fairness, accuracy of representations to the Court,

accurate depictions of the words and actions of the Defendant, and the need for transparency within the context of allegations of danger or of dangerousness of a flagpole with a zip-tie-affixed finial incapable of being turned upside down without the finial being induced by gravity to fall off. Basically, within the context of this case, public access to the flagpole and finial did not previously exist. Access to the flagpole and finial by the Defendant is, at this time, non-existent. The Government knows that this is the question at issue within the context of this Motion. The Government has chosen not to respond to the assertions of the Defendant in his Motion herein. The Government does not mention the flagpole. The Government has not produced the flagpole. The circumstances herein have not only truly changed, but in significant sense, demonstrate a trend by the Government away from that which would constitute responsible discharge of duties as a representative of the Department of Justice to ensure that justice is done versus to garner favorable optics to support the actions of the Department of Justice. Compassion, not solitary, is required.

As a final matter, it is impossible to abate a threat which never existed.

KODNER WATKINS

By: ___/s/ Albert S. Watkins___
ALBERT S. WATKINS, MO#34553
1200 South Big Bend Boulevard
St. Louis, Missouri 63117
Phone: (314) 727-9111
Facsimile: (314) 727-9110
E-mail: albertswatkins@kwklaw.net

**CERTIFICATE OF SERVICE**

Signature above is also certification that on June 11, 2021, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court utilizing the CM/ECF system which will send notification of such filing to all parties of record.