*let this be filed.*
*Roger C. Lamberth*
*U.S.D.J. 7/6/21*

```
1      June 30, 2021.  Judge Lamberth.  3:00.

2              THE CLERK:  Good afternoon, Your Honor.  We're

3      on the record in Criminal Case 21-3, United States of

4      America versus Jacob Anthony Chansley.  Counsel, please

5      identify yourselves for the record.

6              MR. NELSON:  Good afternoon, Your Honor.  Jim

7      Nelson for the United States standing in for Kim Paschall.

8              THE COURT:  All right.

9              MR. WATKINS:  Albert Watkins present here on

10     behalf of the defendant, Jacob Chansley.

11             THE COURT:  Okay.  Mr. Chansley, can you hear me

12     okay?

13             THE DEFENDANT:  Yes, Your Honor.  I can.  Thank

14     you.

15             THE COURT:  Okay.  All right.  Mr. Watkins,

16     we're here on your motion.  So you may proceed.

17             MR. WATKINS:  Thank you, Your Honor.

18             I do not want to put this Court through the

19     burden of having a re-recital of an extraordinary amount

20     of information that's been set forth in the original

21     motion, the response in opposition submitted by the

22     government and the reply filed by the defendant.  I do not

23     want to belabor the supplemental briefing on the issue of

24     the flight risk.  But I do want to highlight matters of

25     importance.  Since the initial detention hearing conducted
```

1     by this Court, significant additional new information and

2     evidence has come forth which supports the proposition

3     that the gravamen of the evidence relied upon by the Court

4     in the initial ruling of this Court for pretrial opposing

5     or denying pretrial release of Mr. Chansley was erroneous.

6     The new evidence includes the ascertainment that the

7     finial and flag pole and flag which the government

8     represented to this Court was a dangerous weapon and which

9     this Court had every right to rely on on the accuracy of

10    this affirmative longstanding representation of the

11    government which was made at the first detention hearing

12    in front of the magistrate in Phoenix, it was and has been

13    since determined that that flag, that flag pole and that

14    finial have been in the possession of the government since

15    the defendant voluntarily surrendered himself in Phoenix

16    on January 9 and provided the government with access to

17    introduction of that flag pole, flag and finial.  Only to

18    find out that, you know, the government which obviously

19    did not present the flag pole or the inspection by parties

20    much less the Court, that flag pole and that finial and

21    the flag were not able to be used as a deadly weapon.  In

22    fact, that finial had no screw or no nail that would affix

23    it to the pole.  But rather if you see the images, all of

24    the images of the defendant as he travels up to, into

25    through and outside of the Capitol building on

1    January 6th, he is holding that pole upright,

2    perpendicular to the ground and he's doing that for a

3    reason.  Because if he tilted it, the finial and the flag

4    would fall off.  It was not able to be used as a weapon.

5            And despite the fact that the government had

6    that flag pole and finial and flag in its possession, the

7    government insisted on representing to this Court that it

8    was a deadly weapon when pointedly sua spontae by the

9    Court and asked by the Court if it was a deadly weapon.

10           In addition to that, we as we noted with the

11   Court in our briefing, we made a public plea for video

12   footage, video footage that the government dismissed

13   because the links that we provided to this Court depicting

14   the defendant traveling up to, through and outside of the

15   Capitol after he traversed its hallways, because the links

16   were on YouTube, they were somehow worthless.  They were

17   open to the public.  They were from the public.  No.

18   Indeed those were videos that we posted on YouTube to

19   acquire the links so that we could incorporate the links

20   into the brief.

