IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| JACOB CHANSLEY, | ) | |
| | ) | Cause No.: 1:21-cr-00003 |
| Defendant | ) | |
| | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

COMES NOW Defendant, Jacob A. Chansley ("Chansley"), by and through his

undersigned counsel, and files with the Court the following Memorandum for Sentencing.

## I.    BACKGROUND

*"My momma always said, you've got to put the past behind you before you can move on."*

**Forest Gump**

On January 6, 2021, the Defendant was one of tens of thousands of individuals who

walked from the Ellipse in Washington, DC, down Pennsylvania Avenue to the Capitol Building.

Defendant, Jacob Chansley, thereafter entered into the U.S. Capitol Building.

The Defendant was sporting his Shaman attire, replete with face paint, a tattoo-covered,

naked upper torso, and a fur pelt. He was carrying a megaphone and a flag affixed to a makeshift

flagpole topped with a misaligned, loose-fitting finial in the form of a spear.

The countless images broadcast and published by the news media showing the Defendant

in and around the Capitol on January 6, 2021, collectively gave rise to the Defendant being

inextricably linked to, and in effect, becoming for many the face of January 6, 2021.

On January 7, 2021, while returning by car to his hometown of Phoenix, Arizona, the

Defendant was advised that federal law enforcement officials were seeking to speak with him.

That same day, the Defendant called the Washington Field Office of the Federal Bureau of

Investigation and requested to speak with law enforcement.  The Defendant did so, was immediately and fully forthcoming, admitting that he was the man who had been photographed in the Capitol adorned by horns in a fashion consistent with his Shaman faith.

At the request of federal law enforcement authorities, on January 9, 2021, being the day following his return home from Washington, DC, the Defendant voluntarily appeared at the Phoenix, Arizona, FBI Field Office to continue his interview with federal law enforcement authorities.  The self-surrender of the Defendant was peaceful and punctuated by a cooperative and forthcoming demeanor.

At all times during his initial in-person interaction with Federal law enforcement, the Defendant spoke honestly.  He did so without hesitation and without legal counsel.

At that time, the Defendant exhibited further degrees of cooperation with the FBI, granting agents permission to inspect and garner possession of his car, which contained his Shaman attire, inclusive of his horns, headdress, face paint, tan pants, flag pole/finial and bullhorn.

On January 11, 2021, a Grand Jury indicted the Defendant.  The Indictment charged the Defendant with two (2) Felonies and four (4) Misdemeanors, all arising out of the January 6, 2021, appearance of the U.S. Capitol Building in Washington, DC.  This case has not progressed in a vacuum.

Thereafter, legal counsel was appointed to represent the Defendant.  A Detention Hearing was conducted by a Magistrate Judge in the U.S. District Court for the District of Arizona on January 15, 2021.  The Magistrate Judge in the U.S. District Court in Phoenix, Arizona, ruled that, given the totality of the circumstances, the Defendant's request for pre-trial release should be denied.  The denial was duly ordered and Mr. Chansley was detained.

The inauguration of President Biden as the 46th President of the United States took place on January 20, 2021.

The Defendant was thereafter transferred by the U.S. Bureau of Prisons from Phoenix, Arizona, to Washington, DC, to initially be held in the District of Columbia Department of Corrections.

On January 29, 2021, this Court heard the Defendant's Emergency Motion for Sustenance and the Court entered an Order directing the Washington, DC, Department of Corrections to serve the Defendant organic food.

Shortly thereafter, the Washington, DC, Department of Corrections confirmed with this Court an inability to comply with its Order relative to diet protocols.  The Defendant was thereafter promptly relocated to a facility in Alexandria, Virginia.

By virtue of the restrictive COVID-19 protocols established at the Alexandria, Virginia, facility at which the Defendant has been detained, and not for reasons relating to the actions of the Defendant, the Defendant has been in solitary confinement since his self-surrender on January 9, except for the time it took to transfer him to and from the U.S. Bureau of Prisons facility in Englewood, Colo., where a Court-ordered psych exam was administered to the Defendant.

The abovementioned COVID-19 protocols were a function of the March 13, 2020, declaration by the United States of a national emergency due to the virus.

Also following the events of January 6, 2021, the U.S. House of Representatives passed an Article of Impeachment asserting that then President Trump, by and through his actions and words, had incited those who had walked down Pennsylvania Avenue and entered the U.S. Capitol Building on January 6, 2021.

