**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : |
| | :  **CR. NO. 21-CR-003 (RCL)** |
| **v.** | : |
| | : |
| **JACOB ANTHONY CHANSLEY,** | : |
| | : |
| **Defendant.** | : |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

*"Thank you Heavenly Father for gracing us with this opportunity…to allow us to send a message to all the tyrants, the communists, and the globalists, that this is our nation, not theirs. That we will not allow America, the American way of the United States of America to go down…Thank you for filling this chamber with Patriots that love you… Thank you for allowing the United States of America to be reborn. Thank you for allowing us to get rid of the communists, the globalists, and the traitors within our government.*

- *Defendant Jacob Chansley, January 6, 2021, on the Senate Dais inside the U.S. Capitol, to rioters gathered in the Senate chamber.*

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits its Sentencing Memorandum as to Defendant Jacob Chansley ("defendant"). As noted in the Presentence Investigation Report (ECF No. 77), the defendant faces a United States Sentencing Commission guidelines range of 41 to 51 months' incarceration and a statutory maximum sentence of 20 years' incarceration for Count Two of the indictment, Obstruction of an Official Proceeding. For the reasons set forth below, the United States respectfully recommends that the Court impose a sentence of 51 months' imprisonment followed by three years' supervised release, and $2,000 restitution.

1

**INTRODUCTION**

**I.      FACTUAL BACKGROUND**

**A.      The January 6, 2021 Attack on the Capitol**

On January 6, 2021, hundreds of rioters, Chansley among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

On January 6, 2021, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings

underway inside. At approximately 2:00 p.m., certain individuals, forced their way over the barricades and past the officers, and the crowd, the defendant among them, advanced to the exterior of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, at approximately 2:13 p.m., individuals in the crowd forced their way inside the building, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. As law enforcement spent the next several hours attempting to quell the riot, more than 140 members of law enforcement were assaulted by the rioters. See Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf. All proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the U.S. Capitol and grounds from the time he was evacuated from the Senate Chamber until the session resumed. *See* Statement of Offense ¶¶ 2-9; PSR ¶¶ 18-24.

The attack caused extensive, and in some instances, incalculable losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. See, e.g., Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), available at https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf; United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), available at https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The substantial damage to the U.S. Capitol required the expenditure of nearly $1.5 million dollars for repairs.

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the

Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.").

**B.  Defendant's Role in the January 6, 2021 Attack on the Capitol**

In the weeks leading up to January 6, 2021, the defendant used his social media presence

to spread the type of false information and hateful rhetoric that led thousands of rioters to descend

on the U.S. Capitol on January 6, 2021. The defendant had accrued thousands of followers across

several platforms, including Facebook, Rumble, Parler, and YouTube.



*"We shall have no real hope to survive the enemies arrayed against us until we hang*
*the traitors lurking among us." -Facebook Post from Jacob Chansley, November 19, 2020*

On January 6, 2021, at approximately 1:50 p.m., the defendant was among the rioters at

the police line on the West front of the U.S. Capitol building, where U.S. Capitol Police and

Metropolitan Police were standing in a line behind temporary bike rack style barricades in order

to keep back the crowd. The defendant climbed the media tower erected for the Inauguration,

directly ahead of the police line holding the rioters back at the West front.[1]  The defendant was

dressed in a viking hat with fur and horns, was shirtless, wearing red, white and blue face paint,

and carrying an American flag tied to a pole with a spear at the tip and a bullhorn.

---

1 See submitted Government Exhibit 1.



***Photograph from The Telegraph of Jacob Chansley on the media tower at the West Front of the U.S. Capitol***

When rioters then breached the police line at the West front, the defendant entered the scaffolding erected to the northwest of the plaza, which led to the top of the staircase heading up to the Lower West Terrace of the U.S. Capitol grounds. The defendant and others were briefly blocked there by police, before they pushed past the police line at the top of the scaffolding, and entered the Upper West Terrace of the U.S. Capitol grounds at approximately 2:10 p.m.[2]

