<pre>
 1                    BEFORE THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2

 3      UNITED STATES OF AMERICA,         .
                                          .  Case Number 21-cr-3
 4               Plaintiff,               .
                                          .
 5          vs.                           .
                                          .  Washington, D.C.
 6      JACOB ANTHONY CHANSLEY,           .  November 17, 2021
                                          .  10:09 a.m.
 7               Defendant.               .
        - - - - - - - - - - - - - - - - -

 8

 9                    TRANSCRIPT OF SENTENCING HEARING
                  BEFORE THE HONORABLE ROYCE C. LAMBERTH
10                     UNITED STATES DISTRICT JUDGE

11

12      APPEARANCES:

13      For the United States:        KIMBERLY PASCHALL, AUSA
                                      United States Attorney's Office
14                                    555 Fourth Street Northwest
                                      Washington, D.C. 20530
15

16      For the Defendant:           ALBERT WATKINS, ESQ.
                                      Kodner Watkins, LC
17                                    7733 Forsyth Boulevard
                                      Suite 600
18                                    Clayton, Missouri 63105

19

20      Official Court Reporter:      SARA A. WICK, RPR, CRR
                                      United States District Court
21                                       for the District of Columbia
                                      333 Constitution Avenue Northwest
22                                    Room 4704-B
                                      Washington, D.C. 20001
23                                    202-354-3284

24

25      Proceedings recorded by stenotype shorthand.
        Transcript produced by computer-aided transcription.
</pre>

P R O C E E D I N G S

1      (Call to order of the court.)

2          COURTROOM DEPUTY:  Your Honor, we are on the record

3  for Criminal Case 21-3, United States of America versus Jacob

4  Anthony Chansley.

5      Counsel, please approach the lectern and identify

6  yourselves for the record.

7          MS. PASCHALL:  Good morning, Your Honor.  Kimberly

8  Paschall for the United States.

9          MR. WATKINS:  Your Honor, Albert Watkins on behalf of

10  the defendant.  Pleasure to meet you.

11          COURTROOM DEPUTY:  Your Honor, let the record reflect

12  that Ms. Crystal Lustig is here from Probation as well.

13          THE COURT:  All right.  I have the final presentence

14  report.  I take it both sides are satisfied with the report and

15  there are no further objections for the Court to resolve; am I

16  correct?

17          MS. PASCHALL:  That's correct for the government, Your

18  Honor.

19          MR. WATKINS:  Your Honor, I have had the opportunity

20  to review the final iteration of the presentence investigation

21  report with the defendant.  The defendant has approved and

22  signed off on it, as have I as counsel for the defendant.  Thank

23  you, Your Honor.

24          THE COURT:  All right.  The Court sets forth for the

1    record that in the calculations in the report, the total offense

2    level of 22, criminal history category I results in a guideline

3    provision of 41 to 51 months of custody, supervised release term

4    of one to three years, and, under the guidelines, ineligible for

5    probation, a guideline fine in the range of $15- to $150,000,

6    restitution of $2,000, special assessment required to be imposed

7    by statute of $100.

8         Under the plea agreement, the defendant, of course, is able

9    to argue for a variance from the guideline sentence or for -- it

10    can also argue, I guess, for a below guideline sentence as well.

11         The government may allocute first.

12              MS. PASCHALL:  Thank you, Your Honor.

13         Sentencing recommendations weigh heavy on the minds of all

14    prosecutors, knowing that what we are asking for is the

15    deprivation of someone's liberty in an attempt to quantify what

16    is justice.  It is incredibly difficult in this case --

17              THE COURT:  You may need to speak more into the

18    microphone so everybody can hear you.

19              MS. PASCHALL:  Sure.  Is that better, Your Honor?

20              THE COURT:  Yes.

21              MS. PASCHALL:  It is even more difficult in this case.

22    This defendant was the very first defendant indicted with

23    criminal acts perpetrated on the January 6th attack on the

24    Capitol building.  In many ways, this is unprecedented territory

25    for all of us.

1    So we as prosecutors learn to begin with the rubric set out

2    in 18 U.S.C. 3553 and the sentencing guidelines.  As Your Honor

3    has just noted, the parties and Probation in this case are all

4    in agreement.  The guidelines suggest a range of 41 to 51 months

5    of incarceration.  The government has asked for the top of that

6    guidelines range.

7        The government is not going to belabor all the points that

8    we have made in our sentencing memorandum, but we do think that

9    a few of the factors bear special import, and we want to

10   highlight for Your Honor today.  Those three factors are the

11   nature of the conduct, the need to avoid unwarranted sentencing

12   disparities, and general deterrence.

13       Your Honor is well aware now of the nature of the conduct

14   in this case.  We're not going to rehash all of the actions of

15   the defendant on the grounds of the Capitol on January 6, 2021.

16   The events are well publicized.  They speak for themselves.

17       But I do want to highlight some of those actions for the

18   Court as they pertain to a particular word that keeps coming up

19   in these proceedings, and that word is "peaceful."  It's come up

20   in prior pleadings from defense counsel.  It has come up in the

21   letters of support for this defendant.  And the right to

22   peaceably assemble is enshrined in the First Amendment to our

23   Constitution.  If the defendant had been peaceful on that day,

24   Your Honor, we would not be here.

25       So what the government finds troubling when viewing the

1    evidence of this case is the knowledge that the defendant's

2    activities were anything but peaceful.  In the months leading up

3    to January 6, the defendant posted vitriolic messages on social

4    media, encouraging his thousands of followers to expose corrupt

5    politicians, to ID the traitors in the government, to halt their

6    agenda, to stop the steal, and end the deep state in the United

7    States.  That is not peaceful.  That's a call to battle.

8         The Court is well aware by now from the government's

9    evidence submitted with our sentencing recommendation how the

10   government has alleged that the defendant entered the U.S.

11   Capitol on that day.  I have pulled up Sentencing Exhibit

12   Number 3 to show the exact moment when the defendant and the mob

13   who joined him on January 6 entered the building.

14        (Audio recording played.)

15             MS. PASCHALL:  Your Honor, that is not peaceful.  That

16   is chaos.

17        We know the defendant then makes his way outside of the

18   Senate.  He is face to face with Officer Keith Robishaw.  He

19   ignores the requests of law enforcement to leave the building,

20   and he ends up in the Senate gallery, at which point the

21   following interaction from Government's Exhibit 7 occurs.

22        (Audio recording played.)

23             THE COURT:  That video's not showing.

24             MS. PASCHALL:  Court's brief indulgence.

25        (Video recording played.)

1          MS. PASCHALL:  The audio on that video is a little bit

2     difficult to hear, but the government also submitted

3     Government's Exhibit 8, which the government believes better

4     articulates exactly what the defendant was saying while he was

5     screaming in the gallery at the Senate.

6          (Video recording played.)

7          MS. PASCHALL:  That last statement, "Time's up, you

8     motherfuckers," that is not peaceful, Your Honor.  That is

9     chilling.

10          We then know that the defendant makes his way to the dais

11     of the Senate, where minutes before the Vice President of the

12     United States was present, and he leaves this now famous note:

13     "It's only a matter of time.  Justice is coming."

14          Your Honor, those words mean something different when the

15     defendant is literally in the place where the object of his

16     vitriol and hate had been an hour before.  Those words hit

17     differently knowing that he is not across the country.  He is

18     not hours away.  He's minutes away.  He is not miles away.  He

19     is not a plane ride away.  He's feet away from the object of his

20     contempt and his hatred.  This note is not peaceful.  This note

21     is a threat.

22          The Senate continues to fill with additional rioters,

23     despite Keith Robishaw's attempts as the lone law enforcement

24     officer in the chamber to clear everyone out.

25          The defendant gives this invocation in Government's Exhibit

1   11 over his bullhorn to the rioters gathering.

2        (Video recording played.)

3        THE COURT:  Now, in that particular video, have you

4   counted the number of -- he appeared to be the leader and

5   speaking to all of that crowd.  Have you counted the number of

6   people there in the Senate chamber?

7        MS. PASCHALL:  I think it's approximately 20 at that

8   point in time, Your Honor.  Over the course of the day, the

9   government has estimated that between 55 and 60 rioters entered

10  the chamber.  This is in the secondary portion of that time

11  frame.  So I believe there's approximately 20 people gathered

12  there.

