**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-003 (RCL)** |
| **JACOB CHANSLEY,** | |
| **Defendant.** | |

**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION**
**UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to defendant Jacob Chansley's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct the Sentence. ECF No. 117 (hereinafter Def. Motion). Chansley's motion asserts several cursory claims challenging his conviction and sentence, which resulted from his guilty plea in 2021.[1] Chansley's claims should be summarily denied because they are barred by Chansley's guilty plea and the appeal waiver in his plea agreement, are too vague and conclusory to warrant relief under § 2255 and lack merit. Additionally, Chansley's claims are not just belied by the record—they are completely at odds with the remorse he professed at the time of his sentencing: supposed remorse that he and his then-counsel used to great success in seeking a lower sentence.

**BACKGROUND**

On January 11, 2021, Jacob Chansley was one of the first defendants indicted for criminal acts that took place at the U.S. Capitol on January 6, 2021, including Obstruction of an Official

---

[1] These claims are primarily based on videos shown on a Fox News program hosted by Tucker Carlson, aired in March 2023. The majority of the footage in question was recorded between 2:56 p.m. to 3:00 p.m. on January 6, 2021. This footage, and the cameras from which they came, are discussed more fully below.

Proceeding in violation of 18 U.S.C. § 1512(c)(2). ECF No. 3. On February 3, 2021, attorney Albert Watkins, Esq., entered a notice of appearance to represent Chansley. ECF No. 5.

On March 5, 2021, the government filed a motion for a protective order, so that discovery could be sent to defense counsel and shared with Chansley. ECF No. 21. On March 8, 2021, the Court granted the motion. ECF No. 24. On April 22, 2021, the government filed a motion for a court order to disclose materials protected by Fed. R. Crim. Pro. Rule 6(e) and sealed materials in discovery to defense counsel. ECF No. 36. On April 27, 2021, the Court granted the motion. ECF No. 37.

On May 20, 2021, the government filed a notice of discovery, with a letter to defense counsel attached. ECF No. 38. That letter detailed six productions made up to that date. Of note, this discovery letter detailed the disclosure of: (1) video footage from the Senate floor (produced April 24, 2021); (2) video footage from a subpoena to *The New Yorker* (produced April 24, 2021); (3) nine videos from relevant Metropolitan Police Department ("MPD") body worn cameras (May 17, 2021); (4) five videos of Capitol Closed Circuit Video ("CCV") footage (May 18, 2021); and (5) two grand jury transcripts with ten accompanying grand jury exhibits (May 19, 2021).

These disclosures were made through an online file-sharing system called USAfx. The five CCV cameras that were disclosed through USAfx were labeled with the camera number, the side of the Capitol or Grounds (USCS for Senate, USCH for House, or USCG for Grounds), the floor of the Capitol building, a general location descriptor, the date, and the time in military time.

who is depicted in the footage from the Tucker Carlson program, as referenced in the Def's Motion (ECF No. 117, at 2), testified in the Grand Jury in this matter.

grand jury transcript was turned over in the first round of discovery on May 20, 2021. ECF No. 38. Several officers who saw Chansley in the Capitol were Metropolitan Police Department

officers who were wearing body worn cameras. Some of these officers' cameras were also disclosed on May 17, 2021, as noted in the May 20, 2021 discovery letter. ECF No. 38. Those cameras include those of Officer Daniels and Reisinger, both of whom encountered Chansley with Officer Robishaw, walking in the stairwell and the hallway of the Capitol between 2:58 and 2:59 p.m. on January 6, 2021, as depicted in the Tucker Carlson program segment.

Finally, footage from *The New Yorker* story "A Reporter's Video from Inside the Capitol Siege," was disclosed on April 24, 2021, as noted in the May 20, 2021 discovery letter. ECF No. 38. From this footage, a viewer would observe Chansley entering the Senate floor through the door opened by Officer Robishaw, at approximately 6:17 minutes into the video.

The May 20, 2021 discovery letter also contains the following statement:

> Due to the extraordinary nature of the January 6, 2021 Capitol Attack, the government anticipates that a large volume of materials may contain information relevant to this prosecution. These materials may include, but are not limited to, surveillance video, statements of similarly situated defendants, forensic searches of electronic devices and social media accounts of similarly situated defendants, and citizen tips. The government is working to develop a system that will facilitate access to these materials. In the meantime, please let me know if there are any categories of information that you believe are particularly relevant to your client.

ECF No. 38-1, at 3.[2]

On July 12, 2021, the government filed a memorandum regarding the status of discovery. ECF No. 62. The government reiterated the extraordinary volume of discovery anticipated in the January 6th cases, and its plans to make that information accessible to defense counsel. The

---

[2] Ultimately, seven discovery letters were sent to defense counsel in this case, dated as follows: May 20, 2021; September 24, 2021; October 4, 2021; October 15, 2021; October 22, 2021; October 29, 2021; and November 5, 2021. One additional discovery letter regarding viewing physical evidence items seized by the government during the course of the investigation, and a spreadsheet of those items, was also sent to defense counsel on July 9, 2021. One additional email was sent to defense counsel on July 15, 2021, explaining that serials from the FBI case file for Chansley, including tips and interviews, had been uploaded to USAfx for review.

government noted the types of materials accumulated, that "may contain discoverable information for many, if not all, defendants," including: "[t]housands of hours of closed circuit video ("CCV") from sources including the USCP, MPD, and United States Secret Service, and several hundred MPD Automated Traffic Enforcement camera videos." ECF No. 62, at 2-3. The memorandum addressed how the government anticipated processing and further reviewing this voluminous discovery through the implementation of a contract with an outside vendor (*Id.*, at 6-7), the systemic reviews of the materials (*Id.*, at 7), and the complexities requiring careful consideration (*Id.*, at 8). The memorandum further noted that "[p]roducing discovery in a meaningful manner and balancing complex legal-investigative and technical difficulties takes time. We want to ensure that all defendants obtain meaningful access to voluminous information that may contain exculpatory material, and that we do not overproduce or produce in a disorganized manner." *Id.*, at 8. Also, the government noted "[w]e also must protect Law Enforcement Sensitive materials by ensuring they are carefully reviewed for discoverability and, if they are discoverable, that they are disclosed in an appropriate manner. We continue to develop [a] workable paradigm for disclosing a vast amount of Capitol CCV while ensuring that the Capitol's security is maintained." *Id.* at 9.

