## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>**JACOB ANTHONY CHANSLEY**,<br><br>*Defendant.* | Case No. 1:21-cr-3 (RCL) |

## <u>MEMORANDUM OPINION</u>

Defendant Jacob Anthony Chansley, who was the face of the riot at the United States Capitol on January 6, 2021, is now the face challenging the prosecutions of the criminal conduct that occurred that day. Citing what he calls "newly discovered" evidence, Mr. Chansley moves to vacate, set aside, or correct his guilty plea and corresponding sentence under 28 U.S.C. § 2255. The government opposes and urges the Court to summarily deny Mr. Chansley's motion.

Upon consideration of Mr. Chansley's motion, the government's opposition, the record therein, and the applicable law, the Court will **DENY** Mr. Chansley's § 2255 motion.

### I.   BACKGROUND

#### A. Mr. Chansley's Involvement in the Events of January 6, 2021 and Indictment

On January 6, 2021, at approximately 1:00 pm, the Senate and House of Representatives assembled in a joint session at the U.S. Capitol building to count electoral votes cast in the 2020 presidential election. Statement of Offense, ECF No. 70, ¶ 3. Then-Vice President Michael R. Pence was present and presiding over the joint session. *Id.* At approximately 1:30 pm, the Senate and House adjourned to their respective chambers to resolve an objection to the certification. *Id.* Vice President Pence adjourned with the Senate and presided over that proceeding. *Id.*

1

Meanwhile, a large crowd of rioters gathered outside of the building, assembled behind barricades in front of the police line at the West front of the Capitol. *Id.* ¶¶ 4, 5.

At approximately 1:50 pm, Mr. Chansley scaled a media tower constructed in preparation for the presidential inauguration. *Id.* ¶ 5. That day, Mr. Chansley was shirtless, wearing a horned and fur-lined hat, and red, white, and blue face paint. *Id.* He carried a six-foot-long pole with an American flag zip-tied to it and a spearhead affixed to the top, as well as a bullhorn. *Id.*; *United States v. Chansley*, 525 F. Supp. 3d 151, 155 (D.D.C. 2021). Approximately ten minutes later, Mr. Chansley and the other rioters breached the barricades and advanced to the Capitol's West front. Statement of Offense ¶¶ 6, 7. At approximately 2:13 pm, rioters forced open the Senate Wing Door, which set off a loud alarm. *Id.* ¶ 9. One minute later, Mr. Chansley entered the Capitol through the broken door, becoming one of the first thirty rioters to do so. *Id.* ¶ 10.

At approximately 2:16 pm, two minutes after entering the Capitol, Mr. Chansley and other rioters charged upstairs to the second floor of the Senate side of the Capitol building. *Id.* ¶ 11. On the second floor, Mr. Chansley encountered several U.S. Capitol police officers, including Officer Keith Robishaw. *Chansley*, 525 F. Supp. 3d at 155. Officer Robishaw instructed Mr. Chansley and his fellow rioters to leave the building. Statement of Offense ¶ 11. Most of the other rioters complied, but Mr. Chansley refused. *Id.* Instead, he used his bullhorn to demand that the lawmakers be brought out to face the crowd. *Id.* At 2:20 pm, the members of the Senate and House, including the Vice President, evacuated their chambers and all certification proceedings were suspended. *Id.* ¶ 10. During this time, Mr. Chansley ascended another staircase, arriving on the third floor of the Senate side of the Capitol building. *Id.* ¶ 12.

At approximately 2:52 pm, Mr. Chansley entered the Senate gallery alone. *Id.* While standing in the gallery, Mr. Chansley shouted obscenities. *Id.* After that, Mr. Chansley exited the

gallery and descended a staircase, where he again met Officer Robishaw. *Id.* ¶ 13. Officer Robishaw again instructed Mr. Chansley to leave the building, but Mr. Chansley again refused. *Id.* Instead, Mr. Chansley said that he planned to join rioters who were on the Senate floor. *Id.*

Mr. Chansley then entered the Senate chamber, followed by Officer Robishaw. *Id.* Once inside the Senate chamber, he climbed onto the Senate dais and sat in the Vice President's chair, taking pictures of himself as he did so. *Id.* ¶ 14. Officer Robishaw asked Mr. Chansley to vacate the seat, but Mr. Chansley refused. *Id.* Instead, he stated, "Mike Pence is a fucking traitor." *Id.* Mr. Chansley then grabbed paper left on the dais and wrote the following note to the Vice President: "It's Only A Matter of Time. Justice Is Coming!" *Id.*; *Chansley*, 525 F. Supp. 3d at 155. Mr. Chansley repeated the same message verbally to a reporter from *The New Yorker* who was filming the events in the Senate chamber at the time. *Chansley*, 525 F. Supp. 3d at 155. Officer Robishaw asked that Mr. Chansley vacate the seat and assist him by using his bullhorn to convince his fellow rioters to leave the Senate chamber, but Mr. Chansley refused. Statement of Offense ¶ 15. Instead, Mr. Chansley used his bullhorn to lead his fellow rioters in the following "prayer": "Thank you for allowing the United States of America to be reborn. Thank you for allowing us to get rid of the communists, the globalists, and the traitors within our government." *Id.*; *Chansley*, 525 F. Supp. 3d at 155. At that time, there were approximately 20 rioters in the Senate Chamber. Sent'g Hr'g Tr., ECF No. 111, at 7:7–12. Officer Robishaw was the only law enforcement officer present. Statement of Offense ¶ 14. At approximately 3:09 pm, additional law enforcement officers arrived in the Senate chamber. *Id.* ¶ 16. The officers then cleared Mr. Chansley and the other rioters from the chamber. *Id.*

Several media outlets interviewed Mr. Chansley in the hours and days after he left the Capitol. *Id.* ¶ 18. In an interview on January 7, 2021, Mr. Chansley stated: "The fact that we had

a bunch of our traitors in office hunker down, put on their gas masks and retreat into their underground bunker, I consider that a win." *Id.*; *Chansley*, 525 F. Supp. 3d at 156.

On January 8, 2021—just two days after the riot—the government filed a sealed criminal complaint against Mr. Chansley, alleging that his actions on January 6 violated various federal laws. *See* ECF No. 1. Three days later, on January 11, 2021, a grand jury returned an indictment against Mr. Chansley, making him the first Capitol rioter to be indicted in connection with the events of January 6. Indictment, ECF No. 3; Sent'g Hr'g Tr. at 3:22–24. The indictment charged him with six counts: civil disorder in violation of 18 U.S.C. § 231(a)(3) (Count One); obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2) (Count Two); entering and remaining in a restricted building in violation of 18 U.S.C. § 1752(a)(1) (Count Three); disorderly and disruptive conduct in a restricted building in violation of 18 U.S.C. § 1752(a)(2) (Count Four); violent entry and disorderly conduct in a Capitol building in violation of 40 U.S.C. § 5104(e)(2)(A) (Count Five); and parading, demonstrating, or picketing in a Capitol building in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Six). *See* Indictment.

On the same day as his indictment, Mr. Chansley was arrested and appeared before U.S. Magistrate Judge Deborah M. Fine in the District of Arizona. *Chansley*, 525 F. Supp. 3d at 156. The government moved for, and Magistrate Judge Fine ordered, Mr. Chansley's pre-trial detention. *Id.* at 156–57; *United States v. Chansley*, 2:21-mj-5000 (DMF), ECF Nos. 5, 10 (D. Ariz. Jan. 19, 2021). Magistrate Judge Fine then ordered Mr. Chansley to be committed to this District. *Chansley*, 2:21-mj-5000 (DMF), ECF No. 11 (D. Ariz. Jan. 19, 2021). Mr. Chansley was arraigned by the undersigned in late January 2021. Minute Entry (01/29/2021). He was then represented by Mr. Albert Watkins ("plea counsel"). *Id.*

**B.  Video Evidence and Discovery Process**

Mr. Chansley, through plea counsel, moved in this Court for pre-trial release and the Court held a hearing on the motion on March 5, 2021.  Minute Entry (03/05/2021); ECF No. 12.  At the hearing, plea counsel made several representations regarding the video evidence in this case: that "there's miles and miles and miles of footage of my client from January 6th[,]" ECF No. 28, at 7:5–6; that he "provided the Court with the video footage that we were able to garner through an independent investigative undertaking" in conjunction with a "former FBI special agent[,]" *id.* at 7:13–15; and "[t]here's a lot of footage of my client interacting peacefully, chatting with and supporting law enforcement who were similarly positioned in [the Senate] part of the Capitol[,]" *id.* at 10:2–4.  Considering this evidence, in conjunction with the other evidence of Mr. Chansley's actions that day, the Court denied Mr. Chansley's motion.  *Chansley*, 525 F. Supp. 3d at 172.