21           So we have a -- the new information is basically

22   a video montage of not entirely but most steps taken by

23   the defendant as he traversed the hallways of the Capitol,

24   which depict among other things efforts on the part of the

25   defendant to garner the friendly return of a stolen shield

1    by an individual in the Capitol back to the police, the
2    thwarting of the much maligned muffin theft in the break
3    room in the Senate outside of the Senate chamber.  We had
4    video that clearly depicted the defendant assisting law
5    enforcement in emptying out the chamber and the Capitol
6    after the President told everyone it was time to go home.
7            We demonstrated through the video that we
8    provided to the government that the defendant was the
9    recipient of express permission granted by a high ranking
10   member of the Capitol Police force, Capitol Police
11   department, being one of the high ranking inspectors.
12           We provided the government with video footage
13   depicting the defendant traversing the halls of the
14   Capitol in line with law enforcement as they were emptying
15   out the Capitol.  We provided video of the defendant on
16   his bull horn telling people to get out of the chamber and
17   to get out of the Capitol.
18           We provided video to the government depicting
19   the defendant standing on the elevated what was then
20   grassy circle area in the upper west balcony of the
21   Capitol.  It's now just dirt.  As people passed by him,
22   hundreds of them passed by him into the Capitol before the
23   defendant entered the Capitol, the defendant was standing
24   on that grassy circle allowing selfies to be taken of him
25   by others.

1          The video footage that we provided to the

2    government included clear depiction of the defendant

3    having the door held open for him by Officer Robichaux as

4    he entered into the Senate chamber.

5          We provided to the government clear video

6    footage depicting my client, Mr. Chansley, walking into

7    the Capitol through doorways that were being held by and

8    lined by law enforcement.  We provided video footage of

9    numerous instance of friendly, respectful interaction by

10   and between the defendant with law enforcement both inside

11   of and afterwards outside of the Capitol where law

12   enforcement were in his immediate vicinity, said nothing

13   about nor did they seek to seize the flag pole with the

14   flag on it and the finial on top.  This despite that being

15   the same flag pole that was donned as part of the Shaman

16   costume, if you will, worn by Mr. Chansley for a period

17   leading up to January 6th.  That included times when

18   including on January 6th when there were security check

19   points where weapons going down to nail clippers and

20   pocket knives were being confiscated.  No such

21   confiscation or seizure of the flag, flag pole or finial

22   occurred with Mr. Chansley.

23          The most interesting and I believe probative

24   issue that has come to light during the course of our

25   briefings had been the mental health issues that the prior

1    or pre-existing mental health vulnerabilities that were

2    diagnosed or noted during psych exams when the defendant

3    was in the custody of the U.S. military as a member of the

4    armed forces in 2006.  And, Your Honor, I have confirmed

5    that the psych exam has concluded and we understand the

6    results of that exam will be forthcoming in short order.

7            We have been forced and compelled to face the

8    reality that the government is opting to vigorously fight

9    the pretrial release of the defendant despite the fact

10   that I was able to provide the government and this Court

11   with nothing short of 20-something defendants who were

12   charged with crimes arising out of January 6th that

13   involved violence, theft, destruction, weapons, vitriol

14   and the various acts, all of whom were released for

15   pretrial release, many of whom were released on their own

16   recognizance.

17           And the Court in its decision, this Court in its

18   decision in denying the pretrial release relied very

19   heavily, overwhelming heavily on the representation of the

20   government about the deadliness of the weapon, the flag

21   pole, the spear, whether you call it a spear or a finial,

22   and this information in turn put us all in a position of

23   having to address with a really elevated degree of clarity

24   that the lip service that is given -- very genuine lip

25   service that is given by the government by and through its

```
 1    what I call boots on the ground, the Assistant U.S.
 2    Attorney is based on a learned appreciation for not just
 3    the videos that we have provided including other videos
 4    that were demonstrative of an elevated degree of
 5    cooperation by Mr. Chansley.  But that there is a
 6    dichotomy between the knowledge and position of the boots
 7    on the ground, the Assistant U.S. Attorneys, and those up
 8    the chain of command who are forcing and compelling their
 9    boots on the ground, the Assistant U.S. Attorneys not to
10    have the role, the traditional role that they have in
11    addressing counts and the reconciliation of cases by means
12    of various forms of pretrial disposition.
13              In addition, what has not been brought to the
14    fore for the benefit of this Court is that since the
15    initial hearing, a great deal of collaborative undertaking
16    was pursued on behalf of and by the defendant such as to
17    permit not one, but multiple debriefings to be conducted
18    by the FBI and the Assistant U.S. Attorney of the
19    defendant.  This was done without promises.  This was not
20    done without a plea deal.  This was not done as part of a
21    formal proffer.  It was done as a debriefing.  And the
22    cooperation, the assistance, the information, the video
23    that had been provided to the government by the defendant
24    demonstrate a wholesale commitment by the defendant doing
25    that which is right for the country, that which is right
```