On January 14, 2021, the Defendant, by and through his counsel, reached out to then White House Chief of Staff Mark Meadows to confirm a request on behalf of the Defendant for a Presidential Pardon of the Defendant and other peaceful individuals who had accepted the President's invitation to go to the Capitol.

Following the January 20, 2021, cessation of the term of former President Trump as President, the Defendant was forced to reconcile his expectation that he would be pardoned with the reality that the now former President Trump not only had not done so, but was no longer in a position to do so.

In short order thereafter, the Defendant publicly announced his disappointment with former President Trump and confirmed his willingness to testify at the impeachment trial.  On February 8, 2021, the Defendant released a statement confirming his introspection, accountability, and responsibility for his actions on January 6, 2021.  The Defendant's apology was offered without consideration for its potential legal ramifications to his case.

The apology was wholly devoid of equivocation.

On February 13, 2021, the U.S. Senate voted to allow witnesses to be called in the impeachment trial of former President Donald Trump.  On February 14, 2021, the Defendant publicly reconfirmed his willingness to testify at the impeachment trial.

While the decision was ultimately made by the U.S. Senate not to hear testimony from witnesses, the ongoing willingness of the Defendant to assist in this regard was immediate and unconditional.

During the impeachment trial, evidence was presented for global consumption.  The impeachment trial of former President Donald Trump included a video presentation from the House Impeachment Managers that clearly demonstrated that a large number of those who had

traveled down Pennsylvania Avenue and into the U.S. Capitol on January 6, 2021, believed and understood that they were following then President Trump's order/directive/suggestion to do so.

Subsequent to the impeachment trial, the House Floor Manager who handled the presentment of the prosecution to the U.S. Senate filed an independent civil action against former President Trump seeking recovery under the U.S. Anti-Racketeering Act in which the publicly elected official Plaintiff specifically noted that if the allegations of former President Trump regarding the election were true, that would have justified the actions of those who appeared at and in the Capitol on January 6, 2021.

During the summer of 2021, Defendant's counsel shared with the Court concern about the mental health and wellbeing of the Defendant, attributing the issues to indicia of the need for prompt mental health care.

In response thereto, this Court directed the U.S. Bureau of Prisons to conduct a psychological examination of the Defendant, ultimately culminating in the preparation of a forensic psychological report by Angela J. Van der Walt, Psy.D, ABPP, Licensed Clinical Psychologist, Board Certified in Forensic Psychology, American Board of Professional Psychology with the U.S. Department of Justice, Federal Bureau of Prisons.  The Forensic Psychological Report was provided to this Court as were 2006 medical records from the United States Military depicting a prior psychological evaluation in 2006 while the Defendant was serving on active duty on the USS Kitty Hawk.

The July 13, 2021 Forensic Psychological Report concluded with a diagnosis of the Defendant that was consistent with but more credibly detailed than findings arising out of the 2006 examination of the Defendant.

The Defendant was diagnosed with mental health infirmities both in 2006 and in 2021. The 2006 report concluded with the determination that the Defendant was "fit for duty" and the 2021 report concluded that the Defendant was "competent."

This Court found the Defendant competent to proceed herein. The Defendant's counsel pointedly concurred with the finding of competency. Prior to the forensic psychological evaluation, the Defendant voluntarily and without condition agreed to and was subjected to debriefing interviews with the Assistant United States Attorney in the company of federal law enforcement personnel.

On September 1, 2021, Mr. Chansley pleaded guilty to Count II of the Indictment, being "Obstruction of an Official Proceeding, in violation of 18 USC 1512(c)(2)." The plea was entered pursuant to a written Agreement. In the Agreement, the parties estimated a total offense level of 22 and anticipated an advisory guideline range of 41 to 51 months in federal prison. The Pre-Sentence Investigation Report confirms these estimates. For the reasons set forth below, a sentence of time served will prove sufficient, but not greater than necessary, to comply with the purposes of sentencing.

## II. The Purposes of Sentencing

There are four (4) Purposes of Sentencing: Retribution, Deterrence, Incapacitation, and Rehabilitation, see Tapia v. United States 564 US 319, 325(211) and under 18 USC Section 3553(a), this Court must impose a sentence "sufficient," "but not greater than necessary, to comply with [these purposes]." The United States Sentencing Commission's ("Commission") Guidelines identify a sentence between 41 months and 51 months as appropriate to meet these purposes based on the offense and offender facts they consider. But the available information

and Mr. Chansley's history and characteristics show the statutory purposes of sentencing do not justify a sentence in excess of the time served to date by the Defendant.