---

2  See submitted Government Exhibit 2.



***Capitol CCTV Camera Upper West Terrace, appx 2:10 p.m.***

The defendant and others in the mob then approached the first floor of the U.S. Capitol building on the Senate side.[3] Other members of the mob broke two windows and jumped inside the building at approximately 2:13 p.m., as a lone law enforcement officer attempted to keep the rioters at bay with pepper spray. Those rioters then broke open the Senate Wing Door to the U.S. Capitol building, setting off a loud alarm. The defendant then entered through the broken door at approximately 2:14 p.m. The defendant was among the first 30 rioters inside the U.S. Capitol building on that day.[4]

---

3 See submitted Government Exhibit 3.
4 See submitted Government Exhibit 4.



*Capitol CCTV Camera Senate Wing, appx 2:14 p.m.*

At approximately 2:16 p.m., the defendant and other rioters ascended the stairs to the second floor on the Senate side of the U.S. Capitol building.[5] In a clearing on the second floor, the defendant and other rioters were met by a line of U.S. Capitol Police officers who instructed them to leave the building peacefully. The defendant challenged U.S. Capitol Police Officer K. R. to let them pass, ultimately using his bullhorn to rile up the crowd and demand that lawmakers be brought out.

---

5  See submitted Government Exhibit 5.





*Getty Images and AFP Photographs of Jacob Chansley on Second Floor of Senate Wing of U.S. Capitol in front of U.S. Capitol Police Officer*

Instead of obeying the instructions of the U.S. Capitol Police to leave the building, the defendant traversed another staircase to the third floor of the Senate side of the U.S. Capitol building. At approximately 2:52 p.m., the defendant entered the Gallery of the Senate alone.[6] The

---

6  See submitted Government Exhibit 6.

defendant then proceeded to scream obscenities in the Gallery, including "time's up motherfuckers," while other rioters flooded the Chamber below.[7]



***Getty Image of Jacob Chansley in Senate Gallery***

The defendant then left the Gallery and proceeded down a staircase in an attempt to gain entry to the Senate floor. There, the defendant once again encountered Officer K.R., who again asked him to leave the building. The defendant insisted that others were already on the Senate floor and he was going to join them. Officer K.R. then followed the defendant on to the Senate floor.

The defendant then scaled the Senate dais, taking the seat that Vice President Mike Pence had occupied less than an hour before.[8] The defendant proceeded to take pictures of himself on the dais and refused to vacate the seat when Officer K. R., the lone law enforcement officer in the Chamber at the time, asked him to do so. Instead, the defendant stated that "Mike Pence is a

---

7 See submitted Government Exhibits 7 and 8.
8 See submitted Government Exhibit 9.

10

fucking traitor" and wrote a note on available paper on the dais, stating "It's Only A Matter of Time. Justice Is Coming!"[9]



***Note Written by Defendant Chansley at the Senate Dais and Collected by U.S. Capitol
Police***

After Officer K. R. again asked the defendant to vacate the seat, the defendant remained, calling other rioters up to the dais and leading them in an incantation over his bullhorn, which included giving thanks for the opportunity "to allow us to send a message to all the tyrants, the communists, and the globalists, that this is our nation, not theirs, that we will not allow America, the American way of the United States of America to go down." The defendant went on to say "[t]hank you for allowing the United States of America to be reborn. Thank you for allowing us to get rid of the communists, the globalists, and the traitors within our government."[10]

Finally, at approximately 3:09 p.m., after Chansley had spent eight minutes on the Senate floor, other law enforcement officers arrived to support Officer K. R. and clear the defendant and

---

9  See submitted Government Exhibit 10.
10  See submitted Government Exhibit 11.

other rioters from the Chamber.[11]  The defendant screamed "FREEDOM!" into his bullhorn as he was finally escorted by police from the building, approximately one hour after entering it. The actions of the defendant and his fellow rioters halted the normal functioning of the Congress on January 6, 2021, including the certification of the electoral college votes for the 2020 Presidential Election, and were calculated to do just that.

In the days after January 6, 2021, the defendant gave interviews to media outlets,[12] including an interview with NBC News in which the defendant stated, "[t]he fact that we had a bunch of our traitors in office hunker down, put on their gas masks and retreat into their underground bunker, I consider that a win."[13]  The defendant also called the FBI, and admitted that he was the horned man on the Senate floor, was glad he sat in the Vice President's chair because Mike Pence was a "child trafficking traitor," and stated that the current government of the United States was tyrannical, with conditions similar to those prior to the American Revolutionary War. After his arrest, the defendant also gave an interview to CBS 60 Minutes+ from jail, in which he minimized his actions on that day, claiming he was let into the building by law enforcement, and was merely intending "to bring divinity, to bring God back into the Senate."[14]

## II.    PROCEDURAL BACKGROUND

On January 9, 2021, pursuant to an arrest warrant, the defendant was arrested at the FBI offices in Phoenix, Arizona. ECF No. 1. On January 11, 2021, the Grand Jury returned an indictment charging the defendant with, *inter alia*, obstruction of the Electoral College vote that took place at the U.S. Capitol on January 6, 2021, to which he has now pleaded guilty. ECF No.