13       THE COURT:  At that moment, okay.

14       MS. PASCHALL:  Yes, Your Honor.

15      That invocation, Your Honor, is not peaceful.  It's

16  terrifying.

17      And finally, Your Honor, his statements after January 6

18  about how "the fact that we had a bunch of our traitors in

19  office hunker down, put on their gas masks, and retreat into

20  their underground bunker is considered a win" shows that this

21  defendant knew exactly what the rest of the world did not, that

22  a mob of people descended on the Capitol with the express

23  purpose of disrupting the activities of the lawmakers that day.

24  That is not peaceful.  That is criminal obstruction.

25      It is true, and the government will not deny, that this

1    defendant did not assault any law enforcement officers, did not

2    steal any property, did not destroy anything on the grounds that

3    day, as many others did.  That alone does not a peaceful person

4    make.  These moments -- screaming, asking for the lawmakers,

5    time is up -- in the gallery of the Senate really says all we

6    need to know about the peacefulness of that day.

7              THE COURT:  Now, I take it, to be fair, at the time --

8    the government has no evidence that at the time he wrote that

9    note to the vice president that "your time is coming," the

10   government has no evidence that he knew that noose was hanging

11   outside and the hangman's noose was -- had been constructed

12   outside the Capitol?

13             MS. PASCHALL:  We have no evidence of that.

14             THE COURT:  There's no evidence that he had

15   participated in putting that up or that he knew about that?

16             MS. PASCHALL:  We have no evidence of that.  Your

17   Honor is correct.

18             THE COURT:  But that makes that even more difficult.

19             MS. PASCHALL:  It does.  It's chilling, given the

20   context of the day.

21             THE COURT:  Right.

22             MS. PASCHALL:  And what we know to have actually

23   occurred.

24             THE COURT:  What we know now.

25             MS. PASCHALL:  What we know now.

1          THE COURT:  But we have no evidence he knew that at

2    the time?

3          MS. PASCHALL:  Correct.

4      What the government finds so interesting about this

5    peacefulness portrayal is that it is in direct contrast to what

6    should have been happening that day, the peaceful --

7          THE COURT:  Let me ask one more in that regard.

8          MS. PASCHALL:  Sure.

9          THE COURT:  There were people -- I have seen tapes.

10   There were people saying Trump should be hung -- Pence should be

11   hung that day.  I take it there's no evidence that he heard

12   those tapes -- or you don't have any tapes showing that he heard

13   those expressions that Trump should -- I keep saying the wrong

14   thing, that Pence should be hung?  There are no tapes that

15   you're aware of that demonstrate that he actually heard those

16   threats?

17         MS. PASCHALL:  I don't have that, Your Honor, correct.

18         THE COURT:  Okay.  That would make this a far

19   different case.

20         MS. PASCHALL:  It would.  However --

21         THE COURT:  But still, what was meant by what he wrote

22   there is still a big problem.

23         MS. PASCHALL:  It is, Your Honor, and it is especially

24   when you know the timing of the day.  So the defendant enters

25   the Senate at approximate 3:00 p.m.  All of the videos that we

have submitted to the Court before that show that he was on the grounds at least an hour before that with those members of the mob.  And we know what those people were chanting.  We know that this defendant was using his bullhorn to incite the crowd.  We know the tenor of what was going on that day, and I think we can use that context and apply it to that note, especially given -- and the government did not play this portion of the video, but before that note happens, the defendant takes the dais and says, excuse my language, that "Mike Pence is a fucking traitor."  So I think the context is quite clear.

THE COURT:  I did hear that said.  Right.

MS. PASCHALL:  All of this on a day that should have been peaceful, when the world should have witnessed the peaceful transfer of power.  That is what our democracy is built on.  It is what we show the world to explain why our government is so strong, why our government is so special.  None of what happened on January 6, 2021, was peaceful.

And to contrast this defendant's alleged peacefulness against the backdrop of what should have been the peaceful transfer of power is hugely problematic.  And the government hopes that with this sentencing recommendation we get at the heart of the issue here, which is his obstructionist activities.

The government addressed possible sentencing disparities, as we must, when we look at 18 U.S.C. 3553 in our sentencing memorandum.  Your Honor is well aware that the defendant is now

the third defendant to be sentenced for a violation of 18 U.S.C.
1512(c)(2).

The government has asked for the top of the guidelines here
because the guidelines are driven by that obstruction count.
And the defendant's obstructionist activities are the most clear
of any defendant who has thus been sentenced on this count.  He
is one of the first 30 people to enter the building.  He is
there for almost an hour.  He is ignoring the requests of law
enforcement at every turn.  He is spewing obscenities aimed at
our nation's lawmakers.  He leaves that chilling note for the
Vice President of the United States.  He is literally in the
spot in which this congressional proceeding should have
occurred, and it cannot occur while he is doing these activities
there that day.  In the government's mind, that distinguishes
him from others.

And finally, the government asks that the Court focus on
one of the sentencing factors that we believe to be incredibly
impactful and drives our sentencing recommendation, and that's
deterrence.  Specific and general deterrence both weigh heavily
on the government's recommendation here.

For this specific defendant, the government can only hope
that this period of incarceration will be sufficient to deter
any criminal activity of this kind ever again.  But perhaps most
importantly, we ask for a sentence at the top of the guidelines
for this flag bearer of the January 6 Capitol riot events to

1    send this strong message to this defendant and any other,

2    regardless of their creed, belief, political persuasion, or

3    otherwise, to anyone who may wish to do harm to this city or

4    country or democracy, the message today is don't.  Don't think

5    that your illegal actions come here without consequences.  Don't

6    think that the federal law enforcement agencies will take

7    lightly the crimes you commit in this city.  And don't think

8    that the justice system will sit idly by while you attempt to

9    end that peaceful transfer of power.  Just don't.

10           For all those reasons and those put forth in our sentencing

11    memorandum, we ask humbly of this Court for 51 months of

12    imprisonment, three years of supervised release, and $2,000 of

13    restitution.

14               THE COURT:  Thank you very much, Ms. Paschall.

15        Mr. Watkins?

16               MR. WATKINS:  Thank you, Your Honor.

17               THE COURT:  Good morning, sir.

18               MR. WATKINS:  Before I start, I want to make sure I

19    make a public record about the appreciation I have for the

20    professionalism of Ms. Paschall as the Assistant U.S. Attorney

21    in this case.  I want to express my appreciation for your court

22    personnel who have helped me, my office serve our client in this

23    case.  I want to thank the Court personally, not having had the

24    privilege of meeting you before in person, for a lot of

25    compassion and patience that you've demonstrated, not simply for

the defendant but for an old white guy from the heartland, skinny guy, and I appreciate it.

Your Honor, you have been reasoned throughout these proceedings.  When I have been asked repeatedly to opine about one ruling or another in this case, I felt secure and genuinely accurate in a good way when I would respond it was a very reasoned decision.

When I first started using that word within the context of this case to describe your decisions, it was designed to shroud my disappointment and to do it respectfully.  As the case developed, I used it in a true sense of the word, to express appreciation for not just the legal reasoned basis for your decision, but I came to appreciate, as has my client, how those decisions, as reasoned as they were, not only served justice, but my client.

And we're here today uniquely presenting, not just as defense counsel but uniquely presenting as a defendant.  We as a nation, as a democracy, as a country of people that are brothers and sisters and relatives and colleagues and coworkers, we are at a crossroads of divisiveness.  It's on all levels.  It's political and socioeconomic and racial-based divisiveness.  It's intrafamilial divisiveness.  Our dinner tables, my dinner table has been compromised by that divisiveness.

I have come to conclude -- and my opinion means nothing. The opinion of this Court means something.  But I've come to

conclude that the events of January 6 are not of the same degree of abhorrence as that which has been described about Pearl Harbor, the day that will live in infamy, or 9/11 and the tragic circumstances that surround that.

And while I can shun those comparisons, I cannot, as a man who was appalled on January 6, deny the attack on democracy that occurred.  It occurred with alarming clarity and in a calculated fashion.

January 6 gave rise to the eyes of the world being able to see repugnancy on display, unbridled, unfettered repugnancy, the cause of which is not our issue here.  Those responsible in one form or another is not the issue here.

I have said that I truly believe that January 6 will be a day that we look back and view in our rearview mirror as the day that collectively, as a nation, no matter who is responsible for all the machinations and marches and trespass and obstruction, that will be the day when we were compelled as a nation to belly up to the bar and to own our own role in permitting the auger of January 6 to blossom.  Whether our role was active or passive, we all had a role.