Fully armed with this information, on September 3, 2021, Chansley voluntarily, intelligently, and knowingly entered into a plea agreement. ECF No. 69. As part of the plea, Chansley agreed to plead guilty to Count Two of the indictment, Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2). *Id*. ¶ I. Chansley agreed that the "Statement of Offense," filed simultaneously with the Plea Agreement, "fairly and accurately describe[d] [defendant's] actions and involvement in the offenses to which [defendant was] pleading guilty." *Id*. ¶ II. In exchange for Chansley's guilty plea, the government agreed, among other things, not to further prosecute the defendant for the conduct to which he pleaded guilty, or for any other non-

4

violent criminal offenses about which the government was made aware prior to the execution of the agreement, and to dismiss the additional counts in the indictment at the time of sentencing. *Id.* ¶ III. The parties agreed that the voluntary sentencing guidelines range applicable to this single count was 41 to 51 months, and that a sentence within that guidelines range was appropriate, but that the defense could argue for a downward variance based on the factors to be considered when imposing a sentence pursuant to 18 U.S.C. § 3553(a). *Id.* ¶¶ IV, V.

Chansley agreed to several express waivers as part of the Plea Agreement. This includes that Chansley waived his appellate rights, except to appeal an illegal sentence or above-guidelines sentence, or to claim that he received ineffective assistance of counsel. *Id.* ¶IX(D). Chansley also waived any right to challenge his convictions in a collateral attack, including a motion brought under § 2255, except to the extent that such a motion was based on newly discovered evidence or on a claim that he received ineffective assistance of counsel. *Id.* ¶ IX(E).

Chansley also agreed that he was satisfied with his plea counsel, and that he understood the contours of the Plea Agreement. On page 10 of the Plea Agreement, Chansley signed his name under the following affirmations:

> I have read every page of this Agreement and have discussed it with my attorney, Albert Watkins. I fully understand this Agreement and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Agreement fully. I am pleading guilty because I am in fact guilty of the offense(s) identified in this Agreement.

> I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this Agreement. I am satisfied with the legal services provided by my attorney in connection with this Agreement and matters related to it.

*Id.* at 10.

The Statement of Offense was also filed on September 3, 2021, and it was also signed by Chansley, who affirmed that he had read it and agreed that it was "true and accurate." ECF No. 70, at 7. After a fulsome colloquy with this Court, the Court accepted Chansley's guilty plea and scheduled sentencing on November 17, 2021.

In the interim time between Chansley's guilty plea and his sentencing, the government continued to make additional productions consistent with its discovery obligations. On September 17, 2021, the government filed two memoranda regarding the status of discovery. ECF Nos. 75 and 76. The first memorandum explicitly addressed the government's discovery obligations with respect to arguably exculpatory materials, and the plan to produce them in a comprehensive, accessible, and usable format. ECF No. 75, at 1. Notably, the memorandum addressed concerns raised by some defense counsel in Capitol Breach cases about information that "shows people 'peacefully walking around the Capitol; or suggests that a member (or members) of law enforcement allowed people to enter or remain in the Capitol or on restricted grounds, acted friendly or sympathetic to the rioters, or otherwise failed to do their jobs." *Id.*, at 2. In response, the memorandum states:

> To the extent the type of information described above may exist, it may be interspersed among the voluminous sets of data referenced above. Given the volume of material, and because '[d]efendants are in a better position to determine what evidence they believe is exculpatory and will help in their defense,'[3] it is our intent to provide the defense with all data that may contain such information, but in

---

[3] *United States v. Meek,* No. 19-cr-00378-JMS-MJD, 2021 WL 1049773 *5 (S.D. Ind. 2021). See also *United States v. Ohle*, No. S3 08 CR 1109 (JSR), 2011 WL 651849 *4 (S.D.N.Y. 2011)(not reported in F. Supp. 2d) ("placing a higher burden on the Government to uncover such evidence would place prosecutors in the untenable position of having to prepare both sides of the case at once. Indeed, the adversarial system presumes that the defense will be more highly motivated to uncover exculpatory evidence, so if anything the onus is on defense counsel to conduct a more diligent search for material potentially favorable to his client. This is especially true considering that, if exculpatory evidence exists, the defense is in the best position to know what such evidence might be and where it might be located.")

a manner that will facilitate search, retrieval, sorting, and management of that
information.

*Id.*, at 2. The second memorandum discussed the Axon evidence.com database that was available
to the defense and administered by the District of Columbia Federal Public Defender's ("FPD")
office. ECF No. 76, at 2-3. The memorandum also noted that the government had uploaded
approximately twenty percent of the relevant USCP surveillance footage and expected to share
such footage with the defense system in the next week. *Id.*, at 3. Finally, the memorandum noted
that the government will furnish information to help facilitate defense review of the footage. *Id.*,
at 3, n.1.

On October 25, 2021, the government filed yet another notice of the status of discovery.
ECF No. 78. In this notice, the government relayed that "[a]s of October 18, 2021, FPD has sent
emails to all Capitol Breach defense counsel with instructions on how to request a license for the
legal defense team to view videos in evidence.com." ECF No. 78, at 2. By the time of this October
25, 2021 filing, 16,295 U.S. Capitol Police Closed Circuit Video files from 515 cameras had been
shared to the defense instance of evidence.com. *Id.*, at 2. In addition, to assist the defense in
locating relevant USCP CCV for their case, the government produced 15 camera maps of the
interior of the Capitol and the Capitol Visitor's Center. *Id.*

On November 5, 2021, the government filed its final memorandum in this case regarding
the status of discovery in the Capitol Breach cases. ECF No. 79. The government provided an
update on the status of disclosure of video footage, noting that since the October filing, the
government had produced 4,204 more CCV files, from 123 cameras. *Id.*, at 2. The memorandum
also summarized that over 23,000 files, consisting of USCP CCV, Body Worn Camera and U.S.
Secret Service surveillance footage, had been made available to all defense counsel through
evidence.com. *Id.*

On November 17, 2021, this Court held the sentencing hearing. Chansley fully acknowledge the scope of his criminal conduct on January 6, 2021, noted his repentance, and asked this Court for leniency. 11/17/2021 Sentencing Hearing Tr. 32: 23- 33:17 ("So I had to come to terms with the fact that I was in solitary confinement because of me, because of my decision. I broke the law, and if I believe in freedom, if I believe in law and order, if I believe in responsibility and accountability, then that means that I should do what Gandhi would do and take responsibility even and especially when it incriminates me. No ifs, ands, or buts about it. That's what men of honor do."); 34:25 – 35:5 ("I am truly, truly repentant for my actions, because repentance is not just saying you're sorry. Repentance is apologizing and then moving in the exact opposite direction of the sin that you committed. And that's what I've been trying to do ever since I realized the magnitude of my error and the magnitude of my mistake.") Chansley's       then-counsel       cited Chansley's acceptance of responsibility, and his professed contrition, and argued for leniency. 11/17/2021 Sentencing Hearing Tr. 27: 15-17. ("Jake presents with having apologized without equivocation. No buts, no blames, I did it, I want to be accountable, I want to be held accountable.")