The case then proceeded.  As part of the discovery process, the government filed in March and April 2021 motions for a protective order and for an order to disclose certain sealed and protected materials with defense counsel.  Gov't Opp'n, ECF No. 123, at 2; ECF Nos. 21 & 36.  The Court granted both motions within days of their filing.  ECF Nos. 24 & 37.

On May 20, 2021, the government provided its first notice of discovery with the Court.[1] ECF No. 38.  That notice contained a letter to plea counsel, dated the same date, recounting the various discovery productions made to counsel between January and mid-May 2021.  ECF No. 38-1.  Of relevance here, the letter listed the following productions:

> (1) video footage from the Senate floor (produced April 24, 2021); (2) video footage from a subpoena to *The New Yorker* (produced April 24, 2021); (3) nine videos from relevant Metropolitan Police Department ("MPD") body worn cameras ([produced] May 17, 2021); (4) five videos of Capitol Closed Circuit Video ("CCV") footage ([produced] May 18, 2021); and (5) two grand jury transcripts with ten accompanying grand jury exhibits ([produced] May 19, 2021).

---

[1] In total, the government provided nine discovery updates in this case.  Gov't Opp'n at 3 n.2.

Gov't Opp'n at 2 (referencing ECF No. 38-1 at 2).

On September 17, 2021, the government provided two updates on the status of discovery. ECF Nos. 75 & 76.  In the first update, describing the status of discovery as of August 23, 2021, the government expressly acknowledged the following: "Defense counsel in Capitol Breach cases have made requests including any and all information that captures an individual defendant's conduct or statements; *shows people "peacefully walking around the Capitol"; or suggests that a member (or members) of law enforcement allowed people to enter or remain in the Capitol or on restricted grounds, acted friendly or sympathetic to the rioters, or otherwise failed to do their jobs*." ECF No. 75 at 2 (emphasis added).  In response, the government noted "there may be additional types of information a defendant may consider material or exculpatory" but that "since the government does not know the defense theory in any particular case, it is impossible to [*sic*] for the government to determine what other types of information a defendant may believe to be material." *Id.*  The government added: "To the extent the type of information described above may exist, it may be interspersed among the voluminous sets of data." *Id.*

The government informed plea counsel of its proposed solution to this discovery conundrum.  The government described how it was working with the Federal Public Defender ("FPD") for the District of Columbia to upload discovery materials to electronic databases. *Id.* at 3.  Specifically, the government noted that it had already begun populating one database, named Relativity, with documentary discovery.  *Id.* at 5.  Further, due to processing and usability limitations associated with Relativity, the government explained that it was in the final stages of contracting to facilitate, in close consultation with FPD, production of video discovery via a different database, named Evidence.com. *Id.* at 7.

In the second discovery update of September 17, 2021, describing the status of discovery as of September 14, 2021, the government confirmed that the Evidence.com contracting process was complete and that the database was operational. ECF No. 76 at 2–3. The government further reported that it was in the process of populating Evidence.com with approximately 2,300 hours of footage captured by law enforcement body-worn cameras. *Id.* at 3. Specifically, the government stated that it "*expect[ed]* to produce [such footage] no later than the end of next week (Friday, September 24, 2021)." *Id.* (emphasis added).

On October 25, 2021, the government provided its fourth update regarding the status of discovery, current as of October 21, 2021. ECF No. 78. The update reported, in relevant part, that the following evidence had been made available on Evidence.com: (1) 16,925 closed circuit television ("CCTV") video files, containing approximately 4,800 hours of footage, recorded by 515 cameras located throughout the Capitol; (2) 15 maps indicating the location of cameras in the Capitol Visitor Center and interior of the Capitol; and (3) 1,676 files from body-worn cameras belonging to Metropolitan Police Department ("MPD") officers, containing approximately 1,600 hours of footage. *Id.* at 2. The government later represented that these materials were made available to defense counsel through Evidence.com on October 22, 2021. Def.'s Mot., ECF No. 117, at 12; Gov't Opp'n at 16. Separately, the government provided defense counsel with information about the location of the files within the database, their naming conventions, and the videos' timestamps. Gov't Opp'n at 17. Additionally, the government noted in the October 25, 2021 update that the FPD, who was coordinating access to Evidence.com on behalf of defendants charged with crimes related to January 6, 2021, had sent emails to all defense counsel with information on how to request a license to access the database. ECF No. 78 at 2. The FPD had also developed and shared a guide for defense attorneys on how to use Evidence.com and share

discovery with their clients. *Id.* Mr. Chansley's plea counsel received the FPD's notification on October 15, 2021. Def.'s Reply at 6–7.

On November 5, 2021, the government provided its fifth update regarding the status of discovery, current as of that date. ECF No. 79. The government noted that, since the last status update, the government had populated Evidence.com with additional video footage. *Id.* at 2. In relevant part, the government stated that it shared an additional 4,204 CCTV video files recorded by 123 cameras, some of which were located in the Capitol's interior. *Id.*

### C. Mr. Chansley's Guilty Plea and Sentencing

On September 3, 2021, Mr. Chansley pleaded guilty to Count Two, obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2), in exchange for the government's dismissal of the five other charges then-pending against him. *See* Minute Entry (09/03/2021). Mr. Chansley, in consultation with plea counsel, executed and signed a written plea agreement with the government. Plea Agreement, ECF No. 69. In the plea agreement, Mr. Chansley agreed that he was pleading guilty to Count Two because he was "in fact guilty." *Id.* at 10. In so doing, Mr. Chansley averred that the Statement of the Offense "fairly and accurately describe[d] [his] actions and involvement" in the offense. *Id.* ¶ II. Mr. Chansley also agreed that he had "read every page of [the] Agreement," "discussed it with [his] attorney," and "fully underst[ood the] Agreement and agree[d] to it without reservation." *Id.* at 10. In the plea agreement, Mr. Chansley attested that he was "satisfied with the legal services provided by [his] attorney in connection with [the] Agreement and the matters related to it." *Id.* at 10. Mr. Chansley reiterated his satisfaction with plea counsel to this Court during the plea hearing. *See* Plea Hr'g Tr., ECF No. 110, at 7:9–15; 9:22–25.

The plea agreement contained—and Mr. Chansley assented to—several express waivers. Specifically, Mr. Chansley agreed to waive his right to directly appeal his sentence, except for his rights to appeal a sentence imposed beyond the statutory maximum or U.S. Sentencing Guidelines range, and to appeal based on ineffective assistance of counsel. Plea Agreement ¶ IX(D). Furthermore, Mr. Chansley agreed to waive "any right to challenge the conviction entered or sentence imposed" through a motion brought under 28 U.S.C. § 2255, unless "such a motion is based on newly discovered evidence or on a claim that [Mr. Chansley] received ineffective assistance of counsel." *Id.* ¶ IX(E).