1    for the government.  And at the end of the day that which

2    is properly demonstrative of a sense of responsibility and

3    prudence living up to his longstanding love of his

4    country.

5             The government has gone so far as to suggest

6    that the pretrial release of Mr. Chansley should not be

7    granted.  And what's really telling is that as part of

8    that opposition, when it was brought to the government and

9    the Court's attention that we now were aware of the fact

10   that that flag pole wasn't useless.  It was nothing more

11   than a thimble or a clan on a hot July day.  It was no

12   more dangerous than that.

13            The government in its response in opposition did

14   not mention the flag, did not argue the flag, did not

15   attempt to again characterize it as a weapon.  And in fact

16   certainly did not bring to the Court or to permit me to

17   any access to the flag or the finial or the pole.  That

18   wholesale absence of addressing that issue is one which I

19   as counsel respect.  If I was in the Assistant U.S.

20   Attorney's shoes, I would probably do the same thing

21   except I would also say Court, you're right or the

22   defendant is right, that finial wasn't held on to the top

23   of that flag pole such as to render it a deadly weapon;

24   you are right, the defendant is right; in fact if you

25   tipped that flag pole over, that finial would fall over.

1          You know, it is obviously our duty and our

2    burden to show that this new evidence and that this new

3    information is sufficient to warrant reopening the

4    detention hearing.  But the government is now going so far

5    as to assert that the defendant is a flight risk because

6    he lives in a state that borders an international boundary

7    somehow rendering citizens close to Mexico and citizens

8    close to Canada less entitled to their lawful rights to

9    pretrial release.

10          So, Your Honor, given the totality of the

11   circumstances, given the new evidence, given the new

12   information, given that which has been set forth in the

13   full briefing of these issues that are before the Court,

14   we request that the Court grant the defendant pretrial

15   release subject to those conditions that are deemed

16   appropriate by this Court.  There are plenty of terms and

17   conditions that be can set forth.  If the government does

18   not like Arizona despite the fact that Mr. Chansley has

19   never owned a passport, speaks no foreign language, has

20   never been out of this country except with the military,

21   has lived in Phoenix all of his life, his mother has lived

22   in Phoenix all of his life.  His mother has lived in the

23   same home for all of Jacob's life virtually and Mr.

24   Chansley lives with his mother.  His maternal grandfather

25   lives there.  His maternal step grandmother lives there in

1    very close proximity.  The maternal grandfather is the
2    sole significant male role model up with whom defendant
3    grew.
4           The defendant's -- two of the defendant's
5    siblings reside in Phoenix.  Of course, the defendant has
6    made his home in Phoenix, has worked in Phoenix.  And,
7    yes, he has had prior to his self peaceful self surrender
8    worked in Phoenix.
9           Now what's interesting also is the government
10   mischaracterized virtually everything about the defendant,
11   trying to make him out to be everything from any drug
12   user, mischaracterizing the government's own FBI forms and
13   reports that were disclosed as part of discovery, has made
14   it clear that the defendant did not try any drugs ever.
15   Didn't use any drugs other than marijuana.  That the
16   defendant had not consumed alcohol for many, many years
17   preceding peacefully self-surrendering.
18          The government failed to note for the Court that
19   the second the defendant learned of the interest in him by
20   the FBI, he didn't wait until he returned to Phoenix.  He
21   was on the grid.  He got on his phone.  He called the FBI.
22   He spoke freely with them.  He spoke honestly with them.
23   He was truthful with them as he was throughout protracted
24   debriefings.
25          The government knows the defendant is not lying.