### A.  Retribution

Of the purposes of sentencing, Retribution is the most difficult to measure.  But it is not altogether immeasurable, and retribution-related factors commonly relied on by Courts in similar cases to justify downward variances warrant the same sentencing consideration herein.  The Plea Agreement entered into by the parties permits the Defendant's counsel to argue for a sentence that deviates downward from the range of sentencing recommended by the Federal Sentencing Guidelines.  As of the date of sentencing, Mr. Chansley has served 317 days in solitary confinement due to COVID-19 protocols. Mr. Chansley's first weeks of his post-surrender confinement were spent fasting pending resolution of dietary issues. The Alexandria, Virginia facility to which Mr. Chansley was transferred and held for the majority of his pre-sentencing detention is dank, fully enclosed without exposure to the outside, and sound buffered. Mr. Chansley's confinement was endured without end in sight. He has not been involved in a single incident of misconduct while confined. He blames no one for his plight, reflecting contrition for his misconduct. The conditions of Mr. Chansley's incarceration have taken a significant toll on his mental and emotional health. See PSR. To ensure his safety, Mr. Chansley has been confined to solitary confinement where he spends 22+ hours a day locked in a cell alone. Family visitation time is limited to just two 30-minute visits per week, a moot restriction by virtue of his family's lack of resources to travel to and from Alexandria, Virginia from Arizona. He suffers from severe anxiety, panic attacks, and a constant feeling of claustrophobia while he is locked alone in his cell each day. These conditions of confinement were designed for violent offenders who pose risks to the safety of other inmates or jail personnel, or who are placed in solitary confinement as

punishment for disciplinary infractions; they were surely not intended for the long-term

confinement of a first-time non-violent offender. Section 3553(a) recognizes that the Court

should take into account any medical issues facing the defendant and whether the sentence

imposed will "provide the defendant . . . with needed medical care . . . in the most effective

manner." 18 U.S.C. § 3553(a)(2)(D). The advisory Guidelines likewise provide that: Physical

condition or appearance, including physique, may be relevant in determining whether a departure

is warranted, if the condition or appearance, individually or in combination with other offender

characteristics, is present to an unusual degree and distinguishes the cases from the typical cases

covered by the Guidelines. An extraordinary impairment may be a reason to depart downward;

e.g., in the case of a mentally infirm defendant, home detention may be as efficient as, and less

costly than, imprisonment. Courts routinely impose non-custodial sentences in cases involving

defendants who suffer from serious medical conditions. For example, following the defendant's

conviction after trial for wire fraud in United States v. Burks, 2010 WL 1221752 (E.D.N.Y. Mar.

29, 2010) , the sentencing court imposed a sentence of one month incarceration and five years'

probation despite a Guidelines range of 57-71 months where, inter alia, the defendant suffered

from degenerative diabetes. Id. at *2; see also United States v. McFarlin, 535 F.3d 808, 810-11

(8th Cir. 2008) (affirming variance for 56-year old defendant with numerous health problems,

including coronary disease and who had undergone several operations); United States v. Alatsas,

2008 WL 238559 (E.D.N.Y. Jan. 16, 2008) (imposing a term of probation, despite Guidelines

range of 24-30 months where, inter alia, "[d]efendant has multiple complex medical problems,

which will be better cared for outside of prison."). In United States v. Barbato, 2002 WL

31556376 (S.D.N.Y. Nov. 15, 2002), a pre-Booker decision, the defendant pled guilty to using

extortionate means to collect extensions of credit. The sentencing court granted a downward

departure from a then-mandatory Guideline range of 24-30 months imprisonment based on the defendant's history of heart problems, and imposed a sentence of home detention and two years of supervised release. Notably, the Barbato court imposed home confinement even though the prosecution contended that the Bureau of Prisons would be able to provide adequate treatment for the defendant's health conditions. The court noted that "[i]t is often relevant, though not always controlling, whether the BOP can provide adequate care." Id. at *4. The Court has been apprised under seal of details relating to medical and mental health care, housing, security and counseling being made available to the Defendant.