---

11 See submitted Government Exhibit 12.
12 https://www.telegraph.co.uk/news/2021/01/08/qanon-shaman-claims-like-martin-luther-king-capitol-riot/
13 https://www.nbcnews.com/news/us-news/capitol-rioter-horned-hat-gloats-feds-work-identify-suspects-n1253392
14 https://www.cbsnews.com/news/qanon-shaman-capitol-riot-interview-60-minutes-plus-2021-03-04/

3. He was also charged with interfering with law enforcement during the course of a civil disorder, and unlawful presence on U.S. Capitol grounds and inside the U.S. Capitol building. At a detention hearing held in Arizona on January 15, 2021, the defendant was ordered detained by the Magistrate. ECF No. 11. The defendant has remained detained through the pendency of this case.

On May 21, 2021, following an oral motion by the defendant for competency evaluation, the Court ordered a psychological examination for the defendant. ECF No. 39. On July 13, 2021, the forensic examiner from the Bureau of Prisons submitted a report to the parties and the Court concluding that the defendant is competent to stand trial. On September 3, 2021, the defendant pleaded guilty to Count Two of the indictment. ECF No. 69. The sentencing hearing is set for November 17, 2021.

### III.     THE PROSECUTION OF THE JANUARY 6, 2021 RIOT

The Department of Justice began its historic investigation into the attack on the U.S. Capitol mere hours after the breach occurred on January 6, 2021. To date, the Department has brought charges by complaint, information, or indictment against approximately 650 defendants. The charges range from Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2), and Assaulting, Resisting or Impeding Law Enforcement, in violation of 18 U.S.C. § 111(a) and (b), to Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a) and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e).   Of those defendants, at least 90 have pleaded guilty to misdemeanor charges and at least 15 have pleaded guilty to felony charges.

### IV.     STATUTORY PENALTIES

The defendant now faces sentencing on Obstruction of an Official Proceeding in violation

of 18 U.S.C. § 1512(c)(2). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count Two, Obstruction of an Official Proceeding.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government concurs with the U.S. Probation Office's assessment of the defendant's criminal history score. ECF No. 77. The defendant has a criminal history score of 0, which translates to criminal history category I. The government also concurs with Probation's assessment of the applicable guidelines, to which the parties had previously agreed in the plea agreement. ECF No. 69, at 2. According to Probation, the defendant's base offense level for violation of 18 U.S.C. § 1512(c)(2) is 14. Two specific offense characteristics are applicable, which raise the base offense level: U.S.S.G. §2J1.2(b)(1)(B) because the offense involved causing or threatening to cause physical injury to a person in order to obstruct the administration of justice, which garners an additional 8 points, [15] and U.S.S.G. § 2J1.2(b)(2) for substantial interference with the

---

15  The defendant's threatening language towards lawmakers and the note left for the Vice President of the United States renders this provision applicable.

administration of justice, which adds 3 points.[16]  With demonstrated acceptance of responsibility, the total offense level is 22. Based upon a total offense level of 22 and a criminal history category of I, the defendant's guideline imprisonment range is 41 months to 51 months.[17]

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

Pursuant to 18 U.S.C. § 3553(a), the court shall impose a sentence that is sufficient, but not greater than necessary to comply with the purposes of the statute. Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6); and the need to provide restitution, § 3553(a)(7).

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying

---

16  The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." See U.S.S.G. § 2J1.2(b)(2), Application Note 1. The defendant admitted that he corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and nearly $1.5 million in property destruction. As described herein, law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

17 Based on the facts and circumstances of Chansley's case, the government does not seek imposition of an upward departure pursuant to U.S.S.G. § 3A1.4 n.4 (*see* Plea Agreement at ¶IV(C)) because a sentence within the Guidelines range of 41-51 months is sufficient, but not greater than necessary, to comply with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2).

with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to

Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

Defendant Chansley's now-famous criminal acts have made him the public face of the Capitol riot. A sentence of 51 months of incarceration, followed by three years of supervised release, and $2,000 restitution, is appropriate. An application of the facts of this case to the statutory factors supports this recommendation.