So the cause of the assault, those who were planners and schemers, those who funded and orchestrated, those questions remain to be answered, and they're not for us today.

And I certainly will not belabor the Court with that which I have, in my own humble opinion, eloquently set forth in my

sentencing memorandum on behalf of the defendant.  I will not belabor the obvious when it comes to the laws governing sentencing and the magic language and the keys that permit this Court to entertain lawfully bona fide and substantial requests for downward departures from the range of sentencing suggested by the federal sentencing guidelines.

I will and am compelled to note that I recognize and Jake Chansley recognizes that this case presents every bit as uniquely as Jake presented on January 6.  This Court is in a remarkably unique position to simultaneously mete out justice and to emphasize common ground upon which all of us can premise somehow a way to bridge this great divide.  As a nation, we have prided itself and indeed bloomed, blossomed, grown, and demonstrated its greatness by protecting its weak and the world's weak.  We're retched masses.

The government -- and when I say "the government," I need to make it very clear, I am not talking about the Assistant U.S. Attorney Ms. Paschall.  The government expended virtually limitless resources, and they had those limitless resources to expend, within the context of a prosecution of anyone and everyone who should be prosecuted within the context of January 6.

The government knew; the government knew before they prosecuted the defendant, before he was charged that indeed he was a member of our Armed Forces.  He was a sailor.  The

government, if they did not have access to and ready possession

of those military records before they prosecuted the defendant,

they should have.  They had the resources.  They had the

ability.  They had the access.  And it would have been nothing

but a call.  Those resources are great for a reason.

The government has deployed those virtually limitless

resources in response to January 6 in a way that's very noble.

They moved fast.  Those investigations are still going on.  The

government on all sorts of levels is moving forward with

investigations.

But we're not in a position of slowing this court

proceeding down because we don't have to, because those

investigations, those outcomes are irrelevant as to my client,

as to the defendant in this case, as to the decision of my

client to enter a plea, not because of any reason other than he

is accountable and wants to be held accountable based on

evidence that we have today, that this court has seen.

I've provided you with videos.  I've provided the

government with videos.  The government's given me videos.  The

government's given you videos that I've given her.  This isn't a

drive-in movie theater.  You don't need to see more video.

I need to emphasize to this Court that the government in

2006 had in their charge a young man who was 19 years old, pie

faced.  I gave you a photograph of him from that era.  It looks

like he's 12.  It looks like he's in a Macy's Department Store

of yesteryear having a Christmas photo taken in a uniform.  That
young man, that kid, for the first time in his life at the age
of 19, he had access, access to medical care.  And that young
kid who had forged his way all the way to the Navy at the age of
19, at that time had already been through one trauma after
another, significant trauma, he had the foresight, the insight,
and the introspection to go to the doc on the ship and say hey,
I want to find out if I'm crazy.

     And in looking back, 2006 wasn't that long ago.  The doctor
took his time, and he diagnosed Jake.  What was the doctor's
duty?  He was a sailor, too.  His duty was to ascertain the
answer to one question:  Is this sailor fit for duty?  It wasn't
oh, let me diagnose you, let me hold your hand, let me tell you
what your diagnosis is, and let's see if we come up with a
treatment plan.  If it was cancer, they would have had to treat
my client.  If it was a broken bone, if it was any one of
virtually any health ailments that were diagnosed, treatment
would have been given.

     In those medical records, you see identification of
folliculitis because of ingrown hairs.  They have a diagnosis.
They have a treatment plan.  But you have a mental health
disorder, a life-long disorder that's diagnosed, that's serious.
And in 2006, the government didn't share that with the patient.
Their question was, is he fit for duty?

     There's a 15-year window of opportunity that the defendant

lost.  The government didn't do what the government should have
done.  Not Ms. Paschall, not the Department of Justice, but it's
one government.  This is our government.  And for 15 years, that
decision -- it wasn't malicious.  It wasn't evil.  But the
decision not to share that diagnosis, not to make sure that this
young man, the pie-faced young man in a sailor outfit, was at
least aware of a diagnosis that required attention, that was a
fateful decision, because there was a 15-year quest of this
young man, socially isolated, mentally challenged with respect
to this pronounced mental health disability, moving forward on
a -- not mindless, but a really committed, disciplined quest for
answers.  Why am I different?  What's wrong with me?  Why am I
bullied?  Why am I isolated?  Why am I not a part of everyone?

That 15-year window, one can't help but to wonder if this
government had in 2006 said, hey, Jake, you got a problem, we
gotta address it, we need to deal with it, and you need to be
aware of it, had that been done, speculation, I know Jake's
discipline on a lot of levels, if one-tenth of that discipline
was employed during those 15 years to address this issue, we
would not be in this courtroom today.  Jake would not have been
at the Capitol on January 6.  But that's could have, should
have, would have.

Since the outset of this case, the government, as a matter
of record over and over, has attempted to portray Jake as a
leader, a planner, an organizer, leading the charge into the

Capitol.  Finally, as the Court acknowledged, no, he wasn't

violent.  He wasn't destructive.  He didn't thieve.  He wasn't a

planner.  He wasn't an organizer.

I shared with this Court the candid reality that Jake, for

better or for worse, because of his costume, because of his

paint on his face, his torso, tattoo-ridden, fur pelt, horns,

that costume, that part of his shamanic commitment and faith,

whether you're seeing it in my eyes as hey, hell of a costume,

or in the eyes of another shaman, it doesn't matter.  That image

stuck.

THE COURT:  He made himself the image of the riot,

didn't he?

MR. WATKINS:  Correct.

THE COURT:  For good or bad, he made himself the very

image of this whole event.

MR. WATKINS:  That's correct, Your Honor.  There's no

question about it.

THE COURT:  Even walking down the avenue, he made

himself that image, before he even got there.

MR. WATKINS:  Before he ever got to D.C., before he

ever had a dream of walking from The Ellipse to the Capitol.

THE COURT:  Yeah.

MR. WATKINS:  The government has made representations

to this Court that support the detention of Mr. Chansley while

this case has been proceeding.  The government has cast Jake in

a pretty horrific light.  And I will be the first to acknowledge that the one-dimensional light that has been utilized by the government fully supports the proposition that Jake is a horrific image indeed, supporting the proposition that his role in this horrible day, this assault on democracy was repugnant.

But the government knows.  I know.  Jake knows.  And I'm very hopeful that by the end of this presentation this Court will understand obviously there's more to the story.  There's the other side of the story.  There's the rest of the story.

Being polite, the government knew that many of its representations were, at best, strained.  It was not until only recently that the Court actually had the government acknowledge to it that Jake was not an organizer or a planner.  The government has never publicly affirmed that until today.

The government has harped on flagpoles or tired threats, obscenities.  The informal posture of the government is different, and the professional compassion demonstrated by Assistant U.S. Attorney Paschall is heart-warming.  It is true blue to the job of the Department of Justice.  It is that which has rendered the Department of Justice the ability to be the crown jewel for the world to see.

I recognize and am tremendously respectful of the fact that the assistant U.S. attorneys who are the boots on the ground within the context of these January 6 cases have, to a certain and not insignificant extent, had their wings clipped.  There is

1    a chain of command.  There is an overwhelming optics-driven

2    desire, not an ignoble desire, but it's still an optics-driven

3    desire, and that man has the greatest optics appeal in the world

4    for that chain of command.

5         The moral duty has one which -- has been one which courts

6    have been hesitant to rely upon for precedence.  The ethical

7    duty, the legal duties of the government require pursuit of

8    justice, an evenhanded justice born of candor and transparency

9    and respect for all accused, for the rights of the accused.  The

10   importance of this case is not simply to Mr. Chansley, but

11   clearly, by virtue of the circumstances, the image, effectively

12   the brand and the logo and the tag line all wrapped in one for

13   January 6, personified by Jake has rendered this case important

14   for the nation.

15        As a nation, as citizens, as members of those who breathe

16   air in our land, citizens or not, we have a right to rely on the

17   integrity of our government.  We have a right to rely on the

18   accuracy of their representations.  We have a right to expect

19   nothing short of decency.  It should be the proud duty of our

20   government to protect the weak and the vulnerable.  It's a

21   burden that the government should continue to wear as a badge of

22   honor.