In issuing sentence, the Court noted that if Chansley had been convicted at trial, he could have faced a significantly higher sentence:

> You know, you were facing 20 years, Mr. Chansley, you're right. The one advantage you get here is you're only facing now 41 months, minus the time you've already served. Had you gone to trial -- and I've got other cases with these same charges, and if they want to go to trial, they can. But you were smart. It may not feel it today, but let me guarantee you, you were smart. *You did the right thing. And you owned up to it today in a fashion that is unusual for me to see, the candor with which you approached me today*. I appreciate it.

11/17/2021 Sentencing Hearing Tr. 55:18-56:2 (emphasis added). After considering the parties' written submissions and oral arguments, the Court sentenced Chansley to 41 months' incarceration, at the bottom of his applicable guidelines range. The Court noted that a guidelines

sentence was appropriate because "although you have evolved in your thinking clearly and reversed your thinking in many ways, what you did here was horrific, as you now concede, and obstructing the functioning of the government as you did is the type of conduct that is so serious that I cannot justify a downward departure." 11/17/2021 Sentencing Hearing Tr. 48:21-25. The Court also noted that "the minimum under the guidelines is something you've earned because you've done everything right from the time that you started in the other direction. You've certainly done everything you could today to convince the Court that you're a new person, and I think you're on the right track." 11/17/2021 Sentencing Hearing Tr. 49:1-5. Chansley noted an appeal on November 30, 2021 (ECF No. 108), but filed a motion to withdraw that appeal on July 5, 2022 (ECF No. 112).

On March 17, 2023, Chansley's current defense counsel sent a letter to the government seeking discovery on the issues underlying his Motion. The government responded on March 27, 2023.

In that response, the government noted what information was turned over to prior counsel and when. For example, the government created and provided present counsel a table of the cameras displayed – in part or in full – on the Tucker Carlson program, as well as the dates that they were disclosed to prior counsel.

| U.S. Capitol CCV Camera Depicted in Clip[4] | Time Stamp of Tucker Carlson Clip Aired March 6, 2023 | Approximate Time on January 6, 2021 | Earliest Date Disclosed to Defense |
|---|---|---|---|
| Camera A | 2:48 minutes in the segment | 2:13 p.m. | May 2021 |
| Camera B | 3:28 minutes in the segment | 2:59 p.m. | October 2021 |
| Camera C | 4:01 minutes in the segment | 2:59 p.m. | October 2021 |

---

[4] Due to the highly sensitive nature of these cameras and their locations, counsel have agreed to identify these cameras by letter instead of by their true identifiers. Defense counsel has been given the precise camera numbers, and the government can also provide them to the Court under separate cover.

| Camera D | 3:35 minutes in the segment | 2:57 p.m. | October 2021 |
|---|---|---|---|
| | 5:21 minutes in the segment | 2:57 p.m. | |
| Camera E | 2:06 minutes in the segment | 2:49 p.m. | October 2021 |
| | 3:09 minutes in the segment | 2:51 p.m. | |
| | 4:12 minutes in the segment | 2:57 p.m. | |
| | 5:00 minutes in the segment | 2:57 p.m. | |
| Camera F | 4:31 minutes in the segment | 2:56 p.m | October 2021 |
| | 5:14 minutes in the segment | 2:56 p.m. | |
| Camera G | 3:48 minutes in the segment | 2:59 p.m. | February 2023 |
| Camera H | 3:40 minutes in the segment | 2:57 p.m. | October 2021 |
| | 5:25 minutes in the segment | 2:57 p.m. | |

On April 27, 2023, Chansley filed a motion under 28 U.S.C. § 2255, which is now pending before the Court. ECF No. 117 (Def. Motion). The motion alleges that: (1) the government withheld materially exculpatory video in violation of *Brady v. Maryland* and its progeny; and (2) Chansley received ineffective assistance of counsel because (a) plea counsel failed to obtain the CCV videos that would have impacted his sentencing or plea decision; and (b) plea counsel inappropriately agreed to a +8 enhancement to the base offense level on Chansley's guidelines. (Def. Motion at 11, 16, 17). The government now responds.

## ARGUMENT

### I.   Legal Standards

#### A.  Section 2255

A defendant may move to vacate, set aside, or correct a sentence if he believes the sentence was imposed "in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. The relief contemplated by § 2255 "does not encompass all claimed errors in conviction and sentencing." *United States v. Addonizio*, 442 U.S. 178, 185 (1979). "Because of the premium placed on the finality of judgments, there are limited circumstances under which a court should grant a Section

2255 motion." *Bedewi v. United States*, 583 F. Supp. 2d 72, 76 (D.D.C. 2008) (internal quotation marks omitted).

A defendant bears the burden of demonstrating that he is entitled to relief under § 2255. *See, e.g., United States v. Bell*, 65 F. Supp. 3d 229, 231 (D.D.C. 2014). It is "well-settled" that "to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982); *see also United States v. Pollard*, 959 F.2d 1011, 1020 (D.C. Cir. 1992). A judgment challenged on collateral attack carries with it a "presumption of regularity," "even when the question is waiver of constitutional rights." *Daniels v. United States*, 532 U.S. 374, 381 (2001) (internal quotation marks omitted). In order to have a guilty plea set aside under § 2255, a defendant "must show that the plea proceeding was tainted by a fundamental defect which inherently results in a complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Weaver*, 265 F.3d 1074, 1077 (D.C. Cir. 2001) (internal quotation marks omitted).

**B.  The Government's Obligations under *Brady v. Maryland*, 373 U.S. 83 (1963)**

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or the bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).[5]

---

[5] The government has found no case law in this Circuit that conclusively addresses whether a defendant has a right to exculpatory evidence at the plea stage, given that *Brady* is commonly conceived as a trial right. *See United States v. Nelson*, 979 F. Supp. 2d 123, 129 (D.D.C. 2013). In *Nelson*, former Chief Judge Roberts noted a circuit split, and a lack of D.C. Circuit and U.S. Supreme Court authority on the issue. *Compare, United States v. Ohiri,* 133 Fed. Appx. 555, 562 (10th Cir. 2005); *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998); *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995); *White v. United States*, 858 F.2d 416, 422 (8th Cir. 1988); Campbell v. Marshall, 769 F.2d 314, 322–24 (6th Cir.1985) (holding that a *Brady* violation can justify allowing a defendant to withdraw a guilty plea)*; with Matthew v. Johnson,* 201 F.3d 353 (5th Cir. 2000) and *United States v. Moussaoui,* 591 F.3d 263 (4th Cir. 2010) (holding *Brady* is a trial right, and when a defendant pleads guilty, the concerns of a fair trial are almost

Evidence is "material" when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *Cone v. Bell*, 556 U.S. 449, 469-470 (2009). A "reasonable probability" of a different result is one in which the suppressed evidence would "undermine confidence in the verdict." *Id.,* (citing *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). *See also Turner v. United States*, 582 U.S. 313, 324 (2017). In other words, defendants are entitled to relief only if they "establis[h] the prejudice necessary to satisfy the 'materiality' inquiry." *Strickler v. Greene*, 527 U.S. 263, 282 (1999). This means that the omission must be evaluated in the context of the entire record. *United States v. Agurs*, 427 U.S. 97, 112, (1976), holding modified by *United States v. Bagley*, 473 U.S. 667 (1985). "If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial." *Id.*, at 112-113.