Finally, Mr. Chansley agreed to several provisions regarding sentencing. As relevant here, Mr. Chansley agreed that his sentence would be "determined by the Court, pursuant to the factors sector forth in 18 U.S.C. § 3553(a), including a consideration of the Sentencing Guidelines[,]" *id.* ¶ IV, and that he understood "that the sentence to be imposed is a matter solely within the discretion of the Court." *Id.* ¶ VII. He further agreed to the government's estimated offense level calculations under the Guidelines. *Id.* ¶ IV(C). Specifically, he agreed that the estimated offense level for Count Two was 25, representing the base offense level (14) plus enhancements for property damage (8) and substantial interference (3). *Id.* ¶ IV(A). The estimated Count Two offense level of 25, minus reductions for acceptance of responsibility (2) and assistance to authorities (1), rendered an estimated total offense level of 22. *Id.* Accordingly, Mr. Chansley agreed that, considering an estimated total offense level of 22 and criminal history category of I, *id.* ¶ IV(B), the estimated Sentencing Guidelines range in his case was 41 to 51 months' incarceration. *Id.* ¶ IV(C). He further concurred with the government's estimated monetary penalties, including a fine range of $15,000 to $150,000, *id.*, a special assessment of $100 for his

felony conviction, *id.* ¶¶ I, IV(C), and restitution in the amount of $2,000, *id.* ¶ XI.  Finally, he agreed that his conviction carried a maximum supervised-release term of three years.  *Id.* ¶ I.

On November 17, 2021, after the government's five updates regarding the status of discovery, this Court sentenced Mr. Chansley.  *See* Minute Entry (11/17/2021).  In calculating the applicable sentence, the Court agreed with the Guidelines calculations as outlined by the parties in the plea agreement and calculated a total offense level of 22.  Sent'g Hr'g Tr. at 2:25–3:7.  When it came time for plea counsel's presentation, he appreciated the seriousness of the events of January 6, 2021, *id.* at 14:9–11, and acknowledged the overwhelming evidence in this case: "I've provided you with videos.  I've provided the government with videos.  The government's given me videos.  The government's given you videos that I've given her.  This isn't a drive-in movie theater.  You don't need to see more video."  *Id.* at 16:18–21.  Plea counsel went on to focus on Mr. Chansley's acceptance of responsibility, which he previewed by saying, "Jake presents with having apologized without equivocation.  No buts, no blames, I did it, I want to be accountable, I want to be held accountable."  *Id.* at 27:15–17.

Mr. Chansley then spoke to the Court, accepting responsibility for his actions and expressing remorse.  *See, e.g., id.* at 32:23–33:4 ("So I had to come to terms with the fact that I was in solitary confinement because of me, because of my decision.  I broke the law, and if I believe in freedom, if I believe in law and order, if I believe in responsibility and accountability, then that means that I should do what Gandhi would do and take responsibility even and especially when it incriminates me.  No ifs, ands, or buts about it.  That's what men of honor do."); *id.* at 34:25–35:5 ("I am truly, truly repentant for my actions, because repentance is not just saying you're sorry.  Repentance is apologizing and then moving in the exact opposite direction of the sin that you committed.  And that's what I've been trying to do ever since I realized the magnitude of

my error and the magnitude of my mistake."). Mr. Chansley unequivocally stated: "[I]n retrospect, I would do everything differently on January 6. In all honesty, I would do everything differently." *Id.* at 35:16–18. The Court heavily credited Mr. Chansley's apparent remorse and acceptance of responsibility. *See id.* at 48:21–22 ("[Y]ou have evolved in your thinking clearly and reversed your thinking in many ways"); *id.* at 49:3–5 ("You've certainly done everything you could today to convince the Court that you're a new person, and I think you're on the right track"); *id.* at 55:23–56:2 ("[Y]ou were smart. It may not feel it today, but let me guarantee you, you were smart. You did the right thing. And you owned up to it today in a fashion that is unusual for me to see, the candor with which you approached me today. I appreciate it.").

The Court then sentenced Mr. Chansley to 41 months' incarceration as to Count Two, the bottom of the Guidelines range, with credit for time served. *See* J., ECF No. 92, at 2. In explaining the sentence, the Court stated: "[W]hat you did here was horrific, as you now concede, and obstructing the functioning of the government as you did is the type of conduct that is so serious that I cannot justify a downward departure [from the Sentencing Guidelines range of 41 to 51 months]." Sent'g Hr'g Tr. at 48:22–25. Even considering the seriousness of the offense, the Court credited Mr. Chansley's remorse and acceptance of responsibility to sentence Mr. Chansley consistent with the bottom of the applicable Guidelines range. *See id.* 49:1–3 ("I do think that the minimum under the guidelines is something you've earned because you've done everything right from the time that you started in the other direction."). The Court also sentenced Mr. Chansley to three years of supervised release, a special assessment of $100, and $2,000 in restitution.[2] *See* J. at 3, 6. Approximately two weeks after sentencing, Mr. Chansley's current counsel, Mr. William

---

[2] Mr. Chansley appealed his conviction, ECF No. 108, but the U.S. Court of Appeals for the District of Columbia Circuit later issued a mandate dismissing Mr. Chansley's appeal pursuant to his own motion, ECF No. 112.

Shipley ("post-conviction counsel") appeared to represent Mr. Chansley, ECF No. 101, and the Court granted plea counsel's motion to withdraw.  Minute Entry (11/29/2021).

In late March 2023, Mr. Chansley was released from custody after having completed his term of incarceration, accounting for his time previously served and good-time credit.[3]

### D.  Post-Sentencing Events Related to Mr. Chansley's Case

On March 6, 2023, then-television host Tucker Carlson aired footage from January 6, 2021 on his eponymous show.[4]  The host claimed that certain videos recorded on January 6 had been withheld from the public and that such videos demonstrated that the Capitol rioters were merely "sightseers."  That segment prominently featured Mr. Chansley.  All of the footage of Mr. Chansley aired on the program was recorded on CCTV cameras positioned inside the Capitol building between the times of 2:49 pm and 2:59 pm, except for one CCTV clip recorded at 2:13 pm.  Gov't Opp'n at 9–10.  Mr. Chansley arrived at the Capitol more than one hour prior to this period and stayed for some time afterward.  Statement of Offense ¶¶ 4, 5, 16.  The footage, in relevant part, showed Mr. Chansley traversing hallways in the Senate side of the Capitol, sometimes followed by and sometimes following law enforcement officers who did not visibly impede Mr. Chansley's movements.  The footage did not include any audio recordings.  The host claimed that the videos undermined the legitimacy of the government's prosecution against Mr. Chansley.  Two days later, plea counsel stated on the same television program that he had not seen the videos at any point during his representation of Mr. Chansley.[5]

---

[3] Scott MacFarlane, *"QAnon Shaman" Jacob Chansley Released Early from Federal Prison, Transferred to Halfway House*, CBS News, https://www.cbsnews.com/news/qanon-shaman-jacob-chansley-released-early-federal-prison-halfway-house-jan-6/ [https://perma.cc/4WNZ-4WVS].

[4] Fox News, *Tucker: This Video Tells A Different Story of Jan 6*, YouTube (Mar. 6, 2023), https://youtu.be/Opy7MLGAPBk?t=169 [https://perma.cc/753P-ESUW].

[5] Fox News, *"QAnon Shaman's" Lawyer Speaks Out After Jan. 6 Bombshell Footage Released*, YouTube (Mar. 9, 2023) https://www.youtube.com/watch?v=WTdL5VtjbtY [https://perma.cc/T4BP-68ST].

On March 9, 2023, Dominic Pezzola, who at the time was on trial for his own felonious conduct on January 6, 2021, moved to dismiss his indictment based on the government's failure to disclose the footage aired on March 6, which Pezzola claimed was "exculpatory" for himself and Mr. Chansley.[6] *See United States v. Pezzola*, 21-cr-175-6 (TJK), ECF No. 679.  On March 12, 2023, the government opposed, claiming that the footage of Pezzola and Mr. Chansley aired during the broadcast was neither withheld from the defense nor exculpatory. *Pezzola*, ECF No. 689, at 2. Specifically, the government asserted that all of the footage aired on the broadcast, save for one 10-second clip, was produced to defense counsel via the Evidence.com database by September 24, 2021, and that the remaining clip was produced on January 23, 2023.  *Id.* at 3.  Based on these representations, along with a consideration of the applicable law, Judge Timothy J. Kelly denied the motion because "Pezzola ha[d] not shown that the video footage tends to show his innocence" "[n]or ha[d] the evidence been suppressed." Mem. Order, *Pezzola*, ECF No. 755, at 3.