1    The government knows the defendant made representations

2    that helped the government, provided the government access

3    to video that the government would not have otherwise had

4    that related to the theft of classified material from the

5    Capitol on January 6th.

6          So we have before us a unique opportunity to

7    take advantage of this hearing and permit the defendant

8    pretrial release.  If Arizona is not the place for the

9    defendant because it's close to Mexico, we have

10   alternative arrangements available for him in a secure

11   location in St. Louis, close proximity to my office that I

12   am confident will give rise to no concern on the part of

13   pretrial services.  I'll be happy to talk to you in detail

14   about that off the record, off the public record to avoid

15   disclosure of names and locations.

16         We have healthcare lined up, mental healthcare

17   lined up for the defendant in both Phoenix and St. Louis

18   and it's mental healthcare that's needed.  The goal

19   objective is to take a man who has a high degree of mental

20   acuity and capacity to hold it together to not only be

21   appreciative of his role in getting where he is today, but

22   being able to play a role in his defense, to assist his

23   counsel, to assist his counsel in assisting him and that's

24   something because of COVID, because of confinement,

25   because of representations made by the government, because

1    of the cumbersome nature of communication by telephone or
2    by video conferencing, and to be in person simply cannot
3    be accomplished.
4           With that obviously an oral supplement to the
5    briefs that have been filed with the Court, I would
6    request this Court take those measures necessary to order
7    the pretrial release of the defendant subject to and
8    pursuant to those terms and conditions that the Court
9    deems appropriate to ensure the safety not only of the
10   defendant, but obviously to secure his presence here.
11          The defendant is a man who needs some attention
12   that he is not able to get.  I want to be able to put this
13   Court in a position of a high degree of comfort knowing
14   that this case is able to be deposed of one way or another
15   with a competent, cogent, articulate defendant.  And this
16   defendant is capable of that.  But in an environment
17   involving socio stresses associated with protracted
18   indefinite solitary confinement, that's not going to
19   happen.  And that's an injustice for the defendant, but
20   for all of us because of the historical import of
21   January 6th and because of just basically the most
22   fundamental tenets of our justice system.  This is a man
23   who has zero, zero criminal history and an overwhelming
24   longstanding commitment to all that is nonviolent.
25          THE COURT:  I think you started the right way by

1    talking about in order to reopen the detention decision, I

2    have to look at what conditions have changed, what

3    material information that was unknown at the time of the

4    original decision.  And I understand the arguments you've

5    made about what changed on the dangerousness question.

6    I'm not sure that there's any different information now

7    that I had at the time of the initial decision though on

8    risk of flight.  What is the new information on risk of

9    flight that I didn't have at the time of the initial

10   decision and there has to be something material that has

11   changed.

12           MR. WATKINS:  Yes, Your Honor.  In the initial

13   hearing, I did not provide the Court with nor did I have

14   information about the longstanding tenure of residency of

15   the defendant in Phoenix or the ties that he had in

16   Phoenix including the lifetime of residency in Phoenix for

17   all of the years of her life of the mother of the

18   defendant, the close proximity of the mother of the

19   defendant to the siblings of the defendant in Phoenix, the

20   grandfather of the defendant in Phoenix, the cousins and

21   other relatives of the defendant in Phoenix.

22           What I was not aware of at the time nor was the

23   Court was the -- what were the vulnerability issues that

24   are longstanding which I believe play a really important

25   role in the Court's evaluation of new information and

1    evidence.  Those mental vulnerabilities are not -- are not

2    are not fictional.  They were not created out of thin air.

3    They are documented by the government's own records,

4    albeit through the U.S. military.  But that longstanding

5    period between 2006 and the present without a blemish of

6    criminality showing up in the record of the defendant

7    reflection indicates that absent the socio stressors that

8    trigger the vulnerabilities that are reflected in the

9    medical records and described more fully in the narrative

10   provided to the doctor conducting the psych exam pursuant

11   to the request of the court puts us all in the position

12   of -- even the government -- having a high degree of

13   comfort with the ability of the defendant to navigate

14   peacefully in a fashion wholly compliant with the

15   directive of the Court, especially the directive to return

16   to court.