### B. Deterrence

General Deterrence does not justify a sentence in excess of time served.  In fact, "[l]ittle credible evidence" suggest that increases in sentence severity reduce crime through general deterrence.  See e.g., <u>United States v. Yeaman</u>, 248 F.3d 223, 238 (3rd Cir. 2001) ("it is widely recognized that the *duration* of incarceration provides little or no general deterrence for white collar crimes.") (citation omitted) (emphasis in the original); see also Cheryl Marie Webster and Anthony N. Doob, *Searching for Sasquatch: Deterrence of Crime through Sentence Severity*, The Oxford Handbook of Sentencing and Corrections, p. 174-175, Oxford University Press (2012) (Despite enormous research efforts, no credible consistent body of evidence has been found to support the conclusion that harsher sentences (within ranges conceivable in Western democracies) achieve marginal deterrent effects on crimes."); Valerie Wright, Ph.D., Research Analyst, the Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty Versus Severity of Punishment* at 9 (2010) ("Existing evidence does not support any significant public safety benefit of the practice of increasing the severity of sentences by imposing longer prison terms.  In fact, research findings imply that increasingly lengthy prison terms are

counterproductive."); Anthony N. Doob, Cheryl Marie Webster and Rosemary Gartner, *Issues Related to Harsh Sentences and Mandatory Minimum Sentences: General Deterrence and Incapacitation*, at A-3, University of Toronto, Centre for Criminology & Social Studies, (2014) ("At this point, we think it fair to say that we know of no reputable criminologist who has looked carefully at the overall body of research literature on 'deterrence though sentencing' who believes that crime rates will be reduced, through deterrence, by raising the severity of sentences handed down in criminal courts."); Michael Tonry, *Learning from the Limitations of Deterrence Research*, Chicago Journals, Crime and Justice, Vol. 37, No. 1, University of Chicago Press (2008), pp 301-302 ("It is unclear to me which is more surprising: that so little credible evidence exists that criminal behavior is much affected by changes in punishment policies or that policy makers continue to believe that policy changes significantly affect behavior and that research continued to test for their crime-preventive effects.")

"Three National Academy of Science panels, all appointed by Republican presidents, [have] reached [this] conclusion, as has every major survey of the evidence."  Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006).

Research abroad has concluded the same, *see e.g.*, Andrew Von Hirsch, et. al., Cambridge University, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (finding no data to support a statistically significant correlation between increases in sentence severity and crime rate reductions); *see* also David Farrington, et al., *Changes in Crime and Punishment in America, England, and Sweden between the 1980s and the 1990, Studies in Crime Prevention*, 3:104-131(1994) (comparing crime and punishment trends in the United States, England, and Sweden and failing to detect any decrease in crime rates as a

result of increases in sentence severity), as has more recent research published in *Federal Probation.  See e.g.*, Kelli D. Tomlinson, *An Examination of Deterrence Theory: Where do We Stand?*, 8-Dec Fed. Probation 33 (2016) (concluding "non-legal factors, such as marriage, employment, peers, morality, disapproval from loved ones, ostracism, and shame, hav[e] more impact on conformity than do sanctions and threats.").

In short, no evidence indicates that a sentence in excess of time served will better promote the purpose of general deterrence than will a sentence of time served.

## C. **Incapacitation**

Incapacitation does not justify a sentence greater than time served.  Mr. Chansley's criminal history Category I status reflects his reduced re-offense risk relative to similarly situated offenders in all other criminal history categories.  *See* United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, pp. 28-30 (May 2004) [hereinafter "*Measuring Recidivism*"].  But his re-offense risk is lower than that of most criminal history Category I offenders, as well.  *See id*. Mr. Chansley's status as a true "first offender"[1] does the same and, in the words of the Commission, places him among the "federal offenders who are the least likely to reoffend."  *Recidivism and the "First Offender": A Component of the Fifteen Year Report on The United States Sentencing Commission's Legislative Mandate* at 17.

## D. **Rehabilitation**

---

[1] The term "first offender" includes offenders with one or more prior arrests.  It excludes offenders with one or more prior convictions.  *See Recidivism and the "First Offender": A Component of the Fifteen Year Report on the United States Sentencing Commission's Legislative Mandate, Introduction (May 2004)*.  Most Criminal History Category I offenders have one or more prior convictions and are not first-offenders.  *See id*. At 17.  Chansley has no prior convictions or arrests.  *See* PSR at ¶¶. 90-94

Mr. Chansley has several rehabilitative needs.  *See* PSR at ¶¶ 101-104.  But those needs do not justify a sentence more than time served.  Indeed, most research indicates that rehabilitative services are best delivered within a community setting, rather than a setting of confinement.  *See e.g.*, Washington State Institute for Public Policy: *Evidence-Based Public Policy Options to Reduce Future Prison Construction, Criminal Justice Costs and Crime Rates*, Exh. 4 at 9 (October 2006) (finding rehabilitative services delivered in non-custodial settings reduce recidivism rates at greater rates than do services delivered in custodial setting); *see also* Bruce P. Archibald, *Let My People Go: Human Capital Investment and Community Capacity Building via Meta/Regulation in a Deliberative Democracy – A Modest Contribution for Criminal Law and Restorative Justice*, 16 Cardozo J. Int'l & Comp. L. 1 at 79 (2011) (noting imprisonment isolates offenders from regular social interactions, inhibits their capacity to interact positively with well-integrated members of society, and disrupts family relationships).