### A.     Nature and Circumstances of the Offense

The historic January 6, 2021 attack on the U.S. Capitol involved the actions of a mob made up of thousands. Yet, this Court is tasked with looking at this defendant's specific conduct as a part of that mob, to fashion a sentence appropriate to his specific criminal acts, on the spectrum of conduct present on that day. To do so, this Court, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The government cannot overstate the seriousness of the defendant's conduct as a one of

the most prominent figures of the historic riot on the Capitol on January 6, 2021. Armed with a six-foot long spear, the defendant brazenly marched past dozens of law enforcement officers, with rioters throwing debris of all kind at those who opposed them, past broken windows and through doors ringing with alarm bells. The defendant was among the first 30 rioters to penetrate the U.S. Capitol building. The defendant then stalked the hallowed halls of the building, riling up other members of the mob with his screaming obscenities about our nation's lawmakers, and flouting the "opportunity" to rid our government of those he has long considered to be traitors. All of this took place mere minutes after the Vice President of the United States was evacuated from the Senate Chamber. The defendant's consistent argument throughout this case that his actions on that day were peaceful[18] is undermined by the evidence submitted to this Court, but demonstrative of a persistent mindset that could lead the defendant to commit similar acts again.

The defendant's statements before, during, and after the January 6th riot are also concerning. The defendant, like every other person in this country, has the right to peaceably assemble and protest. What he cannot do, as this Court has noted, is storm into the U.S. Capitol building during a joint session of Congress to stop Congress from certifying the results of a lawful election. ECF No. 25, at 17. His words, taken in the context of his actions that day, undermine any suggestion that the defendant breached the U.S. Capitol merely to engage in peaceful, political commentary on the Senate dais. ECF No. 25, at 19. Unlike those who voice their concerns, or even their violent hate, towards those in positions of power in this country, with no intention of or ability to follow through, the defendant spoke his violent hatred while standing in their halls as members

---

18  See, e.g. ECF No. 12, at 11 ("Please be patient with me and other peaceful people who, like me, are having a very difficult time piecing together all that happened to us, around us and by us."); ECF No. 40, at 19 ("The totality of the video demonstrates a clear granting of permission to Defendant and others to be in the Capitol provided they were peaceful.")

took shelter. His consistent rhetoric before and after the event, and his apparent ability to carry out his intentions of violently removing the "traitors" in our government, is clear from the evidence in this case. Only the valiant efforts of law enforcement kept those upon whom he set his sights out of his path.

What should have been a day in which Congress fulfilled its solemn, constitutional duty in certifying the vote count of the Electoral College, ensuring the peaceful transition of power in our nation, was disrupted by a mob of thousands on January 6, 2021. And this defendant was, quite literally, their flagbearer.

**B.  The History and Characteristics of the Defendant**

The defendant has no criminal history and there is little for the Court to review with respect to prior contacts with the justice system. Yet, there is much to review with respect to the defendant's characteristics and life before his appearance on at the U.S. Capitol on January 6, 2021. The defendant has scant educational and employment history. ECF No. 77, at 14-15. Yet, he has a large social media following, garnering thousands of Facebook followers and posting in dozens of groups by January 7, 2021 when the account was disabled. From November 2020 onwards, the defendant posted videos and sent messages across multiple platforms, aimed at stoking his followers. For example, the defendant posted the following messages in multiple Facebook groups, linking to videos on YouTube and Rumble:

November 5, 2020: "This video details the many ways we can use the current voter fraud & election crisis to the USA's advantage as a way to awaken its citizens. This is an opportunity to expose the corrupt politicians, the corrupt media, & the corruptible voting system."

November 19, 2020: "This video explains how we can all ID the traitors in our government, news networks, entertainment & corporations. It also gives a detailed description of how we can

19

examine these traitor's actions on a grander scale so we may halt their agenda in the USA!"