23        The government's sentencing memorandum and the sentencing

24   presentation, legally sound, but they constitute a rote refrain

25   which the government has in this case opted to sing over and

1    over again until such time as that message, despite its cracks

2    and its weaknesses and despite its obvious oversight of a

3    glaring tragedy that occurred in 2006, it has morphed into a

4    commercial truth.

5         That doesn't mean it's false.  That's the reality here.

6    That's the unique nature of this case.  The government has its

7    story, and it has prosecuted nobly based on that story.

8         But you cannot characterize every defendant, every

9    January 6 defendant based on and labeled under one moniker.  The

10   government, the Department of Justice has done the noble thing

11   and the right thing.  They had to shift gears to do it, and they

12   shifted away from trying to label everybody under one moniker to

13   actually drilling down.  And they've done it.  They've done it

14   in large part with how they're charging, what they're charging,

15   who they're charging.

16        Jake presents as a very unappealing defendant to drill

17   down, to drill down on, scratch the surface, and find out who he

18   is.  But it's particularly because of that absence of appeal

19   that renders him most worthy of drilling down and scratching

20   that surface, for he is, he is a part of our weak.

21        The country has come to see that in no small part not all

22   of those who participated in events on January 6 were the same.

23   The nation has the choice to evaluate things based on

24   information that they garner.  The government has the right and

25   the duty to prosecute based on the information and the evidence

that they have.  This Court has the choice and the opportunity
to ensure that justice is indeed done, an opportunity to right a
wrong that occurred and was perpetrated by the government, not
the Department of Justice but the Navy, 15 years prior to
January 6.  The government's doctor diagnosed Jake in 2006 and
didn't tell Jake.  With the limitless resources of the
government, one would thing somebody would have told Jake.

Tragically, that decision in 2006 is impacting us today.
Jake does not present to this Court with some spontaneously
identified medical ailment curiously found only by the doctor
that I hired and spent a lot of money on to say what I wanted
him to say.  Jake presents with a long-standing diagnosis by a
government doctor.  Jake re-presents with a 2021 forensic
psychiatric exam by Dr. Van Der Walt which was like none other I
have seen in almost four decades of practice before the federal
bench.

THE COURT:  One of the best I've seen.

MR. WATKINS:  It was an admirable piece of work, and
it took work.

Jake has schizoid personality disorder, ups and downs of
depression.  These are diagnoses by government agents.  Jake is
a man who in July, when that psych evaluation report came out,
he became a new man.  He became a new man who had just a month
earlier been slipping into an abyss that scared me and those who
knew him.  Jake presented as a new man because he had an answer

to a question that he had been consumed with for all of his knowing life, not just adult life but going back to grade school days, between the abuse, the neglect, the bullying, and all the unreconciled childhood traumas that we all have and hang our hat on.  These were real.

Jake has served 317 days effective today, and with the exception of the short stint in Englewood, Colorado, they were in solitary, not administrative segregation because of a wrongdoing or disciplinary issue.  It's COVID; it's COVID.

I am compelled, while I'm thinking about it, the personnel at the Alexandria Detention Facility, Warden Quentin Wade, every single one of them with respect and dignity discharged their duties and did so in a fashion consistent with the high standards that we all hope are followed by others.

Jake has endured the trauma of being held, at first being held and not being able to eat.  Curiously, Jake's dietary restrictions, while shamanic based, interestingly, those very types of dietary treatment -- or dietary restrictions are used as treatment for people with the type of mental health disorder that he has, as but one of many incremental measures that can be taken to help.  In a very real sense, his faith became his self-medication.

Jake has endured the entirety of his 317 days alone, no family visits.  The resources weren't there.  So perhaps more tragically than anything else, Jake's sole touchdown to humanity

was me, and that's horrific.  Being a counsel whose skill sets have never ever included holding hands or singing Kumbaya, I'm grateful to Jake, because while I didn't learn the words to the song, I'll tell you what, it did teach me, at least professionally and as a human, to hold hands, because it was necessary.  It was needed.  I grew because of him.  Graciously, he taught me.

Being at counsel with a guy like Jake alone in jail while I'm in St. Louis and he's in Alexandria, it's humbling.  Jake endured his detention, his incarceration through discipline, meditation, contemplation, self-reflection, introspection, all the neat things that kind of touchy-feely and therapists like to talk about.  But he did that.  He did that in a way that was devoid of any disciplinary issues.  He did that in a way that was noble and humane and peaceful.  Every day that was spent by Jake in solitary, in my opinion, it's worth more than a day in general.

Jake presents, as this Court knows all too well, because that's been my rote refrain, he has no criminal history, zero.  Jake self-surrendered.  He showed up.  They wanted to talk to him.  Here I am.  Here's my clothes.  Here's my horns.  No disciplinary issues while confined.

But this case has not occurred in a vacuum.  Jake went through a process, a process which in hindsight wasn't a process that was anticipated.  This is a process that started with a

loud mouth proclaiming that Trump should pardon the shaman.
That was a part of the extrication.  Nobody held their breath
believing that President Trump --

THE COURT:  There's no question his views evolved.

MR. WATKINS:  I'm sorry?

THE COURT:  There's no question his views have
evolved.

MR. WATKINS:  That's correct, Your Honor.

When Jake was not pardoned, he expressed disappointment.
He didn't say I hate Trump.  He said he was disappointed.  And
that morphed into having had the opportunity, without the socio-
stressors and all the malarky that gave rise to this euphoric,
manic state, of being horrified by what he saw, as I had to go
through the painful process of navigating one-dimensional WebEx
or Zoom to show videos to Jake as a part of the discovery
disclosure process.

I couldn't watch Jake watch them anymore, hours of them.  I
had support personnel watching Jake watch them.  And they all
were drained, not by the videos, drained by watching his
response to himself, a detached view of a former self.

Jake presents to this Court having all on his own and
without promises of good treatment or a 5K1.1, he has
voluntarily submitted to debriefing, not once, multiple times.
He has been candid, forthcoming, truthful.  He went out of his
way to make sure I had the information necessary to garner from

a third person who would never ever in a million years do
anything to provide anything to the government to give to me a
video to give to the government which depicted actions which the
government was looking for, did not have, and demonstrated the
faces of individuals who were responsible for breaking into and
compromising the integrity of a highly elected official and
stealing and being destructive to classified property.

He did that without promise.  He didn't do that as a
bargaining chip.  He did it.  He's there.  He's available.  He
was available, will remain available to demonstrate to the
government that he wants to make right, make good by the
government, to the government, because he's never been a man who
wanted to be who he is.  He never wanted to be seen or depicted
as anything other than a noble lover of his land.

Jake presents with having apologized without equivocation.
No buts, no blames, I did it, I want to be accountable, I want
to be held accountable.  Jake presents with a life-long history
of kindness, peacefulness.

Oh, peaceful wasn't the tenor of the day.  No, January 6
was not peaceful.  We're not talking about tenor.  Jake presents
as a guy who is completely devoid of any benefits, because he
sought none, from having done anything that he's done with the
government from the time he peacefully self-surrendered to date.
He did not ask for, did not want.  To be pure, you give not to
be recognized.  I'm not pure.  I'm asking the Court to recognize

me.  I'm asking the Court to recognize that this is a bright young man.  I'm asking the Court to take special note, because Jake's going to speak.  I'm representing to this Court as an agent of the court, I have not told Jake what to say.  I have not suggested to Jake any words.  I have not reviewed a thing that he's written, rewritten, thought about writing, or even what he's going to say.

I know that Jake works well with pictures.  He communicates well with pictures.  I implore the Court to not simply listen to what Jake has to say within the context of this case.  It's important to watch, see how he speaks and some of the characteristics which may to a trained eye but not to an untrained eye be indicia that supports that perhaps a long time ago someone in a learned position of authority in his life could have said hey, you know what, come on over here, we've got to take care of you.

Jake has prepared his own words, and how he articulates is important.  The Court has the military records.  The Court has the psych evaluation from 2021.  But it's really important that this is recognized by Jake and that the Court recognize that Jake recognizes this isn't a case about Trump.  This isn't a case about pardons or whether Jake was duped, used, exploited. Whether Jake has anyone to cast blame on is wholly irrelevant, because he doesn't.

This is not a case about social media or COVID or social

isolation made me do it.  This is certainly not a case that
should be a film festival.  It's not about guilt or innocence
anymore.  The defendant has entered a plea competently,
genuinely.  The Court has accepted that plea.