### C.  To Prevail on an Ineffective Assistance of Counsel Claim, Defendant Must Show Both Deficient Performance and Prejudice.

To prevail on an ineffective assistance of counsel claim, a defendant must demonstrate that: (1) counsel's performance was deficient, and (2) counsel's deficient performance "prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also, United States v. Gooch,* 842 F.3d 1274, 1279 (D.C. Cir. 2016); *United States v. Murray*, 897 F.3d 298, 310–11, (D.C. Cir. 2018) (explaining the *Strickland* standard). "'Surmounting [this] high bar is never an easy task.'" *United States v. Brinson-Scott*, 714 F.3d 616, 623 (D.C. Cir. 2014) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).

---

eliminated). However, Chief Judge Roberts held in *Nelson* that the balance of circuit court precedent and the purpose of *Brady* should allow a defendant to assert a *Brady* claim after a guilty plea, and that "[p]ermitting a defendant to move to withdraw a guilty plea he entered without having been given exculpatory evidence in the government's possession comports with the purpose of the prosecution's *Brady* obligation." *Id.*, at 130. *See also Miller v. Gettel,* No. 22-1034, 2023 WL 2945340, at *7 (6th Cir. Apr. 14, 2023) (recent case collecting the circuits that have addressed this issue, and reached opposite conclusions.)

To establish deficient performance, a defendant must show that his attorney "made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Strickland*, 466 U.S. at 687. A defendant "must identify the acts or omissions of counsel" that were not the result of "reasonable professional judgment," and the Court "must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. The first *Strickland* factor requires a defendant to "show that counsel's actions were not supported by a reasonable strategy...." *Massaro v. United States*, 538 U.S. 500, 505 (2003); *United States v. Brisbane*, 729 F.Supp.2d 99, 109 (D.D.C. 2010) (same). "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland,* at 689; *see also, Payne v. Stansberry*, 760 F.3d 10, 13 (D.C. Cir. 2014) ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.")

To show prejudice, a defendant must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, at 694. "To satisfy the prejudice requirement in the context of an attack on a guilty plea, 'the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" *In re Sealed Case*, 488 F.3d 1011, 1016 (D.C. Cir. 2007) (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)). Notably, establishing a "reasonable probability" requires that "the likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011); *see also Brinson-Scott*, 714 F.3d at 624. The prejudice inquiry is founded in part on the recognition that the government's substantial interest in the finality of guilty pleas would be undermined if it were too easy for defendants seeking a better outcome to challenge a guilty plea after the fact. *See Hill*, 474

U.S. at 58; *see also United States v. Timmreck*, 441 U.S. 780, 784 (1979) ("[T]he concern with finality served by the limitation on collateral attack has special force with respect to convictions based on guilty pleas.") (internal footnote omitted).[6]

Failure to make the required showing of *either* deficient performance or sufficient prejudice defeats an ineffectiveness claim. *See Strickland*, 466 U.S. at 700. Consequently, the reviewing court need not even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. "If it is easier to dispose of an effective assistance claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*; *see also Brinson-Scott*, 714 F.3d at 623.

## II.    Defendant's Discovery Claims Should Be Summarily Denied.

Chansley asserts his sentence should be vacated because of an alleged discovery violation by the government. These claims are barred by defendant's guilty plea and are meritless.

### A.    Defendant's Claims Regarding the Alleged Discovery Violation Are Barred By His Guilty Plea.

Here, in exchange for defendant's guilty plea, the United States agreed not to pursue additional charges set forth in the Proffer of Evidence. Plea Agreement, ¶ III. In accepting the plea bargain, defendant waived his right to file a collateral attack, Plea Agreement, ¶ IX.E., except to the extent that such a § 2255 motion was based on "newly discovered evidence" or ineffective

---

[6] Even if Chansley were ultimately successful in advancing a meritorious claim to vacate his conviction (which, the government submits, he is unable to do), the case against him would not be dismissed. Rather, Chansley's guilty plea would be withdrawn, the charges in the indictment would be reinstated, and the case would proceed to trial – where Chansley, if convicted, could face up to 20 years' imprisonment. Chansley therefore may wish to consider whether the "relief" that he could obtain through these claims is truly preferable to preserving the benefits of the Plea Agreement, under which he was sentenced to the minimum sentence under his calculated guidelines range. Additionally, Chansley has not presented any arguments regarding a known defect in the colloquy, a lack of voluntariness in the plea, or a claim of actual innocence.

assistance of counsel. *See Garcia-Santos*, 273 F.3d at 509 (noting that defendants receive "important benefits" from collateral attack waivers because such waivers are "part of the bargain by which defendants "receive[] exemption from prosecution for other crimes" and other plea agreement benefits).

Because the need for finality has "'special force with respect to convictions based on guilty pleas,'" collateral review of such convictions may proceed only in "strictly limited" circumstances. *Bousley v. United States*, 523 U.S. 614, 621 (1998) (quoting *Timmreck*, 441 U.S. at 784). In *United States v. Broce*, 488 U.S. 563, 569 (1989), the Supreme Court explained that "[a] plea of guilty and the ensuing conviction comprehend all of the factual and legal elements necessary to sustain a binding, final judgment of guilt and a lawful sentence." Indeed, a guilty plea "is more than a confession which admits that the accused did various acts"; rather, "[i]t is an admission that he committed the crime charged against him." *Id.* at 570 (internal quotation marks and citations omitted). Thus, when a defendant files a § 2255 motion to challenge the validity of a conviction obtained pursuant to a guilty plea, "the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary." *Id.* at 569.[7]

Chansley expressly agreed as a condition of the Plea Agreement to waive his rights to challenge his convictions in a collateral attack, including a motion brought under § 2255, except to the extent that such a motion was based on newly discovered evidence or on a claim that he