On March 17, 2023, Mr. Chansley's post-conviction counsel contacted the government via letter asking specific questions about when the CCTV videos appearing in the March 6, 2023 segment were produced.  Def.'s Mot. at 11; Gov't Opp'n at 9.  The government responded on March 27, 2023, explaining that all of the clips appearing in the broadcast, except for the 10-second clip, were produced on October 22, 2021, and that the remaining clip was produced on February 21, 2023.  Def.'s Mot. at 12; Gov't Opp'n at 9–10.

The Court summarizes the videos aired on March 6, 2023 as the following:

---

[6] In early May 2023, a jury convicted Pezzola of eight of the ten crimes for which he was indicted, including seditious conspiracy in violation of 18 U.S.C. § 2384.  Verdict, *United States v. Pezzola*, 21-cr-175-6 (TJK), ECF No. 804.

| Approximate Time on January 6, 2021 | U.S. Capitol CCTV Camera[7] | Time Stamp in Television Segment | Government's Representation of Approximate Date Disclosed to Defense via Evidence.com |
|---|---|---|---|
| 2:13 pm | Camera A | 2:48 | May 2021 or October 22, 2021[8] |
| 2:49 pm | Camera E | 2:06 | October 22, 2021 |
| 2:51 pm | Camera E | 3:09 | October 22, 2021 |
| 2:56 pm | Camera F | 4:31 | October 22, 2021 |
| 2:56 pm | Camera F | 5:14 | October 22, 2021 |
| 2:57 pm | Camera D | 3:35 | October 22, 2021 |
| 2:57 pm | Camera D | 5:21 | October 22, 2021 |
| 2:57 pm | Camera E | 4:12 | October 22, 2021 |
| 2:57 pm | Camera E | 5:00 | October 22, 2021 |
| 2:57 pm | Camera H | 3:40 | October 22, 2021 |
| 2:57 pm | Camera H | 5:25 | October 22, 2021 |
| 2:59 pm | Camera B | 3:28 | October 22, 2021 |
| 2:59 pm | Camera C | 4:01 | October 22, 2021 |
| 2:59 pm | Camera G | 3:48 | February 21, 2023[9] |

See Def.'s Mot. at 12; Gov't Opp'n at 9–10.

In April 2023, Mr. Chansley, through counsel, moved to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255, claiming newly discovered evidence and ineffective assistance of his plea counsel. Def.'s Mot. at 2–4. Specifically, he claims that conduct by both the government and his plea counsel with respect to the videos aired during the March 6 broadcast rendered both his plea agreement and resulting sentence unconstitutional. Id. First, Mr. Chansley asserts that the videos were both exculpatory and withheld from the defense in violation of Brady

---

[7] The Court follows government counsel's lead in referring to cameras by letter instead of their true identifiers due to the sensitive nature of the cameras and their locations. See Gov't Opp'n at 9 n.4.

[8] Mr. Chansley's motion contains a purported excerpt from the government's March 27 letter indicating that this video was produced via Evidence.com on October 22, 2021 along with the vast majority of the other videos appearing in the segment. Def.'s Mot. at 12. However, the government's opposition indicates that this file was produced in May 2021. Gov't Opp'n at 9. The exact date of production is immaterial, as the Court will explain, because the record unmistakably shows that this video was not suppressed nor is it exculpatory.

[9] Even though this clip was not available to Mr. Chansley prior to the conclusion of his case, it does not exculpate him nor would its disclosure have affected this Court's sentencing determination. See Part III.C.

*v. Maryland*, 373 U.S. 83 (1963), and that, had the videos been disclosed to the defense prior to sentencing, plea counsel would have used the videos' contents to argue for, and that this Court would have imposed, a lower sentence than the one Mr. Chansley received. *Id.* at 16–17.  Second, he claims that plea counsel was unconstitutionally ineffective because counsel did not seek production of the videos from the government and because counsel recommended that Mr. Chansley accept the plea agreement containing a sentencing-enhancement stipulation and waiving appeal rights without this evidence. *Id.* at 17–21.  Relatedly, he insists that further discovery into the video-disclosure issue is required, particularly due to government's conflicting statements regarding the dates of production as stated in filings in this and the *Pezzola* case. *Id.* at 21–22.

In June 2023, the government opposed, insisting that Mr. Chansley has not met his burden to establish that he is entitled to collateral relief because he either waived his claims or they are meritless.  Gov't Opp'n at 1.  Mr. Chansley submitted a brief reply.  Def.'s Reply, ECF No. 126. Mr. Chansley's motion is now ripe for review.

## II.    LEGAL STANDARDS

### A.  28 U.S.C. § 2255

A prisoner may move to vacate, set aside, or correct his sentence if (1) the sentence was imposed "in violation of the Constitution or laws of the United States"; (2) the court lacked jurisdiction to impose the sentence; (3) the sentence "was in excess of the maximum authorized by law"; or (4) the sentence is "otherwise subject to collateral attack." 28 U.S.C. § 2255(a).  The petitioner bears the burden to prove his right to relief by a preponderance of the evidence. *United States v. Baugham*, 941 F. Supp. 2d 109, 112 (D.D.C. 2012).  A court need not hold an evidentiary hearing when "the motion and the files and records of the case conclusively show the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).

## B. Government's Discovery Obligations

The government has a constitutional obligation, as recognized in *Brady* and its progeny, to disclose "evidence in its possession that is favorable to the accused and material either to a defendant's guilt or punishment." *United States v. Trie*, 21 F. Supp. 2d 7, 23 (D.D.C. 1998). Favorable evidence "tends to help the defense by either bolstering the defense case or impeaching potential prosecution witnesses." *United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005); *see also Brady*, 373 U.S. at 87; *Giglio v. United* States, 405 U.S. 150, 153–55 (1972). To prevail on a *Brady* claim, the defendant must show prejudice; in other words, "'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United States v. Sitzmann*, 893 F.3d 811, 826 (D.C. Cir. 2018) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "A court should evaluate prejudice under *Brady* based on the suppressed evidence as a whole rather than an 'item by item' basis." *United States v. Martin*, No. 98-cr-329 (RCL), 2021 WL 4989983, at *4 (D.D.C. Oct. 27, 2021) (quoting *Kyles v. Whitley*, 514 U.S. 419, 420 (1995)). Importantly, "[f]or an item to be *Brady*, it must be something that is being 'suppress[ed] by the prosecution.'" *United States v. Blackley*, 986 F. Supp. 600, 603 (D.D.C. 1997) (quoting *Brady*, 373 U.S. at 87).

## C. Ineffective Assistance of Counsel

To prevail on a claim of ineffective assistance of counsel, a petitioner "must prove both incompetence and prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). Specifically, the petitioner must demonstrate that (1) "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). That sets a high

bar, as a court's evaluation of counsel's actions "must be highly deferential," and is assessed under the circumstances present at the time of representation without the benefit of hindsight. *Id.* at 689. Furthermore, a "reasonable probability" under *Strickland*'s second prong is one that is "sufficient to undermine confidence in the outcome." *Id.* at 694. To establish prejudice, the petitioner must show there is "a substantial, not just conceivable, likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (internal quotations and modifications omitted). An ineffective assistance of counsel claim is defeated if the defendant fails to demonstrate either prong. *Strickland*, 466 U.S. at 700.

## III.   DISCUSSION

Mr. Chansley's motion concocts a *Brady* claim, and a derivative ineffective assistance of counsel claim, based on videos aired devoid of context and supposedly inconsistent disclosure dates provided by government counsel in two separate cases. These videos are decidedly not exculpatory, especially when viewed in context with the "miles and miles and miles of footage" recorded of Mr. Chansley on January 6, 2021. ECF No. 28, at 7:5–6. Such footage, conveniently omitted by the March 6, 2023 program, shows nearly all of Mr. Chansley's actions that day, including: carrying a six-foot-long pole armed with a spearhead, unlawfully entering the Capitol through a broken door, disobeying orders from law enforcement on more than a half-dozen occasions, screaming obscenities, entering the Senate chamber, climbing onto the Senate dais, sitting in the Vice President's chair, and leaving a threatening message for the Vice President. Moreover, the precise date that the particular videos appearing in the program were disclosed is immaterial because Mr. Chansley and plea counsel were aware of the videos' content—Mr. Chansley interacting with law enforcement officers who did not visibly impede his progress—by May 20, 2021. In other words, Mr. Chansley possessed the facts in the videos well in advance of

his plea agreement, yet still determined, quite sensibly, to accept responsibility for his role in the criminal events of January 6, 2021. What is more, the record shows that the government disclosed virtually all of the videos at issue weeks before Mr. Chansley's sentencing. These facts and the underlying law conclusively demonstrate that Mr. Chansley is not entitled to relief under § 2255.