17          I cannot understate the importance or overstate

18   the importance of the weapon, the flag pole because that

19   was the corpus that served as the basis for the decision

20   of this Court to deny the initial request for pretrial

21   detention.  The flight risk issue, the response of the

22   government was jaw dropping for me because I don't know

23   how to respond to an agent acting on behalf of the

24   government in the form of an Assistant U.S. Attorney to

25   the Department of Justice suggesting that somehow because

1    an accused lives in a state that borders another country

2    that somehow the burden on that defendant should be

3    greater.

4            THE COURT:  Did the person at Colorado that you

5    talked to give you an indication of when their initial

6    report might be sent along to me to advocate for that?

7            MR. WATKINS:  Yes, Your Honor.  I will represent

8    to this Court that the information that I garnered was

9    directly from my client.  I did not speak to the doctor.

10   My client indicated to me that he was told that the final

11   portion of a protracted series of meetings with the doctor

12   assigned to this matter concluded the end of last week at

13   which time my client was advised that the report would be

14   finalized in very short order because she understood the

15   importance of it to the Court and that she anticipated the

16   Bureau of Prisons would be picking him up for transport

17   back to Alexandria anywhere from two days to two weeks.

18   That was the window --

19           THE COURT:  All right.  That's helpful.  Okay.

20   All right.  Mr. Nelson?

21           MR. NELSON:  Yes, Your Honor.  Thank you.

22   Briefly, I would just note that the most important factor

23   before the Court is whether there is new or material

24   information with regard to the detention proceedings.

25   Counsel for the defendant has been talking for more than

1    20 minutes and hasn't said a single thing he hasn't said

2    before.  This is all whether or not there was a weapon,

3    whether or not the defendant was at the front of the line

4    or back of the line or walked in through open doors.  All

5    of that is disproven by the actual video footage from

6    inside the Capitol.

7         The defendant did not walk in through doors held

8    open by the police.  The video was clear that he was part

9    of the very first group of people who pushed past the

10   police.  He entered the Capitol through a window broken

11   open by Dominic Pasolla.  It's on CCTV.  It's made all the

12   more easy to discern by the fact that the defendant wore a

13   buffalo hat and face paint.  He's not easy to miss.

14        It's very clear from the footage that the

15   defendant pushed his way into the Senate chamber alongside

16   Officer Robichaux as Officer Robichaux is telling him he

17   should leave and instead walks up onto the dais, sits in

18   the vice president's chair, writes a threatening note, all

19   the while consistent with the defendant calling the vice

20   president a "fucking traitor."  There is no new

21   information here.

22        To the extent that it's new, it's not material.

23   The defense counsel may have found videos which he thinks

24   might be useful in defeating elements of the offenses at

25   trial, but none of them go to the actual factors before

16

the Court.  And they certainly don't bear on the risk of
dangerousness for flight if the defendant is released.  It
is simply recycled arguments and reworded hyperbole that,
first of all, the defendant didn't do what the videos show
him doing.  Or if he did, he was brainwashed along the
lines of 60 Minutes interview under the guise of a legal
call by the sitting president of the United States.  Or if
the Court doesn't believe that, he was incompetent on
January 6th and remains incompetent today.  And
interestingly, Your Honor, that last point which the
defense says is its most probative point is critically
important for the Court because if the defendant is
actually incompetent which the psyche eval hasn't come
back yet, then the Court can't release him.  We have to go
through civil commitment proceedings to have him held.

So this is -- to the extent that there's
anything here for the Court to rule on, it's not ripe
because we have an incompetence standard to review before
we go down any further down the path.  And so I would say
to the Court that, first of all, there is no basis to
reopen the detention hearing.  But to the extent that
there is, we cannot do anything until we hear back on the
defendant's competence.

THE COURT:  All right.  I had a couple of
questions for the government as well.