More importantly, under existing precedent, courts cannot lengthen a term of imprisonment to promote a defendant's rehabilitation.  *See Tapia v. United States*, 564 U.S. 319, 335 (2011) ("As we have held, a court may not impose or lengthen a prison sentence to enable an offender to complete a treatment program or otherwise to promote rehabilitation.").  They can and should, however, impose supervised released conditions to further rehabilitative needs where appropriate.  *See* 18 U.S. C. § 3583 (instructing courts to consider a defendant's rehabilitative needs in determining the conditions of supervised release to impose).

### III. Jacob A. Chansley

On January 6, 2021, the images of Mr. Chansley spontaneously and globally became iconic images inextricably linked to and commanding immediate association with the events at

the Capitol. They have become to January 6 what the Swoosh is to Nike. At first blush, the images of Mr. Chansley elicited in many feelings of disdain and repudiation.

These initial, emotion-driven impressions of Mr. Chansley should have been tempered by what in hindsight were obvious indicia of mental health vulnerabilities. Mr. Chansley was half-nude for the entire morning and early afternoon of a wintery January 6, when the temperature was in the 30s and low 40s in Washington, DC. His tattoo-inked torso was on full display, his face carefully painted in the colors of the nation's red, white and blue, his crown adorned by horns and his "costume" accessorized by a fur pelt. His Shamanic chants were further indicia of mental health vulnerabilities. So too was the rapid clip at which his widely published post-Capitol entry speech was uttered. So too were his gait and apparent Forest Gump-like obliviousness too much of the activity and many of the actions of those surrounding him as he approached, entered, and traversed the Capitol.

The events that led Mr. Chansley to do what he did on January 6, 2021, antedate his presence in the Capitol. He was not an organizer. He was not a planner. He was not violent. He was not destructive. He was not a thief.

Instead, the actions of Mr. Chansley on January 6, 2021, resulted from a host of issues and traumas. Mr. Chansley's biological father was drug- and alcohol-addled and incarcerated for the lion's share of Mr. Chansley's life. He played no parental or financial role in Mr. Chansley's life. Mr. Chansley saw him one time in his life, a brief meeting so unimpressive as to render elusive the year in which the meeting occurred, being either 2018 or 2019.

Mr. Chansley's "father" was in fact his stepfather, a man whose alcoholism and drug use increasingly impaired his parenting skills, resulting in extraordinary physical and mental abuse being imposed on Mr. Chansley, as more fully delineated in the Government's presentence

investigation report. Nevertheless, Mr. Chansley, as a young adult, and despite the long standing abuse and neglect at the hands of his step-father, was the sole provider of care accorded his stepfather until the abuse became too much for a 25 year old Mr. Chansley to handle.

In May of 2013, Mr. Chansley's stepfather committed suicide using a combination of pills and alcohol to do so.

Mr. Chansley was deemed the "oddball" by his classmates from his formative grade school years through high school. He was bullied ceaselessly and subjected to physical abuse in the process. Mr. Chansley's mother worked full time, recognized her son's potential mental health issues, was advised by teachers that Mr. Chansley should perhaps be examined generally, and for Attention-Deficit/Hyperactivity Disorder in particular. Not wanting to resort to medication, and not having the resources to pay for specialized care, she did not consult with any medical professionals, opting instead to stress exercise and diet

Mr. Chansley was graduated from high school on schedule in 2005 and briefly attended a local community college. Strapped financially and ungratified by community college, he left the community college and commenced a disciplined self-education protocol, one that was both scholastic and spiritual in nature. While disciplined, and while demonstrating a high intellectual capacity, Mr. Chansley's self-directed forays in this regard fell outside the sphere that many would characterize as normal. Mr. Chansley embraced Shamanism as his spiritual leaning, one that was sprinkled with Judeo-Christian markings; the words and actions of Gandhi; and a sincere belief in the role of the paranormal in his life. Mr. Chansley wrote science fiction and poetry, much of it weaving tales that combined his unique spiritual and personal beliefs. Mr. Chansley painted. His pieces tended to be marked by colorful bursts of unique design and exaggerated figures.