November 30, 2020: "What an honor it is to be present for this historic meeting and meet such awesome patriots in the process! HOLD THE LINE PATRIOTS! USA WILL PREVAIL, WE WILL STOP THE STEAL! CUZ AS ALWAYS GOD WINS!"

December 28, 2020: "This video dives deep into the globalist plot for world domination thru the plandemic & its numerous different agendas. It also explains how the deep state was created, who in our gov. is responsible for is propagation in the US & what we can do to end it."

These messages, taken in the context of what actually happened on January 6, 2021, when the defendant and so many others finally took action on these words, cannot be ignored.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[19]  To be sure, the defendant accepted responsibility for his conduct by entering a guilty plea and agreed to meet with law enforcement to discuss the events of January 6, 2021. But these actions pale in comparison to the disrespect the defendant showed for the law and our democracy on January 6, 2021. The defendant spent approximately one hour inside the building—from his entrance at the Senate door on the Upper West Terrace 2:14 p.m. until his escorted exit at the East side of the building almost an hour later—and flouted rules and law enforcement at every turn. He moved with a mob that pushed past law enforcement multiple times to make his entrance into the building. He watched as other rioters broke two windows and

---

[19]  Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

entered through a door that was kicked open by another rioter, amidst a loud alarm. He ignored

the repeated requests of Officer K.R. and others to leave the building—from the time the defendant

and Officer K.R. first came face to face at approximately 2:20 p.m., until a swarm of officers

entered the Senate chambers to assist Officer K.R. in evacuating those rioters, including the

defendant, at approximately 3:09 p.m. Even still, the defendant did not leave the U.S. Capitol

grounds until after former President Donald Trump tweeted to the mob to go home. After the

events of the day, the defendant gave multiple interviews to media in which he espoused his belief

that he did nothing wrong. The severity of his actions, and respect for the laws of this country,

must be impressed upon him.

### D.      The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime

generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir.

2010).

### *General Deterrence*

A significant sentence is also needed "to afford adequate deterrence to criminal conduct"

by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases

involving domestic terrorism, which the breach of the Capitol certainly was.[20] The demands of

general deterrence weigh strongly in favor of incarceration, as they will for nearly every case

arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated

to interfere, and did interfere, with one of the most important democratic processes in this nation:

---

[20] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188 (RDM):

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. 07/19/2021 at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188 (RDM), Tr. 07/19/2021 at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Although the defendant has now expressed remorse and contrition, his media statements immediately after January 6 were those of a man gloating over victory in battle. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

With respect to the need to protect the public from his actions, the Court should consider both the defendant's actions on that day, but also the broader danger to our democracy that the defendant's actions implicate. The defendant stormed the U.S. Capitol building with a six-foot spear—an inherently dangerous weapon, as the Court has previously found (ECF No. 25, at 14)—demanding to see lawmakers and leaving a threatening note for the Vice President of the United States.   That conduct demonstrated dangerousness—as the justice system typically defines the term—from which the public must be protected.

However, his actions were dangerous in another way as well.   His actions struck at the roots of our democracy. When rioters flooded the U.S. Capitol and the defendant took the Senate dais, they accomplished the goal so many could never have imagined—they halted the peaceful transfer of power upon which our democracy is built. The defendant succeeded in encouraging a mob of angry citizens in delaying the solemn act of certifying who, in the words of the 12th Amendment of the Constitution, "having the greatest number of votes for President, *shall* be the

President." U.S. Const. amend. XII (emphasis added). And it would be naïve to assume that this was an anomalous event in this defendant's life; he has, long before January 6, drawn attention to himself and voiced his desire to remove those from our government who he views as traitors. The threat became action on January 6, 2021.

The damage done by the defendant and the mob he cheered onward that day will last far longer than the hours' delay in the certification of the Presidential election results. Deterrence, for both this defendant and for others who may take up his banner after his criminal acts, must weigh heavily on the Court's sentencing consideration. The world watched the actions of this defendant and others on January 6, 2021 shake one of the foundations of our democracy—the peaceful transfer of power after free and fair elections—and has made us all question the safety and security of the country in which we live. Those enormous harms, borne out of the acts of this defendant, must be deterred so that we never see a similar assault on our democracy again.