This is about culpability, a different analysis.  It's
important for you to hear from Jake.  I'm confident that this
Court has heard limitless pleas for mercy and leniency.  I am
confident this Court has witnessed tears of significant
magnitude, some of which are alligator tears.

You won't get that from Jake.  This is not Jake being a
pleader.  This is a straight-shooting young man who's got some
problems, problems that he has overcome because of a loving,
caring, unbelievably dedicated mother, hard working, but she
couldn't be there all the time.

Jake was in jail.  He lost the one male role model of
positive significance in his life while incarcerated, and Jake
gets that the only one responsible for that was Jake.  It tears
him up, but he gets that he's the one that made decisions.

The sincerity and genuineness of the words of Jake will
show, and when Jake has concluded, I would request just a few
more minutes, not even that, to conclude.

Mr. Chansley?

I want the record to reflect that I am going to step aside
while he talks, Your Honor, because I think it's important that
he do so, in a presentation sense, naked, not in the January 6

1  sense.

2          THE COURT:  All right.  Good morning, Mr. Chansley.

3          THE DEFENDANT:  My humblest regards, Your Honor,

4  seriously.

5      I want to start by saying I really wish I would have met a

6  man of your honor and stature under far different circumstances.

7  That's to say the least.  And thank you for your service to our

8  military, our Constitution, and our federal court system.

9      Also, thank you for the Court-ordered organic diet while I

10  was in solitary.  It did wonders for me.  Thank you.

11          THE COURT:  I took a lot of flak for that.

12          THE DEFENDANT:  God bless you for it.  Seriously,

13  thank you.  It made all the difference.

14      I would also like to say that I'm going to be upfront with

15  Your Honor as I was upfront with the FBI, with the prosecution,

16  and with the doctor in Colorado.  And I would like to start with

17  a quote from Max DePree.  The quote goes something like, you can

18  help yourself understand problems by asking yourself questions.

19      To understand my predicament, you know, while I was in

20  solitary, I asked myself a lot of questions.  But I think the

21  most important question I asked myself was, what would Jesus do.

22  And I followed that up with, what would Gandhi do in this

23  situation.

24      And the truth of the matter is, I came to the conclusion

25  that Jesus would love, understand, and respect everybody

involved in this court proceeding, and that would result in his

acceptance of responsibility, no matter what the consequences.

And Gandhi, who viewed God as truth and truth as God, would

allow his loyalty to God and to truth to guide him to accepting

responsibility even and especially when it incriminated him.

As I implemented this strategy, because I look up to these

men, I look up to Gandhi, I look up to Jesus, I want to mirror

their character as much as I can, part of the reason why,

looking at the video, I was just like, oh, my God.

So I tried to remain objective and impartial.  And in the

process of being objective and impartial, I was blessed with

hearing a quote from, of all people, Clarence Thomas, Justice

Clarence Thomas, because I actually admire him quite a lot as

well.  And he likened being a Supreme Court justice to being a

referee on a football field.  And he said that, you know, if you

make a ruling on the field that causes people's favorite team to

lose, well, then, the people are in an uproar, and they say the

referee should be fired and he's blind, but if the referee makes

a call and a ruling on the field that the people like and it

makes their team win, well, then all of a sudden, the referee is

deserving of praise and is to be promoted and, you know,

glorified.

And so when I heard that, I thought to myself, well, you

know what, if I'm going to remain objective and impartial, then

I need to put myself in Your Honor's shoes.  I have to put

myself in your shoes.  I have to put myself in the prosecution's
shoes.  I have to put myself in the shoes of everybody that saw
the coverage, shall we say, in the media and saw my image from
their subjective perspective without knowing me.

And so if I'm asking Your Honor to be impartial, I need to
be impartial, too.  I have to look at the situation from a
third-party perspective, not looking at it from Jake's
perspective.

I believe in freedom, Your Honor.  I believe in freedom
with all of my heart and soul.  It's why I joined the military.
I support the Constitution.  I support this country.  Every
fiber of my being, I am willing to die for it, much like
yourself, which God bless you.  Thank you for your time and
service in 'Nam.

But I also believe in law and order, because without
freedom -- without law and order, you can't have freedom.  And
in order for freedom and law and order to coexist, freedom has
to be exercised with accountability and responsibility.  Those
things have to be practiced in tandem with freedom.  Otherwise,
I mean, what's the point.  If the law is broken and there's no
punitive action, then there's no point in having the law.  It's
anarchy.

So I had to come to terms with the fact that I was in
solitary confinement because of me, because of my decision.  I
broke the law, and if I believe in freedom, if I believe in law

and order, if I believe in responsibility and accountability, then that means that I should do what Gandhi would do and take responsibility even and especially when it incriminates me.  No ifs, ands, or buts about it.  That's what men of honor do.

It's painful logic, but I subscribe to the truth even when it hurts and especially when it hurts, because that's the only way we can grow as a human being.

Your keeping me detained was your right as a federal judge, and I don't blame you.  I don't.  Looking at it objectively, I understand completely, and I respect you for it.  Because in all honesty, I needed the time to re-evaluate.

In short, if I didn't like the ruling on the field, I should not have behaved in a way that caused the Department of Justice and the Court to blow the whistle and throw the yellow flag.  That's just all there is to it.

In solitary confinement, I did a lot of quiet reflection. I did a lot of soul-searching.  I learned a lot about myself that -- you really dig when you're locked up 22 hours a day, Your Honor.  And me being as introspective as I am, as you know, I'm kind of a loner.  I've also been introspective.  I've always kind of done this self-examination.  I'm into enlightenment and Christ and Buddha and Gandhi.  So spirituality and looking inward and meditating has always been a part of me.  That's what shamanism is all about, is looking inward.

So I asked myself a lot of questions, and I forced myself

to answer those questions, no matter how painful they were, with impartial answers.  And I re-evaluated a lot of my premises, my first premises, and I came to some conclusions that I would like to share with Your Honor.

Number 1, men of honor admit when they're wrong, not just publicly but to themselves.  So I would like to use this as an opportunity to admit to Your Honor, to the prosecution, to the nation, to the world, I was wrong for entering the Capitol.  I have no excuse, no excuse whatsoever.  The behavior's indefensible.

Number 2, I may be guilty of this crime, absolutely, but I am in no way, shape, or form a dangerous criminal.  I am not a violent man.  I am not an insurrectionist.  I am certainly not a domestic terrorist.  I'm a good man who broke the law, and I'm doing all I can to take responsibility for that, Your Honor.

Number 3, in all honesty, from an objective perspective, I am nothing like these criminals that I have been incarcerated with.  Some of these people, you know, God love them, not only are we miles, light years away mentally, but like they're acting like they're in the Holiday Inn while they're incarcerated.  Multiple offenders, yeah, I've been here a bunch of times.  And I'm just like thinking to myself, how do you go through something like this and come back?  Why would you ever do anything that would bring you back to this?

Number 4, I am truly, truly repentant for my actions,

because repentance is not just saying you're sorry.  Repentance is apologizing and then moving in the exact opposite direction of the sin that you committed.  And that's what I've been trying to do ever since I realized the magnitude of my error and the magnitude of my mistake.

That's why I called the FBI as soon as I heard I was wanted for questioning.  It's why I set up an appointment with the FBI without a lawyer present.  And I told them everything.  Even stuff that I knew would incriminate me, I told them everything because I am loyal to the truth.  And if I did it, I'm not going to try and battle it in court.  I'm just going to say no, that's the truth, this is what happened.  That's the reason why I worked with the prosecution without any promise of anything.  It's the reason why I took the plea deal of the crime for which I'm guilty.

Number 5 is, in retrospect, I would do everything differently on January 6.  In all honesty, I would do everything differently.  I would, with all of my heart and soul, try to stop people from allowing anything like that to happen.  I'm not going to try and tout the things I did prior to the trespass that happened.  But when people were throwing stuff at the police, I told them to stop.  When I saw what was going on on the scaffolding, I got down because I saw that things were getting kind of crazy, and I was walking along with my megaphone saying hey, the cops are our friends, leave them alone.

1    But there's no excuse for once the breach was made, you

2    know.  I watched it.  There's no excuse.  But I'm just being

3    honest with you.