---

[7]The limited exceptions to this rule are not applicable to defendant's claims. Such exceptions include claims that a defendant was coerced by the government or defense counsel, *see United States v. Wright*, 43 F.3d 491, 497-500 (10th Cir. 1994), that he was misinformed of the elements of the offenses, *see Bousley v. United States*, 523 U.S. 614, 618-19 (1998), or that the court had no power to enter the conviction or impose the sentence, *see United States v. Broce*, 488 U.S. 563, 569 (1989). A claim that a defendant received ineffective assistance of counsel prior to entering a guilty plea is also cognizable on collateral attack. *See, e.g., In re Sealed Case*, 488 F.3d 1011, 1015 (D.C. Cir. 2007). Defendant's ineffective assistance of counsel claims are addressed below in Section III.

received ineffective assistance of counsel. (Plea Agreement ¶ IX(D)). Although Chansley's motion frames his argument as newly discovered evidence, the relevant materials he now claims as exculpatory were largely produced before Chansley was sentenced. Moreover, such material depicts Chansley inside of the U.S. Capitol – videos that he himself, in real-time and in first-person, experienced. None of this can be truly considered newly "discovered," in context. Chansley's plea agreement sufficiently and appropriately waived this collateral attack. *See, e.g., United States v. Guillen*, 561 F.3d 527, 529 (D.C. Cir. 2009) (holding that "waivers [in plea agreements] generally may be enforced").

### B. Even if Collateral Attacks were not Waived, Chansley's *Brady* Claims are Meritless.

#### 1. *The footage at issue was not withheld from defense counsel.*

The footage underlying Chansley's Motion derives from the CCV system of the U.S. Capitol. This footage, with which the Court is quite familiar, is core evidence in nearly every January 6 prosecution. As part of the government's expansive, if not unprecedented, discovery dissemination, such CCV was produced *en masse*, labeled by camera number and by time, to all defense counsel in all cases.[8] With the exception of one CCV camera (where said footage was ten seconds in length and implicated an evacuation route of legislative and executive persons), all of the footage played on the Tucker Carlson program was uploaded to the defense instance of evidence.com by October 22, 2021, and noted in the October 25, 2021 memorandum on the status

---

[8] The productions excluded a limited set of footage that the Capitol Police designated as security information, such as X-Ray machine feeds and views of evacuation routes and Sensitive Compartmented Information Facility ("SCIF") office lobbies.

of discovery.[9] ECF No. 78.  The final 10 seconds of footage was produced in global discovery to the defense instance of Relativity on February 17, 2023. Chansley's *Brady* claim therefore fails at the threshold because nothing has been suppressed. *United States v. Blackley*, 986 F. Supp. 600, 603 (D.D.C. 1997) ("For an item to be *Brady*, it must be something that is being 'suppress[ed] by the prosecution.'") (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).

While discovery in this case is voluminous—a point hyperbolically emphasized by Chansley (Def. Motion at 9-10)—the government provided all defense counsel with the necessary tools to readily identify relevant cameras within the CCV to determine whether footage was important to their case. The government provided maps of the Capitol to defense counsel in order to help them review cameras they deemed relevant to their respective clients. ECF No. 78, at 2. The government also explained to defense counsel in a discovery letter sent in October 2021 the naming convention of the files uploaded to evidence.com, which explained their location and their timestamps. Moreover, in this case, defense counsel also possessed more specific videos—like the CCV cameras disclosed in May 2021, the body worn cameras, and the Senate Floor cameras—with time stamps that would help narrow down the time range to look for relevant materials. ECF No. 38. Of course, Chansley did not need the government to tell him the path he travelled on January 6, 2021, as he is obviously the person best situated to know where he was that day.

The volume of discovery does not excuse defense counsel from making reasonable efforts to ascertain whether an item has been produced before making representations about what was and was not produced, let alone before filing inaccurate and inflammatory allegations of discovery failures. The existence of large volumes of discovery—specifically the large volume of

---

[9] The remaining CCV was disclosed in global discovery in February 2023. It similarly – as with the majority of the other CCV of which defense counsel complains– depicted Chansley outside of the Senate Chamber with law enforcement, *after* his initial breach into the gallery of the Chamber.

outstanding video evidence—was filed on the record multiple times in this case; defense counsel and defendant chose to proceed with a plea hearing knowing this was the case. See, ECF Nos. 38 (May 2021 discovery letter) and 62 (July 2021 discovery status memorandum).

Moreover, the substance of these videos which now occupy the basis of this Motion— purported evidence of Chansley being "escorted"—was disclosed to defense counsel by May 20, 2021. For instance, prior counsel was provided video from two MPD officers' body worn cameras depicting Chansley and the Capitol Police officers walking together during the period of time displayed on the Tucker Carlson program—between 2:58 and 2:59 p.m. ECF No. 38-1. Those items were disclosed on May 17, 2021, long before Chansley's plea and sentencing on September 3, 2021. ECF No. 38-1, at 2.

Additionally, the government disclosed footage from *The New Yorker* on April 24, 2021, showing Chansley entering the Senate floor. ECF No. 38-1, at 2. In an email on May 14, 2021, prior defense counsel not only relayed to the government that he had reviewed this video, but that he believed it depicted "the door to the Chamber being held for Mr. Chansley by law enforcement as he entered into the Chamber (followed thereafter by law enforcement)" and his client "being escorted into the Chamber just before 3:00p." See Exhibit 1, May 14, 2021 Email from Albert Watkins. Counsel even annotated still shots of this video, and noted "[Chansley] enters Chamber with ROBISHAW a few minutes later," demonstrating not only his awareness of his client's conduct, but his appreciation of Officer Robishaw's involvement. See Exhibit 1, May 14, 2021 Email from Albert Watkins. As this Court well knows, Officer Robishaw was not "escorting" Chansley into the Chamber; instead he was trying, in vain, to convince Chansley and other members of the mob to leave the building. Again, Chansley was a first-hand witness to Officer Robishaw's efforts and is uniquely positioned to know exactly what Officer Robishaw did and

said on January 6, 2021. Regardless, defense counsel had the video available for his use and explicitly knew the contents of said video.

Finally,                                    testified before the grand jury

                    That transcript was also disclosed in discovery on May 19, 2021. ECF No. 38-1, at 2.

In other words, *all* of this material was provided to Chansley prior to his plea and/or sentencing.  In sum, Chansley and his prior counsel received— thousands of hours of CCV, body-worn, Senate floor, and third-party video, the grand jury testimony of the most relevant officer depicted in the footage, and a trove of other discovery and elected to proceed to sentencing *knowing* that despite the fact that they had received copious discovery, it was nevertheless incomplete.  Against this backdrop, Chansley's claim that he is entitled to some type of relief is spurious at best.