### A. Mr. Chansley's Claims Are Timely, Not Waived, and Not Moot

As a threshold matter, Mr. Chansley claims are not time-barred. Under the Anti-Terrorism and Effective Death Penalty Act, a defendant must bring any § 2255 claims within one year of "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(4). Mr. Chansley's claims rely on facts, namely alleged discrepancies in the dates and circumstances surrounding discovery in his case, discovered in March 2023. Because Mr. Chansley filed his motion within one year after these events, his motion is timely.

Nevertheless, the government insists that Mr. Chansley's *Brady* claim is procedurally barred because he waived this claim through his plea agreement.[10] Gov't Opp'n at 14–16. Mr. Chansley agreed to waive a collateral challenge to his conviction unless the motion was based on "newly discovered evidence." Mr. Chansley responds that his claim is not waived because neither he nor his plea counsel were aware of the specific *evidence* (the videos broadcast on March 6, 2023), even if they may have been aware of the *facts contained in the evidence*. Def.'s Reply at 2–3. The Court is mindful of the government's view that the "concern with finality served by the limitation on collateral attack has special force with respect to convictions based on guilty pleas." Gov't Opp'n at 15 (quoting *Bousley v. United States*, 523 U.S. 614, 621 (1998)). At the same

---

[10] Mr. Chansley's plea agreement expressly reserved the right to collaterally attack his conviction based on a claim of ineffective assistance of counsel. Plea Agreement ¶ IX(E).

time, this Court "will not bar the door" to Mr. Chansley's collateral attack when "his waiver only arguably or ambiguously forecloses his claims." *United States v. Hunt*, 843 F.3d 1022, 1027 (D.C. Cir. 2016). Because it is not clear that Mr. Chansley's plea agreement unambiguously waived his right to bring his claim, and because the government admits that one 10-second video appearing in the March 6, 2023 was not disclosed prior to Mr. Chansley's plea and sentencing, the Court concludes that Mr. Chansley did not waive his *Brady* claim.

Additionally, although not raised by either party, the Court notes that Mr. Chansley's claims are not moot even though he ended his period of incarceration prior to filing his motion. In addition to a prison term, the Court sentenced Mr. Chansley to supervised release, a special assessment, and restitution. He may still pursue relief from the remaining aspects of his sentence under § 2255. *See United States v. Mejia*, No. 10-cr-256-03 (RCL), ___ F. Supp. ___, 2023 WL 2297465, at *2 (D.D.C. Feb. 23, 2023) (citing *United States v. Mejia*, No. 20-3086, 2022 WL 4280686, at *1 (D.C. Cir. Sept. 14, 2022)).

The Court will therefore proceed to the merits of Mr. Chansley's claims.

**B.  *Brady* Applies at the Plea-Bargaining Stage**

Mr. Chansley's motion assumes that *Brady* provides a right to the disclosure of exculpatory information by the government to the criminal defendant at the plea-bargaining stage but does not directly address this question or offer any authority to support his position. The government, on the other hand, does engage with the question—whether *Brady* applies throughout the criminal proceeding or if it is only a trial right—and notes that there is currently a circuit split on the issue with no binding authority in this Circuit, but does not take a formal position. *See* Gov't Opp'n at 11 n.5; *compare United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (holding that *Brady* applies to the non-disclosure of exculpatory evidence prior to plea bargain); *Campbell v. Marshall*,

769 F.2d 314, 322–24 (6th Cir. 1985) (same); *White v. United States*, 858 F.2d 416, 422 (8th Cir. 1988) (same); *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995) (same); *United States v. Ohiri*, 133 Fed. App'x 555, 561–62 (10th Cir. 2005) (same); *with United States v. Moussaoui*, 591 F.3d 263, 285 (4th Cir. 2010) (holding that *Brady* applies to the non-disclosure of exculpatory evidence only at the trial stage); *Matthew v. Johnson*, 201 F.3d 353, 361–62 (5th Cir. 2000) (same).

     This Court joins the weight of authority and the principles enshrined in *Brady* to conclude that a defendant may challenge the validity of his guilty plea on the basis of *Brady*. Plea bargaining is a critical component of our modern criminal justice system. As the Supreme Court emphasized in *Brady*, "our system of the administration of justice suffers when any accused is treated unfairly." 373 U.S. at 87. When a defendant is forced to decide whether to go to trial or plead guilty without knowledge of exculpatory evidence in the government's possession, he suffers unfairness of the highest order. This is because shielding the plea-bargaining process from *Brady* creates perverse incentives for prosecutors to "deliberately withhold exculpatory information as part of an attempt to elicit guilty pleas." *Sanchez*, 50 F.3d at 1453. What is more, plea bargaining is just one step in the process of preparing for a trial. Plea agreements, like any other contract, are only finalized after the assent of both parties. *See Puckett v. United States*, 556 U.S. 129, 137 (2009). In the situation where a defendant and the government fail to reach a plea agreement, or if that agreement is not accepted by the Court, a defendant must proceed to trial. A *Brady* rule that absolves the government of any responsibility to disclose exculpatory evidence until the eve of trial would impermissibly hinder a criminal defendant in the preparation of his defense. *See United States v. Pollack*, 534 F.2d 964, 973–74 (D.C. Cir. 1976). Under these circumstances, the Court agrees with the majority of circuit courts that *Brady* provides a right to the disclosure of exculpatory information at the plea-bargaining stage.

### C. Mr. Chansley's *Brady* Argument Is Without Merit

Even though Mr. Chansley may assert his *Brady* claim, he does not meet his burden to show that he is entitled to relief on that basis. He argues that the government violated its obligations under *Brady*, and therefore secured an unconstitutional sentence, by not disclosing the videos broadcast on March 6, 2023. Mr. Chansley's argument, and its various permutations, is belied by the record, applicable law—or both.

### 1. Nearly all of the videos at issue were disclosed to the defense

Mr. Chansley relies primarily on a televised statement by his former counsel—unsworn and not subject to Rule 11 sanctions—along with the absence of plea counsel's discussion of the videos at sentencing as evidence that the videos were withheld from the defense. Perhaps plea counsel's memory has faded over the past two years. Perhaps plea counsel's statement was fueled by personal motives contrary to the interest of his former client. Regardless, the record is plain that the vast majority of the videos, and all the pertinent content contained therein, was indeed disclosed to the defense as early as May 2021 and by mid-October 2021 at the latest.[11]

All of the facts surrounding Mr. Chansley's movements around the Capitol featured in the television program were disclosed months before Mr. Chansley's guilty plea, as he concedes. Def.'s Reply at 2–3. For example, the program showed Mr. Chansley's interaction with enforcement officers in the Senate stairwell, after he left the Senate gallery and before he entered the Senate chamber. This same footage was captured by MPD body-worn cameras that were made discoverable on May 17, 2021. Gov't Opp'n at 18; ECF No. 38-1 at 2. Finally, grand jury transcripts containing testimony of an officer who encountered Mr. Chansley several times on

---

[11] One 10-second video showing Mr. Chansley's movements outside of the Senate chamber was not disclosed to plea counsel prior to sentencing. However, because that video was not exculpatory, there is no *Brady* violation with respect to that video. *See* Part III.C.2.