1              MR. NELSON:  Yes, Your Honor.

2              THE COURT:  In the supplemental brief, the

3    government said that the defendant is one of the prominent

4    figures of QAnon, but other than the evidence of his

5    ability to quickly raise large sums of money for travel

6    through non-traditional sources, does the government hold

7    any evidence that the defendant actually has a leadership

8    role in QAnon or what evidence does the government have

9    about what he really is as to QAnon or what his role is as

10   to QAnon?

11             MR. NELSON:  Your Honor, to answer your

12   question, I think that largely that information is unknown

13   to the government other than the defendant's I would say

14   outspokenness with regard to QAnon and its positions

15   vis-a-vis in particular the election.

16             THE COURT:  Okay.  If the Court were to release

17   the defendant to some sort of home confinement or some

18   other conditions that the defendant is proposing now and

19   order that he not use the Internet in the interim, would

20   that mitigate the risk that he could use -- raise money to

21   travel or what -- how do you address that as a mitigating

22   factor because of QAnon?  I don't quite understand how

23   that works in the government's view.

24             MR. NELSON:  Well, Your Honor, I just --

25   realistically, I don't think that -- and I mean no

1    disrespect to the Court, but I don't know how you put

2    somebody on release with the condition that they not

3    access the Internet because accessing the Internet can be

4    done from so many different devices and in such an

5    anonymous way as to make it virtually unenforceable.  And

6    I think that's the real issue.  It can be done from

7    anywhere by so many different devices that I don't know

8    how any supervising agency would enforce that condition.

9              MR. WATKINS:  Your Honor, if I may?

10             THE COURT:  Yes.

11             MR. WATKINS:  The government debriefed Mr.

12   Chansley on a number of occasions.  One of the subject

13   matters that was thoroughly vetted and inquired about for

14   a protracted period was how Mr. Chansley could afford to

15   get to Washington, D.C. for the MAGA Man March in

16   September and then again for the -- or in, yeah, and then

17   again for the January 6th event.  And the government knows

18   exactly how Mr. Chansley did it.  He drove a car.  He

19   drove in a car with another individual.  The other

20   individual put in money and Mr. Chansley had received $500

21   in cash from an individual that was named by Mr. Chansley.

22   The government knows who it is.  They vetted it out.  They

23   understood it.  The government knows that Mr. Chansley has

24   been removed from every social media platform.  The

25   government also knows that Mr. Chansley had a very limited

1     following on those social media platforms in the first

2     place.

3            The government knows that the defendant is not a

4     man of wealth capable of raising large funds, large amount

5     of money quickly, slowly over time.  They know that the

6     defendant is a man of simple means who is not someone who

7     is navigating the Internet on a routine basis except when

8     he's able to garner access to the Internet.  His family

9     home is not one, as I understand it right now, that not

10     only doesn't have Internet service now, hasn't had it for

11     a protracted period.

12            The fact is, Your Honor, whether he had access

13     to the Internet or not, Jacob Chansley, the Shaman, the

14     guy with the horns is being not only disinterested in

15     politics and all of that, but he's the last person in the

16     world that anybody who was a part of QAnon would want

17     anything to do with between now and the end of the world.

18            THE COURT:  All right.  Anything else,

19     Mr. Nelson, you wanted to add?

20            MR. NELSON:  No, Your Honor.  Thank you.

21            THE COURT:  Okay.  Mr. Watkins, anything else

22     you wanted to add?

23            MR. WATKINS:  Yes, Your Honor.

24            THE COURT:  I'll give you the last word.

25            MR. WATKINS:  Thank you very much.  You know,

1    the government obviously has its job to do.  Mr. Nelson,

2    I'm very respectful of, I don't know him, he is in a

3    difficult position right now.  He does not know the full

4    extent and nature of the debriefings and all of the miles

5    and miles of footage and information that is available and

6    has been available to the Assistant U.S. Attorney.  But,

7    you know, there's two things that are really, really

8    important here.  It's disingenuous for the government, for

9    the Department of Justice to say there and to this Court

10   at this time and say there's nothing new, there's no new

11   evidence.  We're in a pandemic era.  We're conducting

12   hearings before this Court remotely.  I don't have the

13   defendant sitting at my side able to whisper in my already

14   compromised ears to tell me in the midst of a hearing, oh,

15   by the way, that flag pole, that finial was on top, it

16   wasn't affixed; if I tilted it down, it would have fallen

17   off.