Mr. Chansley served in the U.S. Navy in 2006-2007. While serving aboard the U.S.S. Kitty Hawk, Mr. Chansley consulted with the ship's medical doctor seeking clarification as to whether he was "crazy". A series of consultations with the doctor ensued, resulting in a 2006 diagnosis of Schizotypal Personality Disorder, an incurable uncommon condition marked by social isolation (not to be confused with solitary confinement), interpersonal relationship issues, limited range of emotions responsive to social cues, and strange or eccentric behavior. Tragically, while the question may have been answered for the U.S. Navy, neither the doctor nor anyone affiliated with the U.S. Navy advised Mr. Chansley of the serious mental health vulnerability with which he was diagnosed.

Upon honorable discharge from the Navy, Mr. Chansley returned to his home in Arizona, working with troubled youths, moving forward with his self-education about his chosen Shamanic faith, and seeking to make sense of his own uniqueness. Through and despite his hardships, Mr. Chansley remained deeply committed to the Ahymsal way of life, one that involves the perpetration of no violence or threats of violence against any man, animal, or insect. Since the deaths of his father and his stepfather and since his discharge from the U.S. Navy, Mr. Chansley has spent his adult years as a loner, with neither guidance nor resources, forging his own path in a society that is largely unequipped to identify and help people like him, people with mental health vulnerabilities.

The schools attended by Mr. Chansley during his grade school years through his high school tenure had the opportunity to help. They did not do so.

Mr. Chansely's biological father had his own problems. He did not help.

Mr. Chansley's stepfather did not help for he, too, had his own problems. He committed suicide.

To its credit, the U.S. Navy identified an issue and diagnosed it in 2006. But the Navy kept the diagnosis secret from the otherwise "fit for duty" sailor. Of course, this was no help.

Not surprisingly, in the ensuing 15 years, Mr. Chansley continued his self-directed spiritual and educational path. Just as unsurprisingly, this path was one of a loner whose status as such remained intact until he found himself caught up in the political milieu that erupted with the Republican Party's nomination of Donald Trump to run for re-election in 2020. The resultant instant community was a fit for Mr. Chansley, one that accorded him the opportunity to be seen, to be heard, and to become part of something he believed to be noble and patriotic, right and righteous. Social media was a perfect medium to serve as an agar in which this comforting community thrived and through which Mr. Chansley could be heard. The exponential growth of social media during the COVID-19 pandemic fanned the flames. The heightened societal acceptance of social media-driven rhetoric and propaganda further fanned the flames. Many in this community identified Mr. Chansley's Shamanic attire, articulate verbal skills, costume-like attire, and booming voice as an ideal presence to boost the impact of their political rallies. While targeted to serve as a political rally's de facto 'guy at the door' calling patrons for Boston's Combat Zone shops of "Live Girls", Mr. Chansley saw himself as a patriot, one who was admired for his self-taught discipline and sincere love for his country. Mr. Chansley was targeted. The arrow landed dead center.

The foregoing all combined to create a powerful socio stressor (a triggering mechanism for Schizo-Personality Disorder), one that strained the vulnerabilities that the U.S. Navy's undisclosed 2006 diagnosis had identified. That socio stressor heightened a manic state in Mr. Chansley on January 6, 2021, and for a few days thereafter.

On January 9, 2021, Mr. Chansley peacefully and voluntarily self-surrendered to federal law enforcement authorities in Phoenix, Arizona. His horns and fur and flag and pants were seized. With that seizure, Mr. Chansley's journey continued *sans* the flamboyant attire. Mr. Chansley was ordered detained by an Arizona Magistrate. The system was not prepared to identify or deal with an accused person possessed of mental health vulnerabilities. As a result, it did not.

Mr. Chansley was alone. The threat posed by COVID-19 induced a protocol requiring his confinement in solitary, aka "administrative deseg." His initial requests for organic food were not received favorably by the District of Columbia Department of Corrections ("DC DOC"). The DC DOC had possession of Mr. Chansley. It was not prepared to identify or deal with an accused possessed of mental health vulnerabilities. As a result, it did not.

The Court ordered that organic food be served to Mr. Chansley. The DC DOC advised the Court that it could not comply with the Court's directive. The Court moved Mr. Chansley to a Commonwealth facility based in Alexandria, Virginia, ("Virginia Detention Facility") acting under a contract with the U.S. Bureau of Prisons ("BOP"). The Virginia Detention Facility also operated under a COVID-19 Response protocol requiring Mr. Chansley be housed in solitary confinement. The Virginia Detention Facility was not prepared to identify or deal with an accused possessed of mental health vulnerabilities. As a result, it did not.