**E.**   **Avoiding Unwarranted Sentencing Disparities**

The crimes that the defendant and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 1512 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

As of the date of this sentencing memorandum, only one felony Capitol Riot defendant has been sentenced – *United States v. Paul Hodgkins*, 21-cr-188 (RDM). Hodgkins unlawfully entered the U.S. Capitol at approximately 2:50 p.m. with a Trump flag. Hodgkins also carried a backpack that had, among other items, protective eye goggles, rope, and white latex gloves. By 3:00 p.m., Hodgkins made it to the floor of the Senate, where he took several selfies and stood near defendant

24

Chansley on the Senate dais as Chansley led the group in his "invocation." Hodgkins subsequently exited the building at approximately 3:15 p.m. There, the United States requested 18 months' imprisonment and Hodgkins was sentenced to 8 months' imprisonment. Hodgkins was the first defendant to be sentenced for a violation of Section 1512(c)(2), having taken very early responsibility for his actions, and he neither committed nor incited violence on January 6.

This Court will also hold the sentencing hearing in *United States v. Fairlamb*, 21-cr-120 (RCL) on November 10, 2021. The government seeks a 44 months' imprisonment sentence in that case, in which the defendant has plead guilty to 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 111(a)(1). Fairlamb stormed the police line on the West Terrace, where he acquired a police baton. Fairlamb then entered the U.S. Capitol building, roughly the same time as defendant Chansley, but almost immediately exited. Approximately ten minutes later, Fairlamb encountered law enforcement officers attempting to keep rioters from entering the building through the Parliamentarian door. Subsequently, still on the Terrace outside the Capitol, Fairlamb assaulted a member of law enforcement, striking him in his face shield. Two days after the riot, on January 8, Fairlamb filmed a chilling video threatening future violence, stating, "*they pulled the pin on the grenade, and the blackout is coming. What a time to be a patriot.*"

The facts here are different than both *Hodgkins* and *Fairlamb*. Long before the events of January 6th, Chansley had been encouraging his social media followers to "expose the corrupt politicians, the corrupt media, & the corruptible voting system," "ID the traitors in our government," and "stop the steal." Chansley armed himself with a six-foot spear before ever arriving at the Capitol. He was one of the very first rioters inside of the Capitol, and he entered the Capitol brandishing that weapon. Chansley used his bullhorn to stoke the passions of other rioters

around him, to spew obscenities and threats in the Senate gallery, and to give the terrifying invocation upon the Senate dais to the gathered rioters about removing the traitors within the government. Chansley repeatedly ignored the directions of law enforcement and remained within the building illegally for almost an hour. Chansley left a threatening note for the Vice President of the United States while inside the U.S. Capitol on January 6. Finally, Chansley showed no remorse in the days after the event, gloating to NBC News that the actions of the rioters that day sent our nations law makers into hiding, with gas masks, retreating into their underground bunker. His actions demand a significantly lengthier sentence than those sentenced to date. Accordingly, a 51-month sentence would not create an unwarranted sentencing disparity.

### F.        Restitution

Finally, 18 U.S.C. 3553(a)(7) requires the Court to consider the need to provide restitution to any victims of the offense. The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[21] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the

---

21 The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. See 18 U.S.C. § 3663A(c)(1).

parties in a plea agreement." See 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. There is no individual official victim in this case, as the defendant has not been charged with nor pleaded guilty to a physical assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that the defendant must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role the defendant played in the riot on January 6.[22] Plea Agreement at ¶ XI. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021.

The sentence of this Court must drive home this fact for this defendant, and any others who may wish to emulate him: crimes committed against this country and democracy will be prosecuted and punished in accordance with the law. The government asks for such a sentence here.

## CONCLUSION

For the foregoing reasons, the government requests that the Court sentence the defendant to 51 months of incarceration, three years of supervised release, and $2,000 in restitution. The government submits that such a sentence would be an appropriate one, which would serve to protect the community, punish the defendant for his criminal conduct, and deter others from committing similar offenses. Finally, the government argues that a sentence of less than 51 months of incarceration would be insufficient to impress upon the defendant the seriousness of his actions and ensure the safety of the nation.

---

[22] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, see U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. See *United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY: _____/s/_____

KIMBERLY L. PASCHALL
Assistant United States Attorney
Federal Major Crimes Section
D.C. Bar No. 1015665
555 4th Street, N.W.,
Washington, D.C. 20530
202-252-2650
Kimberly.paschall@usdoj.gov