4        Number 6 is -- oh, we live -- I heard a saying that we live

5    two different lives:  One life that we learn from and the other

6    life after that.  And I would like to believe that after

7    watching those videos, you know, there's something that you

8    learn from watching yourself objectively, you know, especially

9    when you're in a frenzy.  It's incredible what a third-party

10   perspective can do.

11       Number 6 is, most of the time when we look at other people,

12   and myself included, we tend to think that the small part of

13   them that we see is the whole of who they are, you know.  In

14   many cases, some people think that the small part that they see

15   is who they are in their completeness all the way until their

16   death.  But then I thought to myself, well, what if we all

17   judged Gandhi based on the fact that he used to beat his wife

18   before his spiritual awakening and his liberation movements.

19   What if we judged Jesus based on the fact that he overturned the

20   merchant tables outside the temple in Jerusalem before he went

21   to the crucifixion for his passion.

22       So I'm doing all I can, including some of the people that

23   I've been incarcerated with, to not judge them.  Like Christ

24   said, judge not lest you be judged.  And I'm trying to live

25   that.

1    Number 7 is the media puts intense pressure on the public

2    and targeted individuals to do this process of looking at a

3    small portion of somebody and saying that's who they are, you

4    know, and then they regurgitate the same narrative over and over

5    and over again to like engrain this stuff in the public's mind

6    of the narrative that they want people to absorb.

7    And there's a term for this persecution through propaganda.

8    It's called controversialization or controversializing somebody.

9    I most certainly have been controversialized for sure.

10    With all of that said, I would like to bring up another

11    quote from Max DePree.  We cannot reach our full potential by

12    remaining who we are.  And I would like to add to that that it's

13    hard to grow to our full potential when we're treated based on

14    the bias of a mistake, especially if it's just one mistake in a

15    long history of trying to do the right thing.  I believe that

16    the measure of a man is the extent to which he grows and

17    acknowledges -- grows beyond and acknowledges his mistakes and

18    tries to correct errors and admit mistakes and grow past them.

19    I believe the measure of a man is how much they work to evolve

20    and to change, to be a better person.

21    The PSI, presentence investigation report -- or

22    investigation, I have come to discover, is meant to give Your

23    Honor a much broader perspective of the defendant in the case,

24    much broader a perspective than the media labors to give the

25    public.  That's the reason why we have a justice system and Your

1    Honor has a probation officer to look into and investigate this

2    guy, tell me who he is, what he's done, where he's been, what

3    he's about, et cetera, or she.

4        So I guess I'm asking Your Honor to judge a tree by its

5    fruits.  You read my high school career paper.  My career choice

6    has not changed since high school.  That's what the shamanism is

7    all about.  Despite the way the tattoos may look, I consider

8    this therapy for all the pain that I've been through.  I use

9    physical pain to deal with the mental and emotional trauma that

10   I've been through.  That's what the tattoos are about.  I don't

11   get a tattoo unless I earn it or unless it's to overcome some

12   kind of trauma.  Like these sleeves, I got these sleeves when my

13   dad committed suicide.  It took about 36 hours total to get them

14   done, and so during that process, I was meditating and I was

15   grieving.

16       I would also like to say that I hope that you see my heart

17   and my desire to live the life of like a Christ or a Gandhi in

18   my chosen work for the past several years.  I've worked with

19   kids in group homes, which let me tell you something, that is

20   tough work, Your Honor.  Working with troubled teen boys in

21   group homes, especially some of them fresh out of corrections

22   facilities, that was tough.

23            THE COURT:  Some of the letters I saw --

24            THE DEFENDANT:  What's that, sir?

25            THE COURT:  Some of the letters I saw were very good

1      about what you've done there.  I agree.

2              THE DEFENDANT:  Thank you, Your Honor.  I did it

3      because I love kids, and I don't want any kid, I don't want any

4      child to have to grow up the way that I grew up.  I was trying

5      to give these young men and the children in my care when I was

6      in Free Arts for Abused Kids of Arizona doing art with abused

7      children a positive role model, you know.

8          I tried to start my own business twice.  That failed.

9      Maybe it's because I'm just not good with numbers and I'm kind

10     of a loner and isolated.  Maybe that's why I failed.  I don't

11     know.  But I joined the military because I believe -- I live

12     this way because I believe that spiritual evolution is most

13     reliably achieved when we have selfless -- when we give of

14     ourselves and have selfless service to others, not expecting

15     anything back but giving, the way that Christ gave, the way that

16     Gandhi gave, the way that Buddha or any saint throughout history

17     has given.

18         This is, I think, the -- the best way to be of service to

19     others is the best way to be of service to God.  And most people

20     will never understand the horrors of war that Your Honor has

21     suffered.  And for that, you have my utmost respect.  Similarly,

22     most people, the media, the prosecution included, will never

23     understand what it is like, nor should they because it is my

24     fault, what it's like to not only be in solitary confinement for

25     22 hours a day, but to go starving for 11 days and then to have

1  the DOJ, the FBI, and the media all putting intense amounts of

2  pressure on you and nitpicking and picking apart your life, your

3  political beliefs, using your image and saying words that are

4  nothing of what you are again and again and putting it out

5  there.  The pressure is unreal.

6      Granted, Your Honor's pressures -- the fact that you went

7  through the things you went through gives me confidence and

8  belief that you actually have a greater understanding of any

9  sort of pressure that I've been going through because of what

10  you've gone through.  The horrors of war, comparatively, I'm

11  lucky, because I would never want to go through something like

12  that.

13      Most people will never understand what it's like to have

14  every comfort that they ever had suddenly ripped from them and

15  replaced with discomfort, starvation, confinement, daily

16  multiple panic attacks, praying until you are exhausted, losing

17  a loved one knowing when you're talking to them on the phone

18  that they're going to die, and you, because of your actions,

19  were not able to be there for them.

20      I was my grandfather's first grandchild.  And when my mom,

21  because my mom wasn't with my father when I was born, she would

22  go to my grandfather, and my grandfather, when she needed sleep,

23  my grandfather would do the dad thing.  He would get up at 5:00

24  in the morning, you know.  So we had a really special

25  connection.  And the fact that I wasn't there when he died eats

1    me up every day, every day.

2         And my condolences to you for your loss as well.

3         THE COURT:  That was my grandfather as well.

4         THE DEFENDANT:  Oh, it was?  Well, my condolences,

5    Your Honor.  It's not easy.  And the fact that you know -- it

6    doesn't necessarily do my heart good because I feel for you, but

7    thank God that you know.

8         I think the hardest part about all of this is I know that

9    I'm to blame.  Yet, most people will never have any idea what

10   it's like to have to look in the mirror and say, you know, you

11   really messed up, man, like royally.  Everything that's brought

12   me comfort has now become a source of agony and despondency,

13   because whether it be music I used to enjoy, movies I love,

14   talking to family, eating food, I can't even cook my own food

15   anymore, all of these things used to be sources of comfort.  Now

16   they're sources of discomfort and agony because it's a reminder

17   of you're not free anymore, and guess what, you don't know when

18   you're going to be free again.  Welcome to the world, Jake; you

19   shouldn't have done that.

20        To say the least, while I was in solitary, I really got to

21   understand the whole saying in Shawshank Redemption when Red

22   said, "Hope is a dangerous thing.  Hope can drive a man insane."

23   And every time that I thought I might get a release and I hoped

24   and I didn't, crash, crash, crash.

25        And, you know, I've been through a lot of trauma in my

life.  I was raised by an alcoholic stepdad who was abusive.  I
got bullied in school all the time.  I mean, I went through boot
camp.  100 hours' worth of tattoos.  I went on a vision quest in
Arizona during the summer and dang near died in the heat.  And I
will tell you right now, Your Honor, nothing has been as
traumatic and as painful, emotionally, mentally, spiritually, as
my time in solitary confinement where I sat through this you
screwed up, Jake, and it's your fault, and guess what, you might
go to prison, you know what, you probably are going to go to
prison, you're going to have to deal with that, and you ain't
going to know how long that is.

For the longest time, I thought it was 20 years.  I didn't
understand how the court proceeding worked, and I honestly
thought that it was going to be 20 years of self-confinement.  I
had never been to jail before.  So I thought that's how jail
was, that you are locked in a cell all day for 22 hours a day
and that's the way it was going to be for the next 20 years,
congratulations.