### 2. The video footage is not material to Chansley's conviction or sentence.

Chansley's possession of the videos is dispositive of his *Brady* claim. Nonetheless, the record conclusively shows that the videos in question are not exculpatory of Chansley's or any other rioter's participation in the siege of the Capitol on January 6, 2021. In fact, the videos of Chansley's movements throughout his time in the Capitol are inculpatory.

Chansley's argument seems to be that the random snippets of Chansley's movements that were televised on the Tucker Carlson program establish that he somehow did not obstruct the

proceeding, pursuant to 18 U.S.C. § 1512(c)(2), or that his actions are mitigated by this evidence. But the footage lacks the context of what occurred before and after what was televised. Chansley entered the building as part of a violent crowd that gained access to the Capitol as a result of another rioter's destruction of a window and door—which Chansley witnessed firsthand—comprising the first breach of the building. By the time Chansley breached the building on the coattails of violent rioters smashing the windows of the Capitol, the mob—through the sheer force of its size and the violence of those participating—had wrested control of portions of the Capitol grounds and the Capitol from a vastly outnumbered U.S. Capitol Police force. When Chansley entered the building, those defending the Capitol were in triage mode, trying to deal with the most violent elements of those unlawfully present and holding those portions of the Capitol that had not yet been seized by rioters while simultaneously protecting Members of Congress and staffers who were still trapped in the Capitol.

Chansley's actions during the first violent breach of the Capitol provides more than enough evidence of his corrupt intent to interfere with Congress that day. But of course, there is more. The Tucker Carlson footage primarily shows Chansley's movements from approximately 2:56 p.m. to 3:00 p.m. Prior to that time, Chansley had, amongst other acts, breached a police line at 2:09 p.m. with the mob on the Capitol steps, entered the Capitol building less than one minute behind Dominic Pezzola[10] during the initial breach of the building at 2:13 p.m., and faced off with

---

[10] In *United States v. Ethan Nordean, et al*, 21-cr-175-TJK, Pezzola was tried and convicted of Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) (the same count Chansley plead  guilty to), Conspiracy to Prevent Members of Congress or Federal Officers from Discharging their Duties, in violation of 18 U.S.C. § 372, Obstructing Officers During a Civil Disorder, in violation of 18 U.S.C. § 231(c)(2), two counts of Destruction of Government Property of Value over $1,000, in violation of 18 U.S.C. § 1361, Assaulting, Resisting or Impeding Certain Officers, in violation of 18 U.S.C § 111, and Robbery of Personal Property of the United States, in violation of 18 U.S.C. § 2112.

members of the U.S. Capitol Police for more than thirty minutes in front of the Senate Chamber doors while elected officials, including the Vice President of the United States, fled. Chansley then entered the Senate Gallery unescorted at 2:52 p.m., where he proceeded to scream obscenities, while other rioters rifled through the desks of U.S. Senators on the floor below. All these actions were captured by Senate floor cameras, a journalist's footage, MPD body-worn cameras, other rioter's footage, and/or Capitol CCV cameras; all of these actions were *before* the footage in question. And this material was provided to Chansley before his plea and sentencing.

Chansley was not some passive, chaperoned observer of events for the roughly *hour* that he was unlawfully inside the Capitol. He was part of the initial breach of the building; he confronted law enforcement for roughly 30 minutes just outside the Senate Chamber; he gained access to the gallery of the Senate along with other members of the mob (obviously, precluding any Senate business from occurring); and he gained access to and later left the Senate floor only after law enforcement was able to arrive *en masse* to remove him. It is true that a sole officer— who was trying, unsuccessfully, to convince Chansley to leave—was with Chansley as he made his way to the Senate floor after initially breaching the Chamber. But the televised footage fails to depict that Chansley subsequently refused to be escorted out by this lone officer and instead left the Capitol only after dozens of additional officers arrived and forcibly escorted him out. All the while, Chansley made his intent clear: he wanted to interfere with the official proceeding. Indeed, before screaming a prayer on the Senate dais – where moments earlier the Vice President of the United States sat – Chansley left a note for the second highest officer in the United States' executive branch, which stated: "It's Only a Matter of Time, Justice is Coming." When Chansley pled guilty to corruptly intending to obstruct a Congressional proceeding, he did so knowingly and voluntarily, with a full understanding of the record and discovery of his criminal acts.

**III.    Defendant's Ineffective Assistance of Counsel Claims Conclusively Lack Meirt and/or Are Too Vague and Conclusory to Warrant Relief.**

Chansley raises two other claims based on alleged ineffective assistance of counsel. First, he claims that plea counsel should not have accepted the +8 base offense level enhancement pursuant to U.S. Sentencing Guidelines §2J1.2(b)(1)(B) in the plea agreement reached with the government (Def. Motion at 17-18). Second, he alleges that plea counsel should have obtained all of the CCV video before proceeding to sentencing (Def. Motion at 18-19). These claims are too vague and conclusory to warrant relief under § 2255 and disproved by the existing record. Chansley therefore cannot satisfy his burden to show both that plea counsel's performance was deficient, and that plea counsel's actions resulted in prejudice.

### A.  The claims are too vague and conclusory to warrant relief.

A defendant claiming ineffective assistance of counsel based on a failure to uncover allegedly exculpatory evidence must specifically assert what additional information his counsel should have discovered, and how that information would have produced a different result. *See, e.g., United States v. Bertram*, 209 F. Supp. 3d 243, 256 (D.D.C. 2016). While the government has attempted to cobble together an argument to respond to, Chansley's cursory assertions fall far short of establishing that plea counsel was constitutionally deficient in this regard. *See United States v. Smith*, 172 F.3d 922, 1998 WL 939501, *2 (D.C. Cir. Dec. 14, 1998) (upholding summary denial of § 2255 motion because defendant's claims were conclusory and lacked "any factual predicate"); *Mitchell v. United States*, 841 F. Supp. 2d 322, 328 (D.D.C. 2012) ("[D]istrict courts have the power to deny § 2255 motions on the grounds that they offer only bald legal conclusions with no supporting factual allegations.").

For all of these reasons, Chansley's ineffective assistance of counsel claim on these points should be summarily denied. Nevertheless, we attempt to respond to his claims, in turn.