January 6, 2021, and who appears in the footage aired in the March 6, 2023 broadcast, were disclosed to plea counsel by May 19, 2021. Gov't Opp'n at 19; ECF No. 38-1 at 2.[12]

The television program also discussed Mr. Chansley's time on the Senate floor. The record demonstrates that footage depicting these same events, recorded by *The New Yorker*, was disclosed to plea counsel on April 24, 2021. Gov't Opp'n at 18; ECF No. 38-1 at 2. On May 14, 2021, plea counsel confirmed by email that he was aware of the video and that it was his position that the video "depict[ed] the door to the Chamber being held for Mr. Chansley by law enforcement as he entered into the Chamber (followed thereafter by law enforcement)[,]" whom plea counsel later identified as Officer Robishaw. Gov't Opp'n at 18 (quoting Email, Ex. 1 to Sealed Gov't Opp'n, ECF No. 124-1 at 1, 5). Plea counsel further claimed that the video showed Mr. Chansley "being escorted into the Chamber just before 3:00p[m]." *Id.* (quoting Email at 1). In fact, plea counsel demonstrated awareness of evidence of his client supposedly interacting peacefully with law enforcement in the Capitol building two months earlier when he argued in support of his client's (unsuccessful) motion for pre-trial release. ECF No. 28 at 10:2–4. Thus, plea counsel's statements by email and in court reveal that counsel was aware of all pertinent facts aired in the March 6, 2023 program at least four months prior to Mr. Chansley's plea.

The vast majority of the CCTV footage aired on the program, which did not contain any new facts, was made discoverable through Evidence.com prior to Mr. Chansley's sentencing. Gov't Opp'n at 16–17. Mr. Chansley cries foul at the government's representation in the *Pezzola* case—that disclosure occurred on September 24, 2021—and the government's representation in

---

[12] In fact, as Mr. Chansley admits, counsel was aware of this information even earlier. On January 9, 2021, Mr. Chansley participated in an interview with the Federal Bureau of Investigation. Def.'s Mot. at 18–19. In that interview, Mr. Chansley "claimed that police escorted him into the Senate Chamber and asked if he would assist in getting the protestors to vacate the Chamber. [Mr.] Chansley claimed to use his megaphone to request that protestors depart." *Id.* at 19. Though Mr. Chansley later contradicted the second claim through his agreement to the facts as outlined in the Statement of Offense, the first claim is consistent with the Statement of Offense.

this case—that disclosure occurred on October 22, 2021—and claims that both representations are likely "false." Def.'s Mot. at 12.  Rather than intentional government obfuscation, there is a far more likely, innocent explanation for the date discrepancy.  As the government stated in its second discovery update in this case, filed on September 17, 2021, the government merely "expect[ed]" to produce the videos via Evidence.com by September 24, 2021.  The next update, filed on October 25, 2021, confirmed that the videos were, in fact, produced as of October 21, 2021 (which the government now clarifies as October 22, 2021).  Regardless, contrary to defense counsel's assertions, the information was, in fact, produced by October 2021 at the very latest.

In alternative, Mr. Chansley argues that even if the videos were disclosed, the government provided too many videos too late because it would have been physically impossible for defense counsel to review the 4,800 hours of footage disclosed on October 22, 2021 before Mr. Chansley's sentencing in mid-November 2021.  Def.'s Mot. at 16 & n.3.  Aside from the fact that "[Mr. Chansley] cite[s] no authority for the proposition that the government fails to meet its *Brady* [] obligations by providing *too much* discovery," *United States v. Bingert*, Nos. 21-cr-91-1, 21-cr-91-2 (RCL), 2023 WL 3203092, at *6 (D.D.C. May 9, 2023) (emphasis in original), this argument is an obvious red herring.  As the government points out, Mr. Chansley was well aware of the path he walked on January 6, 2021.  Gov't Opp'n at 17.  That knowledge, combined with the government's disclosure of maps showing the CCTV cameras' locations and a guide for identifying the relevant cameras, certainly enabled the defense to focus on reviewing footage captured by cameras only in the areas of the Capitol that Mr. Chansley actually visited.

Mr. Chansley's *Brady* claim fails at the outset because the record confirms that none of the relevant facts have been suppressed. *Blackley*, 986 F. Supp. at 603.  The Court further notes that "the volume of discovery does not excuse defense counsel," including Mr. Chansley's post-

23

conviction counsel, "from making reasonable efforts to ascertain whether an item has been produced before making representations about what was and was not produced, let alone before filing inaccurate and inflammatory allegations of discovery failures." Mem. Order, *Pezzola*, at 3.

### 2. *None of the videos are exculpatory*

Despite spilling much ink on the supposed significance of the videos, Mr. Chansley does not explain why he believes the videos are exculpatory with respect to the charge to which he pleaded guilty: obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2). This is likely because he cannot make this showing.

Mr. Chansley admitted to engaging in the following conduct on January 6, 2021, all before the events recorded in the videos aired in the March 6, 2023 program: participating in a violent riot; being one of the first rioters to unlawfully enter the Capitol; traveling through hallways, stairwells, and the Senate gallery for approximately 38 minutes; encountering law enforcement on several occasions; ignoring their direct orders; screaming obscenities; and demanding that fleeing lawmakers be brought out to face the mob. Moreover, Mr. Chansley admitted to engaging in the following conduct after the events recorded in the videos: entering the Senate chamber; climbing on the Senate dais; ignoring multiple direct orders from the lone law enforcement officer in the chamber; sitting in the Vice President's chair; leaving a threatening message for the Vice President; leading the rioters in the chamber in a demonstration; and only vacating the chamber after multiple other law enforcement officers arrived. These facts show that Mr. Chansley intended to, and did, obstruct the certification proceedings. That law enforcement officers outnumbered by the quantity of rioters did not physically engage Mr. Chansley or impede his progress is irrelevant to his guilt with respect to Count Two.

Of the videos appearing in the March 6, 2023 segment, one 10-second video was disclosed in February 2023, after the conclusion of Mr. Chansley's case. The clip, capturing Mr. Chansley's movements at approximately 2:59 pm, appears to show him outside of the Senate chamber accompanied by two law enforcement officers. One of the law enforcement officers reaches out to briefly touch a door before leading Mr. Chansley away from the Senate chamber. Mr. Chansley argues that this video, and others, provide further context "about how he came to be inside the Senate Chamber," which he argues is evidence casting doubt on his intent to obstruct the certification proceedings. Def.'s Mot. at 19. This argument, like his others, misses the mark. The circumstances surrounding his entry into the Senate chamber are not legally relevant. His presence that day, his refusal to obey multiple orders from law enforcement, and his specific statements and actions all created serious safety concerns and forced an end to the certification proceedings, consistent with his expressed intent. In addition, entry into the Senate chamber, or even the Capitol building, is not a required element for guilt under 18 U.S.C. § 1512(c), as this Court has implicitly determined numerous times. *See, e.g.*, Notes for Oral Ruling, *United States v. Worrell*, No. 21-cr-292-1, ECF No. 245 (D.D.C. May 12, 2023); Notes for Oral Ruling, *Bingert*, ECF No. 166; Notes for Oral Ruling, *United States v. Hostetter*, No. 21-cr-392-1 (RCL), ECF No. 275 (D.D.C. July 13, 2023); Findings of Fact and Conclusions of Law, *United States v. Powell*, No. 21-cr-179 (RCL), ECF No. 110 (D.D.C. July 18, 2023).

As a fallback position, Mr. Chansley appears to argue that the videos show that "he committed no acts of violence, that he expressed no hostility or intention to do violence to any property or individuals" and therefore the 8-point sentencing enhancement was improper. Def.'s Mot. at 19; *see also id.* at 17–19. But that argument suffers from the same fatal defect as the March 6, 2023 broadcast: it lacks the context of what occurred before and after. The enhancement applies

"[i]f the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice[.]"   U.S.S.G. § 2J1.2(b)(1)(B).   As explained above, Mr. Chansley's actions on January 6, 2021 more than fit the bill.

Whether the videos from the March 6, 2023 television segment are viewed individually or in context with the rest of the evidence against Mr. Chansley, the videos are not exculpatory. Therefore, Mr. Chansley's *Brady* claim fails at the second prong of the analysis as well.

3.   *The government's discovery approach in his case did not violate its* Brady *obligations*

Separate from the alleged failure to disclose specific videos, Mr. Chansley argues that the government's approach to discovery contravened the applicable *Brady* standard in this District. *See, e.g.*, Def.'s Mot. at 9; Def.'s Reply at 3–4.   That argument, like his others, is misplaced.