18          What the problem is that renders the

19   disingenuous nature of the government's representations

20   appalling is that the government knew and if they didn't

21   know, they sure should have because they possessed that

22   flag, that flag pole and that finial since the very day

23   that the defendant voluntarily and peacefully surrendered

24   himself on January 9, that was just as the defendant said

25   he would do when he had called the FBI on January 8th and

```
1    talked to them on the phone and said, yes, you want to
2    talk to me, I'll talk to you, I'll be there, I'll be there
3    tomorrow, I'll see you then and he showed up and exactly
4    as he said.
5           This is not a man who's off the grid.  It's not
6    a man who is trying to hide.  It's not a man who has
7    demonstrated criminal background on any level ever.  He
8    represented to the Court that he had a ticket in Oklahoma
9    on the way home from the January 6th events and in fact
10    made sure that they got taken care of.  It's not
11    outstanding.  It's not an issue.  A traffic ticket.
12           So the insanity that I'm compelled to embrace
13    here is that the government is going to say, yes, we knew
14    it, we didn't represent to the Court that this finial just
15    would fall off and maybe we didn't know it, but we should
16    have known it, but I'm not going to point to that either;
17    I'm simply going to say what's new.  Well, what's new is
18    really a big deal, especially in light of the basis for
19    the decision of this Court at the initial detention
20    hearing.
21           As to the government's representations about the
22    mental vulnerabilities of my client, there's an issue.
23    And I'm the first one to admit that I am probably the
24    least touchy feely and socially sensitive human being in
25    the world.  But the fact is there are multiple forms of
```

1    mental health vulnerability that don't render somebody in
2    need of civil commitment.
3          There are transient fluid mental health
4    vulnerabilities and those vulnerabilities can take a
5    person who falls well inside the bell curve of what you
6    and I and Mr. Nelson may describe as normal and render
7    them because of some stressful or stressor or what they
8    call socio stressor event a person who is well outside
9    that bell curve of normalcy.  Be it a transient form of
10   schizophrenia and aggressive or fluid form of Aspergers, a
11   combination, bipolarity, again a combination.
12         What we're trying to do here is to avoid having
13   our client being someone who is not capable and have to be
14   civilly committed.  What we're trying to do is maintain
15   the integrity of these proceedings.  What we're trying to
16   do is to make sure that justice is served in a fashion
17   which means there is meaning to these proceedings, there
18   is a reason for the government having charged the
19   defendant, there is a reason why the defendant should have
20   the right and the ability to move forward with his defense
21   and his rights under the Constitution as a defendant, but
22   not to have the government put him in a position because
23   they have chosen to misrepresent to the Court the nature
24   and character of a very important element of the Court's
25   decision and simply say, oh, you know, we knew or maybe we

1    should have known, but we didn't do anything about and,

2    you know, that's the basis, he needs to be committed now.

3    He needs to be committed because for a hundred and fifty

4    days, he's been sitting in solitary confinement 22, 23

5    hours a day.  On the best day of the most mentally sane

6    and healthy human being in the world, you are going to

7    turn into a blithering idiot in a hundred and fifty days

8    with no end in sight.

9           I want my client to be able to be in a position

10   to confront his own -- the consequences of his own

11   actions, to do it in a learned fashion and to dispose of

12   this case, to maintain the integrity of the disposition

13   for the benefit of the government, for the benefit of the

14   defendant and for the benefit of this Court.

15          THE COURT:  All right.  The matter is submitted.

16   I'll rule as promptly as I can.  Thank you very much,

17   counsel.

18          MR. WATKINS:  Thank you, Your Honor.

19          MR. NELSON:  Thank you, Your Honor.

20

21

22

23

24

25