Interaction by the undersigned with Mr. Chansley gave rise to patent indicia of mental health vulnerabilities that, at first blush, had gone unnoticed by all, Defendant's counsel included.

Without speaking for the U.S Bureau of Prisons, the U.S. Department of Justice, the U.S. Navy, the Office of the United States Attorney, our federal judiciary, U.S. Pretrial Services, the

Assistant United States Attorney assigned to the present matter, but admittedly speaking for the Defendant's counsel, one can, with color and integrity, assert that the role of mental health vulnerabilities in the underlying fact situation giving rise to the present case cannot be underestimated.

Employing a lawyer's skills as a lay person devoid of medical and mental health training or education, the routine observation of Mr. Chansley confirmed his slide into an abyss caused by his decline in mental health; the undersigned feared for the health and well-being of Mr. Chansley. Requesting a psychological evaluation of a client in a case of this nature is not common. The request was not without risk -- to Mr. Chansley and to the undersigned. The resulting 2021 Psychological Evaluation Report ("Report") supported (albeit with heightened medical profession integrity) the diagnosis of Mr. Chansley's significant mental health vulnerabilities, diagnostically concluding Mr. Chansley suffered from Schizotypal Personality Disorder, anxiety and depression. The 2021 confirmation of the 2006 diagnosis of Schizotypal Personality Disorder is noted by Dr. van der Walt as being an "enduring disorder that is unlikely to change without intensive therapeutic intervention." See Dr. van der Walt's Forensic Psychological Examination dated July 13, 2021 for more details.

The tragic non-disclosure to Mr. Chansley of his 2006 diagnosis is a bell that cannot be un-rung. The delay on the part of the undersigned, the U.S. BOP, the U.S. DOJ, the prosecuting AUSA, indeed all in our land, to identify Mr. Chansley's mental health vulnerabilities is also a bell that cannot be un-rung. We are now presented with the redeeming opportunity to act appropriately, given what we now know of Mr. Chansley's condition.

It is universally accepted that the placement in solitary confinement of those possessed of mental health vulnerabilities of the nature possessed by the Defendant is nothing short of torture.

Not political torture. Simply unwitting torture that, if designed with intent, could not more effectively serve to deliver Mr. Chansley and others in like state into the proverbial mental health abyss. Each day of confinement, 22+ hours spent absolutely alone, adversely affected Mr. Chansley, serving as an unwitting push in the wrong direction. Imagine knowing that your sole touchtone to human interaction was limited to COVID-19-induced remote contact with legal counsel.

With humility and introspection-induced trepidation, I can say with confidence that Mr. Chansley is in dire need of mental health treatment, starting with the ability to interact with others. I call on the U.S. DOJ, the AUSA prosecuting the present matter, the U.S. BOP, this Court and all those who support all of us to push for his release as soon as possible. Further delay jeopardizes his mental stability.

It is respectfully suggested that this Court has the opportunity to not simply do that which is medically prudent and legally supported, but also to place front and center the important role of mental health in our otherwise divided world. Perhaps this act of educated compassion would serve to bring to the fore the patience and empathy required of all Americans, regardless of their political leanings, beliefs, and inspirations, to overcome the otherwise prevailing great divide.

This case is not about Donald Trump. It is not about politics. It is not about conspiracy theorists and those who embrace the resultant conspiracies. It is not about an insurrectionist seeking to overthrow a government or seeking to thwart the peaceful transition of power. It is not about elections, those seeking to be elected or re-elected. It is not about impeachment or prosecution of politicians or their counsel and aides and confidants. It is not about any one or more charges. It certainly is not about pardons. Mr. Chansley is not a political prisoner. He does not seek to be labeled such. Rather, this case is about a frail and vulnerable human…one of our

own (possibly our sibling, kin, friend, colleague, co-worker, neighbor). It is about an American whose search for answers ended with the disclosure to him of the Court-ordered Psychological Examination Report. This case is about a remarkable, gentle, kind, smart, spiritual, non-violent young man who has spent his life trying to overcome significant but secreted vulnerabilities, hardships, and societal neglect to self-educate scholastically, self-educate spiritually, self-navigate societally, and self-conclude that he is accountable for his actions, seeks to be held accountable, and wishes nothing short of the Court recognizing same. He seeks not to abdicate his responsibility for what he has done. His counsel seeks to advocate for a global recognition of diminished culpability. It is readily acknowledged that the only recognition of diminished culpability that matters is that of this Court. Mr. Chansley's struggle is very much our struggle. His struggle is not his identity.