Oh, my God.  I don't know if it's due to the personality
disorder that I have or being on the autism spectrum or
whatever, but this trauma has done something to me, physically,
spiritually.  I've got the white hairs to prove it.  I never had
white hairs before.  I have white hairs in my beard, on my
chest, on my arms.  I have white hairs now.  I see Your Honor
has a lot of them, so no offense.  But I'm 34 years old.  I

should not have white hairs, Your Honor, but I do.

And it's because this cyclical trauma -- I'm not sure if Your Honor is aware, but to the functional system of neural activity that creates our world, the same portions of the brain that process physical pain also process mental and emotional pain as well.  So to the functional system of our neural activity, there is no difference between physical and emotional pain; they're one and the same.

So having this mental and emotional pain going over and over and over again, it was nothing short of torture.  And I'm not blaming anybody else but myself, but now I can honestly say that I understand.  I never understood why it is that my dad committed suicide -- I never understood why my stepdad committed suicide.  I didn't understand that level of psychological pain. I thought well, why did he do it, why did he do it.

After going through this, I can honestly say, without condoning or condemning, because I wouldn't take my own life, but without condoning or condemning, I understand.  When you experience that level of mental and emotional pain, that level of trauma, you do one of two things.  You either take yourself out, or you become unprecedentedly open to alternative ways to live, and you re-evaluate not only the mistake that put you there, but every single mistake you ever made, any time you ever treated somebody poorly even just for -- because you were tired or whatever.  You re-evaluate everything.  It was like a

near-death experience on a daily basis, because I had to fight

off this will to want to not live anymore but still want to

live, you know.  I wanted to live, but I didn't want to be there

anymore, but at the same time, I didn't want to live that way,

you know.

So how anybody can re-offend after going through something

like that, I don't understand.  I really don't understand how

people -- I met people throughout my incarceration where they

spent five and a half years in solitary, and then when they got

out, they did something within two months that brought them

back.  And I'm just thinking to myself, dude, you were out, you

were out, why didn't you get a job at Burger King or something,

you know.  You were out, man.  You could have gone to a homeless

shelter.  You were out, dude.  I met a guy that was in solitary

for 13 years, and he got put back.

And I'm just -- if that is what institutionalization is, I

ain't ever going to be institutionalized, Your Honor.  I tell

you right now.  I never want to go through anything like this

ever again, and I don't recommend that anybody do anything like

what I did, that's for sure.  This is the first time I've ever

been incarcerated.  It's the first time I've ever been arrested.

And it will be the last.  I can guarantee that beyond a shadow

of a doubt.

They say every saint has a past and every sinner has a

future.  That is certainly true.  And to be honest with you, I

want to evolve.  I want to grow beyond what it is that I was,
because that's what life's all about, is growing past what held
you back, learning about yourself and using that knowledge to
grow and to influence the world in a positive way.

I once heard about this gentleman that had a near-death
experience, and he said that it's not so much that his entire
life flashed in front of his eyes, but that he felt everything
he ever felt throughout his entire life, and he felt everything
he made everybody else feel throughout his entire life.

So when I heard that, that's when I started working with
kids and trying to have a positive impact in the world, which is
part of the reason why I'm so appalled at the way my image has
been used and it's been used to create fear and the way it's
invoked fear.  That bothers me a lot, because that's a lot of
bad juju that I never meant to create, you know.  My shamanic
attire was designed to ward off evil spirits, not to scare
people.

Now that I know that I have a personality disorder -- and
whether the personality disorder was a result of trauma that I
experienced as a child or the trauma I experienced as a child as
a result of the personality disorder does not matter.  What
matters is that I had the diagnosis in 2006, and I didn't even
know about it, and I have the diagnosis now, and now that I
know, it's like okay, well, now I can better navigate the world.
Now I can better navigate and go okay, now I can realize okay,

maybe that was a social queue right there.  Maybe I need to
change me so that I can be better in the world, so I can be a
better man, a better American citizen, so that I can, God
willing, one day be a good husband and a good father, because I
do want to have a family.

More than anything, I just -- I want the trauma to stop.  I
just want the trauma to stop.  I want the pain to stop, and I
want to heal.  I want to heal.  I want to grow.  I want to
evolve.  And I want to grow beyond the symptoms of my disorder.
Now that I know that I have this diagnosis, it's like okay, how
am I going to deal with it.  I want to be more than I was.

There's a saying that goes something like intelligence and
education allows people to ascertain facts, but it takes true
wisdom to see and discover the truth.

Well, Your Honor, you were in the military.  You were an
attorney for some time.  And you have been a federal judge as
long as I've been alive.  So I'm of the belief that I could not
have asked God for a better judge to judge my character, to look
at me and say you know what, this is a wise man, an honorable
man that is going to be impartial, is going to be fair.
Regardless of whether or not you do what it is that I would
like, which of course I hope you do, but that aside, I'm being
impartial, and I'm looking at the situation from a third-party
perspective.  And I hope that you see that my remorse is
genuine.  I hope that you see that my acceptance of

responsibility is real, that my official statement here is
heartfelt and that it's truthful, that I'm being honest with
you, with the Court, with the nation, with the world, because I
believe that, as I said before, spiritual evolution is most
reliably attained by service to others.  And Your Honor has
spent quite a long time being in service to others.

So if Your Honor believes that I deserve more punishment
beyond the trauma in the solitary confinement I have received
thus far, then I will accept and respect Your Honor's decision,
and I will endure the sentence you give me.

However, before you do, before you hand down your sentence
and your judgment, allow me to assure Your Honor, the
government, and the nation that I am a peaceful man who believes
in nonviolence, noncooperation with evil and tyranny, that the
bible says that love is patient, love is kind, and does not
insist on its own way.  So I'm doing all I can to be as loving,
as patient, and as kind as I can be and to not insist on my own
way.

With that said, I want to say that I intend to continue to
focus on my spiritual evolution, far beyond this court
proceeding and ever afterward.

Now, like I said, we live two lives, the life that we learn
from and the one we live after that.  And this healing includes,
you know, and this focus of spiritual evolution includes my
mental and my emotional wellness and well-being.

1   So please believe me when I say, Your Honor, with almighty

2 God as my witness, I make this holy vow and this sacred oath, I

3 will never re-offend ever again, and I will always from here on

4 forward think about the ramifications of everything that I do

5 and what it is that I say and how it may be perceived.

6 Regardless of whether or not I'm saying it in jest or not,

7 regardless of what it is I'm posting on social media, everything

8 is going to be re-evaluated and examined through a new lens from

9 this point on, you know, from this point forward.

10   So with all of that said, I thank Your Honor for your time.

11 God bless you, and may God bless the United States of America.

12    THE COURT:  Okay.  I have a few things to say before I

13 announce the sentence.

14   First of all, I thank you for your comments.  I think --

15 yesterday, I celebrated my 34th year here as a judge, and I

16 think your remarks are the most remarkable I've heard in 34

17 years.  I think you are genuine in your remorse and heartfelt.

18 Parts of those remarks are akin to the kinds of things Martin

19 Luther King would have said.

20   I guess the basic problem I have in considering a departure

21 downward is that although you have evolved in your thinking

22 clearly and reversed your thinking in many ways, what you did

23 here was horrific, as you now concede, and obstructing the

24 functioning of the government as you did is the type of conduct

25 that is so serious that I cannot justify a downward departure.

1   I do think that the minimum under the guidelines is something
2   you've earned because you've done everything right from the time
3   that you started in the other direction.  You've certainly done
4   everything you could today to convince the Court that you're a
5   new person, and I think you're on the right track.

6       I think if I recommend mental health treatment during your
7   period of incarceration, you will be out of -- as soon as I sign
8   the J&C, you will be designated to some other federal facility,
9   and you will end this incarceration and go to some other
10  facility.  I will see what your attorney recommends in terms of
11  designation, but the designation will be up to the attorney
12  general.  But hopefully, you will get to some minimum security
13  facility promptly and will have a better life and better ability
14  to do this period of incarceration.

15      But the serious nature of the crime itself does not lead to
16  my ability really to think that I could depart downward, even
17  though I do think you're genuine.  What you did was terrible.
18  You made yourself the epitome of the riot.

19      I had a sentencing last week.  It was the most any
20  defendant has gotten, and it was a young man -- I don't take any
21  pleasure in these sentencings.  It's a young man who is from a
22  law enforcement background, from New Jersey.  He has a brother
23  in the Secret Service.  His father is a state trooper.  But he
24  came down and slugged one of the policemen in the face.  And I
25  can't not -- I can't depart downward to give him a break when

it's assault on a police officer at the Capitol.  It's one of those kinds of cases, it's too serious an offense.