**B.  The existing record disproves any concerns about plea counsel's effectiveness.**

**i.  Base offense level agreement**

As to the first argument regarding the base offense level enhancement, Chansley's own signature on the various plea documents – including the agreed-upon guidelines range – dispels the notion that his counsel was ineffective. "'[T]he representations of the defendant [at a plea hearing] as well as any findings made by the judge in accepting the plea, constitute a formidable barrier in any subsequent collateral proceeding' and the defendant's 'declarations in open court carry a strong presumption of verity.'" *United States v. Farley*, 72 F.3d 158, 163 (D.C. Cir. 1995) (quoting *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977)). *See also United States v. Jones*, 642 F.3d 1151, 1158 (D.C. Cir. 2011) ("A motion that can succeed only if the defendant committed perjury at the plea proceedings may be rejected out of hand unless the defendant has a compelling explanation for the contradiction.") (internal quotation marks and citation omitted). Indeed, the written Plea Agreement features Chansley's affirmations that he "agree[s] to it without reservation," and that he is "satisfied with the legal services provided by [his] attorney in connection with this Agreement and matters related to it." ECF No. 69, at 10.

It is well within the realm of valid strategic decisions of competent counsel to agree to certain enhancements when the government is willing both to drop charges or forego seeking additional adjustments that might increase a sentence.[11] *See Strickland,* 466 U.S. at 689, ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (quoting *Michel v.*

---

[11] Indeed, the government could have sought additional departures, such as U.S.S.G. §5K2.7, for substantial disruption of government, or U.S.S.G. §3A1.4 n.4, as contemplated by the plea agreement. ECF No. 69, at 3.

*Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955))); *see also United States v. Calderon,* 163 F.3d 644, 646 (D.C. Cir. 1999) ("We cannot agree with Calderon that this plea bargain was a 'contract of adhesion'; indeed, its terms do not suggest even a hint of unfairness.") To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant Chansley a windfall to which the law does not entitle him. *Lockhart v. Fretwell*, 506 U.S. 364, 369–70 (1993).

Chansley cites no authority, and we are aware of none, requiring defense counsel to secure a more favorable plea offer than the one the government actually made. *Cf. Lafler v. Cooper*, 566 U.S. 156, 168 (2012) ("[i]f a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it," however, "[i]f no plea offer is made, or a plea deal is accepted by the defendant but rejected by the judge, the issue raised here [the appropriate remedy for erroneous advice concerning a plea offer] simply does not arise."); *Delatorre v. United States*, 847 F.3d 837, 846 (7th Cir. 2017) (defense counsel "cannot be faulted for the government's decision not to reward" defendant "with a plea agreement"). The law is well-settled that dissatisfaction with a plea deal does not rise to a showing of constitutionally ineffective counsel. See, e.g., *Hunter v. United States*, 160 F.3d 1109, 1115 (6th Cir. 1998) ("[W]hile [petitioner] may later have decided that he could have done better, his dissatisfaction does not rise to a showing of constitutionally ineffective counsel"); *United States v. Parker*, 609 F.3d 891, 895 (7th Cir. 2010) ("[W]hether a petitioner 'could have negotiated a better plea deal is irrelevant in the ineffective assistance context.' ") (quoting *Bethel v. United States*, 458 F.3d 711, 720 (7th Cir. 2006)).

Moreover, Chansley has generally failed to establish the requisite prejudice under *Strickland*. Chansley admitted he was guilty of the charged offense in the plea agreement, he

voluntarily and knowingly agreed to the plea deal, and he has not asserted his innocence or made any showing of a viable defense at trial—facts that preclude a finding of *Strickland* prejudice. *See Mansfield v. United States,* 800 F. Supp. 2d 84, 90 (D.D.C. 2011) (finding that because defendant admitted her guilt and knowingly entered into the plea agreement, defendant could not establish that she was prejudiced by counsel's alleged incompetence). Also*,* unlike cases in which the prior counsel failed to warn a defendant of applicable career-offender provisions (*see, e.g.*, *United States v. McCoy*, 215 F.3d 102, 108 (D.C. Cir. 2000)) or failed to argue against questionable grouping enhancements post-trial (*Glover v. United* States, 531 U.S. 198, 201 (2001)), here, plea counsel agreed to an enhancement that *was* applicable to Chansley's actions, and has applied in many January 6 prosecutions when calculating the guidelines for violations of 18 U.S.C. § 1512(c)(2). *See, e.g., United States v. Anthony Williams,* 21-cr-377 (BAH), *United States v. Douglas Jensen*, 21-cr-006 (TJK), *United States v. Jerod Hughes*, 21-cr-106 (TJK), *United States v. Scott Fairlamb*, 21-cr-120 (RCL), *United States v. Christopher Grider*, 21-cr-22 (CKK), *United States v. John Douglas Wright*, 21-cr-341 (CKK); *United States v. Thomas Robertson,* 21-cr-34 (CRC).

In this instance, the enhancement was and is appropriate, given that Chansley was carrying a large spear through the Capitol, verbally fighting with law enforcement officers, and left a threatening note for the Vice President of the United States. There is no reason to believe that rejecting a plea offer and arguing over the same sentencing guidelines, as Chansley's Motion suggests plea counsel should have done (Def. Motion at 20-21), would have changed the outcome of the guidelines' calculation or the ultimate sentence.

### ii.  CCV videos

As for the second contention, the docket plainly shows that plea counsel *did* have access to CCV before Chansley's sentencing. Present counsel now claims that "as of [November 15,

2021], prior counsel had not been provided *any* CCV video evidence from inside the Capitol." Def. Mot at 18 (emphasis added). This claims lacks any basis in fact and is patently false.  Not only had plea counsel been provided the CCV that forms the basis of this motion (ECF No. 78 and 79), plea counsel received footage from five specific CCV cameras through USAfx in May 2021. ECF No. 38. By the time that Chansley was sentenced, plea counsel had in fact received videos from hundreds of CCV cameras. ECF No. 79, at 2. No further work was required on behalf of counsel to obtain these videos; they were already in his possession.

 Moreover, not only does the record reflect that plea counsel had video from MPD officer's body worn cameras, testimony from one of the officers involved, and journalist footage depicting what Chansley now claims is compelling evidence in support of his cause, but the record also establishes that plea counsel reviewed video evidence *with Chansley*. At the sentencing hearing, for example, plea counsel stated that he went through "the painful process of navigating one-dimensional WebEx or Zoom to show videos to Jake as a part of the discovery disclosure process" and that they watched "hours of them." Sentencing Hearing Tr. 11/17/2021 26:13-17.