In cases involving voluminous discovery, courts are "wary of requiring the government to, in effect, do defense counsel's work for them and of inserting itself into the fray of micromanaging discovery in these cases."   *United States v. Sheppard*, No. 21-cr-203 (JDB), 2022 WL 17978837, at *14 (D.D.C. Dec. 28, 2022).   "On the other hand, [courts are] sympathetic to the needle-in-the-haystack problem defendants face when confronted with such enormous amounts of discovery, only some of which is relevant to their cases, particularly since defense counsel have comparatively fewer resources at their disposal for identifying which evidence is relevant." *Bingert*, 2023 WL 3203092, at *6 (citing *United States v. Hsia*, 24 F. Supp. 2d 14, 29 (D.D.C. 1998)).   Balancing the government's obligations and defendants' responsibilities, courts in this District have settled on the following standard: "'[T]o the extent that the government knows of any [*Brady*] material in its production,' the Court will 'require [the government] to identify' it." *Sheppard*, 2022 WL 17978837, at *14 (alterations in original) (quoting *United States v. Saffarinia*, 424 F. Supp. 3d 46, 86 (D.D.C. 2020)).

Mr. Chansley cites the government's first September 17, 2021 discovery update, and the two district court cases referenced in a footnote therein, as evidence that the government's approach to discovery does not adhere to *Saffarinia*. Def.'s Mot. at 14; ECF No. 75 at 2 (citing *United States v. Meek*, No. 19-cr-378 (JMS/MJD), 2021 WL 1049773, at \*5 (S.D. Ind. Mar. 19, 2021) and *United States v. Ohle*, No. S3-08-cr-1109 (JSR), 2011 WL 651849, at \*4 (S.D.N.Y. Feb. 7, 2011)).

Taking the second portion of his argument first—and declining to opine on the wisdom of the government's choice to cite out-of-circuit, unpublished memorandum orders for points of law as important as *Brady*—Mr. Chansley's argument misses the mark. The government cited those cases merely for the proposition that "[d]efendants are in a better position to determine what evidence they believe is exculpatory and will help in their defense" than the government. ECF No. 75 at 2 (citing *Meek*, 2021 WL 1049773, at \*5). That proposition is not inconsistent with *Saffarinia*. What is more, Mr. Chansley reads *Saffarinia* far too broadly. That opinion clearly held that the government is only required "to identify Brady material *already known to it* based on its *existing knowledge* of the documents it collected and reviewed in the first instance[,]" and that, as a corollary, the government is not required to "sift through the evidence in search of anything that could help the defense[.]" *Saffarinia*, 424 F. Supp. 3d at 86 (emphases in original) (internal citations omitted). In other words, *Saffarinia* does not require the government to specifically identify to a defendant any evidence in the government's voluminous disclosures that could conceivably qualify as *Brady* material based on the government's anticipation of any possible defense theory. Instead, *Saffarinia* only requires the government to identify exculpatory evidence of which it is aware.

The first part of Mr. Chansley's *Brady* argument similarly falters. In his view, the government's *en masse* production of discovery with the opportunity for defendants to lodge specific requests for information that they believe to be exculpatory is improper because this District "looks with disfavor on narrow readings of the government's *Brady* obligations[.]" Def.'s Mot. at 10 (collecting cases). But it is precisely the government's recognition of this District's exacting *Brady* standards that compelled the government to contract for, fund, and facilitate the introduction of a platform to disseminate massive amounts of discovery in cases related to January 6, 2021, and to equip defense teams with the tools necessary to digest the information made available on the platform. To be sure, this unprecedented prosecutorial effort places enormous disclosure burdens on the government and necessitates novel approaches to sharing discovery information with defendants. That said, Mr. Chansley has not demonstrated how the government's approach is inconsistent with *Brady*.

As a last gasp, Mr. Chansley faults the government for not providing him with specific discovery earlier because he was "easy to identify in the crowd of people who entered the Capitol" due to his distinctive costume. Def.'s Mot. at 13. Mr. Chansley does not cite any authority, and the Court is aware of none, stating that the government faces a heightened *Brady* obligation merely because a defendant is recognizable. Regardless, as previously discussed, the evidence that Mr. Chansley claims is exculpatory is decidedly not so.

*     *     *

Mr. Chansley has failed to demonstrate that the government fell short of its *Brady* obligations with respect to the production of video evidence in his case. Therefore, this claim fails.

### D.  Mr. Chansley's Ineffective Assistance of Counsel Argument Is Without Merit

Despite his repeated assertions that he was satisfied with plea counsel in writing and on the record, Mr. Chansley now argues that plea counsel was ineffective in two ways: (1) by encouraging him to accept a plea agreement containing a sentencing enhancement and appeal waivers; and (2) by not demanding production of the CCTV videos aired during the March 6, 2023 program prior to sentencing in order to use such video at sentencing.  Def.'s Mot. at 17–21.  He claims that he suffered prejudice because, absent these errors, he would have received a more favorable plea agreement and the Court would have imposed a lower sentence.  *Id.*  His argument is wildly speculative, contrary to established caselaw and practice, and devoid of common sense.

*1.  Mr. Chansley has not demonstrated that plea counsel's performance was deficient*

Mr. Chansley's ineffective assistance of counsel claim stumbles at the start because he is unable to establish that his plea counsel's performance was deficient.

Mr. Chansley's first argument, that plea counsel erred in negotiating the terms of his plea agreement, collapses upon cursory inspection.  First, a "prosecutor is not obligated to make a plea offer at all, let alone a plea offer on any particular terms." *United States v. Zaia*, 751 F. Supp. 2d 132, 143 (D.D.C. 2010).  Similarly, Mr. Chansley does not point this Court to any authority stating that counsel has a constitutional duty to pursue a plea agreement more favorable than the agreement actually offered.  What is more, dissatisfaction with the terms of a plea agreement alone cannot serve as a basis for an ineffective assistance of counsel claim. *See United States v. Brunetti*, 376 F.3d 93, 95 (2d Cir. 2004); *Hunter v. United States*, 160 F.3d 1109, 1115 (6th Cir. 1998).  Second, plea counsel's suggestion to Mr. Chansley that he accept the plea agreement with the sentencing enhancement and appeal waiver fell squarely within the "wide range of reasonable professional assistance" that *Strickland* protects.  466 U.S. at 689.  In exchange for Mr. Chansley's

plea, the government agreed to dismiss the other charges pending against him and not to pursue other potential sentencing enhancements.  Gov't Opp'n at 24 n.11.  This sort of bargained-for-exchange is entirely consistent with effective performance by counsel during the plea process.

Mr. Chansley's second claim, that plea counsel erred by not demanding or using the CCTV footage, also fails.  As previously discussed, plea counsel did, in fact, have access to the videos well in advance of Mr. Chansley's sentencing.  Similarly, as the government correctly notes, the record reflects that plea counsel reviewed such evidence with Mr. Chansley.  *See id.* at 27 (citing Sent'g Hr'g Tr. at 26:13–16).  And contrary to Mr. Chansley's insistence, plea counsel's decision not to present the videos during sentencing does not demonstrate ineffective assistance—in fact, it was quite effective.  The Court agrees with the government that plea counsel's strategic choice to use his presentation to focus on Mr. Chansley's remorse and acceptance of responsibility, rather than present additional video evidence in a futile attempt to contradict the obvious facts of the case, was objectively reasonable.  *See id.* at 27–28.  And that decision was all the more reasonable when considering that the Court previously rejected as unpersuasive plea counsel's attempt to cite the facts contained in the videos in light of the rest of the evidence of Mr. Chansley's conduct.  *See Chansley*, 525 F. Supp. 3d at 170–71.  Plea counsel sensibly changed course at sentencing, noting that the government was still pursuing investigations and gathering evidence related to the events of January 6, 2021, but that he and Mr. Chansley were "not in a position of slowing this court proceeding down because [they didn't] have to, because those investigations, those outcomes are irrelevant as to [Mr. Chansley], as to the defendant in this case, as to the decision of [Mr. Chansley] to enter a plea[.]" Sent'g Hr'g Tr. at 16:11–15. Plea counsel emphasized that Mr. Chansley wanted "to be held accountable based on evidence that we have today, that this court has seen." *Id.* at 16:16–17.  Based on this presentation, along with Mr. Chansley's own comments, the Court

determined that the appropriate sentence in his case was the bottom of the applicable Guidelines range, despite the seriousness of Mr. Chansley's conduct.