## IV. The Sentence

The Court has the authority and discretion to impose a wide range of alternatives to the lengthy term of incarceration contemplated by the Guidelines or the maximum penalty authorized under the relevant statutes. A sentence significantly below the statutory maximum is appropriate in this case in light of: Mr. Chansley's sincere remorse for his conduct; his acceptance of responsibility as reflected in the plea agreement; the fact that he has a long standing mental health diagnosis which has been secreted from him (effectively wasting not less than 15 years of opportunity to confront and deal with his vulnerabilities).

As of the date of sentencing, Mr. Chansley will have served 317 days, all of which were in COVID-19-related solitary confinement (save travel to, from and Court-ordered appearance in the U.S. BOP Englewood, Colorado medical facility where the psychological examination of Mr. Chansley was conducted). Mr. Chansley voluntarily and peacefully self-surrendered. Mr.

Chansley was at all times forthcoming, transparent to federal law enforcement, the AUSA prosecuting the case, and those who participated in the multiple debriefings to which Mr. Chansley voluntarily subjected himself. Mr. Chansley has endured his detention without a single incident of misconduct. He seeks not to be seen as a political prisoner. He seeks not to blame a former president for his actions. He seeks not to justify his actions with any explanation. He seeks solely to be held accountable. He has done so with alarmingly intact acuity. He has lost his maternal grandfather, his only positive male role model, while sitting in solitary confinement. He blames himself, not others. He is now, for the first time in his life, possessed of and aware of his diagnosis, a reality that accords him comfort, not angst. He has pleaded guilty because he is guilty. More importantly, he seeks the Court's compassion for the right reason.

The Plea Agreement attendant to this case contemplates the ability of Mr. Chansley to seek a sentence beneath that recommended by the Federal Sentencing Guidelines. The Federal Sentencing Guidelines recognize as an important basis for the Court's downward departure from the range recommended by the FSG the mental health vulnerabilities of Mr. Chansley. While Mr. Chansley did not plead with a 5K1.1 plea deal, he chose to and, in fact, did assist the Government on a number of fronts, including voluntarily participating in debriefings and ensuring the procurement by the Government of much sought-after video footage depicting the theft by others of classified materials, unrelated and unknown to Mr. Chansley, on January 6, 2021.

The letters submitted under seal to this Court supporting the prompt release of Mr. Chansley come from those who associate with the political right, the political left, and in between. The man who has become the face of the events of January 6, 2021, is now the face of all of those who call themselves Americans, all of whom are compelled to address and reconcile

roles, be they active or passive, in creating the environment in which the events of January 6, 2021 erupted. Some of the letters miss the point. Others raise good points. All of the letters support the release of Mr. Chansley.

This Court is uniquely postured and charged with the duty to hold accountable a man (a kid, really) who instantly became the face of January 6, 2021. This Court is uniquely postured to partially un-ring the bell in a legally and humanely appropriate fashion. This Court is uniquely postured to demonstrate for all of America, nay the World, that which has and will prospectively render this fair land the fairest of all lands. The Court may do so secure in the knowledge that its compassion will not be subjected to ridicule nor the Court's patience held for naught. The Court may send a message all must hear. Our countrymen must hear that simple message. Patience and compassion represent the only course that is medically appropriate, ethically appropriate, and legally appropriate. It is time for the Shaman to start on his journey to freedom -- not from jail, but from mental health infirmities of significance. It is time for Mr. Chansley to commence his journey from within.

## IV. Conclusion

For all of the foregoing reasons, Defendant respectfully requests that the Court impose a sentence significantly below the range of sentencing recommended under the Federal Sentencing Guidelines, recognizing the harshness of the conditions surrounding time served to date, and impose such sentence as permits Mr. Chansley to proceed hence with his pursuit of his mental and physical health prioritized, and for such other and further relief and conditions as the Court deems just and meet in the unique circumstances herein.

Date:  November 9, 2021                    Respectfully Submitted,

                                           KODNER WATKINS

                                           By: /s/ Albert S. Watkins
                                               ALBERT S. WATKINS, MO#34553
                                               1200 South Big Bend Boulevard
                                               St. Louis, MO 63117
                                               Phone: (314) 727-9111
                                               Facsimile: (314) 727-9110
                                               E-mail: albertswatkins@kwklaw.net

### CERTIFICATE OF SERVICE

Signature above is also certification that on November 9, 2021, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court utilizing the CM/ECF system which will send notification of such filing to all parties of record.