Now, you didn't go that far.  You didn't slug anybody.  But what you did here was actually obstruct the functioning of the whole government.  It's such a serious crime that I just can't go all the way, even though you now recognize.  But you said today what you did was wrong.  You know what you did was wrong. I admire you for being able to come to terms.  You made some very good remarks here today, and I appreciate that, and I think you've gone a long way to where you're going to be.  I think you've learned a lot yourself in this period.  You've demonstrated that today, and I want to wish you the best.

Pursuant to the Sentencing Reform Act of 1984 and in consideration of the provisions of 18 U.S.C. Section 3553, as well as the advisory sentencing guidelines, it's the judgment of the Court that you, Jacob Anthony Chansley, are hereby committed to the custody of the Bureau of Prisons for a term of 41 months on Count 2.  You are further sentenced to serve a period of 36 months of supervised release.  In addition, you are ordered to pay a special assessment of $100 required to be imposed in accordance with 18 U.S.C. 3013.

While on supervision, you shall abide by the following mandatory conditions, as well as the standard conditions of supervision, which are imposed to establish the basic expectations of your conduct while on supervision.  Mandatory

1    conditions include, one, you must not commit another federal,

2    state, or local crime.  Two, you must not unlawfully possess a

3    controlled substance.  Three, you must refrain from any unlawful

4    use of a controlled substance.  You must submit to one drug test

5    within 15 days of placement on supervision and at least two

6    periodic drug tests thereafter as determined by the Court.

7    Four, you must cooperate in the collection of DNA as directed by

8    the probation officer.  And five, you must make restitution in

9    accordance with 18 U.S.C. Sections 3663 and 3663(a) or any other

10   statute authorizing a sentence of restitution.

11       You are ordered to make restitution in the amount of

12   $2,000.  The Court determines you do not have the ability to pay

13   interest and penalty and, therefore, waives any interest or

14   penalties on the -- that may accrue on the balance of

15   restitution.

16       The Court finds you do not have the ability to pay a fine

17   and, therefore, waives imposition of a fine in this case.

18       You shall also comply with the following special conditions

19   of supervision:  One, you must submit to substance abuse testing

20   to determine if you've used a prohibited substance.  You must

21   not attempt to obstruct or tamper with testing methods.  And

22   two, you must participate in a mental health treatment program

23   and follow the rules and regulations of the program.  The

24   probation officer, in consultation with the treatment provider,

25   shall supervise your participation in the program.

1    Restitution payments shall be made to the Clerk of the U.S.

2    District Court for the District of Columbia for distribution to

3    the following victim:  Architect of the Capitol, Office of the

4    Chief Financial Officer, Ford House Office Building, H2-205B,

5    Washington, D.C., attention Kathy Cheryl, CPA.  Financial

6    obligations are immediately payable to the Clerk of Court, U.S.

7    District Court, 333 Constitution Avenue Northwest, Washington,

8    D.C.  Within 30 days of any change of address, you shall notify

9    the Clerk of Court of the change until such time as the

10    financial obligation is paid in full.  You must pay the balance

11    of any restitution owed at a rate of no less than $50 each

12    month.

13    You must provide the probation officer access to any

14    financial requested information, authorize the release of any

15    financial information.  The probation officer may share

16    financial information with the U.S. Attorney's Office.  You must

17    not incur new credit charges or open additional lines of credit

18    without approval of the Probation Office until the restitution

19    is paid.

20    Within 45 days of release from incarceration, you will

21    appear before the Court for a re-entry progress hearing.  The

22    Probation Office in the district in which you are supervised

23    will submit a progress report to the Court within 30 days of the

24    commencement of your supervision.  Upon receipt of the progress

25    report, the Court will determine if your appearance is required.

1     The Probation Office shall release the presentence

2   investigation report to all appropriate agencies, which includes

3   the Probation Office in the approved district of residence.   In

4   order to execute the sentence of the Court, the treatment

5   agencies shall return the presentence report to the Probation

6   Office upon the defendant's completion or termination from

7   treatment.

8     Pursuant to 18 U.S.C. 3742, you have a right to appeal the

9   sentence imposed by the Court if the period of imprisonment is

10  longer than the statutory maximum or the sentence departs upward

11  from the applicable sentencing guideline range.   If you choose

12  to appeal, you must file any appeal within 14 days after the

13  Court enters judgment.

14    As defined in 28 U.S.C. 2255, you also have the right to

15  challenge the conviction entered or sentence imposed if new or

16  currently unavailable information becomes available to you or on

17  a claim that you received ineffective assistance of counsel in

18  entering a plea of guilty to the offense of conviction or in

19  connection with sentencing.

20    If you're unable to afford the cost of an appeal, you may

21  request permission from the Court to file an appeal without cost

22  to you.

23    Pursuant to the D.C. Circuit opinion in *U.S. v. Hunter*,

24  does counsel for either side have any objections to the sentence

25  imposed that have not already been noted on the record?

1          MS. PASCHALL:  No, Your Honor.  Thank you.

2          MR. WATKINS:  No, Your Honor.

3          THE COURT:  Okay.  Any recommendations --

4          MR. WATKINS:  Your Honor, could I be so kind as to

5    request the Bureau of Prisons to house Mr. Chansley at such

6    location as is, one, most convenient to his family in Arizona,

7    in Phoenix, but prioritizing getting him in a location where the

8    healthcare that's appropriate is possibly best available?

9          COURTROOM DEPUTY:  Could you repeat?

10          MR. WATKINS:  I beg your pardon.  Knowing the Bureau

11    of Prisons, obviously, is independent of this Court, but if I

12    could suggest to the Court that Mr. Chansley be sent somewhere

13    close in proximity to Phoenix to permit his family access to and

14    time with Mr. Chansley, balancing that with --

15          THE COURT:  I think I will ask the probation officer

16    to talk to the Bureau of Prisons a little more about that and

17    see if there's a specific recommendation I can make.  I will

18    talk to you about that before I finalize that, then.  I want to

19    do it within a day or two, because it will affect how soon I can

20    get him out of there.

21          MR. WATKINS:  I appreciate that.

22          THE COURT:  I think maybe I can find out what would be

23    better to recommend there.

24          MR. WATKINS:  Thank you, Your Honor.

25          THE COURT:  And the probation officer can talk to

1    Bureau of Prisons placement people about that.  I think it would

2    be a good idea.

3            MR. WATKINS:  Yes, Your Honor.

4            THE COURT:  Anything else you want to recommend?

5            MR. WATKINS:  No, Your Honor, except I hope you're now

6    assured that I did not read anything that the defendant said

7    before he presented to the Court.

8            THE COURT:  It came totally unfiltered.

9        I do want to say one other thing.  The time that he has

10   already served would be credited toward the 41 months as well,

11   obviously.

12           MR. WATKINS:  Very good.

13           THE COURT:  And the government wants to dismiss all

14   other charges?

15           MS. PASCHALL:  Yes, Your Honor.  At this point the

16   government would dismiss the remaining charges in the

17   indictment, which would be Counts 1 --

18           THE COURT:  You know, you were facing 20 years,

19   Mr. Chansley, you're right.  The one advantage you get here is

20   you're only facing now 41 months, minus the time you've already

21   served.  Had you gone to trial -- and I've got other cases with

22   these same charges, and if they want to go to trial, they can.

23   But you were smart.  It may not feel it today, but let me

24   guarantee you, you were smart.  You did the right thing.  And

25   you owned up to it today in a fashion that is unusual for me to

1        see, the candor with which you approached me today.  I

2        appreciate it.

3                    THE DEFENDANT:  Thank you, Your Honor.

4                    THE COURT:  Good luck, Mr. Chansley.

5            Mr. Watkins, nice job.

6                    MR. WATKINS:  Your Honor, thank you for your time here

7        today and throughout the entirety of this case.

8                    THE COURT:  The Court will be in recess.

9            Ms. Paschall, you did a nice job, too.  Thank you.

10           (Proceedings adjourned at 11:56 a.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER


     I, Sara A. Wick, certify that the foregoing is a
correct transcript from the record of proceedings in the
above-entitled matter.



/s/ Sara A. Wick_____            December 2, 2021_____
SIGNATURE OF COURT REPORTER          DATE