 Plea counsel's decision not to use any videos during Chansley's sentencing was not ineffective and instead was a reasonable, strategic choice. Plea counsel noted to the Court, "I've provided you with videos. I've provided the government with videos. The government's given me videos. The government's given you videos that I've given her. This isn't a drive-in movie theater. You don't need to see more video." Sentencing Hearing Tr. 11/17/2021 16:18-21. And the choice not to show any videos was an effective one. At sentencing, the factor that most impressed this Court was the remarks from Chansley himself and Chansley's actions since his arrest. Sentencing Hearing Tr. 11/17/2021 48:15-49:5 ("[Y]esterday, I celebrated my 34th year here as a judge, and I think your remarks are the most remarkable I've heard in 34 years. I think you are genuine in

your remorse and heartfelt. Parts of those remarks are akin to the kinds of things Martin Luther King would have said. I do think that the minimum under the guidelines is something you've earned because you've done everything right from the time that you started in the other direction. You've certainly done everything you could today to convince the Court that you're a new person, and I think you're on the right track.") But the Court also reiterated that this sentence was necessary because "what you did here was actually obstruct the functioning of the whole government. It's such a serious crime that I just can't go all the way, even though you now recognize. But you said today what you did was wrong. You know what you did was wrong." Sentencing Hearing Tr. 11/17/2021 50:3-7.

The transcript makes clear that had sentencing counsel adopted current counsel's approach—litigating the minutiae of what the videos show—it would have undercut the unambiguous acceptance of responsibility that redounded to Chansley's benefit at sentencing.  Put simply, the most likely impact of Chansley's current proposed course of action would have been increasing his sentence, not decreasing it—let alone, leading this Court to question whether an evidentiary basis for the conviction exists.

Finally, Chansley has not established prejudice with respect to any of these claims. Nowhere does defendant claim, much less demonstrate, that absent plea counsel's purported deficiencies there is a "reasonable probability" that defendant "would not have pleaded guilty and would have insisted on going to trial." *In re Sealed Case*, 488 F.3d at 1016. The prejudice inquiry is an objective one, focusing on what a rational defendant would have done "under the circumstances." *Padilla*, 559 U.S. at 372. To establish prejudice, a defendant must therefore show that, in view of all the considerations available at the time of the plea, going to trial would have been a rational choice. *See id.*; *Hill*, 474 U.S. at 59. Even assuming *arguendo* that some of

Chansley's claims of plea counsel's strategic choices had merit, Chansley has simply not proven prejudice. *United States v. Shah*, 263 F. Supp. 2d 10, 23 (D.D.C. 2003), *aff'd* and *remanded*, 453 F.3d 520 (D.C. Cir. 2006). "Where the alleged error is failure to investigate or discover potentially exculpatory evidence, the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial." *Hill*, 474 U.S. at 59. As this Court noted at sentencing, Chansley "made himself the image of the riot." 11/17/2021 Sentencing Hearing Tr. 19:11-19.  Four minutes of video – much of which was previously provided before sentencing – would not overcome the overwhelming evidence that proved Chansley's extensive involvement in the obstruction of the official proceeding on January 6, 2021, nor did its absence prejudice Chansley at his plea or sentencing.

Overall, the evidence against Chansley was overwhelming, and absent a plea agreement, he not only faced serious consequences but would have foregone one of the substantial benefits that plea and sentencing counsel gained for him: credit for accepting responsibility and demonstrating—what we believed at the time to be genuine—remorse. Chansley instead received a bottom of the guidelines sentence. It is thus exceedingly unlikely that Chansley would have forfeited the benefits he gained by pleading guilty and risked trial under these circumstances. *See United States v. Horne*, 987 F.2d 833, 836 (D.C. Cir. 1993) ("[T]he overwhelming evidence suggests that appellant's decision to plead guilty was a rational choice.") (internal quotation marks and citation omitted). Chansley's decision to enter the plea – on consultation with plea counsel – was rational and effective, in light of the evidence.

Finally, Chansley acknowledged this choice, too. At sentencing, he stated that, after reviewing the discovery, there was "no excuse for once the breach was made, you know. I watched it. There's no excuse. But I'm just being honest with you." 11/17 /2021 Sentencing Hearing Tr. 36:1-3.

## IV.  No Discovery Nor Hearing Is Required to Deny These Claims.

Chansley's motion requests "to conduct discovery prior to final briefing and a hearing on the merits." Def. Motion at 8, 11. This request is without merit. "First, though a district court may, in its discretion, grant a § 2255 petitioner discovery upon a showing of 'good cause,' a desire to engage in little more than an unbounded fishing expedition 'in an abundance of caution' does not constitute such a showing." *United States v. Taylor*, 254 F. Supp. 3d 145, 159 (D.D.C. 2017) (citing *District Att'ys Office for the Third Judicial District v. Osborne*, 557 U.S. 52, 72 (2009), and *Strickler v. Greene*, 527 U.S. 263, 286 (1999) ("Mere speculation that some exculpatory material may have been withheld is unlikely to establish good cause for a discovery request on collateral review."). Chansley's discovery demands in his motion do not actually show anything substantive with respect to his alleged claims. Def. Motion, at 21-22. This is clearly "an unbounded fishing expedition."

Second, even if Chansley had shown "good cause," Chansley signed an enforceable waiver in the plea agreement, stating he will "forego the right to any further discovery or disclosures of information not already provided at the time of the entry of [Chansley's] guilty plea ." ECF No. 69, ¶ IX(C)); *see also Taylor*, at 159-160. Chansley has failed to demonstrate any reason to set aside the plea agreement, and cannot now rescind this waiver of any right to further discovery made pursuant to the enforceable plea agreement.

Chansley's claims should be summarily denied without a hearing. "A judge need not conduct an evidentiary hearing before denying a petition for relief under § 2255 when 'the motion

and the files and records of the case conclusively show that the prisoner is entitled to no relief.'"

*United States v. Morrison*, 98 F.3d 619, 625 (D.C. Cir. 1996) (quoting 28 U.S.C. § 2255).

Moreover, "even if the files and records of the case do not clearly rebut the allegations of the

prisoner, no hearing is required where his claims are 'vague, conclusory, or palpably incredible.'"

*United States v. Pollard*, 959 F.2d 1011, 1031 (D.C. Cir. 1992) (quoting *Machibroda v. United*

*States*, 368 U.S. 487, 495 (1962)).

Here, the history of this case, the evidence, and the discovery underlying Chansley's

Motion are laid out plainly for the Court's consideration. No further hearings are necessary to deny

this Motion.

## **CONCLUSION**

For the reasons discussed herein, the Court should summarily deny the claims in

defendant's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct the Sentence.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:   /s/
KIMBERLY L. PASCHALL
Assistant United States Attorney
National Security Section
D.C. Bar No. 1015665
601 D Street, N.W.,
Washington, D.C. 20530
202-252-2650
Kimberly.Paschall@usdoj.gov