Mr. Chansley does not meet his burden to establish that plea counsel performed deficiently.

*2. Mr. Chansley has not demonstrated that he suffered any prejudice*

As for prejudice, Mr. Chansley attempts to tread a fine line. He wisely does not claim that he would have opted for trial absent counsel's performance. Nor could he.[13] Instead, he argues that, had plea counsel performed effectively, he would still have proceeded with a plea agreement, but would have agreed to one absent the sentencing-enhancement stipulation or the appeal waivers. Def.'s Mot. at 20–21. Mr. Chansley argues that without the stipulation, his recommended Guidelines sentence would have been lower and that without the waiver, he would have been able to appeal his sentence on any grounds he wished. *Id.* However, these hypothetical scenarios fall woefully short of establishing a legally sufficient showing of prejudice.

As discussed above, neither the government nor plea counsel had any obligation to reach a plea agreement without the sentencing enhancement or appeal waiver. Also, the enhancement at issue, U.S.S.G. § 2J1.2(b)(1)(B), has been approved by courts in this District in a variety of cases involving the events of January 6, 2021, including this Court. Gov't Opp'n at 26 (collecting cases). And regarding the appeal waiver, it is clear that "[a] 'knowing, intelligent, and voluntary' waiver of the right to appeal 'generally may be enforced.'" *United States v. Adams*, 780 F.3d 1182, 1183 (D.C. Cir. 2015) (quoting *United States v. Guillen*, 561 F.3d 527, 529 (D.C. Cir. 2009)). Mr. Chansley has not alleged, much less shown, that his plea was not knowing, intelligent or voluntary.

---

[13] Both the government and plea counsel acknowledged the overwhelming evidence of Mr. Chansley's guilt, Sent'g Hr'g Tr. at 4:13–16; 16:18–21. Given these facts, "[i]t is highly improbable" that Mr. Chansley would have declined to plead guilty and instead proceed to trial. *United States v. Thomas*, 999 F.3d 723, 738 (D.C. Cir. 2021). Furthermore, Mr. Chansley faced a potential sentence of 20 years in prison—more than five times longer than the term he actually received—had he gone to trial. Sent'g Hr'g Tr. at 42:12–18. A defendant cannot establish prejudice under these circumstances. *See United States v. Ayers*, 938 F. Supp. 2d 108, 115 (D.D.C. 2013).

Nor has he so much as hinted at what other legal challenges to his conviction he could or would have raised had he not waived his direct-appeal rights. Under these circumstances, he cannot show that he suffered any prejudice due to the terms of the plea agreement that he accepted.

Similarly, Mr. Chansley has not met the required prejudice showing with respect to plea counsel's alleged failure to demand or use the CCTV footage appearing in the March 6, 2023 broadcast. Even if plea counsel had presented the Court with this footage, which, as discussed above, plea counsel was correct not to, Mr. Chansley would not have received a lower sentence. The criminal nature of Mr. Chansley's actions that day, including his decision to leave a note threatening "It's Only A Matter of Time. Justice Is Coming!" at the heart of the U.S. government, establish the appropriateness of a sentence of at least 41 months' incarceration.[14] In fact, without Mr. Chansley's apparently unequivocal acceptance of responsibility, the Court is confident that he would have received a higher sentence.

In sum, Mr. Chansley cannot demonstrate that either the absence of certain terms in the plea agreement or the presence of the CCTV footage at sentencing would have resulted in even a "conceivable[] likelihood of a different result," much less a "substantial" one. *Cullen*, 563 U.S. at 189. Therefore, he has not established prejudice.

*     *     *

Mr. Chansley's claims are without merit. Thus, the Court will **DENY** his motion to vacate, set aside, or correct his conviction under 28 U.S.C. § 2255.

---

[14] At the time of his November 2021 sentencing, the government had not gathered any evidence that Mr. Chansley was aware of the noose hanging outside of the Capitol building at the time that he sat in the Vice President's chair and wrote his threatening note. Sent'g Hr'g Tr. at 8:7–13. Therefore, the Court did not take that event into consideration in imposing Mr. Chansley's sentence. Since then, the government has gathered terabytes of additional evidence regarding the events of January 6, 2021. Were Mr. Chansley to be resentenced today, perhaps the government would be able to present such evidence and, if so, the Court would certainly consider such evidence in imposing a new sentence.

The Court is disappointed to learn that, through his filings and public statements, Mr. Chansley has recanted the contrition displayed at his sentencing nearly two years ago.[15] Such an about-face casts serious doubt on the veracity of any of Mr. Chansley's claims, here or elsewhere.

Finally, the Court would be remiss if it did not address the ill-advised television program of March 6, 2023. Not only was the broadcast replete with misstatements and misrepresentations regarding the events of January 6, 2021 too numerous to count, the host explicitly questioned the integrity of this Court—not to mention the legitimacy of the entire U.S. criminal justice system— with inflammatory characterizations of cherry-picked videos stripped of their proper context. In so doing, he called on his followers to "reject the evidence of [their] eyes and ears," language resembling the destructive, misguided rhetoric that fueled the events of January 6 in the first place.[16] The Court finds it alarming that the host's viewers throughout the nation so readily heeded his command. But this Court cannot and will not reject the evidence before it. Nor should the public. Members of the public who are concerned about the evidence presented in Mr. Chansley's case and others like may view the public docket and even attend court proceedings in these cases. Those of us who have presided over dozens of cases arising from, listened to hundreds of hours of testimony describing, and reviewed thousands of pages of briefing about the attack on our democracy of January 6 know all too well that neither the events of that day nor any particular defendant's involvement can be fully captured in a seconds-long video carelessly, or perhaps even cynically, aired in a television segment or attached to a tweet.

---

[15] *See, e.g.*, Caitlin Sievers, *"QAnon Shaman" Looks to Overturn Sentence, Says He Never Renounced QAnon*, AZ Mirror (June 22, 2023), https://www.azmirror.com/2023/06/22/qanon-shaman-looks-to-overturn-sentence-says-he-never-renounced-qanon/ [https://perma.cc/V84G-UUR7]; Mike Wendling, *The 'QAnon Shaman' and Other Capitol Rioters Who Regret Pleading Guilty*, BBC News (July 16, 2023), https://www.bbc.com/news/world-us-canada-66169914 [https://perma.cc/8MTE-PWKM].

[16] George Orwell, 1984, at 103 (1949).

## IV.   CERTIFICATE OF APPEALABILITY

Before appealing a final order denying a § 2255 motion, a court must "issue or deny a certificate of appealability." Fed. R. Governing § 2255 Proceedings 11(b).  The defendant may not appeal without this certificate of appealability, which requires "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c).  Doing so requires the defendant to demonstrate "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983) (internal quotation marks omitted)). When a district court denies relief on procedural grounds, the defendant must also show that reasonable jurists would debate "whether the district court was correct in its procedural ruling." *United States v. Baxter*, 761 F.3d 17, 26 n.10 (D.C. Cir. 2014) (quoting *Slack*, 529 U.S. at 484).

Mr. Chansley's arguments are without merit.  For these reasons, the Court finds that reasonable jurists would not debate whether his claims deserve encouragement to proceed further. Mr. Chansley has not made a substantial showing of the denial of a constitutional right.  The Court will therefore decline to issue a certificate of appealability for Mr. Chansley's claims.

## V.   CONCLUSION

For these reasons, the Court concludes that Mr. Chansley's motion and the record in his case do not show his entitlement to relief.  No evidentiary hearing is warranted, *see* 28 U.S.C. § 2255(b), and the Court will **DENY** Mr. Chansley's motion.  No certificate of appealability shall issue.  A separate Order consistent with this Memorandum Opinion shall issue.

SIGNED this _20th_ day of July, 2023.

_Royce C. Lamberth_
Royce C. Lamberth
United States District Judge